UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 12 CR 190 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| ABIDEMI AJAYI | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR
JUDGMENT OF ACQUITTAL AND MOTION FOR A NEW TRIAL**

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, hereby opposes the motion of defendant ABIDEMI AJAYI to set aside the jury's guilty verdict or, in the alternative, for a new trial. For all of the reasons set forth below, defendant's motions should be denied in their entirety.

**I.    BACKGROUND**

The trial of the above-captioned matter began with jury selection on December 2, 2013. The trial resumed on December 5, 2013, and the government rested its case-in-chief December 6, 2013. R. 52.[1] Defendant then moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). This Court reserved its decision on the motion, in accordance with Rule 29(b). Defendant then testified.

---

[1] As a transcript of the trial proceedings has not been ordered, the government's recitation of in-court procedural history is based upon the collective memory of the government's prosecution team. Docketed items are referenced by "R." followed by the particular docket item number.

The jury convicted defendant of six of the counts charged against him in the indictment, namely, five counts of bank fraud, in violation of Title 18, United States Code, Section 1344 (Counts One through Three, Five, and Six), and one count of money laundering, in violation of Title 18, United States Code, Section 1957(a) (Count Four). R. 52. After the return of the verdict, this Court entered a judgment of guilt based upon the jury's verdict. *Id.* By entering a judgment on the jury's verdict, this Court denied the defendant's pending Rule 29(a) motion.[2]

Defendant has now renewed his motion for acquittal pursuant to Rule 29(c)(1) ("Rule 29 Motion") and, in the alternative, for a new trial under Rule 33 ("Rule 33 Motion"). For the reasons given herein, defendant's motions should be denied.

II. **ARGUMENT**

    A.    <u>Rule 29 Motion</u>

Rule 29 provides that a defendant may move for judgment of acquittal following the jury's verdict for "any offense for which the evidence is insufficient to sustain the conviction." *See* Rule 29(a) and (c). "The issue on a motion under Rule 29(c) is the same as the issue on appeal: whether the evidence, taken in the light most favorable to the verdict, permits a sensible person to find beyond a reasonable doubt that the defendant committed the crime alleged." *United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003). The defendant's Rule 29 Motion should be denied

---

[2] The government does not recall the Court expressly denying the Rule 29(a) motion on the record, although it is certainly possible that the Court did so and the government failed to note it. In any event, the government construes the Court's entry of judgment on the guilty verdict as an implicit denial of that motion.

because any sensible juror could have easily found the defendant guilty of each of the offenses for which he was convicted. Indeed, against the trial record, it would have been an insensible juror who would have concluded otherwise.

By way of a general summary, the government's evidence at trial involved the testimony of five witnesses and the introduction of approximately a dozen exhibits. The government's witnesses were Daniel Corcoran, assistant vice treasurer of the victim company whose check was altered (and subsequently deposited in defendant's bank account); James O'Shea, a senior investigator in the Global Security and Investigations unit from JP Morgan Chase; Dawn Hardwick, another member of Chase's Global Security and Investigations unit; Miguel Duenas, a Chase bank teller; and Postal Inspector Brett Erickson.

Corcoran testified about the procedures at the victim company and how checks were cut and mailed out. Corcoran also testified about how he discovered that the check at issue had been altered and deposited into a bank account unknown to the victim company. Corcoran testified that no one at the victim company authorized the alteration of the check or its deposit in defendant's bank account.

O'Shea testified about Chase documents that established defendant's control of the GR Icon account. O'Shea testified about the account signature card for the GR Icon account, as well as the customer summary that reflected active ATM cards for an account. He also testified about Chase's internal investigation into the deposit of the altered check. O'Shea also laid a foundation for other critical trial exhibits,

including video stills of defendant conducting the transactions at issue, internal Chase documents regarding ATM activity on the GR Icon account, the cashed checks defendant wrote to himself on the GR Icon account, documents recording teller transactions, and the GR Icon bank statements during the late 2009 time period.

Hardwick testified about Government Exhibit Wire Record, which documented how the $53,000 wire transfer from defendant's account was accomplished. As Hardwick explained, defendant was required to provide the destination account number of the wire transfer he wanted to make. Hardwick was also able to determine where the transaction was conducted and when. Specifically, the wire transfer was conducted in a Near North Chase branch; other evidence offered by the government showed that the wire transfer happened immediately after defendant cashed a check he wrote to himself, and just before he traveled to a different Chase branch to cash another check.

Duenas testified about the procedures a teller must follow to cash a check presented by a customer. Duenas testified that a teller must determine if a check drawn on Chase account. If the check is drawn on a Chase account and the transaction is a cash withdrawal over $2,000, the teller would need to see two forms of identification. If the cash withdrawal is over $5,000, two forms of identification and manager approval was required. The teller would check the customer's signature against a signature in Chase's internal files. The teller would also check the date the account was opened and the last deposit date, and would confirm that there were no

holds or stops on the account. The teller would then seek manager approval.

Finally, Inspector Erickson testified. Inspector Erickson testified about how the Postal Inspection Service learned about the deposit of the altered check into the GR Icon account. He testified about the history of GR Icon, including its repeated dissolutions by the Illinois Secretary of State for failing to file the documents or pay the fees required to keep the entity registered with the state.

Inspector Erickson also testified about a summary chart that documented the GR Icon's accounts balances, withdrawals and deposits during the course of the account's existence, as well as about the account statements in November and December 2009. Inspector Erickson's testimony established that before the altered check was deposited, the GR Icon account had never had a monthly ending balance higher than $12,000. In 2009, before the deposit of the altered check, the largest deposit was just $6,000 and the highest ending monthly balance was $331. His testimony also established that at the beginning of November 2009, the account had a balance of just $90.08.

Inspector Erickson also testified about the unusually large activity on the GR Icon account in the days after the altered check cleared. Inspector Erickson testified about the rapid manner in which defendant traveled from bank to bank throughout Chicago to make the withdrawals, conducting multiple withdrawals in a day over the four days between the check being cleared and the fraud's detection. He testified that defendant himself made each withdrawal, presenting his driver's license or state

5

identification card at each transaction. Through Inspector Erickson, the government presented numerous photographs of defendant conducting the cash withdrawals charged in the indictment. Inspector Erickson also testified about additional purchases, made with defendant's debit card, that were also conducted in that same time period.

When considered in its entirety, the government's evidence amply supported the verdicts convicting defendant of bank fraud and money laundering. The evidence showed that defendant did not have a functioning business at the time he received the victim company's check. The evidence showed that defendant had less than $100 in the GR Icon account at the start of November 2009, and in fact defendant never had an ending monthly balance above $400 in his business account in 2009. The evidence showed that defendant personally deposited the altered check into his bank account, and as soon as the check cleared, defendant began rapidly withdrawing cash, making multiple transactions a day and a $53,000 wire transfer at numerous banks across Chicago in the four days before the fraud was detected. The totality of the evidence established that defendant acted knowingly and that he intended to defraud Chase bank.

Defendant argues, however, that the government failed to meet its burden and that the verdicts should be set aside. First, defendant suggested that the Court should grant its motion because of a lack of evidence in the record that defendant was involved in procuring or altering the check. Defendant was acquitted on one count –

6

possessing and using an altered check. Based on the jury's verdict on that count, it is fair to say that the jury agreed that the evidence was insufficient to convict defendant of that violation. Defendant is incorrect in arguing, however, that a deficiency in evidence regarding the possession of the altered check is fatal to the five counts of bank fraud for which defendant was convicted. How defendant received the altered check is not an element of bank fraud. Regardless of whether defendant personally altered the check or knew at the time he deposited the check that it had been altered, his behavior once the check cleared makes evident why the jury convicted defendant of bank fraud. Defendant deposited the altered check on November 27, 2009. The altered check did not clear until December 7, 2009. Between December 9 and December 12, 2009, defendant wrote seven checks to himself and conducted the wire transfer. He conducted a number of other debit card transactions, including spending thousands of dollars on electronics and hundreds of dollars at a clothing store, as revealed by the GR Icon bank statements. His conduct over those four days – conducting several transactions rather than just one to withdraw the funds, traveling to multiple banks a day, withdrawing cash rather than procure a cashier's check or some other bank instrument, writing checks to himself rather than vendors or other business associates – all support a determination that defendant was not engaged in legitimate business transactions. Even if defendant did not know in November 2009 that the check had been altered, defendant's conduct a few weeks later is sufficient to support the jury's verdict. His conduct was sufficient to allow a

7

reasonable jury to find beyond a reasonable doubt that defendant knew that he was not entitled to the funds and had to empty the account as quickly as possible before the mistake was discovered.

Defendant also argues that even including the evidence provided during the defense case, the Court should grant his motion for acquittal. Defendant was the sole defense witness. The only evidence presented to the jury that contradicted the government's theory of the case or that otherwise supported the defendant's various defense theories was defendant's incredible testimony. Defendant testified that he received the check in question from a man named Charles Brown, who defendant met on a flight to London and persuaded to invest in his nascent mobile MRI business. Defendant testified that he expected an investment of approximately $45,000, and when he asked Brown why the check was for more than $344,000, Brown attributed it to a payroll error and told defendant to deposit the check and withdraw the balance. Defendant testified that Brown urged him to deposit the check immediately, and so within an hour of receiving the check, defendant deposited it via ATM because he couldn't make the time to find a parking space and instead double-parked on Dearborn Street in downtown Chicago. Defendant also testified that after depositing the check, he had a number of telephone conversations with Brown, who subsequently arrived in Chicago from Los Angeles without informing defendant ahead of time and immediately demanded the cash balance from the erroneously cut check. Defendant testified that he made the cash withdrawals at Brown's

8

instruction, and made the wire transfer as directed by Brown to a company defendant believed Brown controlled. Defendant testified that he had no records supporting his testimony that he returned the money to Brown. Defendant stated that as he grew concerned and weary of conducting the cash withdrawals, he told Brown that he had written Brown a check for the remaining he owed Brown (close to $130,000), at which point Brown disappeared and turned off his phone, never to be heard from again.

Defendant argues that the Court should grant his motion for acquittal because his testimony established that he acted in good faith by relying on Brown's representations and instructions. The jury's verdict is a clear repudiation of the idea that "defendant honestly believed the validity of that which the government has charged as being fraudulent." Nothing in defendant's testimony supported a determination that he acted in good faith. He testified that a man he had known for a few hours agreed to invest $45,000 in a business defendant had not gotten off the ground, and despite Brown's supposed business savvy and apparent financial liquidity, Brown ran a business where a check was made out for $300,000 more than intended, and was unwilling or unable to reissue the check. Defendant testified that he immediately drove to the bank to deposit the check because he was instructed to do so. Defendant testified that he made multiple large-dollar cash withdrawals at Brown's urging, meeting Brown at a hotel to turn the money over. Everything about defendant's testimony was unbelievable, and the defense presented no evidence that

9

undercut the government's evidence.

Any sensible juror would have easily convicted defendant of the bank fraud and money laundering counts in the indictment based on the government's evidence. Defendant's testimony only provided additional fodder to believe that defendant knowingly engaged in numerous transactions designed to take as much money from Chase as possible. As the evidence establishing each element of the charged offenses is more than sufficient to prove the defendant's guilt beyond a reasonable doubt, the defendant's Rule 29 Motion should be denied.

## II.    Rule 33 Motion

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The defendant's burden on a Rule 33 motion is substantial:

> A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly. But if the judge believes there is a serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted–he has the power to set the verdict aside, even if he does not think that he made any erroneous rulings at the trial.

*United States v. Morales*, 902 F.2d 604, 605-06 (7th Cir. 1990) (citations omitted).

In this case, defendant has moved for a new trial based upon one alleged error committed by this Court: sustaining the government's objections to emails defendant wanted to introduce at trial. Defendant sought to offer the emails to prove that at the time of the fraud, he had a legitimate business. The existence of such a business, defendant argues, undermines any determination that he was acting with the

10

requisite intent to defraud when he engaged in the charged transactions.

The first chain of emails is dated July 20 and 21, 2009. The chain consists of an email from defendant to an individual in which defendant asked for price quotes for used imaging devices. An individual from the recipient company (hereinafter Company X) asked for defendant's brand preferences and other needs. There is no response from defendant in the email chain. The second chain of emails begins on December 9, 2009 and ends December 30, 2009. In it, defendant receives a quotation from Company X he contacted in the July 2009 emails, and then receives several additional emails from a third party (Individual Z) about additional needs. In the final email, defendant emails Company X and asks for a brochure from Company X, explaining "I know this sounds very vague," but asking for a brochure to be mailed to him in Nigeria. Defendant's signature block reflects a company called First Point Energy World Ltd. The third email is dated January 16, 2010 from defendant to Individual Z, in which defendant forwards photographs of an unidentified college of medicine, and states, "We should be doing the MRI/CT equipment installations. I will keep you posted as soon as there is any progress." Defendant's signature block again contains the name of First Point Energy World Ltd.

The Court correctly precluded defendant from introducing the emails at trial. The emails defendant sought to introduce were not relevant and amounted to hearsay. Defendant argues, however, that the emails between defendant and third parties unrelated to this litigation, tended to show that defendant had a legitimate

11

investor and thus was engaged in correspondence to procure MRI equipment.

Defendant's argument must fail. First, defendant failed to establish the relevance of the emails. Defendant argues that the emails were relevant to establishing that defendant was engaged with a legitimate investor in his business, and thus at the time he deposited the altered check, he was acting in good faith. The email correspondence was with individuals unrelated to the victim company or defendant's alleged investor, Charles Brown. Further, the emails from defendant bore a signature for an unrelated company, First Point Energy World Ltd., rather than GR Icon, the entity to which the altered check was made out. To the extent defendant wanted to introduce evidence regarding his work at building a mobile MRI equipment business, he was allowed to introduce Powerpoint slides of regarding the information he purportedly showed Brown during their initial meeting. Nothing in the emails supported defendant's contention that he believed that Brown (or the account holder on the victim check) had issued the altered check to GR Icon.

Additionally, the emails defendant sought to introduce constituted inadmissible hearsay. Defendant stated that "[t]he emails tended to shed light on Ajayi's state of mind because they would have helped to establish he was engaged in legitimate business activity." Dkt. # 58 at 7. In fact, defendant sought to introduce the emails to prove the matter asserted therein – that defendant had solicited quotes for MRI equipment and was engaged in a legitimate business. *See* Fed. R. Evid. 801(c)(2); *United States v. Fluker*, 698 F.3d 988, 1000 (7th Cir. 2012). Defendant

12

failed to produce business records kept in the regular course of his purportedly legitimate business, or any other documents that fall within Rule 803's exceptions to the hearsay rule. Because defendant sought to introduce the emails precisely to show that he was in talks about the costs of MRI equipment – and not to show his state of mind regarding an intent to defraud (about which the emails are entirely silent, being as they do not involve his victims or his purported investor), the emails were properly excluded.

Defendant's arguments lack merit and, therefore, he fails to satisfy his Rule 33 burden of establishing that "there is a serious danger . . . that an innocent person has been convicted. For these reasons, defendant's motion for a new trial should be denied in its entirety.

## IV. CONCLUSION

WHEREFORE, the government respectfully requests that defendant's motion to set aside the verdict and, in the alternative, his motion for a new trial should each be DENIED in their entirety.

Respectfully submitted,
ZACHARY T. FARDON
United States Attorney

By: /s/ Yasmin N. Best
YASMIN N. BEST
NICOLE M. KIM
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Dated: February 10, 2014