```
 1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,      )
                                    )
 5                  Plaintiff,      )   Docket No. 12 CR 190
                                    )
 6             vs.                  )
                                    )
 7   ABIDEMI AJAYI,                 )   Chicago, Illinois
                                    )   December 5, 2013
 8                  Defendant.      )   9:48 a.m.

 9                            VOLUME 1A
10                TRANSCRIPT OF PROCEEDINGS - Trial
        BEFORE THE HONORABLE REBECCA R. PALLMEYER, and a jury
11

12   APPEARANCES:

13

14   For the Plaintiff:      HON. ZACHARY T. FARDON
                             UNITED STATES ATTORNEY
15                           BY:  MS. YASMIN N BEST
                                  MS. NICOLE M. KIM
16                           219 South Dearborn, 5th Floor
                             Chicago, Illinois  60604
17

18   For the Defendant:     LAW OFFICES OF DAMON M. CHERONIS
                            BY:  MR. DAMON M. CHERONIS
19                               MR. IAN M. BARNEY
                            53 West Jackson Boulevard, Suite 1750
20                          Chicago, Illinois  60604

21   Also Present:          Mr. Brett Erickson
                           US Postal Inspection Service
22

23   Court Reporter:        FRANCES WARD, CSR, RPR, RMR, FCRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Suite 2144A
                            Chicago, Illinois  60604
25                          (312) 435-5561
                            frances_ward@ilnd.uscourts.gov
```

1               I N D E X

2                                                    PAGE

3       Opening Statement on Behalf of the           10
        Government - By Ms. Best

4                                                    14
        Opening Statement on Behalf of the

5       Defendant - By Mr. Barney

6       DANIEL CORCORAN
        Direct Examination - By Ms. Best            21

7       Cross-Examination - By Mr. Cheronis         33

8       JAMES O'SHEA
        Direct Examination - By Ms. Kim             36

9       Cross-Examination - By Mr. Cheronis         77

10      DAWN HARDWICK
        Direct Examination - By Ms. Best            83

11      Cross-Examination - By Mr. Cheronis         96

12

13               INDEX TO EXHIBITS

14      GOVERNMENT EXHIBIT                  RECEIVED
        Checks.......................................   27

15      ABM Check....................................   30
        Affidavit....................................   31

16      Customer Summary.............................   44
        ATM Transaction History......................   46

17      Checks.......................................   48
        LAD..........................................   51

18      Teller Journals..............................   52
        Bank Statements..............................   54

19      Video Stills.................................   74
        Signature Card...............................   76

20      Wire.........................................   87

21

22

23

24

25

1               THE CLERK:  12 CR 190, United States versus Ajayi.

2               THE COURT:  I think we are ready to get started on

3       the trial.

4               We did get notice that one of the jurors was

5       delayed.  I am not sure if she is here.

6               But in the meantime, why don't we at least take a

7       quick look at Mr. Cheronis' motion *in limine*, with respect to

8       some of the -- what I think he views as 404(b) evidence.

9               MS. BEST:  Your Honor, so there are three

10      categories of evidentiary information that Mr. Cheronis has

11      objected to.

12              The first category are the bank records for the

13      GR Icon account, which is the account into which the check at

14      issue here was deposited.

15              The second is any reference to the defendant's

16      connections with Houston, Texas, which is where the check

17      went missing.

18              And the third category is regarding tax returns.  I

19      want to start with the tax returns first just because I think

20      we can push that off a little bit.

21              I received tax returns regarding both the

22      defendant's personal returns and GR Icon.

23              Unfortunately, I just received them two days ago

24      from the disclosure office.  I don't yet have a signed order

25      from the U.S. Attorney allowing me to disclose them to

1    Mr. Cheronis.  I do have copies for when that order is -- the
2    motion is signed, and I will submit the motion and a draft
3    order to your Honor.  So we don't have those to disclose at
4    this point.

5            But I will say that to the extent that Mr. Cheronis
6    is concerned about 404(b), that is not the issue, and that's
7    not the reason that the government would use those documents.

8            The documents would be used, really, to go to what
9    we, at this point, think might be one of the theories of the
10   defense, which is whether the defendant believed or had any
11   reason to believe that this was a legitimate check that would
12   have been issued to his business.

13           The government has no concern about whether the
14   defendant filed taxes, didn't file taxes for GR Icon.  It
15   really just goes to his intent and his motive on that point,
16   on whether this check was a legitimate check and whether he
17   believed that at the time.

18           However, because we haven't disclosed those yet, we
19   don't intend to use them at this time.  That may change over
20   the course, and if it does, then we will bring it up to your
21   Honor at that time.

22           THE COURT:  Okay.

23           MS. BEST:  Regarding the bank records, the
24   government has tendered and the exhibit here, essentially the
25   bank records for that GR Icon account beginning in February

1    of 2006 through January of 2010.

2              As noted in the motion *in limine*, the fraud here

3    really occurred in November and December of 2009.  So it is a

4    very short time period.  But, again, the government's

5    intention in using those bank records is not to discuss

6    previous bounced checks by the defendant or anything along

7    those lines.  What it really is, again, to that issue as to

8    whether the defendant had a reason to believe that this was a

9    legitimate check.

10             What those bank records will show when viewed in

11   their entirety is that the defendant never had a balance that

12   would have supported any sort of idea that this was a

13   legitimate check; that over the course of the time he had

14   this bank account opened, he never had a balance of more than

15   approximately $13,000.  At the time that the fraud occurred,

16   the opening balance that month was $90.

17             So this is not a question of whether he defrauded

18   other people in the past, whether, you know, he was bad at

19   managing money.  It's really just a question as to whether --

20   again, one of our anticipated theories of the defense.

21             So for those reasons, I do think that presenting

22   his bank records in their entirety makes sense.  And to the

23   extent that the defense has some question about it when the

24   witness is testifying about them, I don't have a problem with

25   that.  I just don't think that, one, their anticipated -- how

1    they anticipate we'll use them is correct, and I don't think

2    they should be barred.  I think they are properly admitted at

3    this point.

4            THE COURT:  Would it be possible to limit the

5    records to -- I'm sorry -- to limit the bank records to what

6    the balances were at any given time, as opposed to showing

7    how those balances dipped and rose and fell?

8            MR. CHERONIS:  If I may respond briefly, your

9    Honor?

10           If the government just proffered that the only

11   reason that they are intending to introduce this is to show

12   that he didn't have that type of money available to him and

13   this was something new, I don't dispute the fact that they

14   can establish that, but they should be able to do it through

15   a sanitized way.  There are bounced checks.  There are checks

16   in there that -- I don't want the jury to go back with three

17   years of checks going through, basically, extraneous evidence

18   and maybe drawing their own conclusions.

19           THE COURT:  It seems to me that there may be a way

20   to stipulate about bank balances and what Mr. Ajayi knew.  I

21   don't know.

22           But I would agree with you that the notion -- other

23   bounced checks and other potential frauds would not be

24   relevant to the theory that Ms. Best has outlined about why

25   these bank records are admissible.

1          So it sounds to me like it should be entirely

2     possible to get in evidence the bank balances were low or

3     below zero and that Mr. Ajayi knew or could have known that.

4          MS. BEST:  Your Honor, to the extent that we need

5     to rework that a little bit, I will say that I don't

6     anticipate those records will be introduced until our final

7     witness.  So we may have some time today to try to figure out

8     which --

9          THE COURT:  To work it out.

10         MS. BEST:  -- what the best way to present it is.

11    But I do think they will be introduced through Brett

12    Erickson, who will be the government's final witness today.

13         So we will work on that.  I think we'll have a

14    chance a little bit later on.

15         But our second or third witness today is the

16    custodian of records.  So we will have him at least lay the

17    foundation for the bank records, and we can figure out how to

18    proceed in terms of what we will move to admit.

19         THE COURT:  All right.  In other words, we will lay

20    the foundation without actually showing the jurors the

21    records.

22         MS. BEST:  That's correct.

23         And right now, your Honor, it's a binderful.  When

24    Jim O'Shea, who's the custodian of records, when he takes the

25    stand, we had not intended to publish or show, you know, the

1    extent of the records, but really just lay the foundation for

2    their admission.

3              THE COURT:  All right.  And let's talk about that

4    final matter, which is Mr. -- I think what relates to

5    Mr. Ajayi's contacts with Houston, Texas.

6              MR. CHERONIS:  Yes, your Honor.

7              I think I stated it as clearly as I could in the

8    motion as to why I don't think that's relevant and why it

9    would potentially raise 403 concerns.

10             MS. BEST:  Your Honor, at this point, the

11   government hadn't planned, other than mentioning that this

12   check went missing somewhere between Houston and Dallas, to

13   discuss Houston, really, in any depth.

14             I will say, obviously, we don't know whether the

15   defendant is going to testify, and what he may say if he does

16   testify.  So I think it might be premature to say that it's

17   beyond the scope to discuss what his relationship is with

18   Houston.

19             THE COURT:  Right.

20             MS. BEST:  But at this point, the government hadn't

21   planned to elicit any testimony essentially holding the

22   defendant responsible for the actual taking of that check.

23   The government's evidence really regards how that check was

24   deposited into his account and then used.

25             But I do think it's premature without us knowing

1    precisely what -- whether the defendant is going to take the
2    stand and what might come of that testimony.
3              MR. CHERONIS:  And I will just proffer, I don't
4    know if Mr. Ajayi is going to take the stand.  I can assure
5    you that if he does, he is not going to talk about having
6    family in Houston or having gone to Houston.  So we can raise
7    it at a later point, I guess.
8              THE COURT:  It sounds like we can.  Obviously, the
9    government will know that if they are getting dangerously
10   close, we should take a sidebar to make sure that whatever
11   you are about to do is not going to be prejudicial --
12   unfairly prejudicial.
13             MR. CHERONIS:  Okay.
14             MS. BEST:  Thank you, your Honor.
15             THE COURT:  Let's check on our jurors.
16             And just so you are aware, I do know that they have
17   not been sworn, so that's the first thing we need to do when
18   they get here.
19             I just want to make sure they are here.
20             (A brief recess was taken at 9:55 a.m.)F/t
21             THE COURT:  I think she is here, and Officer Mahone
22   will bring them in in a second, the whole group.
23             (Brief pause.)
24             (Jury in at 10:20 a.m.)
25             THE COURT:  Ladies and gentlemen, good morning.  I

1  am going to ask that you all stand and be sworn.

2       Would you raise your right hands.

3       (Jury panel duly sworn.)

4       THE COURT:  Thank you.  You may be seated.

5       I explained when you were here on Monday that the

6  first step is opening statements.  We are going to hear

7  opening statements from the lawyers in just a moment.

8       I want to remind you that what the lawyers say and

9  do is important, but it is not evidence.  So if anything that

10  the lawyers tell you right now or say during the course of

11  the trial or say during the argument is not consistent with

12  your understanding of the evidence, it's the evidence as you

13  see it that counts.

14       But the lawyers are entitled to make opening

15  statements to give you an outline of what they expect you are

16  going to hear.  And we will proceed with that right now.

17       Ms. Best.

18       MS. BEST:  Thank you, your Honor.

19       OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

20       MS. BEST:  In late 2009, the defendant, Abidemi

21  Ajayi, took a check for more than $344,000 and deposited it

22  into a bank account that he controlled.  And then, over the

23  course of just four days, he withdrew as much money as he

24  could to the tune of $172,000.  The only problem was that

25  that check had been stolen and altered.

1          Now, when he deposited the check, it looked as if

2     it had been made out to a company he controlled, a company

3     called GR Icon.  But as you will hear, that check was

4     originally made out by a janitorial services company in

5     Houston, Texas, to its paper supplier in Dallas, not to the

6     defendant and not to his company.  But that check wound up

7     here in Chicago made out to GR Icon in the defendant's hands

8     and in his bank account.

9          And once that check cleared, the defendant did what

10    he could to get as much money as he could before the bank put

11    a stop to it.  He did that largely by cashing checks that he

12    wrote to himself from his business account.

13          Over the course of those four days, he wrote seven

14    checks.

15          On day one, he wrote a check in the amount of

16    $9600.

17          On day two, he wrote another check that he cashed

18    in the amount of $23,500.  And then, later that same day, he

19    went to another bank branch across the city and cashed

20    another check for $16,500.

21          On day three, he cashed a check to himself for

22    $17,000 and then, again, later on that day, went to a

23    different bank branch and cashed a check for $9500.

24          On day four, finally, he cashed a check in the

25    amount of $9650 and then went to yet another bank branch and

1    cashed a check for $9800.

2           So in the course of four days, seven checks to

3    himself, $95,550 in cash in his hands as a result of those

4    checks.

5           But that wasn't all.  On day three, in addition to

6    those two checks to himself, he also wired $53,000 out of his

7    bank account.

8           He wrote checks to other people out of that bank

9    account.  He used his debit card to rack up even more

10   spending.

11          This systematic draining of the account of the

12   money that he received from that stolen check only stopped

13   when the rightful owners of the check realized what was

14   happening and contacted their bank.

15          As a result of his conduct, the defendant has been

16   charged with bank fraud and related offenses.

17          Now, at trial, the government has the burden of

18   proof.  And what that means is that the government must prove

19   beyond a reasonable doubt each and every charge against the

20   defendant.  The government will meet that burden here through

21   the evidence it introduces over the next few days.

22          The witnesses you will hear from will explain how

23   that stolen check was originally made out and how it was

24   processed.  We will explain how they determined that check

25   had been stolen and altered.

1    You will get to see the same documents they looked

2    at:  The check as it was presented to the defendant's bank

3    and the check -- the copy of the check the original payor of

4    the janitorial services company retained in their records.

5    You will get to see the checks that the defendant

6    himself wrote out to himself.

7    You will get to see the video stills of the

8    defendant at bank branch after bank branch across the city as

9    he cashed out each and every one of those checks.

10    And you will get to see the bank statements from

11    the GR Icon account.  And what you'll see in those statements

12    is that at the time the defendant deposited that check into

13    the GR Icon account, in the beginning of November 2009, that

14    bank account had just $90.08 in it.

15    All this evidence will prove beyond a reasonable

16    doubt that the defendant received that $344,000 check, that

17    check that had been altered to reflect the name of his

18    company; that he deposited that check himself; that he then

19    wrote check after check to himself and drove from bank

20    branch -- traveled from bank branch to bank branch across the

21    city to withdraw that money, to cash it out as soon as

22    possible; that he used his debit card to spend yet more

23    money; that he conducted a wire transfer to spend even more

24    money from that account.

25    He spent as much as he could, $172,000, in just

1  four days to empty out that account.

2  He did it because that check wasn't his.  He didn't

3  earn that money, and he wasn't entitled to it.  So he spent

4  that money just as quickly as he could before anyone knew

5  what was happening.

6  After all the evidence is in, Ms. Kim and I will

7  return before you, and we will ask you to return a verdict of

8  guilty on each and every count of the indictment.

9  Thank you.

10  THE COURT:  Thank you, Ms. Best.

11  Mr. Barney.

12  MR. BARNEY:  May I proceed, your Honor?

13  THE COURT:  You may.

14  MR. BARNEY:  Thank you.

15  OPENING STATEMENT ON BEHALF OF THE DEFENDANT

16  MR. BARNEY:  Good morning.

17  You just had a chance to hear from Ms. Best, one of

18  the prosecutors in this case, and what she told you is the

19  government's opening statement.  That's what Ms. Best and

20  Ms. Kim hope that the evidence will be during this case, what

21  the government hopes it will be able to prove during the

22  course of this case.

23  What the government hopes to prove and what they

24  tell you in their opening statement and what they actually

25  prove at trial are two different things.  Keep that in mind.

1    Now, it's my chance to talk to you about what I

2    think and what I expect the evidence to be at trial.

3    You heard some interesting things from Ms. Best

4    about kind of the origin of this case, the origin of this

5    check.

6    She told you that American Building Maintenance

7    Company was a company in Houston, Texas.  They issued this

8    check for $344,000 and some change, and it was issued to a

9    company called Pollock Paper.  That's a vendor that American

10   Building uses.

11   And as Ms. Best told you, somewhere between Houston

12   and Dallas this check disappears, and it never makes its way

13   into Pollock Paper's bank account.

14   Now, the next time it resurfaces, Mr. Ajayi

15   deposits this check into his account.  When he deposits this

16   check into his account, the evidence is going to be that it's

17   payable to his company, GR Icon.  That is his business with

18   his name on it.  He is a signatory on that account.

19   And as Ms. Best told you, Mr. Ajayi withdraws some

20   money from the account, and he wires money from the account.

21   There is no doubt about those things.  There is no doubt that

22   this check was issued by American Building.  There is no

23   doubt that Mr. Ajayi deposited it into his account.  There is

24   no doubt that the check was payable to GR Icon when he did

25   so.  There is no doubt that he withdrew money and that he

1   sent a wire transfer.  That's really not what's at issue in
2   this case.

3           What's at issue in this case, what I want you to
4   focus on, what I think you should focus on during the course
5   of this trial are two issues, two questions that need to be
6   answered:

7           One, how did Mr. Ajayi get this check?  How did he
8   get this check?

9           Two, why did he do the things he did?  Why did he
10  withdraw money?  Why did he deposit that check into his
11  account?  Why did he wire money?

12          Those are the two important issues in this case:
13  How he got the check and why he did the things he did.  Those
14  issues are important because Mr. Ajayi is charged with being
15  part of a scheme to defraud.  He's charged with bank fraud.
16  And in order to have been part of a scheme to defraud, he had
17  to have acted with the intent to defraud when he did these
18  things.  The intent to defraud.

19          Well, you can't answer that question unless you
20  know how he got this check and why he did the things that he
21  did.

22          Now, during this trial, you are going to hear how
23  he got this check.  You are going to hear why he did the
24  things that he did.  And you are going to learn that
25  Mr. Ajayi was essentially a businessman in November of 2009,

1    and GR Icon was his business.  It's a legitimate business

2    that he owned.

3              You are going to learn that he was engaging in a

4    business venture that had to do with medical equipment.  And

5    when he is on a business trip, you are going to learn that he

6    meets somebody.  That person is interested in his business

7    and wants to invest.  That's what the evidence is going to

8    be.

9              You are going to hear that after he returns from

10   his business trip, he received this check in the mail that we

11   have been talking about, $344,000.

12             You are going to learn that that amount is, in

13   fact, more than he was expecting to receive in the mail, but

14   it comes in an envelope.  You are going to see that envelope.

15             What does he do?  Well, Mr. Ajayi tries to find out

16   what this is all about, why he is getting so much more money

17   than he was expecting, why he has this check payable to his

18   business for $344,000.

19             You are going to find out that -- you are going to

20   find out why he deposits the check, but he deposits the

21   check.  He is directed to deposit the check.  He starts

22   withdrawing money to refund the balance of this check.

23   That's what he is told to do with this check that's payable

24   to his company.  That's what the evidence is going to be.

25             Now, there is not going to be any evidence in this

1   case that Mr. Ajayi knew that check had been stolen.  You are

2   not going to hear a single witness come in here and tell you

3   that he knew that check had been stolen or that he had

4   anything to do with stealing that check.

5           There is not going to be a shred of evidence that

6   he knew that check had been altered.  You are going to see a

7   copy of that check.  It's made out to GR Icon.  You are not

8   going to hear a single witness come in here and tell you that

9   Mr. Ajayi had anything to do with altering that check, not a

10  single witness.

11          Now, you are going to learn a little bit about the

12  investigation that happens in this case.  You are going to

13  learn that there are some holes in this investigation.  There

14  are some leads that the investigators have that they just

15  don't follow up on.

16          So what are we left with?  What's the evidence that

17  you are going to see?  No one is going to be able to

18  answer -- the government is not going to be able to provide

19  you with any evidence to answer the question, how did he get

20  this check?  They are not going to be able to tell you why he

21  did the things that he did.

22          They are just going to ask you to infer.  Because

23  he had this check, because he deposited it, because he

24  withdrew the money, he must have been involved with stealing

25  it.  He must have been involved with altering it.  But that's

1  not what the evidence is going to be.  That's not what the

2  evidence is going to be.

3          And one of the first things that Judge Pallmeyer

4  told you when you came into this courtroom was that Mr. Ajayi

5  is presumed innocent as he sits there, and during the course

6  of this trial, he is presumed to be an innocent man.  That

7  presumption does not leave him unless and until the

8  government provides you with enough evidence to prove that he

9  is guilty beyond a reasonable doubt.

10          Now, I am confident when you see the evidence in

11  this case, when you hear all the evidence, you are going to

12  see that Mr. Ajayi wasn't part of a scheme to defraud.  He

13  didn't commit bank fraud.

14          In fact, you are going to see -- the evidence is

15  going to be Mr. Ajayi was the dupe in someone else's scheme.

16  He was a tool used by someone else to steal that money.  He

17  didn't get that money.  It wasn't his plan to steal that

18  check.  That's what the evidence is going to be.

19          And the evidence is also going to be, by the way,

20  that this check that he gets that's payable to GR Icon, does

21  he go and set up shell companies and create fake bank

22  accounts and put that check in there?  No.  He deposits the

23  check into his own account with his name on it that he is a

24  signatory to.

25          And then when he withdraws money, does he wear a

1    disguise?  Does he create a fake identity?  No.  He walks

2    into the bank.  The evidence is going to be, unequivocally,

3    he walks into the bank.  He gives his ID with his name on it

4    on his bank account to withdraw that money.  This scammer,

5    this schemester does it all under his own name.  That's what

6    the evidence is going to be in this case.

7              At the end of the case, when you have a chance to

8    step back and look not just at what the government has told

9    you but what the government has proved to you, the evidence

10   that they have shown you, you are going to see that this

11   wasn't Mr. Ajayi's scheme.  Mr. Ajayi didn't commit bank

12   fraud.  He certainly wasn't part of a scheme to defraud.  He

13   certainly didn't launder any money.  That's what the evidence

14   is going to prove.

15             At the end of this case, when you have the

16   opportunity to examine the evidence that you have been shown,

17   you will know that Mr. Ajayi is not guilty of these crimes.

18             Thank you.

19             THE COURT:  Thank you.

20             Is the government prepared to call its first

21   witness?

22             MS. BEST:  It is, your Honor.  The government calls

23   Daniel Corcoran.

24             THE COURT:  Mr. Corcoran, can you step forward,

25   please.

```
 1              THE COURT SECURITY OFFICER:  Step up here and face
 2    the Judge.
 3              THE COURT:  I will ask you to raise your right
 4    hand, sir.
 5              (Witness sworn.)
 6              THE COURT:  You may proceed, Ms. Best.
 7              MS. BEST:  Thank you, your Honor.
 8              DANIEL CORCORAN, GOVERNMENT'S WITNESS, SWORN
 9                        DIRECT EXAMINATION
10    BY MS. BEST:
11    Q.   Would you please state your full name for the record?
12    A.   Sure.  It's Daniel Corcoran.
13    Q.   Mr. Corcoran, what do you do for a living?
14    A.   I am the assistant treasurer for ABM.
15    Q.   What is ABM?
16    A.   ABM is a 100-year-old company with $4 billion in sales
17    that does facility services; such as, janitorial services
18    parking services, security services, and engineering
19    services.
20    Q.   How long have you worked at ABM?
21    A.   Four years.
22    Q.   Is ABM also known as American Building Maintenance
23    Company?
24    A.   That is true.
25    Q.   How many employees does ABM have?
```

1    A.    It's a little over 100,000 employees.

2    Q.    And in your capacity as assistant treasurer, what is

3    your department like?

4    A.    There is four of us in the Houston office, and we manage

5    the day-to-day cash operations for the company.  We maintain

6    all the bank accounts and the bank relationships.

7    Q.    In the course of your work as the assistant treasurer,

8    are you familiar with a company called Pollock Paper?

9    A.    Yes.

10   Q.    What is Pollock Paper?

11   A.    Pollock Paper is one of our crucial vendors, an

12   important vendor for us that we buy paper products and

13   cleaning supplies from.

14   Q.    Did you work at American Building -- at ABM in late

15   2009?

16   A.    Yes.

17   Q.    And are you familiar with what the process was in late

18   2009 for paying your vendor, Pollock Paper?

19   A.    Yes.

20   Q.    What was the process for issuing payments to Pollock

21   Paper?

22            THE COURT:  I am sorry.  Can you spell Pollock

23   Paper.

24            MS. BEST:  I'm sorry.  It's P-o-l-l-o-c-k.

25            THE COURT:  Oh, Pollock.  Okay.  Thank you.  Sorry.

1    BY MS. BEST:

2    Q.   Can you explain what the process was in late 2009 for

3    paying Pollock Paper?

4    A.   Sure.  Basically, the invoice for Pollock Paper would

5    come to the department or division that ordered the supplies.

6    They would make the necessary approvals on the invoice to be

7    paid.  That invoice would be sent to the Houston office to be

8    paid, where, then, a check would be issued to pay that

9    vendor.

10   Q.   If the invoice that had to be paid was more than

11   $50,000, were there any special procedures that had to be

12   taken in order to issue that check?

13   A.   If the invoice is over a certain dollar amount, it would

14   require certain approvals.  If the check is cut for over

15   $50,000, we require, as an ABM internal control, another

16   signature on the check.

17   Q.   And when checks were produced by ABM, do you know the

18   process by which they were cut and produced?

19   A.   Yes.

20   Q.   What was that process?

21   A.   The process was produced in the Houston office in a

22   secured, locked room where the checks would be cut and

23   actually divided into two different piles, so to speak.

24        If the checks are over $50,000 -- the check that is

25   already produced has a digital signature already on it.  But

1  for checks that are over $50,000, we require another

2  signature, a live signature, so to speak, to be put on that

3  check.  So those checks would be put in a certain pile for

4  another signature.  The checks that were under 50,000, then,

5  would be mailed out.

6  Q.  The checks that were placed in that second pile, what

7  would happen after they got the second signature?

8  A.  After the second signature was put on that check, they

9  would be brought back to the secured room to be mailed out.

10  Q.  Do you know how many checks ABM sends out either on a

11  daily or monthly basis?

12  A.  For our accounts payable checks, we issue about 25,000

13  checks a month.

14  Q.  Approximately how many payroll checks does ABM issue?

15  A.  In one year, we issue over 2 million payroll checks.

16  Q.  Have any of ABM checks been stolen in your tenure as

17  assistant treasurer?

18  A.  Not that I'm aware.

19  Q.  Are you aware of any checks at all beginning in -- I'm

20  sorry.  Let me rephrase.

21          Is it your testimony you are not aware of any

22  checks at all being stolen during the course of your tenure?

23          MR. CHERONIS:  Objection.  Relevance.

24          THE COURT:  Response.

25          MS. BEST:  Your Honor, I will strike that question

1  and just sort of move on.

2  THE COURT:  Thanks.

3  BY MS. BEST:

4  Q.  In your position as assistant treasurer, were you aware

5  of a November 2009 check that ABM issued to Pollock Paper?

6  A.  Yes.

7  Q.  In late November 2009 or December 2009, what did you

8  learn about the November 2009 check to Pollock Paper?

9  A.  We were notified in December 2009 that --

10  MR. CHERONIS:  Objection to hearsay, your Honor.

11  THE COURT:  Objection to the form is sustained.

12  Why don't you ask another question, Ms. Best.

13  BY MS. BEST:

14  Q.  In December 2009, did you take any actions personally

15  regarding a check that ABM had issued to Pollock Paper?

16  A.  Yes.

17  Q.  And what were those actions?

18  A.  We filed an affidavit of altered check with Bank of

19  America.

20  MR. CHERONIS:  I am going to object on foundation.

21  MS. BEST:  Your Honor, I am going to circle back.

22  THE COURT:  All right.

23  BY MS. BEST:

24  Q.  You say that you filed an affidavit.  What led to you

25  filing an affidavit in December 2009?

1  A.    We were notified by Pollock Paper that --

2           MR. CHERONIS:  Objection to hearsay.

3           THE COURT:  Overruled.

4           You may answer.

5  BY THE WITNESS:

6  A.    We were notified by Pollock Paper that they did not

7  receive our payment to them.  So what we did, we pulled the

8  file to see which check we issued to them.  We got the check

9  number and went to our bank portal site to see if that check

10  was, in fact, paid.  And we found out the check was paid.

11  And while looking at the check that was paid, we saw that the

12  check payee name was altered.

13           MS. BEST:  Your Honor, may I approach the witness?

14           THE COURT:  You may.

15           (Document tendered.)

16  BY MS. BEST:

17  Q.    I just handed you a folder that is labeled "Checks."

18  Would you open up that folder and look at the first page of

19  that document.

20           I have handed you what's been marked as Government

21  Exhibit Checks.  Do you recognize the first page of that

22  document?

23  A.    Yes.

24  Q.    How do you recognize it?

25  A.    It is one of our accounts payable checks.

1    Q.   And how do you identify it as one of your accounts

2    payable checks?

3    A.   By the image of the check, the name on the check at the

4    left-hand corner says, "American Building Maintenance

5    Company," our bank account number, the bank account routing

6    number, and the signatures on the check.

7              MS. BEST:   Your Honor, the government would move to

8    publish this check at this time.

9              MR. CHERONIS:   No objection.

10             THE COURT:   That will be admitted.   You may

11   publish.

12             (Government Exhibit Checks was received in

13              evidence.)

14             MS. BEST:   If we can zoom in on this, the check

15   there.

16   BY MS. BEST:

17   Q.   I believe you testified that in the left-hand corner,

18   that's one of the pieces of information you used to identify

19   this check; is that correct?

20   A.   That's correct.

21   Q.   Going to the right-hand side of the document, can you

22   read what the date is there?

23   A.   The date is November 12th, 2009.

24   Q.   And can you read what the check number is?

25   A.   43138762.

1   Q.   What is the amount of the check?

2   A.   $344,557.84.

3   Q.   Looking at the bottom right-hand side of the check

4   there, can you identify what's located there?

5   A.   At the very bottom is the second signature for that

6   check.

7   Q.   So going back to your previous testimony, that's the

8   second check -- second signature that would be required for a

9   check of this amount?

10   A.   If it's over $50,000, it would require a second

11   signature, and that is the second signature at the lower

12   right-hand bottom.

13   Q.   Looking at the "Pay to" section, can you read what's

14   reflected there?

15   A.   It says, "GR Icon International."

16   Q.   Are you familiar with GR Icon International?

17   A.   Not at all.

18   Q.   I believe you testified that you -- strike that.

19         When you looked and pulled this check during the

20   course of your investigation that you mentioned earlier, did

21   you do any research into GR Icon International?

22   A.   Yes.

23   Q.   Did you determine whether GR Icon International had ever

24   been a vendor of American Building Maintenance?

25   A.   We did do an investigation, and it was never a vendor of

1    ABM.

2    Q.   Looking at the check itself, do you notice anything

3    unusual or that deviates from what ABM's checks typically

4    look like?

5    A.   The really only deviation would be on the payee section.

6    The font is different than our normal font for the payee

7    section.

8    Q.   You stated earlier that you determined that this check

9    had been altered, from your investigation.  What other

10   documents did you look at to make that determination?

11   A.   Every check that we cut, we have a voided check that

12   goes along with our file with the invoices.  And that's how

13   we knew that was an altered check, because it did not match

14   what the original check was cut to.

15   Q.   Do you maintain those voided checks in the normal course

16   of ABM's business?

17   A.   Yes, we do.

18   Q.   I have also handed up to you a folder that contains

19   Government Exhibit ABM Check.  Can you take a look at that

20   document.  Do you have that document in front of you?

21   A.   Yes.

22   Q.   And do you recognize that document?

23   A.   Yes, I do.

24   Q.   Is that the document, the voided check copy you just

25   testified about?

1     A.    Yes.

2                  MS. BEST:  Your Honor, the government would move to

3     admit Government Exhibit ABM Check.

4                  MR. CHERONIS:  No objection.

5                  THE COURT:  That will be admitted.

6                  (Government Exhibit ABM Check was received in

7                   evidence.)

8                  MS. BEST:  Your Honor, I would like to publish that

9     to the jury.

10                 THE COURT:  You may.

11                 MS. BEST:  Zooming in on the center portion there

12    of the -- of that document.

13    BY MS. BEST:

14    Q.    Can you read what's in the "Pay to" section?

15    A.    "Pollock Paper Distributors."

16                 MS. BEST:  And if we could, just zoom out -- I'm

17    sorry -- and go to the top section of that check.

18    BY MS. BEST:

19    Q.    Can you read what the check number is there?

20    A.    43138762, it looks like.

21    Q.    And can you read what the check amount is there?

22    A.    $344,657.84.

23    Q.    Does that match the amount that was on the altered check

24    that you reviewed during the course of your investigation?

25    A.    Yes.

1    Q.   I believe you stated -- you testified that during the

2    course of your investigation, you created an affidavit; is

3    that correct?

4    A.   That's correct.

5    Q.   Can you explain what that affidavit was and why you

6    created it?

7    A.   Once we saw that the check was altered, I notified Bank

8    of America to ask them how we should proceed.  They informed

9    me that I had to file an affidavit of claimant attesting that

10   the check had been altered.  So I completed the affidavit and

11   had our treasurer sign off on it, and it was notarized, and

12   then sent to Bank of America for their further investigation.

13   Q.   I placed in front of you what's been marked as

14   Government Exhibit Affidavit.  Can you look in that folder

15   and see the document contained in there.

16              Do you recognize that document?

17   A.   I do.

18   Q.   Is that the document you just testified that you created

19   for Bank of America?

20   A.   That is correct.

21              MS. BEST:  Your Honor, the government would move to

22   admit Government Exhibit Affidavit into evidence.

23              MR. CHERONIS:  No objection.

24              THE COURT:  That will be admitted.

25              (Government Exhibit Affidavit was received in

1        evidence.)

2              MS. BEST:  We would like to publish that to the

3        jury as well.

4        BY MS. BEST:

5        Q.    Looking at the top section of that document there, the

6        top right-hand side, can you read what's reflected there?

7        A.    The check box is marked that the payee name on the item

8        described below was altered to make it payable to the person

9        described there as altered payee.  I do not alter -- I did

10       not alter the payee's name or authorize such alteration.

11       Q.    And that document is dated December 16th, 2009?

12       A.    That is correct.

13       Q.    Do you recall, roughly, when you learned or when you

14       began your investigation into the altered check?

15       A.    I would say it was probably a day before this when we

16       got the call that they did not receive -- that Pollock Paper

17       did not receive their check.

18       Q.    So shortly before this affidavit?

19       A.    That's correct.

20             MS. BEST:  Your Honor, if I could just have a

21       moment?

22             THE COURT:  You may.

23             (Brief pause.)

24             MS. BEST:  Your Honor, the government has no

25       further questions for Mr. Corcoran.

1     THE COURT:  Cross-examination, Mr. Cheronis.

2                    CROSS-EXAMINATION

3    BY MR. CHERONIS:

4    Q.   Good morning, Mr. Corcoran.

5    A.   Good morning.

6    Q.   Did you say you worked at ABM for 40 years or four

7    years?

8    A.   Four years.

9    Q.   I couldn't hear you back there.  I'm sorry.

10            And that's located in Houston, Texas, or at least

11   where you work?

12   A.   That's correct.

13   Q.   Okay.  And you still work at the branch in Houston or

14   the --

15   A.   That's correct.

16   Q.   Okay.  How many employees are there in the Houston

17   offices of ABM?

18   A.   I would say about 100.

19   Q.   About 100.

20            And there is over 100,000 employees nationwide; is

21   that about right?

22   A.   Correct.

23   Q.   Okay.  You talked a little bit about how the check is

24   drawn, how it's cut, and where it goes to be processed,

25   right?

1    A.   Correct.

2    Q.   I want to ask you a few questions about that.

3              First of all, your capacity at ABM, is that as

4    treasurer?

5    A.   Assistant treasurer.

6    Q.   Assistant treasurer.

7              So you are in charge of, to some extent, the money,

8    right?

9    A.   Correct.

10   Q.   And you did a little bit of an investigation regarding

11   the check in this case, correct?

12   A.   That's correct.

13   Q.   Okay.  Now, do you have an understanding as to how, once

14   the check is cut from ABM, how it gets to Pollock Paper?  Did

15   you look into that?

16   A.   Correct.

17   Q.   Okay.  How does that happen?  What's the process where

18   it's actually going from ABM to Pollock?

19   A.   Pollock's vendor requirements require us to cut the

20   check to a lockbox.  That check, then, was mailed to the that

21   lockbox out of the Houston office.

22   Q.   Okay.  It was mailed?

23   A.   Correct.

24   Q.   Do you know how it gets to the post office?

25   A.   Yes.

1    Q.   How does it get to the post office from ABM?

2    A.   It is hand-delivered by an ABM employee.

3    Q.   Okay.  Do you know the name of the ABM employee who

4    hand-delivered it?

5    A.   No, I do not.

6    Q.   Did you ever look into who the ABM employee was who

7    delivered it?

8    A.   Yes.

9    Q.   You just don't remember the name?

10    A.   Offhand, I don't remember the name.

11    Q.   Okay.  And then -- so the employee from ABM is supposed

12    to bring that to the lockbox?

13    A.   No.

14    Q.   Okay.  I am sorry.  To the post office?

15    A.   Correct.

16    Q.   And then it gets mailed to the lockbox?

17    A.   Correct.

18    Q.   Okay.

19          And through the course of your investigation at ABM

20    regarding this, you couldn't determine who took the check,

21    right?

22    A.   That's correct.

23    Q.   You couldn't determine who altered the check, correct?

24    A.   Rephrase that question, please.

25    Q.   You said the name was altered, right?

1    A.   Correct.

2    Q.   Okay.  You couldn't determine who actually altered that

3    check?

4    A.   I guess not.

5              MR. CHERONIS:  Okay.  No further questions, Judge.

6    Thank you.

7              THE COURT:  Any redirect?

8              MS. BEST:  No, your Honor.

9              THE COURT:  The witness is excused.  Thank you.

10             (Witness excused.)

11             THE COURT:  Your next witness, Ms. Kim.

12             MS. KIM:  Your Honor, the government calls Jim

13   O'Shea.

14             THE COURT:  Mr. O'Shea.

15             THE COURT SECURITY OFFICER:  All the way up, sir.

16   Stand up here and face the Judge.

17             THE COURT:  I am going to ask you to raise your

18   right hand.

19             JAMES O'SHEA, GOVERNMENT'S WITNESS, SWORN

20                     DIRECT EXAMINATION

21   BY MS. KIM:

22   Q.   Can you please state your name for the record?

23   A.   James O'Shea.

24   Q.   Mr. O'Shea, where are you currently employed?

25   A.   JPMorgan Chase.

1    Q.    What kind of business is JPMorgan Chase?

2    A.    It's a financial institution.

3    Q.    How long have you been with Chase?

4    A.    I have been with Chase since September of 2008, but I

5    was with Washington Mutual prior to that, which was acquired

6    by Chase in September.  I started with Washington Mutual back

7    in June of 2005.

8    Q.    What is your current position at Chase?

9    A.    Senior investigator.

10   Q.    Is that within a particular department at the bank?

11   A.    The global security and investigations department.

12   Q.    And how long have you had that position?

13   A.    Again, since 2005 when we -- since Washington Mutual.

14   Q.    And what sort of matters do you work on as a senior

15   investigator?

16   A.    We work internal investigations and external

17   investigations based off threshold for the external.

18   Internal investigations would involve matters where a -- an

19   employee to the bank may be the person that we are

20   investigating.  An external situation would be any type of

21   customer relationship where there is a potential fraud

22   exposure to the bank.

23   Q.    Just to clarify, when you say a "situation," are you

24   describing the types of matters that you investigate?

25   A.    Anywhere from theft to check fraud to unauthorized

1    online banking, electronic transfers, any type of

2    unauthorized fraudulent activity.

3    Q.    As a senior investigator do you also investigate claims

4    of altered checks?

5    A.    Yes.

6    Q.    And can you explain very briefly what an altered check

7    is?

8    A.    An altered check is -- it's a legitimately issued check

9    that had some portion of information that had been changed

10   from the original instructions of the maker of the check.

11   Q.    Now, Mr. O'Shea, are you also familiar with what a check

12   hold is?

13   A.    Yes.

14   Q.    And can you describe what that is?

15   A.    It's a hold that the bank places on the item to allow

16   for the item to clear from the bank that it's drawn on prior

17   to releasing the funds to the accountholder.

18   Q.    And how does Chase determine when to put a hold on a

19   check deposited into an account?

20   A.    There are multiple factors involved; anywhere from

21   whether the account is a brand-new account with a

22   relationship or an existing account, the size of the amount

23   of the check, whether or not we have had information in our

24   system that indicates we have received past checks that were

25   returned with similar account information, things to that

1    effect, or -- as well as out-of-pattern activity for a

2    customer that's identified in some of our loss prevention

3    review systems.

4    Q.   And so how does Chase -- if Chase places a hold on a

5    check, then how does the bank determine when to release the

6    check so that funds can be credited to an account?

7    A.   So there are regulations that the banks are held to as

8    to how long they can hold a check -- place a hold on checks.

9    So we place the holds based off of falling within that

10   regulatory guideline as well as within our own terms and

11   conditions that are written out for each account provided to

12   the customer.

13   Q.   And if a hold is lifted and the funds are -- I am sorry.

14   Strike that.

15          If the funds are made available, does it mean that

16   the hold was lifted?

17   A.   If the funds are made available, that's correct; then

18   there is no hold on the funds any further.

19   Q.   In your work as a senior investigator, does law

20   enforcement typically get involved in your investigations?

21   A.   Yes.

22   Q.   Now, what records and documents, if any, do you review

23   to aid you in your investigation?

24   A.   I review the financial documents, specifically the bank

25   statements; bank transaction histories; customer summary

1    screen, which is screens within our primary customer database

2    available to us; different types of loss prevention or

3    risk-operations-based reports, such as LAW and LAD, which

4    stand for "loss avoidance database" and "loss accountability

5    warehouse"; copies of the actual imaged items that -- or

6    imaged checks that are pertaining to the transactions in the

7    transaction history or statements; signature cards --

8    Q.    Are you -- I'm sorry.

9    A.    -- signature cards; video surveillance.  I mean, these

10   are all things that I use in terms of an investigation.

11   Q.    Are you familiar with how those documents and records

12   and that kind of information is created and maintained by

13   Chase?

14   A.    Yes.

15   Q.    Now, you mentioned that you review customer information.

16   So let's talk about that first.

17         What record contains account ownership information?

18   A.    The signature cards.

19   Q.    And what kind of information is typically on those

20   signature cards?

21   A.    The titling of the account; the date the account was

22   opened; information -- if it's a personal account,

23   information pertaining to the identifiers of the person that

24   owns the account; if it's a business account, information

25   specifically relating to the business and the association of

1    the signer to these accounts, whether they are an owner of an

2    account; or if it's a corporate entity, for instance, whether

3    or not they are a president or, you know, what

4    relationship -- officer relationship they may have with it.

5    Q.    And how is that signature card created?

6    A.    When the account is opened, the banker that's opening

7    the account creates the document from system records as they

8    are inputting the information into the system.

9    Q.    And are these signature cards created in the ordinary

10   course of Chase's business?

11   A.    They are.

12   Q.    How are they maintained?

13   A.    They are maintained in a database where we scan -- they

14   are scanned into the system and maintained.

15   Q.    And are these records also kept in the ordinary course

16   of Chase's business?

17   A.    They are.

18           MS. KIM:  Your Honor, permission to approach.

19           THE COURT:  You may.

20           (Document tendered.)

21   BY MS. KIM:

22   Q.    I have just handed you what has been marked as

23   Government Exhibit Signature Card.

24           Do you recognize this exhibit?

25   A.    I do.

1  Q.  What is it?

2  A.  Two of the documents are -- well, one of the documents

3  is a signature card.  It's the standard type of signature

4  card issued when the account is created for a business

5  account.

6  Q.  Mr. O'Shea, I don't mean to interrupt, but can you just

7  not show the document as you are talking about it right now?

8  A.  Okay.

9          One document is a business account -- it's a

10  signature card to add signers to the business account that's

11  already existing.  And then the other document is a business

12  depository resolution, which is typically required with most

13  business accounts to identify the relationship of the signer

14  that's being added to the account to the business.

15  Q.  And was this document created and maintained under the

16  same bank procedures that you just described for us?

17  A.  Yes.

18          MS. KIM:  The government moves to enter the

19  signature cards into evidence at this time.

20          MR. CHERONIS:  Can I take a look at those, please?

21          THE COURT:  Sure.

22          (Document tendered.)

23          MS. KIM:  I am sorry, your Honor.  Can I have a

24  moment?

25          THE COURT:  Sure.

1        (Brief pause.)

2    BY MS. KIM:

3    Q.   Mr. O'Shea, where would you find information about

4    whether an ATM card was issued for a Chase account?

5    A.   The most typical place I would look would be the

6    customer summary screen within our customer database.

7    Q.   And how is that customer summary screen created?

8    A.   The screen is information that's input when the account

9    is originally created, when the relationship is created.  So

10   that data -- that customer screen or the customer summary

11   screen is something in our database to show the relationships

12   to a particular, either, company or a person.

13   Q.   And how are they maintained by Chase?

14   A.   They are maintained electronically in our database.

15   Q.   And if it's an electronic record, then how is a hard

16   copy generated?

17   A.   Through a screen-print.

18   Q.   And is the information in the customer summary kept in

19   the ordinary course of Chase's business?

20            MS. KIM:  Permission to approach, your Honor.

21            THE COURT:  You may.

22            (Document tendered.)

23   BY MS. KIM:

24   Q.   I have handed you what has been marked as Government

25   Exhibit Customer Summary.

1      Do you recognize this exhibit?

2    A.   I do.

3    Q.   What is it?

4    A.   I'm sorry?

5    Q.   What is it?

6    A.   One page here is the initial customer summary screen,

7    which shows the relationships associated to the GR Icon

8    International.  The other is a checking account summary

9    screen-print, which is obtained by clicking on the

10   information relating to the account on the customer summary

11   page.

12   Q.   Was this customer summary created and maintained using

13   the same procedures you just described for us?

14   A.   Yes.

15         MS. KIM:  The government moves Customer Summary

16   into evidence at this time.

17         THE COURT:  Any objection?

18         MR. CHERONIS:  No objection, your Honor.

19         THE COURT:  That will be admitted.

20         (Government Exhibit Customer Summary was received

21          in evidence.)

22   BY MS. KIM:

23   Q.   And where do you find information about ATMs on a

24   particular -- ATM transactions on a particular account?

25   A.   We would go into -- there is a database that was

1    referred to as "SBS," or the Strategic Banking System.

2    Within there, there was a system called "CMM," which was our

3    card maintenance and management system.  From within that

4    system, we can pull up activity on a card dating back to

5    about six months.

6    Q.   And how is -- how is that history created?

7    A.   It's created ongoingly as the activity occurs on the

8    card.

9    Q.   So this is an electronic record in Chase's database?

10   A.   That's correct.

11   Q.   And how do you obtain a hard copy of it?

12   A.   Through screen-prints.

13   Q.   May I ask you to just step back from the mic a little

14   bit.  Thanks.

15            Is the ATM transaction history for accounts, then,

16   kept in the ordinary course of Chase's business?

17   A.   Yes.

18            MS. KIM:  Permission to approach, your Honor.

19            THE COURT:  You may.

20            (Document tendered.)

21   BY MS. KIM:

22   Q.   I have handed you what has been marked as Government

23   Exhibit ATM History.

24            What is this document?

25   A.   These are screen-prints from the CMM ATM transaction

1    histories.

2    Q.   And was that record created and maintained using the

3    same procedures you just described for us?

4    A.   Yes.

5         MS. KIM:   The government moves ATM Transaction

6    History into evidence at this time.

7         MR. CHERONIS:   No objection.

8         THE COURT:   That will be admitted.

9         (Government Exhibit ATM Transaction History was

10        received in evidence.)

11   BY MS. KIM:

12   Q.   Now, in connection with your duties as a senior

13   investigator, you said you also view images of checks that

14   are deposited into accounts; is that correct?

15   A.   That's correct.

16   Q.   How are these check images created?

17   A.   The checks are scanned and maintained in a database as

18   electronic images.

19   Q.   And where are they stored?

20   A.   They are stored within the server -- within our customer

21   server databases.

22   Q.   So how do you get a hard copy of a check image?

23   A.   I would access that through our instant-image software

24   that allows us to retrieve images maintained within those

25   databases.

1  Q.   And when you -- when you print out a hard copy of the

2  image, other than the picture of the check itself, is there

3  any other information contained on that image?

4  A.   There are some specific details pertaining to that image

5  on the top.

6  Q.   Can you describe what kind of details they are?

7  A.   There are dates relating to the posting date, which is

8  the date it would post in the account; the processing date,

9  which typically would be the same.  There are -- there is

10 information specifically to the item itself; such as, if

11 there is an account number on the item, it will show the

12 account number.  It will show the routing number from the

13 item as -- I'm sorry.  It will show the account number and

14 the routing information.  It will show -- if it's a check,

15 it's going to show the check number or sequence number from

16 that check.  It's going to show the amount of the item.  It's

17 going to show if it was conducted -- if it was deposited or

18 negotiated at a JPMC location or Chase location, it will show

19 the cost center for the branch that it was negotiated at, as

20 well as the teller number that processed it and the sequence

21 number from that teller's journal of where the transaction

22 shows up.

23 Q.   Now, all that information that you just described for

24 us, does that appear automatically on the check image when

25 you print it out from the database?

1    A.   It does.

2    Q.   Can the information be manually inserted?

3    A.   No.

4    Q.   Are these scanned images, then, kept in the ordinary

5    course of Chase's business?

6    A.   Yes.

7              MS. KIM:   Permission to approach, your Honor.

8              THE COURT:   You may.

9              (Document tendered.)

10   BY MS. KIM:

11   Q.   I have handed you what has been marked as Government

12   Exhibit Checks.

13             What is this?

14   A.   These are image copies of checks that were scanned into

15   the Chase database.

16   Q.   And were these images created and maintained using the

17   same procedures you just described?

18   A.   They were.

19             MS. KIM:   The government moves to admit Government

20   Exhibit Checks into evidence at this time.

21             MR. CHERONIS:   No objection.

22             THE COURT:   That will be admitted.

23             (Government Exhibit Checks was received in

24              evidence.)

25             MS. KIM:   Thank you, your Honor.

1    BY MS. KIM:

2    Q.    You previously testified that Chase can place holds on

3    certain checks.

4    A.    That's correct.

5    Q.    Can you tell us what the different kinds of holds you

6    can place upon a check?

7    A.    There are system holds that are automatically generated

8    when a check is deposited into the system.  Then there are

9    teller holds that can be placed in addition to that if the

10   check is deposited or negotiated with a teller.  And then on

11   top of it, there are holds that can be placed by our risk

12   operational areas that are the areas that review items for

13   abnormality or potential risk that can place more extended

14   holds if necessary.

15   Q.    I am going to ask you again just to step back from the

16   mic just a tiny bit.

17           So with respect to the holds that a risk team would

18   place on a check, where would you find more information about

19   those kinds of holds?

20   A.    I would go into the LAD or the loss avoidance database.

21   Q.    Is that just another database that Chase has?

22   A.    That's correct.

23   Q.    What kind of information does this database typically

24   have?

25   A.    All of the or many of the loss prevention-related tools

1    that are used to evaluate risk on transactions feed into this

2    database for our risk operational folks to review.

3    Q.   And how is the information in that database generated?

4    A.   Portions of it are automatically loaded into the system

5    based off of the loss prevention system setup in place and

6    the filters requiring it to pull certain data.  And then some

7    of the data is manually entered by the reviewer or by the

8    risk operations person.

9    Q.   Are the records in this database, then, electronic?

10   A.   Yes.

11   Q.   How do you get a hard copy?

12   A.   I would do a screen-print.

13   Q.   Are the records, then, kept in the ordinary course of

14   Chase's business?

15   A.   Yes.

16            MS. KIM:  Permission to approach, your Honor?

17            THE COURT:  You may.

18            (Document tendered.)

19   BY MS. KIM:

20   Q.   I have handed you what has been marked as Government

21   Exhibit LAD.

22            What is this?

23   A.   This is a screen-print from the LAD system.

24   Q.   Was that record created and maintained using the

25   procedures you just described for us?

```
 1    A.   Yes.
 2              MS. KIM:   The government moves Government Exhibit
 3    LAD into evidence at this time.
 4              MR. CHERONIS:   No objection.
 5              THE COURT:   That will be admitted.
 6              (Government Exhibit LAD was received in evidence.)
 7    BY MS. KIM:
 8    Q.   Mr. O'Shea, you previously testified that one of the
 9    things you look at during your investigations are teller
10    journals?
11    A.   That's correct.
12    Q.   So let me ask you a couple questions about that.
13              Describe for us what teller journals are.
14    A.   They are records created -- when a transaction is
15    processed by a teller on the system, they input certain data
16    in order to process that transaction.   These are the records
17    created from those transactions processed.
18    Q.   Now, is information, then, input into the database by a
19    computer?
20    A.   I'm sorry?
21    Q.   Is the information, then, put into the database by a
22    computer -- teller using a computer?
23    A.   The entries are recorded into the system from the
24    teller's transaction entries, yes.
25    Q.   Now, how is the journal, then, maintained by Chase?
```

1    A.    It's maintained electronically.

2    Q.    Are they also kept in the regular course of Chase's

3    business?

4    A.    They are.

5              MS. KIM:  Permission to approach, your Honor.

6              THE COURT:  You may.

7              (Document tendered.)

8    BY MS. KIM:

9    Q.    I have handed you what has been marked as Government

10    Exhibit Teller Journals.

11              Do you recognize these?

12    A.    Yes.

13    Q.    And what are they?

14    A.    These are screen-prints from our electronic teller

15    journals from within the HEJR, within our host electronic

16    journals reports.

17    Q.    And are these journals, then, created and maintained by

18    Chase in the same manner that you just described for us?

19    A.    Yes.

20              MS. KIM:  The government moves to admit Teller

21    Journals into evidence at this time.

22              MR. CHERONIS:  No objection.

23              THE COURT:  That will be admitted.

24              (Government Exhibit Teller Journals was received in

25               evidence.)

1   BY MS. KIM:

2   Q.   Mr. O'Shea, are you also familiar with how bank

3   statements are created and maintained by Chase?

4   A.   Yes.

5   Q.   How are these statements created?

6   A.   At the course of every month, a statement is generated

7   automatically based off of the activity from an account.  The

8   statements are, then, electronically created in our system

9   and with paper copies of the physical statements -- or, I'm

10  sorry -- imaged copies of the physical statements maintained

11  in our database, in similar manner as our check image copies.

12  Q.   Do these bank statements also include copies of checks

13  and other deposit items?

14  A.   They do.

15  Q.   And are they created in the regular course of Chase's

16  business?

17  A.   They are.

18  Q.   How long does Chase keep these records?

19  A.   Seven years, as I recall, yes.

20  Q.   Are the records, then, kept in the regular course of

21  Chase's business?

22  A.   They are.

23          MS. KIM:  Permission to approach, your Honor.

24          THE COURT:  You may.

25          (Document tendered.)

1    BY MS. KIM:

2    Q.   I have handed you a binder containing some documents.

3         Do you recognize these?

4    A.   I do.

5    Q.   What are they?

6    A.   They are copies of Chase statements and other

7    transactional copies that were -- that are maintained in

8    our -- in our -- I'm sorry -- in our database.

9    Q.   They were maintained in the same manner that you just

10   described for us?

11   A.   Yes.

12        MS. KIM:   The government moves to admit Bank

13   Statements into evidence at this time, your Honor, subject to

14   the conditions we talked about this morning.

15        MR. CHERONIS:   With that, no objection, your Honor.

16        THE COURT:   All right.   Thank you.

17        They will be admitted.

18        (Government Exhibit Bank Statements was received in

19         evidence.)

20   BY MS. KIM:

21   Q.   Now, turning your attention to February 2010, what

22   investigation, if any, were you involved in at this time?

23   A.   Check fraud investigation.

24   Q.   Now, I am going to show you what's in evidence as

25   Government Exhibit Checks.

1    MS. KIM:  Permission to publish, your Honor.

2    THE COURT:  You may.

3    BY MS. KIM:

4    Q.   Now, do you recognize this check?

5    A.   I do.

6    Q.   What is it?

7    A.   It's an imaged copy from our database of the check that

8    was deposited into the defendant's business account.

9    Q.   Was this the check that was the subject of your

10   investigation back in February 2010?

11   A.   Yes.

12   Q.   And what, if anything, did your investigation reveal

13   about what was specifically changed on this check?

14   A.   The payee information had been altered.

15   Q.   GR Icon International was not the original payee of the

16   check?

17   A.   That's correct.

18   Q.   As a result of your investigation, did you find out who

19   the original payee was?

20   A.   It was Pollock Paper Distributors.

21   Q.   Now, also as a result of your investigation, did you

22   determine if this check was deposited into a Chase account?

23   A.   It was.

24   Q.   And which account was it deposited into?

25   A.   The GR Icon International account.

1    Q.    How did you determine that?

2    A.    Through the transaction history.

3    Q.    Now, there is some text appearing above the image of the

4    check here.  Is this the text that you previously testified

5    about that comes with this check image?

6    A.    Yes.

7    Q.    Now, this check, does it auto-populate when you print

8    out the check image?

9    A.    This information is auto-populated, correct.

10   Q.    Now, you have the exhibit Checks in front of you in the

11   Redweld.  For the rest of the exhibits in that Redweld, is

12   the format of the text in this check image essentially the

13   same information as all the other exhibits?

14   A.    Yes.

15   Q.    So looking at this -- looking at the top line of that

16   text there, what does the posting date refer to?

17   A.    That's the date, the business date, that the transaction

18   posted to the customer's account.

19   Q.    And for this particular check, the account number, what

20   does that mean to you?

21   A.    That's the account number on the physical check itself.

22   Q.    Now, is that a Chase account number there?

23   A.    In this case, that is not.

24   Q.    And what account number is that for?

25   A.    That's the Bank of America account for the maker of the

1    check, of the altered item.

2    Q.   Going down a couple lines to the bank number, what does

3    that signify?

4    A.   That signifies that it went through the Chase Bank

5    number of 111, which -- in our case, we have several bank

6    numbers or databases broken down by bank numbers based off

7    geography.  This particular one symbolizes that it was done

8    in the Chicago area.

9    Q.   Now, going down a couple more lines to cost center, and

10   it says, "N.A.," which I assume is not available.

11            What is the cost center?

12   A.   Cost center.  If this had been transacted at a teller

13   line -- I'm sorry.  If this had been transacted through a

14   teller, that would have populated the branch cost center of

15   where the teller took the transaction in.

16   Q.   And what about the teller number?

17   A.   The same would have been -- it would have been the same.

18   It would have provided the teller number, which would have

19   told us who processed the transaction.

20   Q.   And the processing date?

21   A.   Processing date would be the date that the item was

22   actually processed.

23   Q.   Because there is a "not available" next to cost center

24   and teller number, does that mean that this check was not

25   processed by a teller at a bank?

1    A.    That's correct.

2    Q.    Next, I am going to show you what's already in evidence

3    as Government Exhibit ATM History.

4              MS. KIM:  Permission to publish, your Honor.

5              THE COURT:  You may.

6    BY MS. KIM:

7    Q.    On the top left-hand part of the screen of the page

8    there, what's written right underneath the numbers that are

9    circled?

10   A.    "GR Icon International."

11   Q.    And what does that signify?

12   A.    It signifies the business that this particular debit

13   card was associated with.

14   Q.    When you say "this debit card," what are you referring

15   to?

16   A.    The card number that's circled.

17   Q.    And who circled that number?

18   A.    I did.

19   Q.    Why did you do that?

20   A.    To highlight the card number on the sheet.

21   Q.    Now, if you turn to the second page of that exhibit, the

22   second date listed there is November 27, 2009.  Can you tell

23   us what transaction is on that line?

24   A.    That is a transaction showing a checking -- an ATM

25   checking deposit was made.

1  Q.    Is there any other information with respect to that

2  deposit on that line?

3  A.    The amount of the check deposit, which was for

4  $344,657.84.  It also provides the date and time that the

5  transaction was processed through the ATM and the location of

6  the ATM, the physical branch location.

7  Q.    And where was that branch?

8  A.    That was the Chase Tower, which is 10 South Dearborn.

9  Q.    There also appears to be some handwritten notes on the

10  side.  Whose handwriting is this?

11  A.    That's my handwriting.

12  Q.    What do those notes mean?

13  A.    The first set of characters, IL 4019, indicates the

14  specific ATM number that the check was deposited into; the

15  second is the sequence number pertaining to that ATM

16  transaction; and the third was me noting that when I

17  attempted to pull video surveillance it was available.

18  Q.    So for the handwritten notes, how did you determine

19  those things about this particular transaction?

20  A.    The first two items were obtained through additional

21  details within the same system.  You can obtain additional

22  details by checking on a specific transaction.  And so I

23  handwrote it rather than printing out a specific

24  full-detailed screen.

25          The third item was just me documenting what I found

1   when I went to attempt to pull video.

2   Q.   Now, is there -- is there a record that would show who

3   that ATM card, the ATM card the number that you circled, who

4   that was issued to?

5   A.   I would obtain that through our customer summary system

6   and customer assist.

7   Q.   And did you check that record in connection with your

8   investigation of the altered check?

9   A.   I did.

10  Q.   I am showing you what's already in evidence as

11  Government Exhibit Customer Summary.  The last page of that

12  exhibit --

13            MS. KIM:  Permission to publish, your Honor.

14            THE COURT:  You may.

15  BY MS. KIM:

16  Q.   Now, is this page where you determined who that ATM card

17  was issued to?

18  A.   It was from within this page, when I clicked on

19  additional information for the card ending in 4475 on the

20  bottom.

21  Q.   All right.  So when you say you clicked on it, what did

22  you exactly click on?

23  A.   So the -- the areas in there -- this is an active

24  customer profile showing the customer relationships

25  associated to it.  When they have an underlined -- when they

1    are underlined, as they are in this particular case, you can

2    click on them for additional information.  In doing so, when

3    you click on that particular page, it shows that the card

4    ending in 4475 was assigned to Mr. Ajayi.

5    Q.   Do you recall the full name of the person who issued --

6    who was issued that card?

7    A.   Abidemi Ajayi.

8    Q.   Was that ATM card issued to anyone else?

9    A.   It was not.  Cards can only be issued to one person.

10   Q.   Now, in the -- in that section of the customer summary,

11   would it also list an ATM card reported lost or stolen?

12   A.   The status, where it says, "Closed," would typically

13   show it as "lost" or "stolen."

14   Q.   And in this particular case, there wasn't such a

15   notation?

16   A.   That's correct.

17   Q.   Now, can you explain to us what a PIN number is?

18   A.   It's a personal identification number.  It's assigned to

19   the debit cards in order to transact ATM or point-of-sale

20   transactions.

21   Q.   By "point-of-sale," what do you mean?

22   A.   Anytime you go to a merchant and would input a PIN

23   number as opposed to just signing your name as you would with

24   a credit card, for instance.

25   Q.   That's a point-of-sale transaction?

1   A.   Those are point-of-sale transactions.

2   Q.   And how many personal identification numbers or PINs

3   could relate to a particular ATM card?

4   A.   There is one PIN assigned to each card.

5   Q.   Now, in your -- in connection with your investigation of

6   the altered check, did Chase place a hold on this check after

7   it was deposited into the GR Icon account?

8   A.   There had been a place -- there had been a system hold

9   placed on it initially, and then an extended hold later,

10  placed by our risk operations deposit review team.

11  Q.   And how do you know that such a hold was placed on the

12  check?

13  A.   I reviewed the information in the LAD or loss avoidance

14  database.

15  Q.   I am showing you what's already in evidence as

16  Government Exhibit LAD.

17          MS. KIM:  Permission to publish, your Honor.

18          THE COURT:  You may.

19  BY MS. KIM:

20  Q.   Is this the record you checked?

21  A.   Yes.

22  Q.   Now, there are a total of four separate boxes on this

23  page.

24          What boxes, if any, is automatically generated by

25  the computer system?

1    A.    So the three sets of boxes above are generated

2    automatically by the system.  It's then -- and you can see

3    that it's assigned to a specific risk person, then, up in the

4    first set of boxes.

5    Q.    Now, looking at the first box on the right-hand side

6    where it says, "Suspect.  Reason:  The deposit is out of

7    pattern," what does that mean?

8    A.    That was the reason that the loss prevention system

9    detected and sent this for review, and it scored it.  So in

10   this particular case, the activity that this particular

11   deposit, based off of prior deposit activity in this business

12   account, was not within the same type of pattern of prior

13   deposits into the account.

14   Q.    Now, if you switch over to the left-hand side of that

15   first box where it says, "Average deposit of $760.64."  The

16   average deposit, what does that refer to?

17   A.    That's basically a cumulation of the deposits where the

18   system takes an average of what the average amount of the --

19   for the deposits that go into this account would be.

20   Q.    Now, looking at the bottom there in the third box where

21   it says, "Placement date," what does that signify?

22   A.    The placement date in this particular case was a memo

23   debit hold that was placed on the system for, in this case,

24   24 hours.

25   Q.    And when was that hold placed?

1  A.  It was placed -- this one is placed on 11-30.

2  Q.  And the release date, it also says, "11-30-2009."  What

3  does that mean?

4  A.  It was scheduled to release at the end of that business

5  day.

6  Q.  Now, if you just zoom in to the last box there, the

7  fourth box.  Is this box automatically generated like the

8  other three boxes?

9  A.  This information is entered by the reviewer primarily,

10  with the exception, I believe, of the hold amount.

11  Q.  Now, in that box where it says, "Hold reason," it says

12  "Inconsistent account activity."  What does that mean?

13  A.  That is a -- when the reviewer has reviewed the item and

14  they go -- they will, then, review the activity in the

15  account themselves.  After they have seen -- they have

16  reviewed the activity and determined that it is out of

17  pattern as identified by the system, they will select a

18  reason to place an extended hold or a longer hold duration on

19  the item.

20        In this case, the reason they chose was

21  inconsistent account activity.

22  Q.  Are those reasons manually inputted by the person

23  reviewing the item?

24  A.  They are manually selected.  But typically they will

25  have a drop-down that gives them several selections, or they

65

 1  can manually enter one if there is another reason other than

 2  outside of the normal scope.

 3  Q.   Now, if you look at the left-hand side of that box where

 4  it says, "Placement date, November 30th, 2009," what does

 5  that mean?

 6  A.   That's the date that the hold was placed by the

 7  reviewer.

 8  Q.   And the release date?

 9  A.   It was scheduled to be released on December 7th, at the

10  end of the business day of December 7th.

11  Q.   Now, in connection with your investigation of the

12  altered check, did you also review checks written from the

13  GR Icon account?

14  A.   I did.

15  Q.   I am going to show you what's already in evidence as

16  Government Exhibit Checks.

17          MS. KIM:  Permission to publish, your Honor.

18          THE COURT:  You may.

19  BY MS. KIM:

20  Q.   Directing your attention to the second page of this

21  exhibit, do you recognize this image?

22  A.   I do.

23  Q.   What is it?

24  A.   It's an image of one of the checks that was cashed at a

25  Chase branch.

1    Q.   Now, what account is this check drawn from?

2    A.   The check is drawn from the GR Icon International Chase

3    account.

4    Q.   What is that account number?

5    A.   The account number is 709440358.

6    Q.   And who's the payee on this check?

7    A.   Abidemi Ajayi.

8    Q.   Now, there also seems to be some handwritten notes next

9    to the teller number line up above the image of the check.

10   Whose handwriting is this?

11   A.   That's my handwriting.

12   Q.   What's it a note of?

13   A.   It's the name of the teller associated with Teller 19

14   for this transaction.

15   Q.   How did you determine that based on the information on

16   this check image?

17   A.   When pulling the original information on the teller

18   journals, I would look at the beginning portion of the report

19   that would show me who signed in as Teller 19 on that

20   particular date to process transactions.

21   Q.   Why did you put the teller's name here?

22   A.   For reference, in the event it was needed.

23   Q.   Now, for the rest of the check images in this government

24   exhibit, did you handwrite all the tellers' names next to the

25   teller numbers?

1  A.   I did.

2  Q.   Now, is there anything on this check image that tells

3  you what time the check was presented for payment, what time

4  the transaction took place?

5  A.   No.

6  Q.   Where would you find the time of the transaction?

7  A.   I would use this image to identify the location and

8  teller, and I would go to that teller's journal within the

9  host electronic journal reports.

10  Q.   So would the teller journal, then, have a time of

11  transaction?

12  A.   It would have the date and the time, correct.

13  Q.   And did you take the steps you just described to

14  determine the times of the transactions for all the checks in

15  this exhibit?

16  A.   Yes.

17  Q.   Now, I want to show you what's already in evidence as

18  Government Exhibit Teller Journal.

19            MS. KIM:  Permission to publish, your Honor.

20            THE COURT:  You may.

21  BY MS. KIM:

22  Q.   Now, if you can direct your attention to the first page

23  of that exhibit.  Is this a teller journal that you looked at

24  to establish the times of the transactions?

25  A.   Yes.

1    Q.   Now, looking at this journal, can you tell us where the

2    time the transaction was noted?

3    A.   It's located in the upper right corner.  Next to

4    where -- in between where it says, "Memo Y," there is the --

5    the time of the transaction is at 10:39, and the date of

6    12-9-09 being the date it was processed.

7    Q.   Does the journal also specify the check number involved

8    in the transaction?

9    A.   It does.

10   Q.   And where is that?

11   A.   It's further over on the image.  There.  It's in the

12   field where it says, "CHK," standing for check, over on the

13   right half of the center portion.  And it's check 10 -- 1086

14   in this case.

15   Q.   And what about the account number?

16   A.   There is two points of account on here in this

17   particular case.  There is the recourse account and the

18   withdrawal account.

19         The recourse account is the first column where it

20   says, "RC CK account."  That's the account -- that's the

21   account that would be held liable if this check was

22   determined to have to be returned, or held accountable.

23         The withdrawal check account, or the "WD CK

24   account," is the account that the physical item was drawn off

25   of that the funds were coming from.

1    Q.    Now, if we just drop back and focus on sort of the

2    left-hand side of that document where it says, "ID section,"

3    what is that?  It says, "Primary ID."

4    A.    Primary ID is what's required in order to identify a

5    person before releasing funds from a transaction.  So in

6    this -- and a primary ID is typically defined within our

7    rules, our policies, which would require standardly a

8    driver's license, passport, state ID, something with a

9    government-issued -- government-issued photo ID is typically

10   a primary ID.

11             In this case, you can see it was a driver's license

12   selected.

13   Q.    So that license was presented when the transaction took

14   place?

15   A.    That's the selection that the teller entered.  It was a

16   driver's license presented with photo, yes.

17   Q.    And if we drop back, is the license number reflected

18   anywhere on that document?

19   A.    Further over on the same line, on the far right where it

20   says, "Number," that's the ID number that the teller manually

21   entered into the system, indicating the ID presented to her

22   and the expiration date associated with it; month and year,

23   in this case.

24   Q.    All the things you have described for us on this teller

25   journal, was the format substantially the same for all the

1    other exhibits?

2    A.    Yes.

3    Q.    Now, also in connection with your investigation of this

4    altered check, did you have an opportunity to review any

5    video surveillance?

6    A.    I did.

7    Q.    And what kind of video surveillance did you review?

8    A.    Specifically, I accessed our software and pulled

9    video-still images from our digitally recorded video

10    surveillance.

11    Q.    And where was the surveillance from?

12    A.    The surveillance itself is maintained on hard drives

13    within digital video recorders at the location sites of where

14    the videos or video cameras are maintained.

15    Q.    Do you know where the cameras are located within each

16    branch?

17    A.    The cameras are located -- every branch has a certain

18    set of cameras, and the DVR is located within a room -- a

19    secure room within each facility.

20    Q.    And just for those of us who aren't very tech savvy,

21    what is a DVR?

22    A.    Basically, it's a computerized version of recording

23    images.  In the past, we -- in the past, videotape was

24    something that was used.  Now they use, basically, hard

25    drives to retain the same images, much like anyone's computer

1    at home.

2    Q.    So is there a DVR located at each branch for

3    surveillance images?

4    A.    There are.

5    Q.    And how long are they typically stored for?

6    A.    We schedule them to try and maintain a minimum of 120

7    days of past video surveillance.  Some go back further.  Some

8    slightly less, depending on whether there was any -- whether

9    there was significant activity in the branch, because it's

10   recorded based off of images being saved over the oldest

11   images.

12   Q.    Are they recorded in black and white or color?

13   A.    They are recorded in color.

14   Q.    Now, are you able to take snapshots or stills from the

15   video surveillance recording?

16   A.    From the software that I have access to to access the

17   DVRs, I am.

18   Q.    And how is this done?

19   A.    So, when I access the software within my system to pull

20   up the video from the DVRs at a specific branch, when I

21   locate a -- when I locate what I am looking for, the date,

22   the time, and specific camera of where the transaction

23   occurred, I will, then, save an image or export an image to

24   save as a JPEG file, which is, basically, a photo file.

25   Q.    I am going to just ask you again to step away from the

1  mic a little bit.

2  A.  Sorry.

3  Q.  And what kind of information is reflected when you take

4  a snapshot of the recording?

5  A.  So the software for the DVR or the software for the

6  images is automatically generated based off of the camera

7  that you are pulling from.  So it will provide the camera

8  number.  It will provide the branch location.  It will

9  provide the date, the time of the image.  I believe there is

10  actually a sequence number, potentially, on there.

11  Q.  What is a sequence number?

12  A.  Just a frame sequence number from the . . .

13  Q.  And that information you just described for us, is that

14  automatically downloaded when you export that image or

15  snapshot?

16  A.  It is.

17  Q.  Can that be manually inputted onto a snapshot?

18  A.  It cannot be manipulated.

19  Q.  Now, in connection with this particular investigation of

20  the altered checks, did you export any images off of the

21  surveillance recordings?

22  A.  I did.

23  Q.  And how did you determine which images to export from

24  the surveillance recordings?

25  A.  I utilized the information I had previously researched

1    through the teller journals, image copies, identifying who

2    the teller was and what they looked like, in order to

3    establish where the transaction occurred and who was in front

4    of the camera at the time transacting it.

5    Q.    And once you exported those images and created the

6    snapshots what, if anything, did you do with those video

7    stills?

8    A.    I saved individual stills and attached them to my case,

9    my electronic case.

10   Q.    Did you do anything with the stills that you created?

11   A.    I provided some of the stills to law enforcement in the

12   process of my investigation.

13              MS. KIM:  Permission to approach, your Honor.

14              THE COURT:  You may.

15              (Document tendered.)

16   BY MS. KIM:

17   Q.    I have handed you a Redweld containing some pictures.

18              Do you recognize this exhibit?

19   A.    Yes.

20   Q.    What is it?

21   A.    These are -- these are printouts from video still images

22   that I had pulled previously.

23   Q.    Now, are these all the stills that you provided to law

24   enforcement?

25   A.    No.  I provided others.

1    Q.   So, then, what does this particular exhibit contain?

2    A.   It appears to represent the best pictures with the

3    defendant's face facing the camera face on.

4    Q.   Does the exhibit fairly and accurately represent some of

5    the snapshots you exported from the video recordings and

6    provided to law enforcement?

7    A.   Yes.

8         MS. KIM:   The government moves to admit Government

9    Exhibit Video Stills at this time.

10        MR. CHERONIS:   No objection.

11        THE COURT:   That will be admitted.

12        (Government Exhibit Video Stills was received in

13          evidence.)

14   BY MS. KIM:

15   Q.   At some point -- strike that.

16        What, if anything, did your investigation reveal

17   about what Chase did with the account that was assigned to

18   GR Icon International?

19   A.   So the account had been restricted on December 15th,

20   2009.

21   Q.   What does that mean, "restricted"?

22   A.   Prohibiting any further transactions from being

23   conducted.

24   Q.   How did you learn that the account was restricted?

25   A.   That was notated on the customer summary page.

1    Q.    Do you know if any funds were remaining in the account

2    after it was restricted?

3    A.    There were.

4    Q.    About how much was in the account?

5    A.    Approximately 172,000 and change.

6    Q.    And what happened to those funds after the account was

7    restricted?

8    A.    We received information from Bank of America

9    indicating -- our claims area received information from Bank

10   of America indicating that there was a claim coming relating

11   to the altered check.  So our claims area pulled those funds,

12   those remaining funds from the checking account and put them

13   into a general ledger account where they manage their claims.

14   Q.    And what, if anything, happened to those funds after

15   they were placed in the general ledger?

16   A.    When it was established that the claim would have to be

17   paid and Chase would have to reimburse Bank of America, those

18   funds were debited and applied towards the payment made to

19   Bank of America.

20   Q.    Do you recall what the payment to Bank of America was?

21   What the amount was for?

22   A.    It was for the entire amount of the check:

23   344,000-plus.

24   Q.    What loss, if any, did Chase incur because of the

25   altered check?

1    A.    Approximately 172,000.

2    Q.    And how did Chase determine that number?

3    A.    It was the amount of the claim paid less the amount we

4    had left remaining on hold to apply toward the loss.

5              MS. KIM:  One moment, your Honor?

6              THE COURT:  Sure.

7              (Brief pause.)

8    BY MS. KIM:

9    Q.    Mr. O'Shea, I think we covered this at the beginning of

10   your testimony, but did you review Government Exhibit

11   Signature Card?

12   A.    Yes.

13             MS. KIM:  Your Honor, I did move that -- I moved to

14   admit it.  I'm not quite sure if that was admitted into

15   evidence.

16             THE COURT:  Was there any objection?

17             MR. CHERONIS:  No objection.

18             THE COURT:  That's admitted.

19             (Government Exhibit Signature Card was received in

20              evidence.)

21             MS. KIM:  Thank you, your Honor.  No further

22   questions from the government.

23             THE COURT:  Cross-examination, Mr. Cheronis.

24             MR. CHERONIS:  Thank you.

25

1   CROSS-EXAMINATION

2   BY MR. CHERONIS:

3   Q.   Good morning, Mr. O'Shea.  How are you?

4   A.   Good.  How are you?

5   Q.   Are you out of the Chicago office or -- do you work in

6   Chicago?

7   A.   I do.

8   Q.   Okay.  I have just got a few questions for you.

9        You looked at, and we just actually discussed, the

10  signature card regarding Mr. Ajayi's account, correct?

11  A.   I did.

12  Q.   And do you still have that up there with you?

13  A.   I'm sure I do.

14  Q.   Take a look at it real quick.

15       MR. CHERONIS:  Maybe we can put it up on the

16  screen.

17  BY THE WITNESS:

18  A.   Oh, here it is.

19  BY MR. CHERONIS:

20  Q.   From reviewing that, can you tell when this account was

21  opened?

22  A.   It was opened on February 15th, 2006.

23  Q.   Okay.  And one of the questions that the government was

24  asking you on direct examination -- you can put that down.  I

25  am not going to ask you any more questions regarding that.

1    But one of the questions you were asked was about

2    this hold that was placed on the check once it was deposited

3    into the GR Icon account.

4    Do you remember those questions?

5    A.   That's correct, yes.

6    Q.   And I believe your testimony was, based on the reports

7    that you had reviewed, that the reason it was on hold was

8    because it was not in line with, basically, the history of

9    deposits that had been made into that account?

10   A.   That's correct, out of pattern.

11   Q.   Much higher?

12   A.   Correct.

13   Q.   Okay.

14   Now, I believe you also testified that the hold was

15   taken off of the account on December -- was it the 7th of

16   2009?

17   A.   It would have been the end of business day, December

18   7th, correct.

19   Q.   Okay.  So at that point when the hold is taken off at

20   the end of business on December 7th of 2009, that would mean

21   that on December 8th of 2009, a valid holder of that account

22   could go in there and take out $344,000; isn't that true?

23   A.   The funds were fully made available.

24   Q.   Okay.  So what that means is if somebody wanted to and

25   they were validly holding the GR Icon account, they could

1    have gone into the bank and taken out $344,000?

2    A.    Assuming they weren't asking for it in a means that we

3    couldn't give it to them.  Like if they walked in and asked

4    for 344,000 in cash, we might have to order it.

5    Q.    Could have got a cashier's check?

6    A.    Correct.

7    Q.    Could have asked you to order 344,000 in cash?

8    A.    Correct.

9    Q.    Okay.  Could have wired all of it?

10   A.    Correct.

11   Q.    Okay.

12             Now, you also testified, in reviewing some of the

13   reports that were generated from Chase Bank regarding a

14   driver's license issue, right?

15   A.    Um.

16   Q.    In other words, there is some report that you looked at

17   that showed when cash was taken out, a driver's license was

18   shown?

19   A.    That's correct.

20   Q.    Okay.  And what that essentially means is, when you were

21   reviewing that report, is when the individual walked in to

22   get the money, they had to show a driver's license?

23   A.    That's correct.

24   Q.    Okay.  And that's reflected in the Chase reports?

25   A.    Yes.

1    Q.   And if the driver's license that was shown to the teller

2    was different than -- a different name or different address

3    than somebody connected to the account, they couldn't have

4    taken money out?

5    A.   No.  Correct.

6    Q.   Throughout the course of your investigation you learned

7    that the driver's license was Mr. Ajayi's driver's license,

8    correct?

9    A.   Yes.

10   Q.   And as far as the ATM transaction where the check was

11   actually put into the account, right?  Do you remember that?

12   A.   Yes.

13   Q.   That's something that Chase offers to their customers,

14   correct?  In other words, you can deposit a check through an

15   ATM.

16   A.   Yes.

17   Q.   You guys have been doing that for several years?

18   A.   Yes.

19   Q.   Now, the cameras that collected those snapshots, those

20   were actually videos, and you kind of just exported some

21   still shots, right?

22   A.   That's correct.

23   Q.   Okay.  And the cameras are visible in the bank?

24   A.   The majority of them.

25   Q.   Okay.  And does it say anywhere in the bank that, "You

1  are being recorded"?  Are there signs in the Chase banks?

2  A.  I couldn't tell you.  I don't believe so.

3  Q.  Okay.

4        MR. CHERONIS:  I have no further questions.  Thank

5  you.

6        THE COURT:  Any redirect?

7        MS. KIM:  No redirect, your Honor.

8        THE COURT:  The witness is excused.

9        (Witness excused.)

10        THE COURT:  Maybe get one more witness started

11  before the lunch break.

12        MS. BEST:  Your Honor, the government calls Dawn

13  Hardwick.

14        Actually, your Honor, before we call Ms. Hardwick,

15  we actually do have a couple stipulations that we would like

16  to read into the record.

17        THE COURT:  All right.  Let's proceed with those.

18        Ladies and gentlemen, a stipulation is a statement

19  of facts that the parties agree are true or a statement of

20  what a certain witness would say if he or she were called to

21  the stand.

22        I will allow you -- you are going to read those for

23  us, Ms. Kim?

24        MS. KIM:  Yes, your Honor.

25        The United States of America by Zachary T. Fardon,

1  United States Attorney for the Northern District of Illinois,

2  through Assistant United States Attorneys, Yasmin N. Best and

3  Nicole Kim, and the defendant, Abidemi Ajayi, individually

4  and through his attorney, Damon Cheronis, hereby agree and

5  stipulate as follows:

6  Stipulation 1:  It is hereby stipulated between the

7  parties that the deposits of Bank of America and JPMorgan

8  Chase Bank were insured by the Federal Deposit Insurance

9  Corporation in 2009.

10  Stipulation 2:  It is hereby stipulated between the

11  parties that Bank of America constitutes an organization

12  because it is a legal entity that operates in or the

13  activities of which affect interstate or foreign commerce.

14  Stipulation 3:  It is hereby stipulated between the

15  parties that JPMorgan Chase Bank constitutes an organization

16  because it is a legal entity that operates in or the

17  activities of which affect interstate or foreign commerce.

18  So stipulated, counsel?

19  MR. CHERONIS:  So stipulated.

20  MS. KIM:  Thank you, your Honor.

21  THE COURT:  All right.  Thank you.

22  And your next witness.

23  MS. BEST:  I am going to retrieve the last set of

24  exhibits, your Honor.

25  THE COURT:  Okay.  The witness is welcome to step

1    in.

2              THE COURT SECURITY OFFICER:  All the way up front,

3    please.  Just step up and face the Judge.

4              THE COURT:  Can I ask you to raise your right hand.

5              (Witness sworn.)

6              THE COURT:  You may proceed, Ms. Best.

7              MS. BEST:  Thank you, your Honor.

8              DAWN HARDWICK, GOVERNMENT'S WITNESS, SWORN

9                        DIRECT EXAMINATION

10   BY MS. BEST:

11   Q.   Would you please state your name for the record?

12   A.   Dawn Hardwick.

13   Q.   And where do you work?

14   A.   JPMorgan Chase.

15   Q.   How long have you worked at JPMorgan Chase?

16   A.   Seventeen years.

17   Q.   What groups or departments have you worked in during

18   your 17 years with JPMorgan Chase?

19   A.   I worked in the legal processing department, and then I

20   worked in the deposit review department, the wire fraud

21   prevention group, and I currently work in the global security

22   and investigations group.

23   Q.   Backing up.  That first group you mentioned, what is the

24   legal processing group?

25   A.   It was a group that would review court orders; such as

1   child support, garnishments, tax levies, and subpoenas.

2   Q.   How long did you work in that group?

3   A.   I worked there for three years.

4   Q.   And what was the deposit review group that you

5   mentioned?

6   A.   The deposit review group, we would review incoming

7   deposits that customers would make and we would place holds

8   on those deposits.

9   Q.   How long did you work in that group?

10  A.   I worked there for seven years.

11  Q.   Until approximately when?

12  A.   2005.

13  Q.   And in 2005, I believe you testified the next group you

14  were in was the wire prevention group; is that correct?

15  A.   Correct.

16  Q.   How long did you work in that group?

17  A.   I worked in that group for six years, until 2011.

18  Q.   And what did the wire fraud prevention group do?

19  A.   We would review customers' outgoing wires and look at

20  them for any fraudulent activity and call the customer and

21  verify if the wire was legitimate or not, and if it was

22  deemed to be fraudulent, we would stop the wire from leaving

23  the bank.

24  Q.   After your time in that group, I believe you testified

25  you moved to the global security and investigation group; is

1    that correct?

2    A.   Yes.

3    Q.   And what do you do in that group?

4    A.   I am currently an electronic-crimes investigator.

5    Q.   And what does that mean?

6    A.   I work cases with law enforcement and review the case to

7    see how the fraud occurred.  We make sure that the banks

8    processes that are currently in place are working properly.

9    And we also look for ways that we can help prevent future

10   fraud from occurring.

11   Q.   In 2009 and 2010, were you in the wire fraud prevention

12   group?

13   A.   Yes.

14   Q.   And can you explain what your responsibilities and

15   duties were in the wire fraud prevention group?

16   A.   Yes.  So I would review customers' wires.  We would work

17   from reports, a database that would feed in wires that were

18   deemed to be risky.  We would look at the wires.  These would

19   be either branch wires or wires that were initiated through

20   Chase.com.  We would take a look at the wire.  And then if

21   things looked suspicious, we would give our customer a call,

22   verify that they did, in fact, initiate the wire.  And if

23   they didn't, we would stop the wire from leaving the bank,

24   thus saving the bank money.

25   Q.   Turning your attention to early 2010.  Do you know a man

1    named Jim O'Shea?

2    A.   Yes.

3    Q.   How do you know Mr. O'Shea?

4    A.   We actually work together now.  And at the time, we

5    worked in different groups, but we had known each other for

6    years, just through working with each other at the company.

7    Q.   Do you recall in 2010 Mr. O'Shea asking you for your

8    assistance regarding a particular wire that had been sent in

9    late 2009?

10   A.   Yes, he did.

11            MS. BEST:  Your Honor, may I approach the witness?

12            THE COURT:  You may.

13            (Document tendered.)

14   BY MS. BEST:

15   Q.   I just handed you what has been marked as Government

16   Exhibit Wire.  If you could, open up that folder and just

17   take a look at that document.

18            Do you recognize that document?

19   A.   Yes.  This is the e-mail that I sent to Jim.

20   Q.   This is a document you created?

21   A.   Yes.

22   Q.   And can you tell us what the date is on that document?

23   A.   I e-mailed the document to Jim on February 12th, 2010.

24            MS. BEST:  Your Honor, the government would move to

25   admit Government Exhibit Wire.

1          THE COURT:  Will there be an objection?

2          MR. CHERONIS:  No objection.

3          THE COURT:  That will be admitted.

4          (Government Exhibit Wire was received in evidence.)

5          MS. BEST:  Your Honor, may we publish that

6   document?

7          THE COURT:  You may.

8   BY MS. BEST:

9   Q.   Looking at the first page of that document, can you

10  explain how you created this?

11  A.   Yes.  The first part there is just text.  I wrote that

12  to Jim.  And then the next part, I actually copied and pasted

13  this from our customer database that's called customer

14  assist.

15  Q.   What is the customer assist database?

16  A.   It's a database that we have that houses our customers'

17  information; such as, their personal information and also

18  their transaction history.

19  Q.   Did you input any of the information that's in that --

20  in those boxes sort of below your signature?

21  A.   No, I did not input it.  I just copied it from the

22  customer assist database and copied it into the e-mail.

23  Q.   I want to just march through the different sections of

24  this document starting with that top box there.

25          Looking at that box, can you read what's reflected

1     in the wire transfer amount section?

2     A.    Yes.  This is the amount and fees.  The first line is

3     the amount of the wire.  It says 53,000.  And then the next

4     section is the wire transfer fee that's charged for $25.  And

5     then the last line is just the combined amount of the wire

6     transfer and the fee.

7     Q.    Going to the next section below that, the wire transfer

8     information, starting with that top line, where is the

9     information in the checking account number -- do you know how

10    that information is obtained and then entered into the

11    customer assist database?

12    A.    The branch banker would actually initiate that.  So this

13    would be the customer's checking account number.  They would

14    type that information in.

15    Q.    And looking at the type of wire transfer below that, can

16    you explain what the options are, what "domestic" means in

17    that context?

18    A.    The customer can send a wire either domestically or

19    internationally.  So the banker would need to select if the

20    wire were domestic or international.

21    Q.    Looking at the next line below that, the transfer

22    request date, do you know what that reflects?

23    A.    Yes.  This would be the date that the customer would

24    request for the wire to leave the bank.

25    Q.    And just going over to the right side there, the

1    transfer effective date, do you know what that reflects?

2    A.   Right.  Once again, this is the date that the customer

3    is actually requesting for the wire to leave.  You can

4    future-date wires.  So if you were, you know, leaving for

5    vacation or such, you could actually request for it to go out

6    on a different day.

7    Q.   Finally, the customer request method there, can you read

8    what it says there?

9    A.   This customer request method, it says, "Walk-in."  The

10   customer -- this would mean that the customer walked into the

11   branch to initiate the transaction.

12   Q.   Are there other options that could be reflected in that

13   section there?

14   A.   Yes.  The customer could fax a wire in.  This is usually

15   something that would need to be preapproved with the branch

16   beforehand, but you could also fax in a wire request.

17   Q.   And who selects that information or how is that

18   information inputted into the customer assist database?

19   A.   For that particular field, that would just be a

20   drop-down box.  The banker would need to select that.

21   Q.   And when would that be selected?

22   A.   That would be selected at the time that the wire is

23   initiated.

24   Q.   Going down to the next box below that under requester

25   information, in the field that has requester name, how is

1    that information input into the database?

2    A.   The banker would input this information.  It should be

3    the name of the person requesting the wire.

4    Q.   And the -- under daytime phone number, how is that

5    information provided?

6    A.   Once again, the banker would type that information in.

7    That would be a phone number that the customer would give.

8    In case there were any questions about the transaction that

9    day, they would need to provide a good phone number in order

10   to reach them.

11   Q.   Is that the same also for the primary identification and

12   primary ID number?

13   A.   Yes.  This would be a photo identification the customer

14   would need to bring in with them.  And the banker would need

15   to input that information before they could do the wire.

16   Q.   Is the banker able to process the wire without checking

17   a customer's identification, in the sense of a driver's

18   license?

19   A.   No, they wouldn't be able to move forward without

20   inputting that information.

21   Q.   And at the bottom there, date issued and expiration

22   date, do you know what those refer to?

23   A.   Yeah.  Those are the date issued for the identification

24   and then the expiration date of the identification.

25   Q.   All right.  Going down from that box, at the bottom of

1   the page there, there is a section that says, "Beneficiary

2   account information."  But turning to the next page, is that

3   information, then, located on the second page of the

4   document?

5   A.   (No response.)

6   Q.   Is that information -- that's the beneficiary account

7   information -- reflected on the second page and cut off from

8   the first page?

9   A.   Correct.  It's on the second page.

10  Q.   And how is that information obtained?

11  A.   This would be the information that the customer should

12  bring with them when they go into the branch to initiate the

13  wire.  And then they would give that to the banker to input.

14  Q.   And would the customer have to have the beneficiary

15  account number to affect the wire transfer?

16  A.   Yes.  They would need to input an account number, and

17  that would be where the wire would be transferred to.

18  Q.   Exiting out of that box there, to the next section, the

19  beneficiary bank information, how is that information -- let

20  me start with the first line, the beneficiary bank name.  Is

21  that something the customer would have to provide?

22  A.   Yes.  The customer would need to tell the banker which

23  bank the wire would be going to.

24  Q.   And what about the information below that, the

25  beneficiary bank ABA/SWIFT routing number?

1  A.   Yes.  The customer would either need to bring the bank
2  name or the routing number, and the banker would need to at
3  least input one of those for it to be filled in.  It would
4  need to be input.

5  Q.   Would the customer have to bring the address information
6  that's reflected below that?

7  A.   No, they wouldn't need to bring that information.  That
8  would be -- it would prefill it.  When the routing number is
9  input, the system would prefill that information.  So the
10  customer does not need to bring that with them.

11  Q.   Exiting out of that box, at the bottom of the page there
12  appears to be just the beginning of a line that is cut off
13  there.  Can you read what that says, or do you know what that
14  is supposed to say?

15  A.   Yes.  It says, "Intermediary bank information."

16  Q.   And do you know why that information was cut off there?

17  A.   Yeah.  I did not provide that information.  There wasn't
18  anything filled in.  Intermediary bank information would
19  typically only be used for an international wire.

20  Q.   And I believe you testified this was a domestic wire
21  based on what you saw on the first page; is that correct?

22  A.   That's correct.

23  Q.   Finally, going to the third page of the document to the
24  section labeled "Queue History," can you explain what this
25  box represents?

1    A.    This is the queue for the bankers.  A wire requires two

2    bankers within the branch to initiate the wire and then a

3    second person to approve it.  So each banker has a queue.

4    They would need to check their queue throughout the day to

5    see if they have a wire that needs approved.  So this is

6    their queue history for that day.

7    Q.    Looking at the left column there, the standard ID, can

8    you explain what -- what those standard IDs represent?

9    A.    Yes.  Each employee at the bank has a standard ID.  This

10   is a number assigned to -- specifically to that person.

11   Q.    So the standard ID just reflects a particular employee?

12   A.    Correct.

13   Q.    And then going to the third column, status/substatus,

14   can you explain what that represents?

15   A.    Yes.  This is showing -- the first line says,

16   "Initiated."  So this is showing that at the time that the

17   first banker initiated the transaction, and then it just goes

18   through the queue process of putting that transaction pending

19   for the next banker to initiate it.  And then as you look

20   through, you can see that the second person approves it, and

21   then, finally, that the wire is submitted and complete.

22   Q.    So is the first person represented by the standard ID

23   starting with the Q, and then the second person needed for

24   approval with the standard ID starting with the W?

25   A.    That's correct.

1   Q.   Going back to the first page of the document, the text
2   at the top of the front page, can you read what's written
3   there?
4   A.   Yes.  It says, "Jim, here are the details for the wire.
5   The wire was done on 12-11 for $53,000, going to ALG
6   International.  It went to TD Bank account number 6861095948.
7   The wire was done at the Near North branch at 11:20 a.m.
8   Thanks."
9        And then it has my name, department, and the phone
10  number I had at that time.
11  Q.   How did you determine that the wire was done at the Near
12  North branch?
13  A.   This was determined by reviewing the standard ID of the
14  bankers that initiated and approved the wire.  Our system,
15  Customer Assist, actually has a hyperlink where you can click
16  on the standard and it will show you the name of that
17  employee and also which branch they work at.  And you can
18  also look in the phone book and determine where they work at,
19  also.
20  Q.   Was that just a JPMorgan Chase internal phone book that
21  lists its employees?
22  A.   That's correct.
23  Q.   You said there was a hyperlink.  Is that, essentially,
24  the boxes that you saw on Page 3 with the standard IDs; is
25  the hyperlink located there?

 1   A.   Right.  You can actually click on the standard ID and it

 2   would show you the name of the person and then the branch

 3   they work at, their phone number, and their e-mail.

 4   Q.   Are you based and work out of Ohio?

 5   A.   That's correct.

 6   Q.   Is that located in the Eastern time zone?

 7   A.   Yes.

 8   Q.   When you said that the wire transfer took place at

 9   11:20 a.m., do you know whether that information was based on

10   the Eastern time zone or the time zone where the transaction

11   occurred locally?

12   A.   That's the Eastern Standard Time zone.

13   Q.   So that 11:20 a.m. would be 10:20 a.m. Central Standard

14   Time?

15   A.   Correct.

16           MS. BEST:  Your Honor, if I can just have a moment?

17           THE COURT:  You may.

18           (Brief pause.)

19   BY MS. BEST:

20   Q.   I just want to draw your attention to Page 2 of the

21   exhibit there.

22           Looking at the beneficiary bank information in that

23   third box, can you read the address, city, and state of the

24   beneficiary bank information there?

25   A.   Yes.  It's TD Bank.  It's going to 7345 West Oakland

1    Park Boulevard in Fort Lauderdale, Florida.  Zip code 33319.

2    Q.   And just to clarify, when you stated on the first page

3    of that document that the transaction was done at the Near

4    North branch, do you know where that -- when you say Near

5    North branch, do you know where that branch is located?  What

6    city and state it was located in?

7    A.   I believe it was in Illinois, but I don't have it

8    written on here.

9            MS. BEST:  No further questions, your Honor.

10           THE COURT:  Cross-examination, Mr. Cheronis.

11           MR. CHERONIS:  Thank you.

12                       CROSS-EXAMINATION

13   BY MR. CHERONIS:

14   Q.   Good afternoon, Ms. Hardwick.

15   A.   Hi.

16   Q.   So this e-mail is dated February 12th of 2010?

17   A.   That's correct.

18   Q.   So is that when you -- right around the time you

19   initially got involved in helping Mr. O'Shea?

20   A.   Yeah.  That would have been around the time that he

21   would have requested the information from me.

22   Q.   And at that time, did you work for Chase?

23   A.   Yes.

24   Q.   Okay.  Do you still work for Chase?

25   A.   Yes.

1    Q.    Okay.

2          Now, you reviewed some information from Chase.  Is

3    what is in here something that was made by you or something

4    that was made by other members of Chase?

5    A.    So everything from my name down, I just copied and

6    pasted it into the document.

7    Q.    Okay.  And if you look at the beneficiary bank

8    information that you just testified about, that is a TD Bank

9    located, essentially, in Fort Lauderdale?

10   A.    That's correct.

11   Q.    All right.  And it also says that the beneficiary

12   accountholder is ALG International?

13   A.    Yes.

14   Q.    Did you look at all into ALG International, or was that

15   not something you were involved in?

16   A.    I was not involved in that.

17   Q.    So all you know is that the account that it was sent to

18   was ALG International?

19   A.    Correct.

20   Q.    Okay.  And there is no name attached to that account, no

21   person's name, at least in the beneficiary account

22   information section?

23   A.    There is not.

24   Q.    And you also testified regarding requester information

25   regarding Mr. Ajayi on the top, that he would have to give a

1    driver's license with a photo in order to execute the wire

2    transfer, right?

3    A.   Yes.  Correct.

4    Q.   And you didn't speak with anyone from Chase at any of

5    the branches who actually were involved in this wire

6    transfer, did you?

7    A.   I did not.

8    Q.   You just essentially reviewed what you, then, cut and

9    pasted onto this document?

10   A.   That's correct.

11             MR. CHERONIS:  No further questions.

12             Thank you, Ms. Hardwick.

13             THE COURT:  Any redirect?

14             MS. BEST:  No, your Honor.

15             THE COURT:  I think we should break for lunch.  I

16   have kept you here for quite awhile.

17             All right.  We are going to break for lunch.  I

18   think we should resume at 1:30.  That gives you a little bit

19   more than an hour.  I have a meeting, but I am confident I

20   will be back at 1:30.

21             And I thank you for your attention.

22             Let me remind you -- I know that you are listening

23   to me, but I have to remind you that you are not to discuss

24   this case with anybody.  You are not supposed to be

25   communicating about it electronically, verbally, over the

1   phone, in any way.  Your attention in this case and your

2   discussion of the case is limited to one another after the

3   case has been concluded.  In the meantime, you pay careful

4   attention here and you don't talk about it with anybody.

5           But you are free to leave the building if you wish

6   to do that.  It's pretty cold, but you are welcome to go

7   outside.  Please be back here by 1:30, and we will get

8   started with further testimony.

9           Reminder.  The lawyers and their witnesses are

10  going to be using that south bank of elevators.  If you

11  people could use the north bank; in other words, the ones

12  closer to us right over here (indicating), that would be

13  great.  And if you do run into them, they won't say anything

14  to you.  It's not a big problem.  I just want to try to make

15  things easier for everyone.

16          (Jury out at 12:10 p.m.)

17          THE COURT:  You may step down.

18          (Witness excused.)

19          THE COURT:  Okay.  So about 1:30.

20          And why don't we talk for a minute about the rest

21  of the schedule.  I probably want to push on today until

22  about 4:30 this afternoon.

23          Where are we on instructions?

24          MS. BEST:  Your Honor, I submitted draft jury

25  instructions last Friday.

1         THE COURT:  I saw those.

2         MS. BEST:  I haven't heard anything from counsel.

3   I don't know if he has any -- he has any views on them.

4         MR. CHERONIS:  I have looked at them.  I have a

5   few, maybe, suggestions regarding those, but not many.  I

6   think some of them, obviously, are going to depend on, you

7   know, how the rest of the evidence comes through.

8         THE COURT:  Sure.

9         MR. CHERONIS:  Also, if I do have any instructions,

10  I may have one or two that we are currently drafting.  I

11  think that, again, would depend on what testimony comes out.

12  But I don't think the jury instruction conference is going to

13  be anything major.

14        THE COURT:  Then why don't we try to do that,

15  maybe, at the lunch hour tomorrow.

16        MR. CHERONIS:  Judge, I don't know if it's going to

17  go that long.  I think the government has one more witness.

18        THE COURT:  Oh, really?

19        MS. BEST:  We have two more.  One of them -- I

20  mean, one is the case agent.  That will be a little bit

21  lengthier.  One of them will be --

22        MR. CHERONIS:  This is an all-time record for least

23  questions asked by me on cross-examination.

24        MS. BEST:  The other witness will be very brief.

25  So I don't want to --

1    THE COURT:  So you may finish by midafternoon?

2    MS. BEST:  We could be -- we could be finished with

3    the government's case-in-chief by this afternoon, your Honor.

4    THE COURT:  We'll just take a look -- we will take

5    a look at the instructions whenever you close.

6    MR. CHERONIS:  And the only --

7    THE COURT:  I am sorry.  Whenever you rest.

8    MR. CHERONIS:  Okay.  We could do that.  And then I

9    may have a witness.  My client is still considering whether

10   he is going to testify or not.  I don't have any other

11   witnesses.  So I am not sure how the Court wants to proceed,

12   whether they want to do the instruction conference and maybe

13   start with our case tomorrow and go right into closing

14   arguments.

15   THE COURT:  That would be my preference.  And here

16   is why.  I really prefer never -- not only prefer, but I kind

17   of make it a hard and fast rule that I won't -- we won't

18   close the same day we review the instructions.

19   So I really want you to have the overnight to think

20   about your argument in light of the instructions that have

21   been adopted.

22   Now, obviously, the instructions that refer to a

23   defendant's testimony or not can be withdrawn at the last

24   minute, but I do want you to know what the issues

25   instructions are going to say at the time that you close, and

1    I want you to have that, you know, the night before.

2          So if the government rests today, I think we should

3    look at the instructions right away.

4          MR. CHERONIS:  Okay.

5          THE COURT:  Obviously, recognizing we may make some

6    final adjustments after you put your case in, but we will

7    have a general idea what they are going to say today.

8          And then, if we don't -- you know, if that process

9    takes -- we can send the jurors home.  If that process

10   requires more time, we can take more time.  But, ideally, we

11   would get those all pretty much ironed out.

12         Tomorrow morning we would find out what kind of a

13   case you want to put on, whether you are putting on

14   witnesses, whether you are putting on your client.  And once

15   that's concluded, take another break, revise the

16   instructions, and instruct and close.

17         MR. CHERONIS:  We should -- I don't think

18   scheduling is going to be an issue.  So I would like to do it

19   that way as well, your Honor.

20         THE COURT:  Good.

21         All right.  I will see you at 1:30.

22         MS. BEST:  Thank you, your Honor.

23         (A luncheon recess was taken at 12:14 p.m.)F/t

24

25

1          C E R T I F I C A T E

2

3          I, Frances M. Ward, do hereby certify that the

4   foregoing is a complete, true, and accurate transcript of the

5   Trial proceedings, Volume 1, Pages 1 to 102, had in the

6   above-entitled case before the HONORABLE REBECCA R.

7   PALLMEYER, Judge of said Court, at Chicago, Illinois, on

8   December 5, 2013.

9

10      /s/ Frances M. Ward, CSR, RPR, RMR, FCRR    7/8/14

11          Official Court Reporter              Date
            United States District Court
12          Northern District of Illinois
                Eastern Division
13

14

15

16

17

18

19

20

21

22

23

24

25