```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    UNITED STATES OF AMERICA,      )  Docket No. 12 CR 190
                                     )
 4                     Plaintiff,    )  Chicago, Illinois
                                     )  December 5, 2013
 5             v.                    )  1:33 p.m.
                                     )
 6    ABIDEMI AJAYI,                 )
                                     )
 7                     Defendant.    )

 8
                             VOLUME 1-B
 9              TRANSCRIPT OF PROCEEDINGS - Jury Trial
         BEFORE THE HONORABLE REBECCA R. PALLMEYER, and a Jury
10

11    APPEARANCES:

12    For the Plaintiff:       HON. ZACHARY T. FARDON
                               UNITED STATES ATTORNEY by
13                             MS. YASMIN N. BEST
                               MS. NICOLE M. KIM
14                             219 South Dearborn, 5th Floor
                               Chicago, Illinois  60604
15
      For the Defendant:       LAW OFFICES OF DAMON M. CHERONIS by
16                             MR. DAMON M. CHERONIS
                               MR. IAN M. BARNEY
17                             53 West Jackson Boulevard, Suite 1750
                               Chicago, Illinois  60604
18
      Also Present:            Mr. Brett Erickson
19                             U.S. Postal Inspection Service

20

21

22    Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
                               Federal Official Court Reporter
23                             219 South Dearborn, Room 2318-A
                               Chicago, Illinois 60604
24                             (312) 435-6047
                               Gayle_McGuigan@ilnd.uscourts.gov
25
```

1                              I N D E X

2     WITNESS                                              PAGE

3     MIGUEL DUENAS
            Direct By Ms. Kim ......................... 108
4
      BRETT ERICKSON
5           Direct By Ms. Best ....................... 113
            Cross By Mr. Cheronis .................... 147
6           Redirect By Ms. Best ..................... 155
            Recross By Mr. Cheronis ..................157

7

8

9

10                           E X H I B I T S

11    NUMBER                                            ADMITTED

12    Government's Exhibit

13        No. Articles ............................. 117

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court outside the presence of the jury.)

2          MS. BEST:  I think we have a couple things we wanted

3     to deal with before the jury comes back.

4          THE COURT:  Okay.

5          MS. BEST:  The first matter is that I do have an

6     application for an order to return the tax returns, and I have

7     a copy of the application order for counsel, but I wanted to

8     present that so I can turn that over to defense counsel at this

9     point.

10         I will hand up to you, your Honor, both the

11    application as well as the draft order to allow me to turn over

12    these couple categories of documents.

13         THE COURT:  There's obviously no objection?

14         MR. CHERONIS:  I mean, not to them being turned over.

15         THE COURT:  Right.  Okay.

16         MS. BEST:  That's the first issue.

17         The second issue, your Honor, is just regarding the --

18    how to approach the issue of the bank statements.

19         I think at this point, what I intended to do when

20    Inspector Erickson is on the stand is just go through a portion

21    of the statements, realistically just starting with the first

22    month and the balance there when the account was opened, and

23    then sort of highest balances, the highest balance in each

24    year, 2006 through 2008, and then go through the November and

25    December 2009 statements and the January 2010 statement, which

1    really hone in on the time of the alleged fraud here, and just

2    deal with the statements that deal with when the check was

3    deposited and the withdrawals around there.

4         I would ask, though -- I mean, I think what we're

5    going to try to do is come up with, and I think we just need

6    additional time, but some sort of summary that deals with --

7    that deals with the statements that we're not moving to admit

8    at this time.  And what I'm hoping to do is we'll finish with

9    Inspector Erickson I believe today, but to leave the case open,

10   and that way we can introduce a summary chart first thing

11   tomorrow, if needed, and then we can deal with not admitting

12   the bulk --

13        THE COURT:  The transactional evidence.

14        MS. BEST:  Correct.

15        THE COURT:  Right.  Right.  That makes sense.  In

16   other words, what you would -- what you would hope to get

17   admitted by way of a summary chart would be an indication of

18   what the balance was over time.

19        MS. BEST:  Correct.

20        THE COURT:  As opposed to how it got there.

21        MS. BEST:  Exactly.  And having just the entire binder

22   full of statements.

23        THE COURT:  Right.  Okay.

24        MS. BEST:  The only other thing is, now that I've

25   turned over these statements, the only question is there's a

1    possibility -- and, again, this depends on either whether the

2    Government manages to call someone in their case-in-chief or in

3    rebuttal, someone to deal with these certification of lack of

4    records regarding the GR Icon account.

5          I don't have an IRS witness lined up right now.  I

6    may -- because I just received these records on the 3rd.  But

7    in case the Government is able to secure someone, there may be

8    a brief witness for about five minutes tomorrow to just talk

9    about the certification of the lack of records for the GR Icon

10   account.  And that's the only other thing I would just want to

11   highlight for the Court.  Again, I anticipate that it would be

12   a fairly brief witness, just to introduce those.  And I don't

13   know if I am going to be able to get anyone, to be quite frank

14   with you.

15         MR. CHERONIS:  I'm sure they'll find someone.

16         I still -- I mean, I have the same objection.  I guess

17   we don't have to deal with it right now, but I guess we may be

18   able to cross that bridge when we get there.

19         THE COURT:  All right.

20         MS. BEST:  And that's -- I mean, that's all I wanted

21   to bring to the Court's attention before we begin.

22         THE COURT:  Okay.  We can bring in the jurors.

23         MS. BEST:  Thank you, your Honor.

24         COURT SECURITY OFFICER:  All rise.

25       (Jury in at 1:37 p.m.)

Duenas - Direct by Kim

1          THE COURT:  You may be seated.

2          The Government's next witness?

3          MS. KIM:  Yes, your Honor.  The Government calls

4    Miguel Duenas.

5       (Witness enters courtroom.)

6          THE COURT:  Can I ask you to step forward, sir?

7          COURT SECURITY OFFICER:  All the way up.  Stand and

8    face the judge.

9          THE COURT:  Raise your right hand.

10      (Witness duly sworn and takes the stand.)

11         THE COURT:  You may be seated.

12         You may proceed, Miss Kim.

13         MS. KIM:  Thank you.

14            MIGUEL DUENAS, GOVERNMENT'S WITNESS, SWORN

15                        DIRECT EXAMINATION

16   BY MS. KIM:

17   Q    Can you please state your name for the record?

18   A    My name is Miguel Duenas.

19   Q    And where are you currently employed?

20   A    I am employed at Chase as a loan servicer.

21   Q    How long have you been with Chase?

22   A    For about five years.

23   Q    And you said you were a loan servicer?

24   A    Uh-hum.

25   Q    What does that job entail?

Duenas - Direct by Kim

1    A    I work in the wholesale loan department, and I deal with

2    servicing loans for commercial customers with annual revenues

3    of 10 million to 300 million.

4    Q    And did you have any positions with Chase before you were a

5    loan officer?

6    A    Before that, I was a teller.

7    Q    Where were you a teller?

8    A    I was a teller at 35 West Wacker; but before that, I was a

9    teller at 10 South Dearborn.

10   Q    And that 10 South Dearborn office, that's in Chicago?

11   A    Uh-hum, yes.

12   Q    Were you a teller at the 10 South Dearborn back in December

13   of 2009?

14   A    Yes.

15   Q    And as a teller there, can you describe for us what your

16   duties were?

17   A    I worked in the commercial loan window -- I mean commercial

18   teller window, and I dealt mainly with business customers.  And

19   I would do deposits that the customer would bring in,

20   withdrawals that they needed.  I would also process change

21   orders, which is when a customer brings in larger bills and

22   swap them out larger -- smaller bills and coin.  And I would

23   also do money orders and cashier's checks.

24   Q    And as a teller at that location, did you deal with

25   customers coming in and presenting checks for payment?

Duenas - Direct by Kim

1   A    Yes.

2   Q    Now, with respect to a transaction like that when somebody

3   presents a check for payment, can you walk us through the

4   process from beginning to end as to how you handle that

5   transaction?

6   A    When a customer come up with a check to be paid, if the

7   customer is a Chase account holder and if the check is drawn

8   off the customer's account, I would ask for one form of ID.

9   And then I would go into a system called Customer Assist, which

10  had the account information, to verify that the funds were

11  available, that there were no stops, no holds on the account or

12  on the check.  And then from there, if everything checked out

13  fine, from there I would go to another system called Teller

14  Express, and that's where the transaction is actually

15  processed.  And there is -- you would click on a button called

16  Cash Pay.  Click on that.  Scan the check.  And from there the

17  image would be scanned onto the computer.  And then from there,

18  we would enter the customer ID.  After that is entered, you

19  click on okay.  Go to the next window.  And if the check is for

20  over 5,000, a manager approval will be needed, and another

21  window pops up where a manager would have to walk over and

22  verify all the information and make sure everything is fine,

23  and then enter -- the manager will enter their ID and password.

24  And then they would click on okay.  And that will give me the

25  window where I can present the customer with their cash.

Duenas - Direct by Kim

1   Q    Now, you mentioned that there are certain transactions that

2   require a manager approval, and those are transactions for

3   over $5,000?

4   A    Correct.

5   Q    Does that -- does the manager approval, is that required

6   for Chase customers or non-Chase customers?

7   A    For both, for Chase customers and non-Chase customers, if

8   it's over 5,000.

9   Q    You stated that you asked for a form of ID if the check is

10  drawn from a Chase account.

11       When you receive that ID, what do you do with it?

12  A    With the ID, I have to check to make sure it's one of the

13  IDs that we can accept, and then we would enter it in the

14  Teller Express, a window pops up, and you would click what kind

15  of ID it is, the ID number and expiration date, if there is

16  one.

17  Q    And when you look at the check that the customer presents,

18  is there anything on there, anything else that you verify on

19  that check, other than I think you mentioned if there were no

20  holds --

21  A    No holds.  No stops.  We would check the customer's

22  signature.  And we do that by either looking at past

23  withdrawals or past checks that were cashed out or by pulling

24  up a signature card, which is something the customer usually

25  signs when they open the account.

Duenas - Direct by Kim

1   Q    And so you mentioned that this information that you put in,

2   is it put into something called Teller Express?  Is that just

3   the name of the Chase database?

4   A    It's just the name of the teller system that we use to

5   process transactions.

6   Q    Now, in your experience as a teller, other than presenting

7   a check for payment and getting cash in return, are there other

8   services that Chase offers to customers if they want to

9   withdraw large amounts of cash?

10  A    Other services?

11  Q    Yes.

12  A    Would offer them, if they want a cashier's check because

13  it's safer that way, instead of carrying large amounts of cash;

14  but if the customer just wants cash, we will just give them the

15  cash.

16  Q    Other than the cashier's checks, are there other

17  officers -- other services that Chase offers?

18  A    There is money orders, but money orders only go up to

19  1,000.

20          MS. KIM:  One moment, your Honor.

21          THE COURT:  Uh-hum.

22      (Counsel conferring.)

23          MS. KIM:  No further questions by the Government.

24          THE COURT:  Cross-examination.

25          MR. CHERONIS:  None, your Honor.

Erickson - Direct by Best

1    THE COURT:  The witness is excused.

2    (Witness exits courtroom.)

3    THE COURT:  Your next witness?

4    MS. BEST:  Your Honor, the Government calls Brett

5    Erickson.

6    (Approaching.)

7    THE COURT:  Mr. Erickson, could you step forward,

8    please?  Ask you to raise your right hand.

9    (Witness duly sworn and takes the stand.)

10    THE COURT:  You may be seated.

11    You may proceed, Miss Best.

12    MS. BEST:  Thank you, your Honor.

13    BRETT ERICKSON, GOVERNMENT'S WITNESS, SWORN

14    DIRECT EXAMINATION

15   BY MS. BEST:

16   Q    Would you please state your name for the record?

17   A    Brett Erickson.

18   Q    Where do you work?

19   A    I am a U.S. Postal Inspector.

20   Q    How long have you been a U.S. Postal Inspector?

21   A    Going on seven years.

22   Q    What are your responsibilities as a postal inspector?

23   A    I'm assigned to the mail theft team, responsible for bank

24   fraud investigations, identity theft investigations, credit

25   card and check fraud and mail theft.

Erickson - Direct by Best

1   Q   Before you became a postal inspector, what did you do for a

2   living?

3   A   I was with the Riverside Police Department as a police

4   officer.

5   Q   How long did you do that?

6   A   Just under four years.

7   Q   In the course of your work as a postal inspector, did you

8   investigate a bank account in the name of GR Icon

9   International?

10  A   Yes.

11  Q   How did that investigation begin?

12  A   In April 2010 I was contacted by Jim O'Shea at Chase Bank,

13  and he told me that he had an account, a business account,

14  where a check was deposited and money was withdrawn, and the

15  bank lost money on that account.

16  Q   And as a result of your contact with Mr. O'Shea, did you

17  then launch an investigation?

18  A   Yes.

19  Q   And as part of that, did you receive certain documents from

20  Mr. O'Shea?

21  A   I did, yes.

22  Q   What documents did you receive from Mr. O'Shea?

23  A   I received a signature card for the account.  I received

24  bank statements for that account.  I received copy of checks.

25  I received video surveillance, still photographs.  And I

Erickson - Direct by Best

1   received Teller Journals.

2   Q   And what was the name of the account of the information

3   that Mr. O'Shea sent you?

4   A   GR Icon International.

5   Q   And do you recall the last four digits of that account

6   number?

7   A   It is 0358.

8   Q   As a result of receiving those documents from Mr. O'Shea,

9   did you begin investigating GR Icon International and what that

10  company was?

11  A   Yes.

12  Q   And what did you learn during the course of your

13  investigation?

14  A   That the company -- from reviewing Secretary of State,

15  Illinois Secretary of State records, I found that it was an

16  import/export company.

17  Q   And did you determine that that was a company that was

18  incorporated in the State of Illinois?

19  A   Yes.

20          MS. BEST:  Your Honor, may I approach the witness?

21          THE COURT:  You may.

22      (Tendered.)

23  BY MS. BEST:

24  Q   I've handed to you what's been marked as Government Exhibit

25  Articles.  Are you familiar with those documents?

Erickson - Direct by Best

1    A    Yes.

2    Q    Do you recognize them?

3    A    Yes.

4    Q    How do you recognize those documents?

5    A    These were provided to me by the Illinois Secretary of

6    State.

7    Q    Are these the documents you just referenced a moment ago?

8    A    Yes.

9    Q    Can you look at the last page of the document and turn it

10   over?

11        (Witness complies.)

12   BY MS. BEST:

13   Q    Can you read what's reflected there?

14   A    There is a red stamp on the back page, the back of the back

15   page.  It states, "State of Illinois, Office of the Secretary

16   of State."  It says, "I hereby certify that this is a true and

17   correct copy consisting of nine pages as taken from the

18   original on file in this office," signed -- there's a stamped

19   signature of Jessie White, Secretary of State.  Dated July

20   16th, 2010.  And there's another signature at the bottom, whose

21   name I can't read.

22        MS. BEST:  Your Honor, the Government moves to admit

23   Government Exhibit Articles.

24        THE COURT:  Any objection?

25        MR. CHERONIS:  No, I believe this is a

Erickson - Direct by Best

1    self-authenticating document, so I have no objection.

2            THE COURT:  That will be admitted.

3        (Government Exhibit Articles admitted in evidence.)

4            MS. BEST:  Your Honor, if we can publish the first

5    page of that document.

6            THE COURT:  You may.

7    BY MS. BEST:

8    Q    If you could just look at the, say, top half of the

9    document there.

10           Can you read what the title of the top of the document

11   is?

12   A    "Articles of Incorporation of the Business Corporation

13   Act."

14   Q    And is there a date there in the middle of the page?

15   A    Yes.

16   Q    What is that?

17   A    December 2nd, 2005.

18   Q    And looking at the corporate name, can you read what's

19   reflected there?

20   A    GR Icon, Incorporated.

21   Q    Is there an initial registered agent reflected on the

22   document?

23   A    Yes.

24   Q    Who is that?

25   A    Abidemi A. Ajayi.

Erickson - Direct by Best

1   Q    And what's the address listed?

2   A    535 Ingraham Avenue, Calumet City, Illinois, 60409, in the

3   County of Cook.

4   Q    And can you read what's reflected on Line or Box 3 there?

5   A    "It is the purpose or purposes for which the corporation is

6   organized."  And what's listed is "telecommunication or general

7   business."  In parentheses, it says "import or export."

8   Q    Just turning to the next page, and in the middle of the

9   page there, can you read what the date is and the signature and

10  name under it?

11  A    The date is December 2nd, 2005.  And the name listed

12  underneath is Abidemi Abolaji Ajayi, with an address of 535

13  Ingraham Avenue, Calumet City, Illinois, 60409.

14  Q    Turning to the next page of that exhibit, can you read what

15  the title is at the top of that page?

16  A    Title states, "Certificate of Dissolution of Domestic

17  Corporation."

18  Q    And in the middle section of the page, can you -- can you

19  just read that sort of first paragraph there?

20  A    Sure.  It says, "Being a corporation organized under the

21  laws of the State of Illinois relating to domestic corporations

22  has failed to file an annual report and pay an annual franchise

23  tax."

24  Q    And then to the last paragraph -- well, I think you need to

25  read a little more.  Can you read the last paragraph there

Erickson - Direct by Best

1    starting with "now"?

2    A    "Now, therefore, the Secretary of State of the State of

3    Illinois hereby dissolves the above corporation in pursuance of

4    the provisions of the aforesaid Act."

5    Q    Is there a date at the bottom of the page?

6    A    May 11th, 2007.

7    Q    Turning to the next page of the document -- of the exhibit

8    there, can you read what the title of the document is?

9    A    "Application for Reinstatment for a Domestic or Foreign

10   Corporation."

11   Q    What is the date stamped on that document?

12   A    Filed September 10th, 2008.

13   Q    Going to Box 3 of the document, can you read what it says

14   there?

15   A    "Date that the certificate of dissolution or revocation was

16   issued."  And the date is May 11th, 2007.

17   Q    The box below that, what name is listed as the registered

18   agent?

19   A    Abidemi Ajayi.

20   Q    Turning to the next page of the document, can you tell us

21   what the title in the center of the page there of this document

22   is?

23   A    "State of Illinois, Domestic Corporation, Annual Report."

24   Q    What is the date for this annual report?

25   A    It's dated 2006.

Erickson - Direct by Best

1    Q    Where do you see that?

2    A    In the upper left-hand corner.

3    Q    And is this for GR Icon, Incorporated?

4    A    Yes.

5    Q    Looking at the middle section of the page, the box there --

6    the table, rather, can you just read whose name is reflected

7    and what the officers are there in the left-hand corner?

8    A    As the President, Abidemi Ajayi, 535 Ingraham Avenue,

9    Calumet City, Illinois, 60409.

10            As the Secretary, Abidemi Ajayi, 535 Ingraham Avenue,

11   Calumet City, Illinois, 60409.

12            As the Treasurer, Abidemi Ajayi, 535 Ingraham Avenue,

13   Calumet City, Illinois, 60409.

14            And as the Director, Abidemi Ajayi, 535 Ingraham

15   Avenue, Calumet City, Illinois, 60409.

16   Q    Are there any other names listed in that table anywhere?

17   A    No.

18   Q    Could you turn to the next page of the exhibit?  What is

19   this document titled?

20   A    This is "State of Illinois, Domestic Corporation Annual

21   Report."

22   Q    What year is this for?

23   A    2007.

24   Q    And just going to the middle section of the page there as

25   well, is this the same as the information listed on the

Erickson - Direct by Best

1    previous page that you just testified about?

2    A    Yes.

3    Q    Finally, turning to the next page of the exhibit -- sorry,

4    one more page.

5         Can you just read what this document is?

6    A    This is "Certificate of Dissolution of Domestic

7    Corporation, Business Corporation Act."

8    Q    And, again, just turning to the middle section under that

9    top paragraph, can you just read what the purpose is for --

10   what the first paragraph states there?

11   A    It says, "Being a corporation organized under the laws of

12   the State of Illinois relating to domestic corporations has

13   failed to file an annual report and pay an annual franchise

14   tax."

15   Q    Please go to the bottom of the page.  Read that paragraph

16   starting with "Now."

17   A    "Now, therefore, the Secretary of State of the State of

18   Illinois hereby dissolves the above corporation in pursuance of

19   the provisions of the aforesaid Act."

20   Q    And what is the date on that document?

21   A    May 8th, 2009.

22   Q    So this follows the previous two late annual reports that

23   were filed in September 2008?

24   A    Yes.

25   Q    In addition to reviewing the Secretary of State documents,

Erickson - Direct by Best

1    what other documents did you review in investigating GR Icon?

2    A   Bank statements.

3    Q   Any other document that you received from -- or any other

4    document?

5    A   Signature card.

6            MS. BEST:  Your Honor, may I approach?

7            THE COURT:  You may.

8        (Tendered.)

9    BY MS. BEST:

10   Q   I've handed to you what's been previously admitted as

11   Government Exhibit Signature Card.  Do you recognize that

12   document?

13   A   Yes.

14   Q   What is that document?

15   A   It is a Chase business signature card that was given to me

16   by Jim O'Shea.

17           MS. BEST:  Your Honor, if we could publish -- there we

18   have it up.

19   BY MS. BEST:

20   Q   If you would just highlight sort of the middle section

21   there.  It's still a little bit difficult to read.  I

22   apologize.

23           In looking at your copy of the document there,

24   Inspector Erickson, can you tell us what the date is that the

25   account was opened?

Erickson - Direct by Best

1    A    February 15th, 2006.

2    Q    And looking at that middle section of the page with -- do

3    you see a line there that says "signers to be added later"?

4    A    Yes.

5    Q    Is there anything reflected there?

6    A    No.

7    Q    Look at the bottom portion of the page.  Are there any

8    names reflected on the signature card?

9    A    Yes.

10   Q    What names are reflected there?

11   A    Abidemi A. Ajayi.

12   Q    Is that the only name reflected on the card?

13   A    Yes.

14   Q    I believe you stated also that you reviewed bank statements

15   during the course of the investigation; is that correct?

16   A    Correct.

17            MS. BEST:  Your Honor, if I may approach?

18            THE COURT:  You may.

19       (Tendered.)

20   BY MS. BEST:

21   Q    I've handed to you what's been previously marked as

22   Government Exhibit Bank Statements.  Do you recognize these

23   documents?

24   A    Yes.

25   Q    Are these documents that you received during the course of

Erickson - Direct by Best

1   your investigation from Chase?

2   A    Yes.

3   Q    Turning to the first page of that document --

4            MS. BEST:  Your Honor, if I could just have a moment.

5            Just publish that first page.

6   BY MS. BEST:

7   Q    I believe you just testified the account was opened on or

8   about February 15th, 2006; is that correct?

9   A    Correct.

10  Q    Can you tell us what month this bank statement is for?

11  A    Bank statement is for February 2006.

12  Q    And can you just, looking at the midsection of the page,

13  can you just read what is listed there in the sort of opening

14  and ending account balance section?

15  A    The beginning balance is zero, and the ending balance

16  is $200.

17  Q    In the course of your investigation, have you reviewed all

18  the bank statements for GR Icon for the Chase account?

19  A    Yes.

20  Q    And in the course of your review, do you know what month in

21  2006 GR Icon had its highest balance for the year?

22  A    It was in October 2006.

23  Q    If you could turn actually what's tabbed in the binder

24  there as the beginning in the October 2006 section of the bank

25  statements.

Erickson - Direct by Best

1      If you look at the summary there, what's the amount of

2  the ending balance there for the month?

3  A    $12,468.79.

4  Q    Is your testimony this is the month with the highest ending

5  balance for the year 2006?

6  A    Yes.

7  Q    In 2007, do you know what month the GR Icon account ended

8  with its highest balance?

9  A    December 2007.

10  Q    If you turn to the next tab section on the binder there.

11  Looking at the ending balance there -- or the balance summary

12  page there, can you tell us what is reflected as beginning and

13  ending balance for that month?

14  A    Beginning balance is $173.20.  Ending balance

15  is $11,653.29.

16  Q    Do you know what month in 2008 had the highest ending

17  balance?

18  A    Yes.

19  Q    What month was that?

20  A    January 2008.

21  Q    So the next month was the highest balance in 2008?

22  A    Correct.

23  Q    Can you tell us what the beginning -- as you turn to that

24  section of the bank statements, can you tell us what the

25  beginning and ending balance were for that month?

Erickson - Direct by Best

1   A    Beginning balance was $11,653.29, and the ending balance

2   was $3,054.85.

3   Q    Finally, for 2009, do you know what month before November

4   2009 had the highest balance in that calendar year?

5   A    January 2009.

6   Q    And if you turn to that section of the binder, can you tell

7   us what the beginning and ending balance for January 2009 was?

8   A    The beginning balance was $428.53, and the ending balance

9   was $331.43.

10  Q    In reviewing the bank statement -- or the bank account

11  documents for the GR Icon account, in your review of them, did

12  you eventually see a check from payor American Building

13  Maintenance Company?

14  A    Yes.

15  Q    And where is that -- where is that reflected in the bank

16  statements?

17  A    In November 2009.

18  Q    If you could turn to the November 2009 section of the

19  statements there.

20       (Counsel conferring.)

21  BY MS. BEST:

22  Q    Were you able to review a copy of that check during the

23  course of your investigation?

24  A    Yes.

25  Q    I believe I've handed up to you what's been marked and

1    previously admitted as Government Exhibit Checks.  Do you

2    recognize that document?

3    A    Yes.

4    Q    How do you recognize it?

5    A    This was given to me by Chase Bank.

6    Q    In the course of your investigation, did you also receive a

7    copy of a void check copy from American Building Maintenance?

8    A    Yes.

9         MS. BEST:  Your Honor, if I can approach?

10        THE COURT:  You may.

11    (Tendered.)

12   BY MS. BEST:

13   Q    I've handed you what's been previously marked as and

14   admitted as Government Exhibit ABM Check.  Do you recognize

15   that document?

16   A    Yes.

17   Q    And how do you recognize it?

18   A    This was given to me by American Building Maintenance

19   Company.

20   Q    During the course of your investigation?

21   A    That's correct.

22   Q    Have you -- having reviewed the copy or Government Exhibit

23   ABM Check and having reviewed Government Exhibit Check, that

24   first page of the exhibit, have you compared the two of them

25   side by side?

Erickson - Direct by Best

1   A    Yes.

2   Q    And what, if anything, have you noticed about the void copy

3   check obtained from ABM and the copy of the altered check that

4   you received from Chase?

5   A    The "Pay To" line is different.

6   Q    How so?

7   A    On the ABM Check, it states Pollock Paper Distributors,

8   P.O. Box -- a P.O. Box in Dallas, Texas.  And on the

9   exhibit marked Checks, the "Pay To" line reads GR Icon

10  International.

11  Q    What else did you notice about them, comparing them side by

12  side?

13  A    That the font is different.

14  Q    The font reflected on the -- on which one?

15  A    The font reflected on the Exhibit Checks is different than

16  on the one marked ABM Check.

17  Q    And how so?  Where is the font changed?

18  A    The font is changed in the "Pay To" section.

19  Q    Finally, turning to the December 2009 bank statements, in

20  that binder there, did you also review those bank statements

21  during the course of your investigation?

22  A    Yes.

23  Q    And did you review the checks that were drawn on the GR

24  Icon account in -- in December 2009?

25  A    I'm still getting to the page.  Sorry.

Erickson - Direct by Best

1           Okay.  I'm there.

2           Can you repeat the question, please?

3    Q    Did you review the checks that were drawn on the GR Icon

4    account in December 2009?

5    A    Yes.

6    Q    And after reviewing those checks, what else did you do?

7    A    Repeat the question, please.

8    Q    After you reviewed those checks, what did you do after

9    reviewing the checks that were drawn on the GR Icon account in

10   December 2009?

11   A    I reviewed the checks.  I looked at Teller Journals and

12   video surveillance from the tran -- from the check withdrawals.

13   Q    I want to turn then to those -- turn to those checks.

14           If you turn to the December 2009 bank statement -- do

15   you have that in front of you?

16   A    Yes.

17   Q    And you turn to the checking section.  What is the first

18   check number that is -- what are the check numbers -- what's

19   the first check number reflected there?

20   A    1056.

21   Q    And what is the date on that?

22   A    Date paid, December 14th.

23   Q    Check below -- I'm sorry.  And the check below that?

24   A    1057.  Dated December 14th.

25   Q    Turning to the next line on that checks paid section, what

Erickson - Direct by Best

1    is the check number reflected there?

2    A    1086.

3    Q    If you turn to the Government Exhibit Checks that you have

4    in front of you, do you have a check with that number in the

5    exhibit in front of you?

6    A    Yes.

7    Q    What is the name of the payee of check 1086?

8    A    The payee is Abidemi Ajayi.

9    Q    What is the amount of that check?

10   A    $9,600.

11   Q    What is the date on the check?

12   A    12-9-09.

13   Q    Turn to what's been previously marked and admitted as

14   Government Exhibit Teller Journals.

15            Do you have a page there that reflects the same date,

16   that same December 9th date, that's reflected on check 1086?

17   A    Yes.

18   Q    Looking at that first page of the document, when you looked

19   at the Teller Journals, what did you look for in these

20   documents?  Or what did you notice?

21   A    I noticed the amount, withdrawal amounts.  I noticed the

22   account number.

23   Q    Let's walk through those.

24            Looking at the top of the page, can you read what that

25   account number -- the last four of that account number is?

Erickson - Direct by Best

1   A   0358.

2   Q   And you said you stated you noticed the withdrawal amount.

3   Where did you see that?

4   A   Approximately two more lines down from the account number.

5   Q   And is that where it says WD AMT?

6   A   Correct.

7   Q   And to the right of that, what is denoted there?

8   A   $9,600.

9   Q   And to the right of the amount, what is listed there?

10  A   Check 1086.

11  Q   Looking further down the page, in sort of that middle

12  section, do you see an area that starts with "Primary ID"?

13  A   Yes.

14  Q   What is reflected there?

15  A   Primary ID, type, U.S. driver's license with photo.  And

16  then there's a number.  State of Illinois.  There's a number

17  next to it.

18  Q   Did you do any investigation regarding the number that's

19  listed there?

20  A   Yes.

21  Q   And what did you learn during your investigation?

22  A   I ran that number through the Illinois Secretary of State

23  database and pulled a photograph corresponding to that driver's

24  license number.

25  Q   And what did you pull -- what did you retrieve when you

Erickson - Direct by Best

1    entered that information into the database?

2    A    This driver's license number comes back to Abidemi Ajayi at

3    535 Ingraham Avenue in Calumet City, Illinois, 60409.

4    Q    And, finally, just looking again back at the -- sort of top

5    of the page, towards the right-hand side, what is reflected

6    there?

7    A    It says memo, and the time of 10:39 and the date of

8    12-9-09.

9    Q    And you're saying that that information listed there

10   reflects the time of the transaction?

11   A    Correct.

12   Q    If you turn to what's been previously marked in front of

13   you as Government Exhibit Video Stills that I have also handed

14   to you, turn to the first page of that exhibit.  Do you

15   recognize that document?

16   A    Yes.

17   Q    How do you recognize it?

18   A    This document was provided to me by Jim O'Shea.

19   Q    Looking at this document, can you read what's listed in the

20   first line of text there?

21   A    It says Teller Number 6, Evanston, Illinois, Orrington

22   Number 1, 1603 Orrington, which is the address of the Chase

23   Bank branch.

24   Q    And in the course of your investigation, have you visited

25   that Chase Bank branch?

Erickson - Direct by Best

1    A    Yes.

2    Q    At that address.

3    A    Yes.

4    Q    Turning to the next line, can you read the date and time

5    listed there?

6    A    Wednesday, December 9th, 2009 at 10:39 a.m. Central

7    Standard Time.

8    Q    I apologize, I didn't mean to cut you off.

9         Does that time match the time that was just listed in

10   the Teller Journal you just testified about?

11   A    Yes.

12   Q    Turning to the next page -- actually, let me back up.

13        Going back to Government Exhibit Checks -- do you have

14   them in front of you?

15   A    Yes.

16   Q    What is the next check that's reflected there in the

17   exhibit?

18   A    Check Number 1087.

19   Q    What is the amount of that check?

20   A    15,000.

21   Q    And who is that check made out to?

22   A    Segun Adetula.

23   Q    Turning to the next check or the next document in the

24   exhibit there, what is the check number -- the check number

25   reflected there?

Erickson - Direct by Best

1  A   1088.

2  Q   And can you tell us what the date on that document is?

3  A   December 10th, 2009.

4  Q   And who is the payee?

5  A   Abidemi Ajayi.

6  Q   What is the amount?

7  A   $23,500.

8  Q   Can you turn to Government Exhibit Teller Journal?  So the

9  next page of that document.  Do you see a document that

10 reflects the same date as Check 1088?

11 A   Yes.

12 Q   Again looking at the top of that document, what is the

13 amount reflected on the document, on the Teller Journal?

14 A   $23,500.

15 Q   What is the check number?

16 A   1088.

17 Q   Going to the right-hand side there, starting at the memo,

18 what are the time and date reflected there?

19 A   11-24.  And the date is 12-10 of '09.

20 Q   Going a little bit further down the page to the primary ID

21 section.

22 A   It states U.S. driver's license with photo, out of

23 Illinois, and a driver's license number.

24 Q   Is that the same driver's license number you testified

25 before came back to Abidemi Ajayi?

Erickson - Direct by Best

1    A    Yes.

2    Q    Finally going to Video -- to the Government Exhibit Video

3    Stills and turning to Video Still 2, does that document reflect

4    a transaction the same day that you just testified to?

5    A    Yes.

6    Q    If you can just read what's listed in the first two lines

7    on the top of that document.

8    A    It says Teller 3, Stony Island Number 1, 6650 South

9    Stony Island Avenue, which is a Chase Bank branch.

10   Q    The next line?

11   A    Thursday, December 10th, 2009, at 11:30 a.m.

12   Q    And is it your understanding -- or let me ask this:  Based

13   on your review of the documents in this case, do you have any

14   understanding about typically -- or how long these transactions

15   sometimes took in the course of cashing a check and receiving

16   the funds from that check?

17   A    Yes.

18   Q    What is your understanding?

19   A    They can take, you know, a decent amount of time.  More

20   than a couple minutes, on some occasions.

21   Q    So just going back to the time stamp or the time listed on

22   the Teller Journal before, it's your understanding this

23   photograph relates to that Teller Journal because there was

24   some amount of time elapsed during the transaction.

25   A    Correct.

Erickson - Direct by Best

1   Q   If you turn to Government Exhibit Checks, and turn to the

2   next document there, what is the next check that's reflected in

3   the exhibit there?

4   A   Check Number 1089.

5   Q   And what is the date on that?

6   A   December 10th, 2009.

7   Q   And who is the payee?

8   A   Abidemi Ajayi.

9   Q   What is the amount?

10  A   $16,500.

11  Q   Turning to the Teller Journal, the next page on that

12  document, do you have a document there that corresponds to that

13  date as well?

14  A   Yes.

15  Q   And going to the top of that page, can you read what the WD

16  AMT, what's reflected in that section?

17  A   $16,500.

18  Q   And what is the check number reflected there?

19  A   1089.

20  Q   Can you tell us what's reflected in the memo line?

21  A   Memo line.  Time of 12:21.  And date of December 10th,

22  2009.

23  Q   Finally, in that middle section there, the primary ID

24  section, is that the ID number there listed the same ID number

25  that you testified about earlier?

Erickson - Direct by Best

1    A    Yes.

2    Q    And that comes back to the defendant?

3    A    Yes.

4    Q    Turning to the next page of the Video Still exhibit, do you

5    have a photograph there that corresponds to that December 10th

6    date and time?

7         (Pause in proceedings.)

8    Q    Video Still 3.  Do you have that in front of you?

9    A    Yes.

10   Q    Can you tell us what is reflected there in the first two

11   lines at the top of the page?

12   A    It says East Teller Number 1, Chicago Main East, 10 South

13   Dearborn.  And that is the location of a Chase Bank branch.

14   Q    And what's depicted on the next line?

15   A    Thursday, December 10th, 2009, at 12:22 p.m. Central

16   Standard Time.

17   Q    Turning back to Government Exhibit Checks, can you look at

18   the next document on the exhibit there.  Do you have that in

19   front of you?

20   A    Yes.

21   Q    What's the check number on the top of that?

22   A    1093.

23   Q    Who is the payee?

24   A    Abidemi Ajayi.

25   Q    What is the date?

Erickson - Direct by Best

1    A    December 11th, 2009.

2    Q    What is the amount?

3    A    17,000.

4    Q    Go to Government Exhibit Teller Journals and to the next

5    page on that document.  You have a document there that reflects

6    the same date, the same -- of that same December 11th date.

7    A    Yes.

8    Q    Going to the top of the page, can you tell us what the WD

9    amount is?

10   A    17,000.

11   Q    And what check number is reflected there?

12   A    1093.

13   Q    What is the time and date reflected on the document?

14   A    10:08.  And the date is December 11th, 2009.

15   Q    Finally, going back to the primary ID section, is the same

16   driver's license number reflected on this Teller Journal?

17   A    Yes.

18   Q    Turning to Government Exhibit Video Still 4, do you have a

19   photograph that corresponds to that date and time?

20   A    Yes.

21   Q    Can you read what's in the first line there?

22   A    Teller Number 4, Illinois Near North, Number 1, 1122 North

23   Clark Street.

24   Q    And is that the location of a Chase Bank branch?

25   A    Yes.

Erickson - Direct by Best

1   Q   Turning to the next line, can you read what's reflected
2   there?

3   A   Friday, December 11th, 2009, at 10:08 a.m.

4   Q   Turning to Government Exhibit Checks and to the next check
5   in that document.  Do you have that in front of you?

6   A   Yes.

7   Q   What is the check number there?

8   A   1095.

9   Q   And what is the -- who is the payee on that document?

10  A   Abidemi Ajayi.

11  Q   What's the date on it?

12  A   December 11th, 2009.

13  Q   What's the amount?

14  A   $9,500.

15  Q   Turn to the next page of the Teller Journal.  Do you have a
16  document there that reflects the same date and check number as
17  the check you just testified about?

18  A   Yes.

19  Q   And can you read what is reflected in the WD amount and the
20  check number there?

21  A   $9,500.

22  Q   What's the check number?

23  A   1095.

24  Q   What is the date and time reflected on that document?

25  A   10:57 is the time.  And the date is December 11th, 2009.

Erickson - Direct by Best

1    Q    And looking at the primary ID section there, is that the

2    same primary ID or the same driver's license number that you

3    previously testified about?

4    A    Yes.

5    Q    Turning to Government Exhibit Video Stills and turning to

6    Video Still Number 5, do you have the document there that

7    corresponds to the date and time you just testified about?

8    A    Yes.

9    Q    If you could just read what's in the first line there?

10   A    Teller 3, Stony Island Number 1, 6650 South Stony Island

11   Avenue, which is a Chase Bank branch.

12   Q    And what's reflected on the next line?

13   A    Friday, December 11th, 2009, at 11:05 a.m.

14   Q    Turn to the next page of the Government Exhibit Checks.

15   What is the check number for that document?

16   A    1097.

17   Q    And what is the date there?

18   A    Date is December 12th, 2009.

19   Q    Who is the payee?

20   A    Abidemi Ajayi.

21   Q    What's the amount?

22   A    $9,650.

23   Q    Turning to Government Exhibit Teller Journals, to the next

24   page there.  Looking again at that middle section, can you tell

25   us what the amount is reflected there?

Erickson - Direct by Best

1    A    9,650.

2    Q    What's the check number?

3    A    1097.

4    Q    And what's the time and date reflected there?

5    A    Time is 10:28, and the date is December 12th, 2009.

6    Q    Turning to the primary ID section, can you explain what

7    that -- what number is reflected -- actually let me start at

8    the left side.  Can you tell us what's reflected in the typed

9    section there?

10   A    It says State Photo ID.

11   Q    And then turning to the rest of that line, to the

12   right-hand side, do you know what that number is there?

13   A    Yes.

14   Q    What is that number?

15   A    That is an Illinois state identification number.

16   Q    And is that number the same as the number -- well, let me

17   back up.  Do you know who that number is linked to?

18   A    Yes.

19   Q    How do you know that?

20   A    I ran that number in the Illinois Secretary of State

21   database and retrieved a photograph.

22   Q    And who was the photograph of?

23   A    Abidemi Ajayi.

24   Q    You previously testified about a driver's license whose

25   records you reviewed.  Do you know how that number for the

Erickson - Direct by Best

1    driver's license corresponds to the state ID number listed

2    here?

3    A    Yes.

4    Q    How so?

5    A    For an Illinois driver's license, the alphabetical or the A

6    would be at the front of the number.  And for a state

7    identification, that letter would be at the end of the number.

8    Q    But are the numbers otherwise the same?

9    A    Yes.

10   Q    Finally, turning to the next page of the Government Exhibit

11   Video Stills, do you have a document there that corresponds to

12   the date and time that you just testified about?

13   A    Yes.

14   Q    If you could read the first line of the text on this page.

15   A    Teller Number 3, North Wrigleyville, 3714 North Broadway.

16   Q    Do you know if there's a Chase branch -- bank branch

17   located there?

18   A    Yes.

19   Q    Read what's located on the next line.

20   A    The date and time.  Saturday, December 12th, 2009, at 10:28

21   a.m.

22   Q    Finally, turning back to Government Exhibit Checks, if you

23   look at the next page of that document, let us know what you

24   have -- what the document is there in front of you.

25   A    Check Number 1098.

Erickson - Direct by Best

1    Q    What's the date on that document?

2    A    December 12th, 2009.

3    Q    Who is the payee?

4    A    Abidemi Ajayi.

5    Q    What's the amount?

6    A    $9,800.

7    Q    Can you turn to Government Exhibit Teller Journal and to

8    the next page in that document, do you have a document there

9    that reflects the same check amount and check number?

10   A    Yes.

11   Q    Looking at the top of that page, read where the WD amount

12   and the check number there.

13   A    $9,800.  And Check Number 1098.

14   Q    And what's the time and date reflected there?

15   A    Time is 11:06.  And date is December 12th, 2009.

16   Q    And, finally, what's listed in the primary ID section

17   there?

18   A    Driver's license, driver's license number.

19   Q    Is that the same number you previously testified as being

20   linked to the defendant?

21   A    Yes.

22   Q    And, finally, if you'll turn to Government Exhibit Video

23   Stills 7.  Can you read what's listed in the first line there?

24   A    Teller Number 1, Uptown, 1101 West Lawrence Avenue.  That's

25   a Chase Bank branch.

Erickson - Direct by Best

1   Q   What's the -- reflected in the next line?

2   A   Saturday, December 12th, 2009, at 11:06 a.m.

3   Q   Turning back to the December 2009 bank statements, did you

4   notice any other spending from the bank statements?

5   A   Yes.

6   Q   What did you notice in reviewing the spending out of the

7   Chase -- out of the account at that time?

8   A   There were other ATM and debit card withdrawals.

9   Q   Did you notice any other transfers of money out of that

10  account?

11  A   Yes.

12  Q   What other transfers did you notice?

13  A   There was a wire transfer.

14  Q   And looking at the -- at the bank statement there, what is

15  the date reflected for the wire transfer?

16  A   December 11th, 2009.

17  Q   What is the amount of the wire transfer?

18  A   $53,000.

19  Q   And who is the recipient of the wire transfer, according to

20  the bank statement?

21  A   ALG International, Incorporated.

22  Q   I believe you just testified to other spending also out of

23  the account by ATM and debit card, correct?

24  A   Correct.

25  Q   Looking at the next page of the exhibit.

Erickson - Direct by Best

1          MS. BEST:  I'm sorry, your Honor, one moment.

2          THE COURT:  Uh-hum.

3      (Counsel conferring.)

4   BY MS. BEST:

5   Q   Do you have in front of you the section that's labeled "ATM

6   and Debit Card Withdrawals"?

7   A   Yes.

8   Q   And in reviewing those, did you -- in reviewing the bank

9   statement, did you determine what other spending was done from

10  the GR Icon account?

11  A   Yes.

12  Q   Did you note that on or about December 11th, there was an

13  ATM withdrawal for approximately $400?

14  A   Yes.

15  Q   Did you note also additional debit card spending from the

16  account at The Gap on December 11th and at the Apple store on

17  December 14th?

18  A   Yes.

19  Q   What is the amount of the spending at The Gap on that date?

20  A   $352.49.

21  Q   And what was the amount of the spending at the Apple store

22  on December 14th?

23  A   $3,305.30.

24  Q   What was the total, looking at the bottom of that section,

25  the total ATM and debit card withdrawals in the month of

Erickson - Direct by Best

1    December on the GR Icon account?

2    A    $4,630.59.

3    Q    Turning to the last page of that -- or the next page of the

4    exhibit, can you tell us what is reflected there as the ending

5    balance at the end of December 2009?

6    A    $172,497.32.

7    Q    Would you also review the January 2010 bank statements for

8    GR Icon?

9    A    Yes.

10   Q    If you would turn to the first page of that -- actually, I

11   think it's the second page.  The first page is just a blank

12   cover page.  Can you tell us what the opening balance is for

13   the account in January of 2010?

14   A    $172,497.32.

15   Q    What was the ending balance for the account that month?

16   A    172,000 -- oh, no, I'm sorry.  I misspoke.  Zero.

17   Q    And turning to the next page of the document there, can you

18   read what's reflected in the other withdrawals and fees and

19   charges section?

20   A    On January 15th, it says debit DDA check charge for

21   $172,497.32.

22   Q    Do you have an understanding of what that debit DDA check

23   charge entry means?

24   A    Yes.

25   Q    What does it mean?

Erickson - Cross by Cheronis

1    A    Chase put a freeze on the remaining money in the account.

2    Q    And was that money that's subsequently debited or taken out

3    of the account at that point?

4    A    Yes.

5    Q    And so the ending balance at the end of January of 2010 was

6    zero; is that correct?

7    A    Correct.

8         MS. BEST:  Your Honor, if I may have a moment?

9         (Counsel conferring.)

10        MS. BEST:  Your Honor, I don't have any further

11   questions for Inspector Erickson.

12        THE COURT:  Cross-examination.

13        MR. CHERONIS:  Thank you.

14                        CROSS-EXAMINATION

15   BY MR. CHERONIS:

16   Q    Good afternoon, Inspector Erickson.

17   A    How are you doing, sir?

18   Q    You work for the United States Postal Service as an

19   inspector, correct?

20   A    Correct.

21   Q    And you've been doing that for how long?

22   A    Almost seven years.

23   Q    All right.  And am I right when I say that the reason you

24   got involved in this case is because it was your understanding

25   that the U.S. mails were used.

Erickson - Cross by Cheronis

1    A    That would be correct, yes.

2    Q    Okay.  And specifically once you got into the case and

3    started investigating, you learned that a check was sent from a

4    business in Houston and was supposed to go to a P.O. box in

5    Dallas, right?

6    A    Correct.

7    Q    And the check came up missing.

8    A    Correct.

9    Q    All right.  And then we've all heard the evidence about how

10   it ended up in the Chase account.  Right?

11   A    Correct.

12   Q    Okay.  Now, did you ever go out to Texas to talk with any

13   of the employees from ABM?

14   A    I did not go out there.

15   Q    You did speak with a Mr. Corcoran, right?

16   A    Yes.

17   Q    He testified earlier?

18   A    Yes.

19   Q    Did you get an employee list of people who were working at

20   ABM at that time?

21   A    No.

22   Q    Did you find out who it was that was responsible for taking

23   the check from ABM to the post office?

24   A    No.

25   Q    Did you find out -- the check was supposed to go to a P.O.

Erickson - Cross by Cheronis

1    box in Dallas, right?

2    A    That's correct.

3    Q    And that was I believe a P.O. box that was controlled by

4    Comerica Bank?

5    A    That's right, yes.

6    Q    Did you ever go there, to the Comerica Bank in Dallas, and

7    interview anyone?

8    A    No.

9    Q    Okay.  Did you ever go to check surveillance at the

10   Comerica Bank like we've seen regarding the Chase Bank in this

11   case?

12   A    No.

13   Q    And as you sit here today, you don't know how the check got

14   from Houston or Dallas to Chicago.

15   A    That's correct.

16   Q    And you were contacted in this case I believe when you

17   launched your investigation, as the Government referred to it

18   as, in April of 2010.

19   A    Yes.

20   Q    You were contacted by Jim O'Shea, who also testified.

21   A    Yes.

22   Q    And he had done some work on the case as well, but he was

23   working for Chase, not for a federal agency.

24   A    Correct.

25   Q    And the U.S. Postal Service, you being an inspector there,

Erickson - Cross by Cheronis

1    they have offices also or departments in Texas, don't they?

2    A    Yes.

3    Q    And you never asked any of your brother or sister officers

4    to go to the Comerica Bank and do an investigation, did you?

5    A    No.

6    Q    Okay.  Now, throughout the course of this trial and through

7    your direct testimony, there's been some questioning about this

8    wire transfer that occurred, right?

9    A    Yes.

10   Q    And the wire transfer for was -- for

11   approximately $53,000 -- exactly 53,000.

12   A    Yes.

13   Q    Okay.  And you understand that Mr. Ajayi is being charged

14   with bank fraud in this case, correct?

15   A    Correct.

16   Q    You understand that he's being charged with money

17   laundering in this case, correct?

18   A    Correct.

19   Q    And when you looked at the wire transfer, from what we've

20   seen from the other witnesses in this case and from what you've

21   reviewed, that wire transfer went from a Chase account to a

22   bank in Florida, correct?

23   A    Yes.

24   Q    And the bank in Florida was called TD Bank.

25   A    That's correct, yes.

Erickson - Cross by Cheronis

1    Q    What's that stand for, if you know?

2    A    I don't -- I don't recall, off the top of my head.

3    Q    And not only that, but it was tied to a specific account at

4    TD Bank; isn't that true?

5    A    That's correct.

6    Q    And the account that it was tied to at TD Bank was some

7    form of corporation.

8    A    Yes.

9    Q    What was the name of that corporation?

10   A    ALG International.

11   Q    And in your investigation, you learned that there was a

12   woman who was tied to that account, correct?

13   A    Correct.

14   Q    And that woman's name was Amelia Granados.

15   A    That's correct.

16   Q    Okay.  And did you go to Florida to try to track down

17   Amelia Granados?

18   A    No.

19   Q    Did you ask any of your brother or sister agents who may

20   have worked in Florida to find out some information about

21   Amelia Granados?

22   A    No.

23   Q    And she was the registered agent of that company, correct?

24   A    Yes.

25   Q    And you learned that she was tied to that account.

Erickson - Cross by Cheronis

1    A    Yes.

2    Q    And according to the Government's theory of the case, that

3    was stolen money that went from the Chase account to ALG or

4    AIG, right?

5    A    Yes.

6    Q    Okay.  And you don't know anything about -- you don't know

7    where Amelia Granados lives, right?

8    A    I do know that.  I have an address in Hollywood, Florida.

9    Q    Okay.  And you had that address for some time, right?

10   A    Yes.

11   Q    Okay.  And during this entire investigation, you never went

12   to talk to her or never sent somebody to talk to her.

13   A    Correct.

14   Q    To see if she knew Mr. Ajayi, right?

15   A    That's correct.

16   Q    You never called her, did you?

17   A    No.

18   Q    Never tried to call her.

19   A    No.

20   Q    Because earlier you testified that you did some telephone

21   conversations with Mr. Corcoran, right?

22   A    Correct.

23   Q    Did you ever find Miss Granado's phone number?

24   A    No.

25   Q    Now, you would agree that as part of your job

Erickson - Cross by Cheronis

1    investigating -- investigating this case, since it deals with

2    the mail, you want to find out, to the best you can, how the

3    check got from Houston or Dallas or the State of Texas to

4    Chicago, right?

5    A    Correct.

6    Q    Okay.  And if you had information about that, you would

7    want to follow up on that, correct?

8    A    Correct.

9    Q    That would be important.

10   A    Correct.

11   Q    Okay.  And did you ever learn that the check was mailed to

12   Mr. Ajayi?

13   A    (No response.)

14   Q    Did he ever tell you that?

15         MS. BEST:  Objection, your Honor.

16         MR. CHERONIS:  If I may have a sidebar, your Honor.

17         THE COURT:  Yes.  Sidebar.

18   (At sidebar outside the hearing of the jury.)

19         MS. BEST:  The objection here is to hearsay.

20         THE COURT:  You can't get your client's statement in

21   this way.

22         MR. CHERONIS:  Here's what I'm trying to do:  My

23   client made a very extensive statement, and some of the

24   statements that he made were certainly exculpatory.  I'm not

25   trying to get into any of that.  What I am trying to offer is

Erickson - Cross by Cheronis

1    one portion of the statement where Mr. Ajayi says to this agent

2    that he received the check in the mail and that he still had

3    the envelope.

4           I'm not offering that for its truth.  I'm offering

5    that to see if this agent did anything in response to that.  So

6    it goes not for its truth, but for the effect that it had on

7    Special Agent Erickson.

8           I don't plan on getting into any other factors of the

9    statement.

10          THE COURT:  In that case, I think what you need to do

11   is say:  Did you have a conversation with my client?  Did you

12   do anything in response to that conversation?  Did you do this?

13   Did you do that?

14          MS. BEST:  Your Honor, to be clear, the interview with

15   his client was on January 14th of this year, more than nine

16   months after this case was charged and more than six months

17   after it was indicted.  Took absolutely no part in the

18   investigation.  Inspector Erickson interviewed him when he

19   returned into the country and when he was placed under arrest,

20   pursuant to the arrest warrant that had been pending at that

21   point for more than six months.

22          There's no reason to believe and I don't -- the

23   reality of this is it's to get into the truth of the matter --

24   the truth of the matter asserted.  There is no evidence that

25   there was any impact on the speaker from hearing the

Erickson - Redirect by Best

1    defendant's statement, and it shouldn't be admissible.

2                THE COURT:  If you go down this road, we're going to

3    hear from the Government about that it all happened months

4    after he was indicted, et cetera.  Do we really want to do

5    that?

6                MR. CHERONIS:  I think it's going to -- I think it

7    will probably come in --

8                MS. BEST:  Needs to take the stand --

9                MR. CHERONIS:  -- when Special Agent Erickson

10   testifies in rebuttal anyway --

11               THE COURT:  The objection is sustained.

12               MR. CHERONIS:  Okay.

13               MS. BEST:  Thank you.

14         (Sidebar proceedings concluded.)

15               MR. CHERONIS:  I have no further questions, Judge.

16   Thank you.

17               THE COURT:  Any redirect?

18               MS. BEST:  Just very briefly, your Honor.

19               THE COURT:  All right.

20                         REDIRECT EXAMINATION

21   BY MS. BEST:

22   Q    Inspector Erickson, you were just asked on

23   cross-examination about some of the contours and the details of

24   your investigation.

25               Regarding Amelia Granados and the ALG account that you

Erickson - Redirect by Best

1   just testified about, did you see that Amelia Granados name or

2   ALG account anywhere else in your review of the GR Icon

3   documents?

4   A    No.

5   Q    At any other point during your investigation, did either

6   one of those names ever appear?

7   A    No.

8   Q    The only instance you saw of ALG International or Amelia

9   Granados was with relation to that one $53,000 wire transfer,

10  correct?

11  A    Correct.

12  Q    Regarding your investigation and questioning of people in

13  Texas, did you conduct telephone interviews with individuals of

14  both Pollock Paper Distributors as well as ABM?

15  A    Yes.

16  Q    Did you learn that ABM had conducted its own investigation

17  in an attempt to determine how the check went missing?

18  A    Yes.

19  Q    Did you also learn that -- well, let me rephrase.

20          During your investigation, did you learn that the

21  check from ABM was taken by a person to the post office in

22  Houston, Texas for being mailed out to Pollock Paper

23  Distributors?

24  A    Yes.

25  Q    And did you learn that was then to be delivered to a

Erickson - Recross by Cheronis

1    lockbox for Comerica Bank?

2    A    Yes.

3    Q    Did you also learn that Pollock Paper then -- strike that.

4    Let me back up.

5            In your investigation, were you able to determine

6    whether the check at issue went missing either at ABM, at the

7    post office, at the lockbox of Comerica, or at Pollock Paper?

8    A    No, I was not able to determine.

9    Q    And in the course of your investigation, did you determine

10   that there was an indeterminate number of people who had access

11   and had their hands or potentially had their hand on that check

12   during its journey from ABM to Pollock Paper?

13   A    Yes.

14           MS. BEST:  I have no further questions, your Honor.

15           THE COURT:  Anything further?

16           MR. CHERONIS:  Briefly, your Honor.

17                          RECROSS-EXAMINATION

18   BY MR. CHERONIS:

19   Q    How many people had their hands on that check from the time

20   it went from ABM to Pollock?

21   A    It would be -- I couldn't give you an exact number.

22   Q    You don't know, do you?

23   A    I couldn't give you an exact number.  I just know from

24   professional experience that, from working at the post office,

25   that a lot of people within the post office could have their

Erickson - Recross by Cheronis

1   hands on a check and through the whole sorting and mail

2   processing process that a lot of people could possibly touch

3   that check.

4   Q   And you don't even know if it got to the post office,

5   right?

6   A   I don't know that for sure.

7   Q   And you didn't interview anyone yourself personally who may

8   have handled that check; isn't that true?

9   A   That's true.

10  Q   Thank you.

11          THE COURT:  Anything further, Miss Best?

12          MS. BEST:  No, your Honor.

13          THE COURT:  The witness is excused.

14          And we'll take a short recess.  All rise.

15          COURT SECURITY OFFICER:  All rise.

16      (Jury out at 2:42 p.m.)

17          THE COURT:  The witness may step down.

18      (Witness exits stand.)

19          THE COURT:  All right.  What additional witnesses do

20  you have?

21          MS. BEST:  Your Honor, after Inspector Erickson, with

22  the exception of potentially dealing with the summary chart for

23  the bank exhibit and, like I said, if we call anyone from the

24  IRS -- which, at this point, I don't anticipate -- that's the

25  sum of the Government's evidence at this point.

1          MR. CHERONIS:  Yes.  Same thing stands, your Honor.

2     If we were going to put on a case tomorrow, it will just be

3     Mr. Ajayi.  We have no other witnesses who are scheduled to

4     testify at this point.

5          THE COURT:  Okay.  Does it make sense for us to send

6     them home and then look at instructions?

7          MS. BEST:  I think that makes sense.

8          MR. CHERONIS:  They don't have to rest now.  If they

9     have one other witness, we can wait until tomorrow --

10          THE COURT:  That's fine.

11          MS. BEST:  To the extent we intend to recall anyone,

12     it will be Inspector Erickson, just for the purpose of a

13     summary chart for the bank exhibit so --

14          THE COURT:  Okay.  Well, after their break, then I'll

15     send them -- I'll send them on their way.

16          I'll be right back myself.

17          MS. BEST:  Thank you, your Honor.

18          THE COURT:  Thank you.

19          And then why don't you pull out whatever, you know,

20     instructions issues we can handle right now.

21     (Recess taken at 2:44 p.m.)

22     (Jury in at 2:55 p.m.)

23          THE COURT:  You may be seated.

24          Ladies and Gentlemen, I understand that the Government

25     has completed or has nearly completed its case-in-chief.

1          Mr. Ajayi, as you know, has no burden of proof in this

2     case.  He's presumed innocent.  He may, however, want to

3     present some evidence.  That is his decision.

4          But to make a long story short, I think we're going to

5     be able to have the case to you for deliberations sometime

6     tomorrow.  That's my expectation.

7          Now, in order for that to happen, I need to review the

8     instructions on the law, and I always do that with counsel.

9     We'll talk those things over.  It might take us a little while

10    to do that.  I don't want you waiting, so I'm willing to excuse

11    you for the afternoon at this point.  You'll be done for today.

12    And ask that you be back by 9:00 tomorrow morning.  We'll start

13    a little earlier tomorrow.  And at that point, I would expect

14    we'll hear any additional evidence from the Government.  We'll

15    hear any evidence that Mr. Ajayi wants to offer.  And when the

16    evidence has been completed, then we'll proceed with closing

17    arguments and my instructions on the law.  And what I'm going

18    to do right now after you leave is work with the lawyers to

19    make sure that the instructions are in good shape and we -- you

20    don't -- we won't need to keep you waiting tomorrow.

21         Now, on the day that a jury deliberates, we provide

22    lunch for you, so you can plan that we'll be providing lunch,

23    either -- Officer Mahone will either take you downstairs or

24    we'll have lunch brought in, something like that.  But you --

25    you'll be able, if you want to, to eat right with one another

1    and even do your deliberations if you're by yourselves,

2    otherwise always alone in the jury room.

3            For now we're ready to adjourn for the day, and I want

4    to thank you for your attention and for being here.  I expect

5    to see you tomorrow morning.  And we'll get the case to you at

6    whatever time is appropriate and whatever time is appropriate,

7    consistent with fairness.  All right.

8            COURT SECURITY OFFICER:  All rise.

9        (Jury out at 2:58 p.m.)

10           THE COURT:  All right.  We can take a look at the

11   instructions that Miss Best had tendered for us.

12           All right.  Does everybody have a set in front of

13   them?

14           MR. CHERONIS:  Yes.

15           MS. KIM:  Yes.

16           THE COURT:  I'm just going to take a look right now.

17           All right.  I know you e-mailed them to me and I

18   looked at them on e-mail.  Are they also in the court file?

19   Maybe that's a better place.

20           MS. BEST:  I have another copy of it here, your Honor,

21   actually, that I just printed up before court.

22           THE COURT:  Yes, maybe you should hand those up.  I

23   know that you -- they're probably in like three different

24   places and I just can't think where.

25           MS. BEST:  Your Honor, I can just hand these to you.

1          THE COURT:  Okay.  Thanks.

2      (Tendered.)

3          THE COURT:  Thank you.

4          MS. BEST:  I didn't file any, so I think it's just by

5    e-mail.

6          THE COURT:  All right.  All right.  Proposed

7    Instruction 1 is the Seventh Circuit pattern 1.01.

8          MR. CHERONIS:  No objection.

9          THE COURT:  All right.  Number 2 is 1.02.

10         MR. CHERONIS:  No objection.

11         THE COURT:  Number 3 is 1.03.  Presumption of

12   innocence.  Any problem with that?

13         MR. CHERONIS:  No objection.

14         THE COURT:  Number 4 is pattern 2.01.  Base your

15   decision on the evidence in court.  No objection to that one?

16         MR. CHERONIS:  No objection.

17         THE COURT:  Pattern 2.02 is Government's proposed

18   instruction Number 5.

19         MR. CHERONIS:  No objection.

20         THE COURT:  Government Instruction Number 6 is 2.03.

21   Direct versus circumstantial evidence.

22         MR. CHERONIS:  No objection.

23         THE COURT:  Number 7 is 2.04.  Don't make your

24   decisions by counting the witnesses.

25         MR. CHERONIS:  No objection.

1          THE COURT:  Number 8 is pattern 2.05.  Defendant has

2    an absolute right not to testify.  Obviously we'll reserve on

3    that one, pending Mr. Ajayi's decision.

4          All right.  Number 9 is pattern 3.01.  Witness

5    credibility.  Any problem with that?

6          MR. CHERONIS:  No, your Honor.

7          THE COURT:  All right.

8          MR. CHERONIS:  The only issue is the bracketed

9    language, which may or may not be included.

10          THE COURT:  Correct.  That would be --

11          MS. BEST:  Correct.

12          THE COURT:  -- whether or not we give the -- make a

13    reference to Mr. Ajayi's own testimony would be the issue.  I'm

14    just tabbing the ones that I need to check later.  All right.

15    So that's 8 and 9 that are still open -- open question.

16          Number 10 is pattern 3.02.  Proper to prepare -- to

17    interview a witness in preparation for trial.

18          MR. CHERONIS:  I don't think there's been any evidence

19    of that.

20          MS. BEST:  We can probably strike that after all the

21    evidence is done --

22          THE COURT:  Probably withdrawn.  All right.  I'll make

23    a note that that's likely to be withdrawn.

24          Government Number 11 is pattern 3.04.  Inconsistent

25    statements.

1          MR. CHERONIS:  I ask that you withhold that.  Reserve.

2          THE COURT:  Yes, we'll reserve on that one as well,

3     pending Mr. Ajayi's decision.

4          Government Number 12 is the pattern 3.09.  And that --

5     that's a statement -- instruction about the defendant's

6     statement to the postal service.

7          MS. BEST:  At this point, there is no evidence

8     regarding that, so I anticipate we can take that out.

9          THE COURT:  That's also likely withdrawn.

10         MS. BEST:  Correct.

11         THE COURT:  Again, this depends potentially on whether

12    Mr. Ajayi testifies and, if so, whether he gets impeached.

13         All right.  Number 13 is 2 -- is the pattern 3.16 for

14    summary charts.  And that may or may not be used?

15         MS. BEST:  Correct, your Honor, just depending on what

16    we do with the bank exhibits and summarizing that.

17         THE COURT:  Okay.  Assuming that we use a bank

18    exhibit, would there be an objection to the form of this

19    instruction?

20         MR. CHERONIS:  No.

21         THE COURT:  All right.  Number 14 -- oh.  Oh.  Is

22    another -- 3.17.  Another summary chart.

23         MR. CHERONIS:  Your Honor, I'm sorry.  I was reminded

24    of something.  I apologize -- no, we can deal with that

25    tomorrow, the summary one.  I don't think the underlying

1  documents would be admitted based on our kind of agreement, my

2  motion *in limine*, so that just might have to be changed.  I

3  would also agree --

4        THE COURT:  Yes, that's bracketed language.

5        MR. CHERONIS:  Yes, just so the Government is aware,

6  obviously, if we do enter in a summary and I need to file or

7  write an additional stipulation regarding something, I would

8  have no problem saying that the summary is accurate and reflect

9  the accounts.

10        THE COURT:  All right.  I'll reserve on 13 and 14,

11  which are both instructions about summaries and charts, pending

12  the decision of how or if at all they get used.

13        Okay.  Government 15 is 3.18.  It's an instruction

14  about notes.  Any problem with that?

15        MR. CHERONIS:  No objection.

16        THE COURT:  All right.  Government Number 16 is an

17  elements instruction regarding financial institution fraud.

18        MR. CHERONIS:  No objection.

19        THE COURT:  That will be given.

20        Government Number 17 is a definition of scheme from 18

21  United States Code, Section 1344.

22        MR. CHERONIS:  No objection.

23        THE COURT:  Government 18 is pattern 4.10, regarding

24  knowingly -- action that it's knowing.

25        MR. CHERONIS:  I would propose an objection to what

1    has just been commonly referred to as the ostrich portion of

2    this instruction, the second paragraph.  I don't think it's

3    appropriate in this case.

4            If we look at the Seventh Circuit notes and some case

5    law, there's really been no evidence that he was aware of

6    certain facts and then deliberately avoided the truth.

7            The evidence, at least at this point, was that he was

8    in possession of an altered check, he deposited it, and he took

9    money out.

10           I don't think that at this point the ostrich

11   instruction is appropriate.

12           MS. BEST:  I would disagree, your Honor.  I mean, I

13   think so far we've had evidence regarding what the check looks

14   like, whether the defendant should have been on notice that he

15   didn't -- that the check had been altered just on the face of

16   it.

17           Additionally, having gone through the bank statement

18   and the idea that -- again, we're not sure how things will turn

19   out tomorrow -- but the idea that there was this legitimate GR

20   Icon business, when the evidence shows there was no real

21   business going on in that bank account.  The idea that there

22   was a $345,000 check that was legitimate to the defendant based

23   on the evidence at this point is just not credible, and so I do

24   think the ostrich portion of this instruction is appropriate.

25           THE COURT:  All right.  And the things that the

1    Government believes he knew or could have had a strong

2    suspicion about would be, A, that there was no legitimate

3    business in the GRI account and, B, that the check itself was

4    altered?

5            MS. BEST:  Correct.  And the fact that it was altered

6    was visible on the face of the document to re -- to have been

7    altered to reflect the GR Icon name and, additionally, that

8    there is no reason, based on a lack of relationship between ABM

9    and GR Icon, that there's any reason to believe that a check of

10   this magnitude would be mailed from ABM and GR Icon and that

11   that would be a legitimate check on its face.

12           MR. CHERONIS:  Just a brief response, your Honor.

13           First of all, the check, if you look at the check, it

14   does not appear to be altered, if you just look at the check.

15   That's something that the Government is trying to establish

16   through different fonts, but the Court may even want to take a

17   look at the check, which has been introduced into evidence.

18           THE COURT:  I did take a look at it, and it seems to

19   me that the defendant is on -- could be on solid ground here,

20   at least in the sense that the bank -- the bank negotiated the

21   check.  So if it was an obvious forgery, one would expect that

22   a bank official, a bank -- even a bank teller would be more

23   likely to detect that than a bank customer.  So I guess with

24   respect to the whole bank -- the knowingly altered check, I

25   don't know that the ostrich instruction is appropriate.

1          Now, there's -- the other aspect is the question about

2     whether or not the ostrich instruction is appropriate because

3     Mr. Ajayi knew or should have known or could -- could

4     reasonably have known that there was no legitimate basis for

5     the account to have hundreds of thousands of dollars in it.

6          MR. CHERONIS:  I don't think the Government has

7     established that.

8          First of all, there are checks going in and out of

9     that account.  Obviously we've asked not to have those

10    introduced into evidence.

11         This is certainly a larger check, as I think the Court

12    can glean from the evidence, than is usually in there, but the

13    mere fact that a check that is larger than a prior amount

14    should not lead to the inference that he was involved in shady

15    dealings based on the evidence that the Government put forward.

16         Now, the Government chose not to put forward a

17    statement made by Mr. Ajayi where he explained to the

18    prosecution -- or explained to the postal inspector exactly how

19    he got the check and why he put it in there.

20         Potentially, if they wanted to get into that, they

21    could then ask the jury to draw the inference that he knew or

22    should have known.

23         But at this point, the only evidence you have is that

24    he deposited a check that did not, at least to my eye or to the

25    bank examiner's eye, look like it was forged, and it was a

1    larger amount.

2              That should not in and of itself lead the jury to have

3    this ostrich instruction that he knew or should have known or

4    that he should have taken steps to find out.  There's just no

5    evidence of that.

6              And I do have a few cases.

7              MS. BEST:  Your Honor, just to back up, first of all,

8    the idea that someone, a bank teller, should have known at the

9    time, to be clear, the defendant deposited this check at an

10   ATM.  There was no human being on the other side of this

11   interaction.

12             But going forward, I mean, the difference here -- you

13   know, defense counsel can't have it both ways and saying it is

14   overly prejudicial to not introduce all the bank statements,

15   but then state there are checks going in and out, because the

16   reality is there was one check for $13,000 in 2006 and one

17   check for $12,000 at some time in 2007.  With those exceptions,

18   there's -- I'm not even sure there are any deposits over

19   $10,000 in the four years the defendant had this bank account.

20   To then deposit a $345,000 check, as if that's somehow

21   legitimate and that -- I just want to say that, I mean, I think

22   there's a very strong argument that the defendant should have

23   been aware based on this check on its face that it was

24   fraudulent.  And I think giving the ostrich instruction,

25   leaving it up to the finder of fact, makes sense in this

1   context.

2         MR. CHERONIS:  Just very briefly.  The knowingly

3   instruction says that if he realizes what he's doing, is aware

4   of the nature of his conduct, he did not act through ignorance,

5   mistake, or accident, you know, and then decide what knowingly

6   is.

7         You know, in an ostrich situation, I believe there are

8   some cases where he took certain steps or avoided taking

9   certain steps to discover or determine the truth.  I don't

10  think there's been any evidence regarding that.  And that's

11  just -- all they have is him depositing a check, and then they

12  want to be able to make the argument to the jury that because

13  he deposited this check for this amount, he should have known

14  that the check was forged or altered or that this was illegal.

15  You know, I don't think at this stage that the ostrich

16  instruction is appropriate for that.  I think the knowingly

17  covers it, the first paragraph of that proposed instruction.

18        There's no deliberate avoidance at this point or that

19  Mr. Ajayi allegedly buried his head in the sand so he would not

20  see or hear bad things.

21        They can argue that he did this knowingly and that it

22  wasn't through ignorance or mistake, and that's covered by the

23  knowingly instruction.

24        THE COURT:  There are a couple of issues that we've

25  addressed in the last couple minutes.

1          Number one, okay, check was deposited at an ATM.  This

2     is true.  But at some point or another, the -- somebody in the

3     bank honored it.  Otherwise, there would never have been any

4     disbursements.

5          So to the extent that this proposed instruction,

6     Government Number 18, addresses Mr. Ajayi's beliefs from the

7     face of the check, I think it's not appropriate to give an

8     ostrich instruction.

9          We also have, backing a little up to the whole issue

10    of whether or not he believed the balance in the account was a

11    legitimate balance, Miss Best is correct that we can't -- you

12    can't keep evidence out on the one hand and then rely on its

13    absence to establish something on the other.  But I'm not sure

14    that that's really quite the argument.

15         I thought the argument on the motion *in limine* was we

16    ought not be telling the jurors about other activity that

17    appears to be other frauds.  There wasn't, or I don't think

18    there could have been, an objection that I would sustain to

19    evidence about what the balances were over periods of time.  I

20    wouldn't have sustained that objection, because -- and I don't

21    think, to be honest with you, I don't think it was made by the

22    defendant.  The defendant was concerned that the jury might

23    draw the conclusion that because Mr. Ajayi had bounced checks

24    before, he was engaged in wrongdoing in this instance.  And I

25    agree that that's not evidence admissible under 404(b).

1          On the other hand, evidence that this business, GRI,

2     had no money, or didn't have any business activity of any

3     legitimate nature that would generate hundreds of thousands of

4     dollars, that would be admissible.  I don't know whether we

5     heard a lot of evidence about what kind of business GRI was

6     engaged in or whether or not it was reasonable for anybody who

7     was familiar with that business to expect that it would have

8     hundreds of thousands of dollars.  I suppose, depending on what

9     kind of business you have, it might be that you get some big

10    contract and you get a big check.

11          MS. BEST:  Perhaps, your Honor, though, there is

12    evidence now in the record that would underscore the idea that

13    GR Icon was not a legitimate business in that it was -- its

14    status as a corporation was dissolved twice in the four or five

15    years that it existed for failure to fail -- failure to file

16    the appropriate reports and pay any of the taxes.

17          THE COURT:  But that's -- but that's not ostrich.

18    That's -- that argument is he knew it, right?

19          MS. BEST:  I mean, at this point, what the evidence is

20    showing is there is this check.  It goes missing.  I mean, I

21    can't help but reiterate, I mean, I do think looking at the

22    check on its face, the idea that the check is altered and that

23    you have a different font where it reflects the defendant's,

24    you know, fake company's name there, that is different than

25    everything else on the face of the check, when combined with

1    the fact that he had never received any amount of money even

2    remotely close, even a fraction of this amount, those two

3    things together I think do go to establish that, to the extent

4    the defendant deposited this check into the account, he did so

5    knowing or should -- or he knew or should have known based on

6    the face of the check and the other interactions going on on

7    that account that that check was fraudulent.  And his failure

8    to acknowledge that would really be equivalent to him sticking

9    his head in the sand.  I just -- I think that's how the

10   evidence seen in summary shakes out.

11           MR. CHERONIS:  Judge, I mean, I know we're going back

12   and forth on this, but it's my reading of the case law on the

13   ostrich instruction that it's more than just maybe should have

14   known.  It's designed for cases in which there is evidence that

15   the defendant knowing or strongly suspecting that he's involved

16   in shady dealings takes steps to make sure that he does not

17   acquire full or exact knowledge of the nature and extent of

18   those dealings.  And I'm citing *United States versus*

19   *Giovannetti*, 919 F.2 1223, 1990.  I mean, it's not -- you can't

20   just say he should have known.  I mean, that's not -- that

21   would almost just destroy the knowingly statement.  It seems

22   like there has to be some sort of steps taken or affirmative

23   steps or something to actually bury your head in the sand in

24   order to consciously avoid it.

25           THE COURT:  You know, I agree with that.  I think you

1    have to have evidence that somebody offered him information and

2    he deliberately chose -- I've had cases like this where the

3    accountant comes to the boss and says, you know, "Sir, you

4    really need to look at the records."  And the boss says, "Oh,

5    you know, I don't want to do that."  That's ostrich.  I know --

6    I know there's something bad out there, I know -- I don't want

7    to -- I don't want to know any better.

8          What I would -- in any case, to back up, the proposed

9    instruction, the Government's proposed Number 18, refers in the

10   first sentence of the second paragraph to the alteration of the

11   check.  I'm sustaining an objection to that.

12         This other proposal about why an ostrich instruction

13   is appropriate doesn't really map on to the proposed -- the

14   language I've got here, in any event.

15         So I'm going to -- I'm sustaining the objection to the

16   first sentence of the second paragraph of Government

17   Instruction 18.

18         Let's turn to 19.  There are alternatives here.  And

19   this is aiding and abetting or acting through another.  It's an

20   accurate statement of the law.  Does it fit with the facts of

21   this case?

22         MR. CHERONIS:  No.  That's why -- I think it's also

23   confusing.  I mean, at this point, I don't know if the

24   Government is under -- taking the position that other people

25   were involved in this, but here I don't know if there's been

1    any evidence that Mr. Ajayi -- I'm assuming it would have to be

2    him -- aided, abetted, or did anything that would make this

3    instruction relevant in this case or to follow the facts from

4    what we've heard so far.  So I'd object to this.

5            MS. BEST:  Your Honor, at this point, I mean, and

6    certainly the defendant's theory of the defense is that this

7    check mysteriously went missing somewhere in Texas, defendant

8    has no idea how it winds up in his hand in his bank account.

9    To the extent -- I mean, that's sort of where we shake out.

10   It's unclear, at the end of the day, obviously not knowing

11   whether defendant is going to take the stand or not, and sort

12   of what explanation, if any, there is for how the defendant

13   wound up with this check.  I don't anticipate the Government

14   will have any more evidence on that point, but I don't know

15   what else will come of defendant's potential testimony.

16           THE COURT:  All right.  Well, depending -- if

17   Mr. Ajayi does not testify, then I think I would sustain the

18   objection.  If he does, it may very well be that his testimony

19   would open the door to a suggestion that somebody else was

20   somehow involved, and then in which case an aiding and abetting

21   instruction could well be appropriate.  So I'm reserving on

22   Government's Number 19.

23           Government's 20 is pattern -- a definition of false

24   and fictitious statement.  18 United States Code, Section 1001.

25   Any problem with that?

 1            MR. CHERONIS:  No objection.

 2            THE COURT:  And same -- Government 21 is also a

 3    definition of fraudulent.  Again, from 18 United States Code,

 4    Section 1001.  Any objection?

 5            MR. CHERONIS:  No objection.

 6            THE COURT:  Count -- Government Instruction Number 22

 7    is the elements on Count 4.  It's derived from 18 United States

 8    Code, Section 1957.  It's the elements instruction for an

 9    unlawful monetary transaction.  Any problem with that?

10            MR. CHERONIS:  No objection.

11            THE COURT:  Number 23 is the definitional language for

12    monetary transaction, interstate commerce, financial

13    institution, and criminally derived property.  Also from 18

14    United States Code, Section 1957.  Any problem with that?

15            MR. CHERONIS:  No objection.

16            THE COURT:  Government 24 is an elements instruction

17    for Count 7 from the case *United States versus Chapman*.

18            MS. BEST:  Your Honor, I'll be -- this is the last

19    513(a) case I did.  There isn't a -- there isn't model or

20    pattern --

21            THE COURT:  Right.

22            MS. BEST:  -- jury instruction.  It's based on that,

23    which originally also came out of a pattern 11th Circuit

24    instruction.  And so it's based on that language, as well as

25    the language from 513(c)(4) itself.

1          But I haven't been able to find anything else really

2     on point, and having dug around a little bit.

3          And I will say that in *Chapman*, we came up with

4     instructions, like I said, based on the Eleventh Circuit, as

5     well as from earlier case law, in which the definition of

6     "organization" led to that conviction being reversed.  And so

7     this incorporates the language regarding "organization."  Make

8     sure that's established as well.

9          MR. CHERONIS:  One of the problems I have with this

10    instruction, just from reading it -- and maybe I can talk to

11    the Government about this -- but when you get into the actual

12    paragraphs one, two, and three -- and this may not be a huge

13    deal -- but in order for you to find him guilty, the Government

14    must prove each of following elements:  The defendant made,

15    passed, or attempted to pass, or possessed a counterfeit or

16    forged security -- I think if this instruction is going to be

17    given that the phrase "knowingly" should be included in the

18    first subsection of that.  I know it is in the first sentence

19    above, but I wouldn't want the jury to read this and say that

20    if he possessed a counterfeit or forged security without doing

21    it knowingly -- in other words, knowing that it was counterfeit

22    or forged -- that they would satisfy that element of it.  So

23    although it may duplicative, I think it would be important to

24    include "knowingly" in that paragraph.

25          Regarding the rest of the instruction, I think it is

1    in line with the law.  I can take a look at some of the things

2    that Miss Best just sort of proffered, and we can discuss it

3    later.  And if there's any issues, I may be able to raise it

4    early tomorrow.

5              THE COURT:  Okay.  Let me -- let me just stop for a

6    second.

7              In the first line, it should be "knowingly" as opposed

8    to "knowing."  Right?

9              MS. BEST:  That's correct, your Honor.

10             THE COURT:  Okay.

11             MS. BEST:  That's a typo.

12             THE COURT:  And I understand Mr. Cheronis to be saying

13   that he doesn't think he's got any other objections, but would

14   ask that the word "knowingly" also be inserted in paragraph

15   one.

16             So it would be that the defendant knowingly made,

17   passed, or attempted to pass or possess a counterfeit or forged

18   security.

19             MS. BEST:  Your Honor, I actually -- I have to admit,

20   I probably need to take some time and just look at it and make

21   sure that that jives with the case law and make sure --

22             THE COURT:  Sure.  Okay.  That's fine.

23             MS. BEST:  -- that's appropriate in that paragraph.

24             THE COURT:  And let me ask.  I think what you told me

25   a moment ago is that this is -- this is your reading of the

1    Seventh Circuit's teaching in *United States versus Chapman.*

2         MS. BEST:  *United States versus Chapman* is a case I

3    had in front of Judge Kocoras two years ago.  This is the --

4    that's the citation to the case.  This was the instruction that

5    was given by Judge Kocoras in that case.  When we posited that

6    instruction, it was based on an Eleventh Circuit pattern

7    instruction, as well as the underlying Seventh Circuit case law

8    that dealt with the definition of "organization," which in

9    earlier cases had not been properly defined.

10        THE COURT:  I see.

11        MS. BEST:  And so that took into account what the

12   Seventh Circuit has determined must be proved to prove up what

13   an organization is.

14        But this is -- I mean, this is the instruction we gave

15   at that -- at that time, and that conviction was then upheld on

16   appeal.  And there was some discussion in that appeal and those

17   briefing as well about the definition of "organization" and

18   what needs to be proven there.

19        THE COURT:  Okay.  And just regardless what decision

20   we ultimately make on this decision in this case, you do want

21   to bring the whole issue to the attention of the Criminal

22   Pattern Jury Instruction Committee, which I think is now a

23   standing committee.

24        You know, whenever I come across something where there

25   isn't an instruction and you've got a proposal, let them know.

1      MS. BEST:  I'll do so, your Honor.

2      THE COURT:  They do -- they vet these things, and then

3  we don't have to worry about it.  I myself will nag the judges

4  at issue as well.  But in any case, I understand you're both

5  going to look at the case law and see whether this language is

6  acceptable.

7      MR. CHERONIS:  Yes.

8      THE COURT:  So I'm reserving on Government's 24.

9      Government 25 is the pattern 4.13.  Definition of

10  possession.  Any objection to that?

11      MR. CHERONIS:  I'm sorry, are we on --

12      THE COURT:  Did I say -- I maybe misspoke.  I'm on

13  Government 25.

14      MR. CHERONIS:  25.

15      THE COURT:  Yes, I misspoke.  Government 25.  It's on

16  page 26, but it's defining --

17      MS. BEST:  I'm sorry, this was two pages --

18      MR. CHERONIS:  I apologize, your Honor.

19      MS. BEST:  -- this previous instruction --

20      THE COURT:  Yes.

21      MR. CHERONIS:  Okay.

22      THE COURT:  The previous instruction was a two-page

23  instruction.  Right.

24      MR. CHERONIS:  I mean, I guess -- I guess I have no

25  objection.  Possession I don't think is too much of an issue.

1    But, yeah, that's fine.

2          THE COURT:  Government 26 is the pattern 4.05 for on

3    or about.  Any problem with that?

4          MR. CHERONIS:  No objection.

5          THE COURT:  Government 27 is pattern 4.06.  Number of

6    charges is not evidence of guilt.

7          MR. CHERONIS:  No objection.

8          THE COURT:  Government 28 is pattern 4.08.  Don't

9    consider the possible penalties.  Any problem with that?

10         MR. CHERONIS:  No objection.

11         THE COURT:  Government 29 is a proposal from a number

12   of judges, should not speculate why any other person whose name

13   you may have heard during the trial.  Is there anybody else?

14         MR. CHERONIS:  I did mention --

15         THE COURT:  Right.

16         MR. CHERONIS:  -- the woman who received the wire, so

17   I think that's --

18         THE COURT:  Right, right, right.

19         MR. CHERONIS:  -- probably proper.

20         THE COURT:  Right.  So that will be given.

21         Government 30 is pattern 7.01.

22         MR. CHERONIS:  No objection.

23         THE COURT:  This is the one where I am always tempted

24   to instead give my own instruction, "Don't write me any notes."

25         (Laughter.)

1          THE COURT:  But I never do.  I never do.

2          MR. CHERONIS:  Ask you the reports.

3          THE COURT:  In civil cases, I always want to give them

4     the instruction.

5          I drafted once something like, "If you need to

6     communicate with me, please don't.  I don't understand the case

7     either, but now it's your problem."

8          (Laughter.)

9          THE COURT:  All right.  We're not doing that.

10          All right.  Government 31 is pattern 7.02.  The

11     verdict form.  Any problem with that?

12          MR. CHERONIS:  No objection.

13          THE COURT:  32 is the *Silvern* instruction.  7.03.  Any

14     problem with that?

15          MR. CHERONIS:  No objection.

16          THE COURT:  And then verdict form is last.  It

17     contains a guilty and not guilty place for each of the seven

18     counts of the indictment.

19          MR. CHERONIS:  I always object to the left portion of

20     the boxes, but it's always given anyway, your Honor --

21          THE COURT:  All right.

22          MR. CHERONIS:  -- so no objection.

23          THE COURT:  All right.

24          MR. CHERONIS:  The only instructions I may be

25     presenting tomorrow, so the Court is aware -- and the

1    Government can look into it if they want to, depending on if

2    Mr. Ajayi does testify, I may be offering -- attempting to

3    offer a good faith instruction.  And I am on a quest to have

4    the Seventh Circuit take into account the Sixth Circuit's

5    reasonable doubt standard jury instruction.

6         I have not been successful yet in convincing a trial

7    court judge in this district to accept it, but I will be

8    tendering it.

9         THE COURT:  I probably won't be, you know, district

10   trial -- district judge number one, but let me say that you are

11   not lawyer number one who has made this pitch to me.

12        MR. CHERONIS:  It's a great instruction.

13        THE COURT:  It is a great instruction.

14        MR. CHERONIS:  It really is.  And I got to argue it

15   once in a case in Kentucky.  And it was a guilty.  But we got

16   to argue it.

17        THE COURT:  You got to argue it.

18     (Laughter.)

19        THE COURT:  Mr. Ajayi, I know you've been listening

20   carefully.  I will be talking to you again tomorrow, sir, when

21   we know for sure what the Government's decision is about its

22   own case.  But just want to give you kind of a preview that it

23   is your decision in the end whether or not to take the stand in

24   your own defense.  You have the freedom to do that.  You also

25   have the freedom to decide not to.  Remember, you have no

1  obligation to testify.  And if you choose not to testify, I

2  will remind the jury that your silence means nothing about

3  whether or not the Government has met its burden of proof.

4  Only the Government has any burden in this case.  I always tell

5  defendants that it is your right to take the stand.  I'm not

6  suggesting to you that you not listen to your lawyers.  You

7  certainly should listen to your lawyers and accept their

8  advice.  But the decision about whether or not to testify is

9  one that finally you make on your own.  And I'll talk to you

10  again about that tomorrow.

11          THE DEFENDANT:  (Nods head.)

12          THE COURT:  All right.  I will see you in the morning

13  at 9:00.  Is that all right?

14          MS. BEST:  Yes, your Honor.

15          THE COURT:  Great.  Okay.

16      (Proceedings adjourned at 3:26 p.m.)

17                  C E R T I F I C A T E

18      I certify that the foregoing is a correct transcript of the

19  record of proceedings in the above-entitled matter.

20

21

   _/s/ GAYLE A. McGUIGAN_____          _July 17, 2014_
22  Gayle A. McGuigan, CSR, RMR, CRR              Date
   Official Court Reporter
23
   _____          _July 17, 2014_
24  Gayle A. McGuigan, CSR, RMR, CRR              Date
   Official Court Reporter
25