```
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3

 4     UNITED STATES OF AMERICA,        )
                                        )
 5                    Plaintiff,        )    Docket No. 12 CR 190
                                        )
 6              vs.                      )
                                        )
 7     ABIDEMI AJAYI,                   )    Chicago, Illinois
                                        )    December 6, 2013
 8                    Defendant.        )    9:10 a.m.

 9
                                  VOLUME 2
10                    TRANSCRIPT OF PROCEEDINGS - Trial
          BEFORE THE HONORABLE REBECCA R. PALLMEYER, and a jury
11

12     APPEARANCES:

13
       For the Plaintiff:      HON. ZACHARY T. FARDON
14                             UNITED STATES ATTORNEY
                               BY:  MS. YASMIN N BEST
15                                  MS. NICOLE M. KIM
                               219 South Dearborn, 5th Floor
16                             Chicago, Illinois  60604

17
       For the Defendant:      LAW OFFICES OF DAMON M. CHERONIS
18                             BY:  MR. DAMON M. CHERONIS
                                    MR. IAN M. BARNEY
19                             53 West Jackson Boulevard, Suite 1750
                               Chicago, Illinois  60604
20

21     Also Present:           Mr. Brett Erickson
                               US Postal Inspection Service
22

23     Court Reporter:         FRANCES WARD, CSR, RPR, RMR, FCRR
                               Official Court Reporter
24                             219 S. Dearborn Street, Suite 2144A
                               Chicago, Illinois  60604
25                             (312) 435-5561
                               frances_ward@ilnd.uscourts.gov
```

1          <u>I N D E X</u>

2                                                    <u>PAGE</u>

   <u>BRETT ERICKSON</u>
3  Direct Examination - By Ms. Best              213

4  <u>ABIDEMI AJAYI</u>
   Direct Examination - By Mr. Cheronis         228
5  Cross-Examination - By Ms. Best              258
                                                310
6  Closing Argument on Behalf of the
   Government - By Ms. Kim
7                                               324

   Closing Argument on Behalf of the
8  Defendant - By Mr. Cheronis
                                                334
9  Final Argument on Behalf of the Government
   - By Ms. Best
10                                              344
   Jury Instructions - By the Court
11

12

                        INDEX TO EXHIBITS
13
   <u>GOVERNMENT EXHIBIT</u>                        <u>RECEIVED</u>
14 Summary Chart...................................  214
   1...............................................  234
15 2...............................................  242
   3...............................................  244
16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  I think our jurors are

2     here.

3          Tell me what we expect is going to happen.  You may

4     be seated.

5          MR. CHERONIS:  Good morning, your Honor.

6          Damon Cheronis on behalf of Mr. Ajayi, along with

7     Ian Barney.

8          MS. BEST:  Good morning, your Honor.

9          Yasmin Best and Nicole Kim on behalf of the United

10    States.

11         Based on our discussions this morning, what I

12    anticipate is that we will call Inspector Erickson just to

13    talk about the summary chart, which I have provided to

14    Mr. Cheronis.  I don't know -- I mean, essentially, he will

15    testify to how this chart was created, which happened

16    yesterday, and which I have given him a copy of.

17         This chart just lists by month --

18         MR. CHERONIS:  Do you want me to just hand a copy

19    to the Court?

20         MS. BEST:  Yes.

21         (Document tendered.)

22         MS. BEST:  -- the opening balance, total deposits,

23    total withdrawals, and ending balance for each month the

24    GR Icon bank account existed from February 2006 through

25    January 2010.

1    So, hopefully, I think that gets around some of the

2    defense's concerns and some of the Court's concerns from

3    yesterday regarding the potential, I guess, prejudicial

4    effect of seeing these other checks and construing anything

5    from that.  It's just two copies of the same document, your

6    Honor.

7         THE COURT:  I was going to say, I think these are

8    the same.

9         MR. CHERONIS:  I can live with that, your Honor.

10        MS. BEST:  You can live with that.

11        THE COURT:  All right.  Good.

12        So you will put in Mr. Erickson to get -- to lay

13   the foundation --

14        One moment.

15        -- for the summary chart?

16        MS. BEST:  Correct.

17        THE COURT:  And then do you expect to rest at that

18   point?

19        MS. BEST:  I do, your Honor.

20        And from talking to Mr. Cheronis, I anticipate the

21   defendant will testify this morning.

22        What I have told him is that I anticipate we will

23   then have a brief rebuttal case, which will include

24   Inspector Erickson and potentially someone from the IRS.

25        As I mentioned yesterday, we are scrambling to get

1  ahold of someone.  But I think in light -- depending on the

2  defendant's testimony, it may be necessary to call someone

3  from the IRS to deal with that issue.

4          MR. CHERONIS:  Thank you, your Honor.

5          I think a couple issues, then, for my motion --

6  motions *in limine* that were premature at the time may now

7  sort of come into play.

8          One is the issue regarding Houston, Texas.  I filed

9  a motion regarding that.  Obviously, I think the evidence in

10  this case, by the government's own admission, had no

11  information that Mr. Ajayi stole the check or that he was in

12  Houston, Texas, the time the check was stolen.

13          I think the fact that he has ties to Houston or his

14  family was there really isn't relevant, and it could lead to

15  speculation on behalf of the jury.  You know, it's got

16  nothing to do with the case, essentially.

17          THE COURT:  Is there evidence that he was in Texas

18  at or near the time?

19          MR. CHERONIS:  No.

20          MS. BEST:  We haven't discovered any evidence, your

21  Honor.  It's just that he -- I mean, he did have family

22  there.  But beyond that, we don't have any evidence regarding

23  Mr. Ajayi being present in Texas anytime in November of 2009.

24          THE COURT:  I think Mr. Cheronis is correct that

25  the fact that he has family ties in Texas would not be

1  admissible.

2          MR. CHERONIS:  The next issue is the tax return

3  issue.  Obviously, the government is trying to tee somebody

4  up regarding -- regarding proving that no tax returns were

5  filed for GR Icon.  They have tendered to me a copy of the,

6  essentially, nonexistence of tax returns.

7          I objected in my motion based on, not only

8  relevance, but Federal Rule of Evidence 403, as well as this

9  could potentially be a propensity argument; that because he

10 didn't file taxes, he is a criminal.  He has never been

11 charged with tax evasion.

12         So based on that, we don't believe that that

13 evidence is relevant.  And if it is deemed relevant, it

14 would -- it's our position that any relevance would be

15 outweighed by the substantial prejudice that Mr. Ajayi would

16 face should that evidence come in.

17         MS. BEST:  And, your Honor, we got into this a

18 little bit yesterday.  But as I stated yesterday, the purpose

19 for introducing that -- those certifications or the lack of

20 record for GR Icon do not go to any sort of implication that

21 the defendant was evading taxes.

22         In fact, based on the evidence, at least for years

23 2007, 2008, and 2010, there is no evidence that GR Icon

24 existed and had any income.  So I don't have any basis for

25 believing they should have filed income tax returns for those

1    years.

2           I won't take a position on 2009, the year that he
3    received the check, and whether he should have filed taxes
4    for that.

5           But the reality is that the purpose for introducing
6    those taxes is really to go to the defendant's intent and his
7    motive.  The fact that he received this check, that he had no
8    reason to believe that it was a legitimate check -- and
9    that's underscored by the fact that GR Icon was not a
10   functioning business -- and that he didn't file taxes for it,
11   and the fact that he, then, received this $344,000 check, he
12   was on notice and knew this was a fraudulent check.

13          So it's really -- the fact that GR Icon didn't
14   exist; that it didn't take the steps, in combination with the
15   Secretary of State documents from yesterday, regarding the
16   dissolution of the business; the fact that the bank records
17   and the lack of sort of business-related expenses in the bank
18   records around the time of the check's deposit; and then in
19   combination with these tax returns showing that GR Icon
20   didn't file taxes for these years, that's the purpose: that
21   the defendant intended to defraud.

22          It's not for the purpose of some other crime or
23   leading to an implication or an inference by the jury that he
24   was evading taxes.  It's really just, he knew GR Icon wasn't
25   a real business, and he knew this check was altered, and he

1    deposited it anyway.

2            MR. CHERONIS:  The government essentially just said

3    that they are attempting, I think, to introduce this as

4    404(b), as motive or intent.  I think that's what it sounds

5    like.

6            They are also not planning, from what I can tell,

7    to introduce this in their case-in-chief, but only in

8    rebuttal if Mr. Ajayi denies having filed taxes for GR Icon.

9            I don't think it's proper 404(b) evidence.  I don't

10   know how the government can say they are not introducing it

11   as 404(b) evidence and then, on the other hand, say they are

12   introducing it for motive and intent.  I think that is what

13   404(b) evidence is.

14           Moreover, if they are attempting to introduce this

15   in rebuttal, as they have told me, after Mr. Ajayi, if he

16   denied, which I'm not suspecting he would do, but if he

17   denied that GR Icon filed taxes, then they couldn't introduce

18   it, because, then, it seems like it would be being offered

19   under 608(b) as a way of sort of impeaching his credibility,

20   and they couldn't prove that by extrinsic evidence.

21           I think that the failure to file tax returns, the

22   way the government has posited the evidence, is being used as

23   propensity evidence to show that this was a criminal act, and

24   by not filing taxes, he must be a fraudster.  I don't think

25   that's proper 404(b) evidence.

1    I think the government, also, has already

2    introduced evidence about the lack of him being certified

3    through the Secretary of State or losing his certification as

4    an incorporation, things such as that.

5    I think this is overkill.  I think that the unfair

6    prejudice outweighs any minimum probative value.  And for

7    that reason, we are asking that that be barred.

8    MS. BEST:  And it's not 404(b), your Honor, if this

9    is not proof of other prior bad acts.  This is just going to

10   the issue -- the fact the defendant knew this check was

11   altered and deposited it, because GR Icon didn't exist and

12   did no business.

13   And the reality is, as I have just said, I mean,

14   based on the evidence we have seen so far, he had no

15   obligation to file taxes for a number of those years because

16   GR Icon did no business, at least from what we can tell.

17   So it's not -- it's not a prior bad act.  And

18   that's not the purpose of it.  It really just goes to the

19   intent and the government's requirement to meet its burden

20   regarding the defendant's intent to defraud by possessing and

21   then using this check and then converting its proceeds for

22   his own use.

23   THE COURT:  So, in other words, the government's

24   argument is that you want to introduce the failure to file

25   tax returns to bolster the conclusion that GRI was not a

1    functioning business.

2              MS. BEST:  Correct.

3              THE COURT:  The trouble with that is there are

4    plenty of functioning, profitable businesses where their

5    managers do not file tax returns.  We are aware of that.  You

6    know, these cases get prosecuted in this building.

7              I mean, it's not unusual for people that make money

8    to decide they don't want to tell the IRS about it and not

9    disclose that information to the IRS.  It's unlawful conduct,

10   but it certainly isn't inconsistent with profitability.

11             MS. BEST:  Your Honor, it's not the question of

12   profitability or --

13             THE COURT:  Or even functioning.  Or even

14   functioning, functioning businesses.  We know that there are

15   functioning and nonfunctioning businesses.  But even

16   functioning businesses routinely ignore their tax

17   obligations.

18             You know, obviously, I don't approve of that at

19   all.  It's criminal conduct.  But I think the fact -- it

20   seems to me it's cumulative of the evidence that GRI was not

21   a functioning business.  And if we need to, we can stipulate

22   to that, perhaps.

23             The only thing it adds is that, in addition to it

24   not be a functioning business, if it were a functioning

25   business, it would have -- there was a further violation of

1    the law.  That does sound like evidence that I should exclude

2    under 403.

3             We are having a dispute about whether it's 404(b)

4    evidence.  404(b) evidence is evidence that does not -- it's

5    a prior bad act, but it is admissible for purposes of intent,

6    motive, and the like.

7             So I think you are both kind of right about that.

8             I don't know that Mr. Ajayi's failure to file

9    income taxes on a business that's not functional goes to

10   anything like his intent or motive vis-à-vis defrauding the

11   bank in connection with this check.

12            In other words, I guess the fact that Mr. Ajayi

13   didn't file taxes in years in which the business was, we can

14   all concede, not profitable and maybe not even functioning, I

15   don't think it makes any fact at issue more likely true than

16   not true.

17            MS. BEST:  Your Honor, I mean, the reality is that

18   it goes to the fact that the defendant, when he received this

19   check that he believes is somehow an investment in this

20   business that hasn't existed up until that point and for

21   which no work is done thereafter, the idea that he has this

22   business that, you know, this check drops into his lap, is

23   undermined by the fact that he never took the steps that one

24   would have if they had a functioning business.

25            I mean, I think while the defense counsel's

1    position is that it's cumulative, it's really -- I mean,

2    these things all need to be taken sort of -- I mean, the

3    evidence has to come in, sort of, together to show that this

4    was the defendant's intent and this was his knowledge at the

5    time that he committed these acts.

6            THE COURT:  But that would only -- that would only

7    establish a basis for introducing the failure to file a tax

8    return in '09.

9            MS. BEST:  I mean, well, the reality is the way

10   that the certifications come in sort of deal with the entire

11   time period.  So it's hard to introduce the fact that it's --

12   short of redacting the document, there is a failure to file

13   because it states 2007, 2008, 2009, 2010.

14           THE COURT:  You know what?  Here is what I am going

15   to do.  I think I will wait until after I hear from

16   Mr. Ajayi's testimony.

17           If he makes statements that suggest that -- that

18   his failure to file a tax return in '09 is meaningful, I

19   think we could put that evidence in the record without

20   including all of these other records in years in which,

21   according to the government itself, there was no obligation

22   to file tax returns.

23           MR. CHERONIS:  The last issue, your Honor, is last

24   week, I tendered some e-mails to the government between

25   Mr. Ajayi and individuals that he was attempting to procure

1  MRI equipment from, a Trent Howell and another individual

2  named Mr. Jim Bates.

3         I may attempt to introduce those e-mails into

4  evidence.  I would not be introducing them as hearsay.  I am

5  not offering them as an out-of-court statement offered for

6  the truth of the matter asserted.

7         I think the issue in this case goes to Mr. Ajayi's

8  intent; it goes to his state of mind.

9         That being said, the government is going through

10  leaps and bounds to try to infer or have the jury infer that

11  Mr. Ajayi just had no legitimate business and wasn't, maybe,

12  trying to do anything legitimate.

13         It's our position that if we can establish he was,

14  in fact, attempting to procure MRI machines -- and you will

15  learn more about this.  I mean, that's the reason he got the

16  check.

17              THE COURT:  Right.

18              MR. CHERONIS:  But if he was making legitimate

19  efforts to procure MRI machines around the relevant time

20  period of these charges and leading up to them, it's our

21  position that goes to his intent to defraud and whether he

22  had an intent to defraud.

23         Without that evidence, it's our position that the

24  government would be left with the argument that there is

25  simply no evidence that he was trying to do these things,

198

1    and, therefore, he must have been doing this just to commit

2    fraud and make easy money and get out of town or whatever.

3           So we think that that evidence being offered for a

4    nonhearsay purpose, not being offered for its truth, but

5    offered for Mr. Ajayi's state of mind would be relevant and

6    admissible.

7           THE COURT:  What are the dates of the e-mails?

8           MR. CHERONIS:  There is one that is in July of

9    2009, and then there is one in December of 2009.

10          THE COURT:  And what's the government's position?

11          MS. BEST:  Your Honor, the government does object

12    to these.

13          One, I do believe it's hearsay.  The purpose of

14    introducing these is to show that the defendant had contacts

15    with these -- these third parties to discuss whether he could

16    procure used MRI equipment.

17          I anticipate what his testimony in his defense will

18    be is that he was trying to get a used-MRI-equipment business

19    off the ground.

20          So as Mr. Cheronis just stated, those first e-mails

21    are about four months before the fraudulent check in

22    question, and then the e-mails seemed to be around

23    December 2009 into early 2010.

24          The purpose of introducing them is to show that he

25    was having these conversations regarding MRI equipment.

1    The fact that the defendant -- his state of mind
2    and the impact that these other statements had on him is not
3    relevant here.

4    One, the defendant is going to be on the stand and
5    can testify as to what he was doing at the time.

6    But to use it to bolster, with these e-mails, these
7    out-of-court statements just isn't appropriate under -- and I
8    can't -- I mean, I don't think it falls within any of the
9    hearsay exceptions. I don't see how the defendant can
10   introduce these to show how it impacts his state of mind at
11   the time.

12   Further, and just so your Honor knows, we got these
13   e-mails last week from defense counsel. We have been trying
14   to track down the people who have been involved on the other
15   sides of these e-mails. The case agent received this morning
16   a return phone call from one of the people on the e-mail
17   stating that he doesn't recall Mr. Ajayi and doesn't have any
18   records related to him.

19   So the government is now in the process of trying
20   to figure out whether this is someone we need to secure for
21   our rebuttal case. I just wanted to put that out there.
22   This person lives in Atlanta, Georgia. We just found out
23   about this, this morning. And it's something that,
24   particularly if this is introduced, that we are going to have
25   to deal with in rebuttal.

1      But that said, I don't think these are properly

2   admitted.  I do think they are hearsay and should be

3   excluded.  And I don't think it falls within any of the

4   hearsay exceptions.

5      MR. CHERONIS:  Well, there is a state-of-mind

6   exception and, you know, the issue of whether it's even

7   hearsay.  For it to be hearsay, it has to be offered for its

8   truth; in other words, that the words in the e-mails were --

9   you need to believe the words.

10      The key to this evidence is not necessarily that he

11   was doing this to prove that it's true, but to prove that his

12   state of mind when he was going into this situation was that

13   he legitimately wanted to get MRI equipment and he was trying

14   to do that.  So that's his state of mind at the time.

15      THE COURT:  I think the e-mails might -- I haven't

16   looked at them, but they might serve to establish that he was

17   attempting to be engaged in a legitimate business.

18      I guess what I need is some kind of a link between

19   those e-mails and the charges which relate to this check.

20      In other words, is there anything about the e-mails

21   that might have led Mr. Ajayi to conclude that getting a

22   $344,000 check was something he could expect based on the

23   business -- the MRI business he was doing?

24      MS. BEST:  Absolutely not, your Honor.

25      There is nothing here that relates -- there's

1   nothing in these e-mails with regard to how the defendant got

2   this check and what he was doing with the check.

3          The idea that somehow -- I mean, we haven't seen

4   anything, and I doubt the defense will proffer that the

5   people who were involved in these e-mails were somehow

6   involved in securing this check for the defendant and that

7   they had any knowledge of this primary -- you know, this

8   investment that the defendant purports he had, and that's why

9   he was going forward with this business.

10         So there isn't any link between his conversations

11  with these people and these e-mails, how this check came into

12  his possession, and what he did with it thereafter.

13         MR. CHERONIS:  In response to that, by way of

14  proffer your Honor, first of all, I will agree that there is

15  no connection between Mr. Ajayi and the individuals that he

16  was e-mailing regarding the check.

17         But what you are going to hear, by way of offer of

18  proof, is that Mr. Ajayi met an individual on an airplane,

19  and he showed this individual some documents.  They got into

20  a discussion regarding Mr. Ajayi's intentions to buy MRI

21  equipment, and that this individual was, then, going to give

22  Mr. Ajayi a loan for that reason.  That's what the testimony

23  is going to be.

24         In other words, Mr. Ajayi is looking for money from

25  investors to fund his MRI business in order to export those.

1      THE COURT:  Understood.

2      Will there be testimony that when he -- that he

3  understood or believed or had a reason to believe that a

4  $344,000 check was somehow connected to these negotiations

5  about a loan involving his MRI business?

6      MR. CHERONIS:  Well, he certainly would testify

7  that he -- the loan that he procured was going to be for the

8  purchase of MRI equipment.

9      THE COURT:  Did he -- will he testify that he

10  understood the loan was going forward and that was, in his

11  mind, why suddenly $344,000 fell into his lap?

12      MR. CHERONIS:  Well, I think -- I think the way the

13  evidence is going to come in is that he would testify that he

14  was going to procure a loan for this MRI equipment.  He

15  received a check.  The purpose of getting that check -- at

16  least part of the money -- was for MRI equipment.  Okay?

17  During that period of time, he is making --

18      THE COURT:  He wanted to use the money for MRI

19  equipment.  I am fine with that.

20      I'm just saying, is there anything that links the

21  e-mails to the check?  In other words --

22      MR. CHERONIS:  No.

23      THE COURT:  In that case, I am likely to sustain

24  the government's objection.  I want to hear Mr. Ajayi's

25  testimony.  I assume he is going to testify that he was

203

1    involved in a legitimate business.  But the fact that he

2    spoke to people about possibly getting a loan for an MRI

3    business would be relevant only if the people to whom he

4    spoke could reasonably have been linked, in his mind, with

5    the source of the check.

6              In other words, "Oh, this must be the people I

7    spoke to on the airplane.  Here is the check."

8              MR. CHERONIS:  No.  Judge -- and I know you are

9    just hearing this now.

10             THE COURT:  Right.

11             MR. CHERONIS:  So I just want to make sure that I

12   properly make a record for this.

13             The evidence would be that Mr. Ajayi was attempting

14   to procure money to fund an MRI business, and then he could

15   export MRI machines to Africa.  That was his goal.  That was

16   his intention around that period of time.

17             THE COURT:  Understood.  Okay.

18             MR. CHERONIS:  He meets an individual on a plane in

19   November of 2009.

20             THE COURT:  And he shares this plan with the

21   individual?

22             MR. CHERONIS:  He shares his plan with this

23   individual.

24             This individual offers to be a financier or to back

25   Mr. Ajayi's potential investment.  Okay?

204

1        Mr. Ajayi, then, gets a check.  We are going to

2    have that come out through the course of the evidence.

3        When he gets the check, Mr. Ajayi's intention is to

4    use the funds in order to fund his MRI business.  All right?

5        So, now, the reason that we think that these

6    statements are admissible, these e-mails, is because they

7    establish Mr. Ajayi's state of mind around this time that, in

8    fact, he was trying to do this, that he is not just making

9    this up.

10       MS. BEST:  Your Honor, these e-mails are, then -- I

11    mean, they are absolutely being introduced for the truth of

12    the matter asserted, which is that the defendant was engaging

13    in these negotiations --

14       THE COURT:  Well, then --

15       MS. BEST:  -- that he was trying to meet with other

16    people to actually get this MRI equipment off the ground --

17    this MRI-equipment business off the ground.  That's the

18    purpose of introducing these e-mails, is to bolster this idea

19    that he somehow had a legitimate business and that he was

20    reaching out to people.

21       THE COURT:  I don't have a hearsay problem.  I have

22    a potential relevance problem because the -- I understand he

23    is trying to get involved in an MRI business.  He wants, you

24    know, investor financing.  He is hoping to meet people and

25    that they will be interested in funding his business.

1    He is hoping that it will be

2    hundreds-of-thousands-dollar business.  He is, you know,

3    taking steps to make that happen.

4    There still has to be some connection so that he

5    could say -- so that it would be reasonable for the jury or

6    somebody to infer that when he got that check, he understood

7    that it related in some fashion to those contacts that he had

8    made.

9    Remember, it's the government's position that he

10   knew or should have known -- that he knew this check was

11   issued in error.  It was improper and a forgery.  He had no

12   right to this money.  He shouldn't have been depositing it,

13   and he shouldn't have withdrawn against it.

14   So to rebut that, he would have to show, "Well, no.

15   I understood this check was part of my business.  In fact, I

16   even had communications with the source of the check."

17   But you are telling me that the e-mails that you

18   want to offer don't link -- don't link in any fashion to the

19   check itself.

20   MR. CHERONIS:  I don't think that's actually

21   accurate.  And i don't think -- just because I didn't say it

22   to you.  It's not because you are missing something, your

23   Honor.

24   The e-mails, essentially, are him getting in

25   contact with these individuals who run an MRI company

1    regarding pricing for how much MRI machines cost.  Okay?  For
2    how much -- you know, he is asking for estimates on how much
3    it would cost for him to buy an MRI machine.

4          THE COURT:  But the source of the check wasn't an
5    MRI company.

6          MR. CHERONIS:  No.  Absolutely not.  I agree with
7    you.  Absolutely.

8          The source of the check has absolutely nothing to
9    do with an MRI company.  But the funds were meant, in
10   Mr. Ajayi's mind, to fund the exporting of MRI machines.

11         MS. BEST:  I think your Honor is correct in that
12   these aren't relevant.  There isn't a link.  These e-mails
13   aren't from people who were involved in the check at all.

14         One predates it by four months, and it's just him
15   reaching out to someone about whether they have MRI equipment
16   for sale.

17         The other one comes after the check has already
18   been deposited.  The money has already been withdrawn.  And
19   then he starts talking about --

20         MR. CHERONIS:  Oh, no, no.

21         MS. BEST:  And so, there is no -- there is no
22   discussion with the check.  There is no discussion about
23   American Building Maintenance Company, about where the check
24   was coming from.  There is no discussion of the check at all.
25   It's really just asking for quotes on MRI equipment and

207

 1   discussing the fact that he might be interested in buying
 2   some of it.
 3            THE COURT:  I think Mr. Ajayi is welcome to tell us
 4   that he was hoping to, you know, run a legitimate business.
 5   And if that gets challenged on cross-examination, the e-mails
 6   might rebut -- the e-mails might rebut any such challenge.
 7            I don't see how they relate to the check.
 8            MR. CHERONIS:  All right.  Certainly, I understand
 9   the Court's ruling.
10            Would it be, just as far as an offer of proof,
11   understanding your ruling, so it's at least part of the
12   record, if I tendered a copy of the e-mails?
13            THE COURT:  I think that's a good idea.
14            And, you know, depending on Mr. Ajayi's testimony
15   and the cross, I might revisit this.  From what I am hearing,
16   it doesn't, again, make any fact more likely -- the fact at
17   issue more likely to be true than not true.
18            While you are doing that, I know we have got a jury
19   here, but I've got a very fast status, and I am going to call
20   those cases.  It looks as though Mr. Hurl is here at least,
21   right?  So we can call those cases.
22            (A brief recess was taken at 9:34 a.m.)
23            THE COURT:  All right.  Anything further before I
24   call in the jurors?
25            MR. CHERONIS:  I am going to tender a copy of the

1    e-mails.

2               (Document tendered.)

3               THE COURT:  All right.  Mr. Ajayi, the government

4    is the about to rest.  As you know, we are going to be

5    hearing some evidence concerning these financial records.

6               And at that point you are free, as I explained

7    yesterday, to take the stand.  And I understand you are

8    planning on doing that.  Obviously, you are free to change

9    your mind as well.

10              I just want to make sure that you understand you

11   remain, as always, presumed innocent.  You don't have any

12   burden of proof.  You don't have to prove anything.  Only the

13   government has to prove anything in this case.

14              And if you choose to remain silent, as you have so

15   far, then, again, I will instruct the jury that the fact that

16   you say nothing means absolutely nothing about whether the

17   government has met its burden of proof.  They can't consider

18   that in any way.

19              I just wanted to make sure that you understand

20   those rights.  And I know you have spoken to your lawyers

21   about this.  It's my responsibility, as well, to make sure

22   that you understand this decision is yours to make.

23              THE DEFENDANT:  Yes, your Honor.

24              MR. CHERONIS:  I just brought something up with

25   Ms. Best.  Real quick -- and I know the jury is waiting.

1    From what you have heard, Mr. Ajayi plans on

2   testifying regarding the conversation he had with this

3   individual who gave him the check.  These are not being

4   offered for their truth.  These are offered -- being offered

5   to show the effect that the statements had on Mr. Ajayi.  In

6   other words, he met this individual.  They had a

7   conversation.  He told him certain things.  Mr. Ajayi

8   responded to those conversations.

9    I am not offering them for the truth.  If the Court

10   wants to give a limiting instruction that they are not being

11   offered for the truth, that's fine.  But Mr. Ajayi's state of

12   mind is certainly in play here.

13    So the conversations he had with the individual who

14   ended up sending him the check I think are certainly relevant

15   and are certainly not be being offered for hearsay purposes.

16    MS. BEST:  Your Honor, it's hard for me to conceive

17   of how they are being offered not for the truth of the matter

18   asserted, which is that the defendant didn't intend to

19   defraud anyone because he had a conversation with a man on a

20   plane, who then told him he was going to invest in his

21   business, and then this check winds up in the defendant's

22   hands.

23    So I think -- I mean --

24    THE COURT:  I thought -- It's two different people,

25   right?

1           MR. CHERONIS:  No.  He's talking to an individual.

2    It's got nothing to do with the e-mails.

3           He meets an individual on a plane.  They have a

4    conversation.  As you remember from the opening statement,

5    it's our position that Mr. Ajayi was sort of duped in this

6    situation.

7           THE COURT:  This is a different person on the

8    plane?

9           MR. CHERONIS:  No, the same person.

10          THE COURT:  Same person.  All right.

11          MR. CHERONIS:  Same person, who's, it's our -- it's

12   our position, actually sent this man this check, sent

13   Mr. Ajayi this check.

14          Mr. Ajayi's conversations with this man are not

15   being offered for their truth.  As a matter of fact, it's our

16   position that what he was saying to Mr. Ajayi probably wasn't

17   true.  But the key is Mr. Ajayi's state of mind and the

18   effect these statements had on Mr. Ajayi.

19          So we are not going to argue their truth.  We are

20   not offering them for their truth.

21          THE COURT:  I am confused because I understood,

22   based on the conversation we had a moment ago, that the

23   e-mails were unconnected to the check.  And I think what you

24   are telling me now is, although the e-mails may be

25   unconnected to the check, the person who wrote the e-mails

1    was, at least in Mr. Ajayi's mind --

2              MR. CHERONIS:  No, no, no.

3              MS. BEST:  Completely different person.

4              MR. CHERONIS:  The check is completely different.

5    Okay?  The person he was talking to regarding the check has

6    nothing to do with the e-mails.

7              Mr. Ajayi meets an individual on a plane.  They

8    have a conversation.  This man makes certain representations

9    to Mr. Ajayi.  They talk.  This man then sends Mr. Ajayi the

10   check that is in issue in this case.

11             The statements that this individual makes to

12   Mr. Ajayi, we are looking to offer, not for their truth, but

13   to show the effect they had on Mr. Ajayi and why he did what

14   he did.

15             It's not hearsay.  It's not being offered for its

16   truth.

17             MS. BEST:  Your Honor, just to be clear, that

18   person that Mr. Cheronis just referenced is not any of the

19   people who are involved in any of the e-mails.  It's a

20   completely separate person.

21             THE COURT:  All right.

22             MS. BEST:  I mean, if it's the defense's position,

23   one, that this person on the plane was making statements that

24   may or may not have been true and that they don't believe are

25   true, then it may, in fact, fall within the exception to

212

1    allow -- to allow the defendant to testify about the impact

2    and the --

3                MR. CHERONIS:  Effect.

4                MS. BEST:  -- effect and the actions he took as a

5    result of hearing it.

6                I think this may just be a question of hearing what

7    the defendant actually has to say when he is on the stand and

8    sort of going forward from there.

9                I appreciate Mr. Cheronis sort of fronting it.

10   It's just hard to say --

11               THE COURT:  Right.

12               MS. BEST:  -- until we know.  I mean, it may well

13   fall within the exception.  We will just have to see what

14   Mr. Ajayi says.

15               THE COURT:  All right.

16               (Jury in at 9:39 a.m.)

17               THE COURT:  Sorry to keep you waiting, ladies and

18   gentlemen of the jury.  You may be seated.

19               We were getting some last-minute things together,

20   and I had another short hearing in another one of my cases

21   that I had to attend to.  But right now, nothing on the

22   calendar other than this case for today.  So we should be

23   able to make progress and get finished -- ideally, finished.

24               You will recall that yesterday we heard several

25   witnesses called by the government.  And I believe the

1   government has an additional witness that the government's

2   lawyers are going to call right now.

3          MS. BEST:  Your Honor, the government actually

4   recalls Inspector Erickson.

5          THE COURT:  All right.

6          Mr. Erickson, you were sworn yesterday.  So I want

7   to remind you that you are under oath.

8          You may be seated.

9      BRETT ERICKSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

10                  DIRECT EXAMINATION

11  BY MS. BEST:

12  Q.   Good morning, Inspector Erickson.

13  A.   Good morning, ma'am.

14  Q.   Yesterday -- just to recap briefly, yesterday you

15  testified about Chase Bank statements for the GR Icon

16  account; is that correct?

17  A.   Yes.

18         MS. BEST:  Your Honor, if I can approach the

19  witness?

20         THE COURT:  You may.

21         (Document tendered.)

22  BY MS. BEST:

23  Q.   I have handed you what's been previously marked and

24  admitted as Government Exhibit Bank Statements.  Do you have

25  that in front of you?

1    A.    Yes.  Government Exhibit Summary Chart.

2    Q.    Actually just the bank statements, correct?

3    A.    Yes.

4    Q.    As a result of reviewing those bank statements, did you

5    create a chart that summarized the opening balances and

6    ending balances and the amount of the total deposits and

7    withdrawals into the GR Icon account?

8    A.    Yes.

9    Q.    And does that chart cover the GR Icon account from the

10   time it was opened in February 2006 through January of 2010?

11   A.    Yes.

12   Q.    And that's based on your review of each month's

13   statements for the GR Icon account, correct?

14   A.    Correct.

15          MS. BEST:  Your Honor, the government would move to

16   admit Government Exhibit Summary Chart.

17          THE COURT:  And this is the one that you showed me

18   earlier?

19          MS. BEST:  Correct, your Honor.

20          THE COURT:  Any objection?

21          MR. CHERONIS:  None.

22          THE COURT:  That will be admitted.

23          (Government Exhibit Summary Chart was received in

24           evidence.)

25          MS. BEST:  Your Honor, if I may publish it to the

1    jury?

2          THE COURT:  You may.

3    BY MS. BEST:

4    Q.   We are not going to go through each and every deposit

5    and withdrawal and ending balance.  But I did want to start

6    at the very top of the document there.

7          MS. BEST:  Actually, just the first month's

8    balances.

9    BY MS. BEST:

10    Q.   So if you could just read the sort of beginning and

11    ending balance and deposits and withdrawals for the account

12    in February 2006.

13    A.   February 2006 the beginning balance was zero.  The total

14    deposits were $200.  The total withdrawals were zero.  And

15    the ending balance was $200.

16    Q.   And I believe you testified the GR Icon account was

17    opened on February 15th, 2006; is that correct?

18    A.   Correct.

19    Q.   And then if you could just --

20          MS. BEST:  Zoom out a little bit and then focus.

21    Thank you.

22    BY MS. BEST:

23    Q.   Turning to the month of October 2006, can you just read

24    what's described there?

25    A.   In October 2006, the beginning balance was $862.42.  The

1    total deposits was $13,647.85.  The total withdrawals was

2    $2,041.48.  And the ending balance was $12,468.79.

3    Q.  And it was your testimony, I believe, yesterday that

4    that was the month in 2006 that had the highest ending

5    balance, correct?

6    A.  Correct.

7    Q.  Can you just read what the monthly balance is the month

8    after that October 2006?

9    A.  November 2006, the beginning balance was $12,468.79.

10   Total deposits was $3,048.  Total withdrawals, $12,442.62.

11   And the ending balance, $3,074.17.

12          MS. BEST:  Your Honor, if I just may approach the

13   witness?

14          THE COURT:  Sure.

15          MS. BEST:  I gave him both copies of my document,

16   and it's hard for me to read it from here.

17   BY MS. BEST:

18   Q.  And at the end of 2006, what was the ending balance in

19   the GR Icon account?

20   A.  Ending balance at the end of December 2006 was $110.38.

21   Q.  And then going through the January 2007 through December

22   2007, what is the highest balance that year?  Highest ending

23   balance.  I apologize.

24   A.  It is $11,653.29.

25   Q.  Is that for the month of December 2007?

1    A.    Yes.

2    Q.    Looking at the total deposits column for that month, can

3    you read what's reflected there?

4    A.    27,000.

5    Q.    And in your review of the documents for the December

6    2007 time period, those bank statements, what did you

7    discover about the balance for that month?

8    A.    There were -- on the bank statements, there were two

9    $12,000 deposits.

10   Q.    And looking at the total withdrawals for that month,

11   what were the total withdrawals?

12   A.    $15,519.91.

13   Q.    And looking at the bank statements for that month, what

14   did you discover in terms of the withdrawals from the account

15   that month?

16   A.    That one of the deposits was reversed.

17   Q.    Can you explain what you mean by that?

18   A.    On 12-19, it says, "DR due to ATM deposit error,

19   $12,000."

20   Q.    Does that correspond to an earlier ATM deposit in the

21   amount of $12,000?

22   A.    Yes.

23   Q.    So, in fact, the $27,000 in deposits for that month was

24   artificially high, and it should only have been $15,000; is

25   that correct?

1  A.  Correct.

2  Q.  Turning to the next year, January 2008 through December

3  2008, what is the highest monthly balance or which month -- I

4  am sorry.

5          Can you just go to the section of the chart and

6  read the highest ending balance for that year?

7  A.  It is in January 2008.

8  Q.  And what is the amount?

9  A.  $3,054.85.

10  Q.  And by the end of the year, looking at the October 2008

11  balance at the end of the month, what was the ending balance

12  there?

13  A.  Negative $1,030.16.

14  Q.  What is the ending balance for November 2008?

15  A.  Negative $1,340.16.

16  Q.  What was the ending balance for December 2008?

17  A.  $428.53.

18  Q.  And then turning to the year 2009, before November of

19  2009, what is the highest ending monthly balance?

20  A.  $331.43.

21  Q.  If you go down to August of 2009, what's the ending

22  balance there?

23  A.  $1,239.61.

24  Q.  Is that the highest ending monthly balance before

25  November of 2009?

1    A.    That's correct.

2    Q.    And, in fact, how many months in 2009 was there a

3    negative balance on the account?

4    A.    Three.

5    Q.    Which months were those?

6    A.    April 2009, May 2009, and July 2009.

7    Q.    And then in November -- I'm sorry.

8          At the end of October 2009, what was the ending

9    balance?

10   A.    $90.08.

11   Q.    What was the ending balance at the end of November 2009?

12   A.    $344,658.45.

13   Q.    Turning to December of 2009, what were the total amount

14   of withdrawals that month?

15   A.    $172,711.13.

16   Q.    And what was the ending balance at the end of December

17   2009?

18   A.    $172,497.32.

19   Q.    And then at the end of January 2010, what was the ending

20   balance?

21   A.    Zero.

22   Q.    And do you know what resulted in that zero balance at

23   the end of January 2010?

24   A.    Yes.

25   Q.    What was -- how did that come to be?

1    A.    Chase froze the funds and charged the funds off.

2    Q.    What do you mean by "charged the funds off"?

3    A.    They froze them and they took possession of the funds to

4    recover some of their money.

5              MS. BEST:  Your Honor, if I could just have a

6    moment?

7              THE COURT:  Sure.

8              (Brief pause.)

9              MS. BEST:  Your Honor, the government has no

10   further questions for Mr. Erickson.

11             THE COURT:  Mr. Cheronis, any cross-examination?

12             MR. CHERONIS:  No, your Honor.  Thank you.

13             THE COURT:  The witness is excused.

14             (Witness excused.)

15             THE COURT:  Any further witnesses for the

16   government?

17             MS. BEST:  No, your Honor.  The government rests at

18   this time.

19             THE COURT:  All right.  Thank you.

20             We will take a short recess, and then we will

21   proceed with the defense case.

22             THE COURT SECURITY OFFICER:  All rise.

23             (Jury out at 9:52 a.m.)

24             MR. CHERONIS:  Your Honor, at this point, on behalf

25   of Mr. Ajayi, I would make a motion for judgment of acquittal

1   pursuant to Rule 29.  I have a brief argument regarding that.

2   Regarding Count I, Mr. Ajayi is essentially being

3   charged with being involved in a scheme to defraud, in that

4   he essentially intended to defraud Chase Bank through

5   misrepresentations and false statements.  And he has to be

6   found to have been in knowing possession of an altered check.

7   I don't think the government has provided any

8   evidence that Mr. Ajayi was involved in the stealing of this

9   check or the altering of this check.

10   I think the check itself does not lend to the

11   belief that it would be immediately apparent that it had been

12   altered knowingly.

13   We do not believe that the evidence provided by the

14   government in this case, even taking the evidence in the

15   light most favorable to the government, as the Court must,

16   leads to the conclusion, under Count I, that he was involved

17   in a scheme to defraud.

18   What they have is somebody going into a bank with

19   his own ID, depositing money, and taking cash out.  There has

20   been no nexus between his being involved in getting that

21   check in an unlawful way.

22   We are asking regarding Count I and essentially

23   Count II.  That would go for Count II, Count III -- Count II

24   and Count III.

25   Regarding Count IV, your Honor, that's a money

1    laundering count, essentially.  And that has to do with the

2    $53,000 wire transferred from GR Icon to JPMorgan Chase to

3    Company C in Hollywood.

4            You've heard -- Hollywood, Florida.  Excuse me.

5            You've heard a little bit of evidence about that

6    wire.  The government did not investigate where that money

7    went to, who that money went to.  The only evidence is that

8    Mr. Ajayi sent that money.

9            Going back to the early argument, if the government

10   can't prove that he had knowledge that this check was stolen

11   or that it was from criminally derived property, it's our

12   position that, taking the evidence in the light most

13   favorable to the government, regarding the money laundering

14   count, that they cannot proceed on that count.

15           Regarding Count V, I would certainly include my

16   earlier arguments and adopt those.

17           Same for Count VI.

18           Count VII is that he knowingly made and possessed

19   an altered security, a check essentially.  Again, there has

20   been no evidence that he made this check, that he altered it,

21   or that he knowingly made and altered it.  He possessed it.

22           There was no -- there was some dispute about

23   whether he actually had it in his own hand, I think, only

24   insofar as it was deposited into the ATM account, and there

25   was no video surveillance that he actually did that or that

1    he was involved in that.

2           That being said -- that being somewhat of a weak

3    argument, I would also suggest that there is no evidence that

4    he knowingly possessed an altered check, which the government

5    has to establish.

6           So based on those reasons, your Honor, I would ask

7    that you entertain our motion for judgment of acquittal

8    pursuant to Rule 29.

9           THE COURT:  Response.

10          MS. BEST:  Your Honor, obviously the government

11   believes that you should deny that motion.

12          There is ample evidence here from which the jury

13   can conclude that the defendant knowingly possessed --

14   knowingly possessed and then used that altered check, and

15   that he engaged in a scheme to defraud JPMorgan Chase in

16   doing so.

17          The evidence that has been tendered so far, one,

18   goes to the nature of the check and what it looked like on

19   its face, looking as if it had been altered.  Certainly, at

20   least two and I believe three witnesses have testified about

21   how the change in the difference in the payee line was

22   visible and immediately recognizable to them in terms of

23   examining the check at that point.

24          Additionally, there has been evidence that the

25   defendant did not, in fact, have an active business at the

1    time and that his actions, after receiving the check, are

2    consistent with someone who's engaged in an attempt to

3    defraud.

4         While the defendant did use his real ID and didn't

5    wear a disguise when he went to the bank to conduct these

6    transactions, certainly one can infer from the way in which

7    he conducted his business, in terms of going to numerous

8    banks immediately after the check cleared, that he was

9    engaged in a scheme to defraud, and to do so as quickly as

10   possible before the fraud was discovered.

11        The idea that the defendant didn't know that that

12   check was altered, in light of all of his financial records

13   up until that point, in light of the fact that the Secretary

14   of State documents show that he did not have an active

15   business, all of that goes to show that his intent at the

16   time that he committed this fraud and that he should

17   have known -- excuse me -- that he knew at the time that the

18   check was altered, and that he took these actions as a result

19   of that altered check before the rightful owners could

20   discover that it had been altered.

21        Regarding the money laundering count, one, defense

22   counsel stated that there was no further investigation as to

23   where that money went, and that's actually not true and not

24   what Inspector Erickson testified to yesterday.

25        He testified he did, in fact, investigate a number

1    of other people who were involved in the fraud, but the

2    reality is that the sum of his investigation pointed back to

3    the defendant; that there were no other overlaps between any

4    of those other people he investigated and the check that went

5    missing and how it wound up in the defendant's account.

6         There is, also, I don't think, any debate about

7    whether this check was actually in the defendant's possession

8    because, as there was testimony yesterday, this check was

9    deposited by ATM.  And while there wasn't video surveillance

10   at the time, his debit card that was issued to him with his

11   personal PIN, which were never reported lost or stolen, were

12   used to conduct that transaction.

13        And furthermore, the transactions that he committed

14   immediately after that check cleared, certainly go to support

15   the idea that he was the one who deposited that check and

16   then took those steps thereafter.  So I don't think there is

17   actually any evidence here that calls into question whether

18   the defendant himself actually possessed that check.

19        But, furthermore, he, then, actually used the

20   proceeds from that check.

21        So 513(a) goes to the possession or use of an

22   altered check.  I would submit that he satisfies both prongs

23   in that he both possessed and used the altered check and knew

24   that it was altered at the time he did so.

25        I think, based on the testimony from the victim in

1   this case, from Dan Corcoran of ABM, plus the evidence

2   introduced through Jim O'Shea in terms of how these

3   transactions were conducted and how they were -- how these

4   transactions were linked back to the defendant, and then, of

5   course, the testimony of Inspector Erickson in terms of the

6   investigation and how these were linked to him and how

7   GR Icon didn't conduct any legitimate business, all that goes

8   to support the idea that the defendant knowingly possessed

9   and used this check and engaged in a scheme to defraud

10  JPMorgan Chase in a four-day period before the fraud was

11  discovered.

12          THE COURT:  I am going to enter and continue the

13  motion.  Let me just make a couple of comments.

14          I do think that arguments could be made both ways

15  with respect to the appearance of the check itself.  And when

16  arguments can be made both ways, we view the evidence in the

17  light most favorable to the government at this stage.

18          It seems to me that a reasonable jury could

19  conclude either that nothing about the check would jump off

20  the pages making it fraudulent or that circumstances support

21  the conclusion that Mr. Ajayi could have looked at the check

22  and knew that it was fraudulent.

23          But let's go beyond that.  I think what's

24  significant here is that the government can legitimately

25  argue, based on the evidence we have heard thus far, that

1    Mr. Ajayi was not conducting a profitable or legitimate

2    moneymaking, money-expecting-to-make business at that point;

3    and therefore, the arrival of a check in the amount of

4    $344,000 should have been an indication to him that some

5    mistake of some kind had been made.

6        And the fact that he did so swiftly act to withdraw

7    funds against that check -- not all of the funds but a

8    substantial amount of those funds in smaller amounts --

9    suggests that he recognized the money wasn't his and that it

10   was important to get his hands on it as quickly as possible.

11       That's the reason -- I am not prepared to rule

12   definitively on this motion at this time, but I am, at this

13   point, going to proceed with further evidence.

14              MR. CHERONIS:  Thank you.

15              MS. BEST:  Thank you, your Honor.

16              MR. CHERONIS:  If I could have one moment before

17   you bring the jury back in?

18              THE COURT:  Of course.  Of course.

19              (Brief pause.)

20              MR. CHERONIS:  All right.  That's all I need, your

21   Honor.  Thank you.

22              THE COURT:  And Mr. Ajayi, you understand your

23   rights regarding testimony?

24              THE DEFENDANT:  Yes.

25              THE COURT:  All right.  And it's your decision to

228

1  take the stand; is that correct?

2          THE DEFENDANT:  It is.

3          THE COURT:  You have chosen to take the stand; is

4  that correct?

5          THE DEFENDANT:  Yes.

6          THE COURT:  We will bring in the jurors.

7          (Jury in at 10:01 a.m.)

8          THE COURT:  You may be seated.

9          Ladies and gentlemen, you have heard the evidence

10  in the government's case-in-chief.

11          We're going to proceed now with the defense case.

12          Mr. Cheronis.

13          MR. CHERONIS:  Thank you.

14          We call Mr. Ajayi to the witness stand.

15          THE COURT:  Sir, can I ask you to step forward,

16  please.  Would you raise your right hand.

17          (Defendant sworn.)

18          THE COURT:  You may proceed, Mr. Cheronis.

19

20

21

22          ABIDEMI AJAYI, DEFENDANT HEREIN, SWORN

23                  DIRECT EXAMINATION

24  BY MR. CHERONIS:

25  Q.   Could you move over just a little bit so I can see you.

 1    Thank you.

 2              Can you please introduce yourself to the ladies and

 3    gentlemen of the jury by speaking slowly and saying your

 4    first and last name?

 5    A.    My name is Abidemi Ajayi.

 6    Q.    How old are you, Mr. Ajayi?

 7    A.    I'm 43.

 8    Q.    Where do you live?

 9    A.    I live in Olympia Fields.

10    Q.    Are you married?

11    A.    Yes.

12    Q.    Okay.  And how long have you been married?

13    A.    About 13 years.

14    Q.    Do you have any children?

15    A.    Yes.

16    Q.    How many?

17    A.    Four.

18    Q.    What are their ages?

19    A.    Nineteen -- I have two 19 twins.  I have a 13-year-old

20    and a six.

21    Q.    Six?

22    A.    Yes.

23    Q.    Okay.  Are you employed?

24    A.    Yes.

25    Q.    Where do you work?

```
 1    A.    I work for Sub-Zero/Wolf appliance.

 2    Q.    Okay.  What do you do for Sub-Zero/Wolf?

 3    A.    I design the control systems on high-end appliances.

 4    Q.    Okay.  Where is Sub-Zero/Wolf located?

 5    A.    It's located in Madison, Wisconsin.

 6    Q.    Okay.  And where do you currently live?

 7    A.    I live in Olympia Fields, but I commute.

 8    Q.    You commute?

 9    A.    Yes.

10    Q.    Okay.  What is your highest level of education?

11    A.    Bachelor's degree.

12    Q.    Okay.  And where did you get your bachelor's degree

13    from?

14    A.    DeVry University.

15    Q.    And when did you get that?

16    A.    2002.

17    Q.    Are you an American citizen?

18    A.    Yes.

19    Q.    Other than your current employment at Sub-Zero/Wolf,

20    have you worked anywhere before that?

21    A.    Yes.

22    Q.    Where?

23    A.    General Electric Healthcare.

24    Q.    Okay.  Have you had any other jobs?

25    A.    Yes.
```

1   Q.   What other jobs have you had?

2   A.   I have had jobs as an engineer for RCN cable.

3   Q.   All right.  Have you ever -- do you have a real estate

4   license?

5   A.   Yes, I have one.

6   Q.   Did you ever have any real estate dealings?

7   A.   Yes.

8   Q.   You understand you are being charged in this case with

9   possessing a forged check?

10   A.   Yes.

11   Q.   You understand that you are being charged with money

12   laundering?

13   A.   Yes.

14   Q.   You understand that you are being charged with bank

15   fraud?

16   A.   Yes.

17   Q.   You have sat in this courtroom this week, correct?

18   A.   Yes.

19   Q.   You have heard the evidence?

20   A.   Yes.

21   Q.   All right.  You have had an opportunity to review the

22   indictment?

23   A.   Yes.

24   Q.   Sir, are you guilty of the charges that the prosecutors

25   have alleged in this case?

1   A.   Not guilty.

2   Q.   I want to talk to you about those charges.

3             The first thing I would like to do --

4             MR. CHERONIS:  Your Honor, I am going to try to use

5   the ELMO.  I'm not sure if we can turn that on.

6             THE COURT:  It should work.

7             MR. CHERONIS:  Thank you.

8   BY MR. CHERONIS:

9   Q.   I am going to show you what the government has already

10  introduced into evidence as a part of their Check Group

11  Exhibit.

12            Do you recognize that check?

13  A.   Yes.

14  Q.   All right.  And did you receive this check?

15  A.   Yes.

16  Q.   When did you receive this check?

17  A.   I received it sometime in November of 2009.

18  Q.   Okay.  And do you see "GR Icon" on the bottom?

19  A.   Yes.

20  Q.   Did you put that in there?

21  A.   No.

22  Q.   When you received that check, did you know it had been

23  altered?

24  A.   No.

25  Q.   Did it look like it had been altered when you looked at

```
 1    it?
 2    A.    No.
 3    Q.    Had you have known it was altered, would you have put it
 4    in your account?
 5    A.    No.
 6    Q.    I am going to show you what I have marked as Ajayi
 7    Exhibit No. 1 for identification.
 8              MR. CHERONIS:   May I approach, your Honor?
 9              THE COURT:   You may.
10              (Document tendered.)
11    BY MR. CHERONIS:
12    Q.    Can you take a look at the total at this, Mr. Ajayi.
13    A.    Yes.
14    Q.    What is that?
15    A.    It's an Express mail envelope.
16    Q.    Okay.  And did you receive anything in that envelope?
17    A.    Yes.
18    Q.    What did you receive in that envelope?
19    A.    I received the check that you placed on the screen, in
20    this envelope.
21    Q.    Is that the exact -- the actual envelope you received it
22    in?
23    A.    Yes.
24              MR. CHERONIS:   Your Honor, I would ask the
25    identification be stricken and it be received in evidence.
```

1            MS. BEST:  No objection.

2            THE COURT:  That will be admitted and you may

3    publish.

4                (Defendant's Exhibit No. 1 was received in

5                 evidence.)

6            MR. CHERONIS:  Thank you.

7    BY MR. CHERONIS:

8    Q.   Mr. Ajayi, I am going to put this on the ELMO, I believe

9    it's called.

10           Now, can you see that on the screen in front of

11   you?

12   A.   Yes.

13   Q.   All right.  What is the date on that envelope for the

14   time it was received by you?

15   A.   It was on the 27th.

16   Q.   Of what month?

17   A.   Of November.

18   Q.   Okay.  And what year was this?

19   A.   2009.

20   Q.   Now, do you see a time on there?

21           Does it look like 11:05 on there?

22   A.   If you can point me to the --

23   Q.   (Indicating.)

24   A.   Yes.

25   Q.   Now, in the "To" section, can you read to the jury what

1    that says?

2    A.    In the "To" section, it says:  "GR Icon International,

3    535 Ingraham Avenue, Calumet City, Illinois 60409."

4    Q.    Okay.  And the address 535 Ingraham Avenue in Calumet

5    City, what is that address?

6    A.    That was my residence at that time.

7    Q.    You used to live there?

8    A.    Yes.

9    Q.    Okay.  I want to ask you about the "From" portion.

10          Do you see that?

11   A.    Yes.

12   Q.    What does the "From" portion say?

13   A.    "Charles Brown, 1948 Manchester Avenue, Los Angeles,

14   California 91247."

15   Q.    Do you know an individual named Charles Brown?

16   A.    Yes.

17   Q.    We are going to talk about him in a second, but I want

18   to ask you some questions about the winter of 2009.  Do you

19   remember that season?

20   A.    Yes.

21   Q.    Okay.  And were you employed at that time?

22   A.    I was self-employed as a real estate broker at that

23   time.

24   Q.    Okay.  Did you have a business called GR Icon?

25   A.    Yes.

1    Q.   Okay.  Did you incorporate that business?

2    A.   Yes.

3    Q.   When did you incorporate that business?

4    A.   I incorporated it about -- between 2005, 2006,

5    thereabout.

6    Q.   And you saw the government's exhibits regarding the

7    incorporation?

8    A.   Yes.

9    Q.   And those incorporation exhibits are accurate?

10   A.   Yes, they are.

11   Q.   Okay.  And what was the purpose of forming GR Icon?

12   A.   GR Icon was formed to be able to do general business.

13   Q.   Okay.  Was it something you used all the time?

14   A.   Not all the time.

15   Q.   Okay.  Any specific types of businesses were you

16   interested in with relation to GR Icon?

17   A.   Mostly MRI business.

18   Q.   Okay.  And what do you mean by the "MRI business"?

19   A.   It's called magnetic resonance imaging.

20   Q.   And did you have any plans or hopes regarding MRIs?

21   A.   Yes.

22   Q.   What were they in 2009?

23   A.   They were to build imaging centers for governments in

24   Africa, and to buy MRI products and sell them in Africa.

25   Q.   What types of MRI products?

1   A.   Mobile MRI.

2   Q.   Okay.  When did you work at General Electric?

3   A.   Between 2007 and 2008.

4   Q.   Did you have any background in MRIs?

5   A.   Yes.

6   Q.   What was your background in MRI machines?

7   A.   I'm an electrical engineer.  I work -- my background is

8   in magnetic -- electromagnetic propagation.

9   Q.   What is an MRI?

10  A.   MRI is magnetic -- it's actually NMRI.  It's nuclear

11  magnetic resonance imaging.

12  Q.   Okay.  And were you trained on working on those?

13  A.   Yes.

14  Q.   Why did you conceive of the idea of exporting MRI

15  machines to Africa?

16  A.   Because it helps save life of the poor people.

17  Q.   Did you want to do it for a profit as well?

18  A.   Yes.

19  Q.   Okay.  Did you have any other companies that you were

20  involved in in 2009?

21  A.   Yes.

22  Q.   Okay.  Which one?

23  A.   The name of it is First Point Energy Walt, Limited.

24  Q.   Was that incorporated in the United States?

25  A.   No.

1   Q.   Where was it incorporated?

2   A.   It was incorporated in Africa.

3   Q.   Okay.  And what was the point of that company?

4   A.   To be able to do general business, to build hospitals,

5   and build imaging centers for African governments.

6   Q.   How were you going to fund this project?

7   A.   I had two ways of trying to fund the project:  To be

8   able to write proposal for state governments and look for

9   investors.

10  Q.   Okay.  Now, in November of 2009, did you take a trip,

11  Mr. Ajayi?

12  A.   Yes.

13  Q.   Where did you travel to?

14  A.   I traveled to Cameroon through Gatwick.

15  Q.   Okay.  Where is Cameroon?

16  A.   Cameroon is in Africa.

17  Q.   Where is Gatwick?

18  A.   Gatwick is in U.K., United Kingdom.

19  Q.   Where did you leave from?

20  A.   I left from Chicago.

21  Q.   Okay.  And how long is the trip from Chicago to Gatwick?

22  A.   About nine hours.

23  Q.   How long is the trip from Gatwick to Cameroon?

24  A.   About seven hours.

25  Q.   Okay.  I want to return to this individual, Mr. Brown,

1    that you discussed.

2              Did you meet an individual named Mr. Brown?

3    A.    Yes.

4    Q.    When did you meet him?

5    A.    I met him on the airplane.

6    Q.    Okay.  Which airplane?

7    A.    The one that took me to Gatwick.

8    Q.    Okay.  And had you ever met him before?

9    A.    No.

10   Q.    Okay.  What did he tell you his name was?

11   A.    He said his name is Charles Brown.

12   Q.    Okay.  Did he say anything else about his name?

13   A.    He said I can simply call him Shaka.

14   Q.    Shaka.

15             And when did you meet him on the plane?

16   A.    Immediately we got on the plane, I met with him.  I was

17   putting my bag on the overpass, and he wanted to use half my

18   side.

19   Q.    What did he look like?

20   A.    He is tall, African-American.

21   Q.    You speak with an accent?

22   A.    Yes.

23   Q.    Did he have an accent?

24   A.    No.

25   Q.    Okay.  Did he sound like he was from the United States

1    or from another country?

2    A.    From the United States, probably southern.

3    Q.    Okay.  How old was he?

4    A.    About mid-50s.

5    Q.    Did you know him from before?

6    A.    No.

7    Q.    You said this was a nine-hour flight?

8    A.    Yes.

9    Q.    Okay.  Where was he sitting in relation to you on the

10   flight?

11   A.    He was sitting directly in front of me.

12   Q.    Okay.  Did you end up sitting with him?

13   A.    Yes.

14   Q.    Why?

15   A.    Because the next seat wasn't taken.  I started a

16   conversation with him because he was holding a *Scientific*

17   *American* magazine.

18   Q.    Okay.  Let me back up.

19             He was holding a magazine?

20   A.    Yes.

21   Q.    And what type of a magazine was he holding?

22   A.    *Scientific American*.

23   Q.    And why did that lead you to want to sit with him?

24   A.    I showed him the -- I pointed to the image on the front

25   of the magazine, and he said -- I told him I worked on that

1   device for about a few years.

2   Q.   Okay.  And what type of device was on the magazine?

3   A.   It's an MRI -- it's a CTR and a magnet.

4   Q.   Okay.  Did you two discuss that?

5   A.   Yes.

6   Q.   Okay.  Did you discuss with him your business idea?

7   A.   Yes.

8   Q.   And what was your business idea?

9   A.   My business idea was proposal to the state government in

10  Africa to build an imaging center.

11  Q.   And did you talk to Mr. Brown about that?

12  A.   Yes.

13  Q.   Did Mr. Brown tell you what he did for a living?

14  A.   Yes.

15  Q.   What did he tell you?

16  A.   He said he finances business.

17  Q.   Okay.  Did he say what types of businesses?

18  A.   He said multiple businesses, but mostly entertainment.

19  Q.   Mostly what?

20  A.   Entertainment.

21  Q.   Okay.  Did you have anything with you on the flight?

22  A.   I had my business gear, my computer.

23  Q.   Okay.  I am going to show you what I have marked as

24  Ajayi Exhibit No. 2 for identification.

25           MR. CHERONIS:  May I approach?

1    THE COURT:  You may.

2         (Document tendered.)

3  BY MR. CHERONIS:

4  Q.   Would you take a look at this.

5         Did you have that on the flight?

6  A.   Yes.

7  Q.   Where was that on the flight?

8  A.   It was an electronic copy in my laptop computer.

9  Q.   Did you show that to Mr. Brown?

10  A.   Yes.

11  Q.   Is that an accurate copy of what you showed him?

12  A.   Yes.

13         MR. CHERONIS:  Your Honor, I would ask that the

14  exhibit identification be stricken and it be introduced into

15  evidence.

16         MS. BEST:  Your Honor, I actually don't know what

17  the exhibit is.

18         MR. CHERONIS:  I'm sorry.  I tendered that to you

19  prior.

20         (Document tendered.)

21         (Brief pause.)

22         THE COURT:  Is there an objection?

23         MS. BEST:  I have no objection, your Honor.

24         THE COURT:  That will be admitted.

25         (Defendant's Exhibit No. 2 was received in

 1            evidence.)

 2    BY MR. CHERONIS:

 3    Q.   Did you show this to Mr. Brown?

 4    A.   Yes.

 5    Q.   Why?

 6    A.   Because our conversation was about my trip to Africa,

 7    about my business, and he was kind of interested in the fact

 8    that I said it's to help the masses in Africa.

 9    Q.   Now, who created this?

10    A.   I created the document as a slide.

11    Q.   I am going to show you Page 2 here.

12            Does this have to do -- this document have to do

13    with your goal of putting together MRI machines and exporting

14    them?

15    A.   Yes.  It has to do with setting up a hospital with an

16    imaging center.

17    Q.   Now, did you have any other documents with you or on you

18    that you shared with this individual you met on the plane?

19    A.   Yes.

20    Q.   What other images or documents did you have with you?

21    A.   Proposals to state government to build a mobile MRI

22    system and to build an imaging center, also.

23            MR. CHERONIS:  May I approach, your Honor?

24            THE COURT:  You may.

25            (Document tendered.)

```
 1         MR. CHERONIS:  I am going to mark this as Ajayi
 2   Exhibit No. 3 for identification.
 3   BY MR. CHERONIS:
 4   Q.   Can you take a look at that?
 5   A.   Yes.
 6   Q.   And is that one of the things you just described that
 7   you had on your computer at that time?
 8   A.   Yes.
 9   Q.   Okay.  Is that a true and accurate copy of essentially
10   what was on your computer?
11   A.   Yes.
12         MR. CHERONIS:  Your Honor, I ask that this be
13   admitted into evidence as Ajayi 3.
14         MS. BEST:  No objection, your Honor.
15         THE COURT:  That will be admitted.
16         (Defendant's Exhibit No. 3 was received in
17          evidence.)
18         MR. CHERONIS:  May I publish, your Honor?
19         THE COURT:  You may.
20         MR. CHERONIS:  Thank you.
21   BY MR. CHERONIS:
22   Q.   You testified earlier about First Point Energy?
23   A.   Yes.
24   Q.   Is this one of the proposals that you had put together?
25   A.   Yes.
```

1    Q.   Okay.  Do you know anything about MRI machines?

2    A.   Yes.

3    Q.   If the government wants to ask you questions about MRI

4    machines, do you feel confident you can answer them?

5    A.   Very confident.

6    Q.   And you include in here the reasons why you want to put

7    this together?

8    A.   Yes.

9    Q.   Did you talk to Mr. Brown about that?

10   A.   Yes.  I showed him this slide.

11   Q.   Did he express an interest in that?

12   A.   Yes.

13   Q.   How long did you two have a conversation while you were

14   on that airplane?

15   A.   About six hours of the flight.

16   Q.   Did you talk about anything other than this?

17   A.   Yes.

18   Q.   Okay.  And when you got on that airplane was your state

19   of mind to solicit business investments?

20   A.   No.

21   Q.   And did you learn if Mr. Brown had any businesses?

22   A.   Yes.  I learned he has multiple businesses.

23   Q.   How did he appear to you?

24        What was your -- what was your take on Mr. Brown

25   from looking at him and talking to him?

1  A.   I see a successful businessman.

2  Q.   How was he dressed?

3  A.   He was dressed in a suit.

4  Q.   Okay.  Did he ever mention anything to you about

5  prospectively investing with you?

6  A.   Yes.

7  Q.   Okay.  When did that come up on the flight?

8  A.   I mentioned to him about my search for investors, and he

9  commented that he can help me with that depending on how much

10  I needed.

11  Q.   Did you discuss with him how much you needed?

12  A.   Yes.

13  Q.   What did you say?

14  A.   I told him I'm trying to procure an MRI mobile for about

15  $45,000.

16  Q.   Would that be a new MRI machine?

17  A.   No, it's a used one.

18  Q.   Had you made any -- taken any steps to learn how much

19  these would cost?

20  A.   Yes.

21       THE COURT:  You said for about how much money?

22       THE WITNESS:  $45,000.

23       THE COURT:  45.  Thanks.

24  BY MR. CHERONIS:

25  Q.   Now, did the two of you discuss the terms of a possible

1    loan?

2    A.    Yes.

3    Q.    What did Mr. Brown say to you?

4    A.    He said -- I mentioned to him that the mobile MRI is

5    $45,000.  He said, "I could help you with that."

6    Q.    Okay.  Now, you never met this guy before?

7    A.    No.

8    Q.    He wasn't your friend?

9    A.    No.

10   Q.    Okay.  Did he talk to you about reducing this to

11   writing?

12   A.    Yes.

13   Q.    What did he say to you?

14   A.    He said he will put together a promissory note.

15   Q.    What's a promissory note?

16   A.    It's a document exchanged, an agreement in exchange for

17   money.

18   Q.    How did you leave it with Mr. Brown on this flight?

19   A.    I left him with my business card, which has my home

20   address on it.  And I gave him my phone number, my cell phone

21   number.

22   Q.    Okay.  When was the last time you saw him in Gatwick?

23   A.    At the baggage claim.

24   Q.    Did he say anything to you, at that point, about this

25   business proposal?

1    A.    He said he will be contacting me soon, and he's very

2    sure he will be helping me.

3    Q.    Did you think he was going to help you?

4    A.    I wasn't too sure.

5    Q.    Were you counting on his help?

6    A.    No.

7    Q.    After you left Gatwick, where did you go?

8    A.    I went to Cameroon.  I connected my flight.

9    Q.    And when did you get back to the United States?

10   A.    I can't recall exactly what date, but I think it might

11   be around the 26th.

12   Q.    26th.  Okay.

13            And I showed you that package that you received on

14   November 27th.  Were you home on November 27th?

15   A.    I was home.

16   Q.    Okay.  And did you receive this package?

17   A.    Yes, I did.

18   Q.    When you received this package, what did you do with it?

19   A.    I opened it.  I looked inside, and I saw a white

20   envelope with a check inside.  And I called Mr. Brown right

21   away.

22   Q.    Let me ask you this:  How did you get Mr. Brown's phone

23   number?

24   A.    He gave his phone number to me.

25   Q.    Okay.  When you got this envelope were you expecting

1  there to be just a check in there?

2  A.  No.

3  Q.  What were you expecting?

4  A.  A promissory note.

5  Q.  Okay.  And were you expecting a check for $344,000?

6  A.  No.

7  Q.  Why not?

8  A.  Because I had mentioned to Mr. Brown I needed $45,000.

9  Q.  Okay.  And this is a lot more than $45,000?

10  A.  It's a lot more than that.

11  Q.  So what did you do after you received the check?

12  A.  I received the check.  I looked at the figure.  I called

13  Mr. Brown.

14  Q.  Did he answer the phone?

15  A.  He answers the phone.

16  Q.  What did you say to him?

17  A.  I said, "Mr. Brown, I received the check.  There is no

18  promissory note here."

19       He said, "Don't worry about it."

20  Q.  What do you mean, "He said, 'Don't worry about it'"?

21  A.  He said, "Don't worry about it.  We will put it together

22  later."

23  Q.  What did he say about the amount?

24  A.  He said that's an error from his accounting department,

25  that I should just go ahead and deposit the check, and we

1    will make up for the difference.

2    Q.   He didn't know you other than meeting you on a plane?

3    A.   Yes.

4    Q.   Did he say anything to you about security or knowing

5    you?

6    A.   He said he had looked me up online.  My name is

7    everywhere, with Douglas Sotheby's, Keller Williams, another

8    real estate brokerage.  I'm the easiest person to find in

9    Chicago, that was his statement.  He said he trust me.

10   Q.   What did he tell you to do with the check?

11   A.   He said, "Deposit it right away."

12   Q.   Okay.  Did you?

13   A.   Yes, I did.

14   Q.   And you saw the evidence that the government introduced,

15   that that check was deposited the same day you received this

16   envelope?

17   A.   Yes.

18   Q.   About an hour after you received it?

19   A.   Yes.

20   Q.   Okay.  Did you deposit the check?

21   A.   Yes, I did.

22   Q.   And where did you deposit it?

23   A.   It was on Dearborn.  I can't remember the cross streets.

24   Q.   Okay.  But it was a Chase branch?

25   A.   Yes.

1    Q.   And you had a checking account with Chase?

2    A.   Yes.

3    Q.   It was a GR Icon account?

4    A.   Yes.

5    Q.   We saw a signature card.

6    A.   Yes.

7    Q.   Is that your signature?

8    A.   That's my signature.

9    Q.   So you had access to those funds?

10   A.   Yes.

11   Q.   And certainly there was proof that you, in fact, were

12   the signature on the GR Icon account?

13   A.   Yes.

14   Q.   Would you knowingly put a forged check into your own

15   account, sir?

16   A.   No.

17   Q.   So you put the check in November 27th?

18   A.   Yes.

19   Q.   Did the check clear right away?

20   A.   It didn't clear right away.  It cleared after like a few

21   days.

22   Q.   There was a hold on the check?

23   A.   Yes.

24   Q.   Okay.  Did you intend on keeping $344,000?

25   A.   No.

1    Q.   Why not?

2    A.   Because Mr. Brown was intending to be giving me $45,000

3    and not 344,600 and some change.

4    Q.   What were you going to do with that money?

5    A.   I was going to buy an MRI machine.

6    Q.   Were you going to use it for anything else?

7    A.   No.

8    Q.   Okay.

9         Now, from November of 2009, when you received the

10   check, through December of 2009, did you speak with Mr. Brown

11   again?

12   A.   Yes.

13   Q.   Okay.  How many times do you think you spoke to him in

14   that period of time?

15   A.   A lot of times.

16   Q.   On the phone?

17   A.   On the phone and in person at some point.

18   Q.   Okay.  Let's talk about the initial phone calls you had

19   with Mr. Brown.

20        When did you talk to him initially after you

21   deposited the check?

22   A.   I can't remember the exact date, but I know a few days

23   after I deposited the check.

24   Q.   What did you two discuss?

25        What did he say to you?

1   A.   He became very arrogant.  As soon as I mentioned that I

2   deposited the check, he became very rude.

3   Q.   Why did -- what do you mean "rude"?

4   A.   Because the first thing he asked me was to send him a

5   cashier's check for the difference of the money.

6   Q.   Okay.

7                MS. BEST:  Objection, your Honor.

8                MR. CHERONIS:  Your Honor, I'm not offering it for

9   its truth.

10               MS. BEST:  Your Honor, if we can go to sidebar?

11               THE COURT:  Sure.

12               (The following proceedings were had at sidebar:)

13               MS. BEST:  Judge, unlike the discussions we talked

14  about on the plane, at this point, I think we actually are

15  getting more into hearsay, and he is offering it for the

16  truth of the matter asserted, which is that this person made

17  these instructions to the defendant.

18               He is introducing this absolutely to prove-up that

19  his client somehow had these conversations with someone who

20  instructed him to behave a certain way.  It's for the truth

21  of the matter asserted.

22               We have no information -- particularly now that he

23  is saying he was directed to get a cashier's check, there is

24  no evidence that it ever happened, and he is just introducing

25  it for that purpose.

1            MR. CHERONIS:  Your Honor, it's being offered to

2    show the effect it had on Mr. Ajayi.  It's the exact same

3    type of evidence that they didn't object to.

4            It's not being offered for its truth.  It's being

5    offered to show why he did what he did.  It goes to weight,

6    not admissibility.

7            THE COURT:  It's not hearsay because it's an

8    instruction.  It's not a declarative fact.  It's an

9    instruction that he claims to have received from a

10   third-party.  It's all subject to cross-examination.

11           Overruled.

12           (End of sidebar proceedings.)

13           MR. CHERONIS:  May I proceed?

14           THE COURT:  You may.

15           MR. CHERONIS:  Thank you.

16   BY MR. CHERONIS:

17   Q.   We were talking about conversations you were having with

18   Mr. Brown, and that he instructed you to send him some money?

19   A.   Yes.

20   Q.   Did you ever see Mr. Brown again?

21   A.   I saw Mr. Brown.

22   Q.   When did you see him again?

23   A.   It was about the time -- after I deposited it, I told

24   him the check cleared.  He flew to Chicago unannounced, and

25   he called me that I should meet him downtown.

1    Q.    How many times did he call you?

2    A.    He called me several times.  I could not recollect

3    exactly how many times.

4    Q.    What did he want when he called you?

5    A.    He wanted the money.

6    Q.    Okay.  Did he tell you how he wanted the money?

7    A.    He said he doesn't care.  I need to give him the

8    difference and keep $45,000 in my account for my MRI.

9    Q.    Okay.

10            Did you meet face-to-face with him when he was in

11   Chicago?

12   A.    Yes.

13   Q.    Where did you meet with him?

14   A.    Marriott Chicago by Rush and -- it's about Rush and

15   Ontario, thereabout.

16   Q.    And when you met with Mr. Brown, what would you do?

17   A.    He asked for the cash on me.  You know, like, he wants

18   the difference of the cash.  Doesn't care about how I get it.

19   Just keep 45,000 and give him the rest.  So I gave him all

20   the cash on me, withdraw it.

21   Q.    Throughout the course of the trial, the government has

22   introduced into evidence a lot of video stills and evidence

23   of you going to different banks and taking out cash.

24            Did you do that?

25   A.    Yes.

1   Q.  Was that you on the video?

2   A.  Yes.

3   Q.  When you went to those banks, did you show your ID?

4   A.  Yes.

5   Q.  All right.

6           Now, let me ask you this:  When you showed your ID,

7   you also wrote checks to yourself?

8   A.  Yes.

9   Q.  Did you keep that money?

10  A.  No.

11  Q.  What did you do with that money?

12  A.  I gave them to Mr. Brown.

13  Q.  Where did you give them to him?

14  A.  By his hotel.

15  Q.  How many times do you think you met with him?

16  A.  I don't recollect, but I think it's about several times.

17  Q.  Do you know Amelia Granados?

18  A.  No.

19  Q.  Do you have any idea what ALG International is?

20  A.  That's Mr. Brown's business.

21  Q.  Okay.  You sent a wire to ALG?

22  A.  Yes.

23  Q.  Why did you send that wire?

24  A.  Because Mr. Brown gave me four accounts to wire funds

25  to.

1   Q.   Okay.  And was that one of the accounts you wired it to?

2   A.   Yes.

3   Q.   The government introduced some evidence regarding some

4   ATM purchases?

5   A.   Yes.

6   Q.   Excuse me.  Some purchases from Apple?

7   A.   Yes.

8   Q.   Okay.  Did you make those purchases?

9   A.   Yes.

10  Q.   What did you purchase from Apple?

11  A.   Business computers.

12  Q.   How many of those did you purchase?

13  A.   Two.

14  Q.   Okay.  And were those for your business?

15  A.   Yes.

16  Q.   When was the last time you saw Mr. Brown?

17  A.   It was in late 2009.

18  Q.   Around the time that we have been talking about?

19  A.   Yes.

20  Q.   And the last time you saw Mr. Brown, did you give him

21  money?

22  A.   The last time I saw him, I gave him money, and he wanted

23  more.  And I told him I will be getting some more to him as

24  soon as I can.  I told him I wanted to pay for my MRI.  He

25  said I should wait on that.  He said to make the difference

```
 1    up before I purchase the MRI.
 2  Q.  Did you try to get in contact with this man again?
 3  A.  I tried to.
 4  Q.  How did you try to get in contact with him?
 5  A.  By phone.  I tried calling his phone, and at some point
 6    he wasn't picking up his phone anymore.
 7  Q.  Did you ever hear from him again?
 8  A.  No.
 9  Q.  Did you ever send him anything?
10  A.  I sent him text messages to call me back.
11  Q.  This check that you deposited, did you alter it?
12  A.  No.
13          MR. CHERONIS:  I have no further questions, Judge.
14          THE COURT:  Cross-examination.
15                  CROSS-EXAMINATION
16  BY MS. BEST:
17  Q.  Good morning, Mr. Ajayi.
18  A.  Good morning.
19  Q.  So you met Charles Brown on a plane?
20  A.  Yes.
21  Q.  His name was Shaka?
22  A.  Yes.
23  Q.  And you guys talked for how many hours?
24  A.  About six hours into the flight.
25  Q.  And you showed him this presentation -- these two
```

1    presentations that you had put together?

2    A.   Yes.

3    Q.   Are these documents on your computer?

4    A.   Yes.

5    Q.   When were these documents created?

6    A.   They were created about -- before my flight.

7    Q.   Are there any dates anywhere on this document?

8    A.   They have dates on the e-mail with which I used it to

9    communicate.

10   Q.   Are there any dates on this document -- on these

11   presentations at all?

12   A.   There are dates on the original.

13   Q.   If you can, look at the document and tell me where there

14   are dates reflected as to when it was created.

15   A.   Not this one, but as an attachment, there are dates.

16   Q.   So there are no dates on this document is what you are

17   telling us?

18   A.   There are dates on the communication of which this is an

19   attachment.

20   Q.   There are no dates on the document itself, correct?

21   A.   On the printouts, no dates, but on the communication

22   there are dates.

23   Q.   But these are documents you showed to this Charles Brown

24   on the plane?

25   A.   Yes.

1    Q.   Do you have his phone number?

2    A.   Come again.

3    Q.   Do you have his phone number?

4    A.   At that time, I have his phone number.

5    Q.   But you don't have it now?

6    A.   I don't have it now, because I don't have the cell phone

7    anymore.

8    Q.   Did you have any investors at the time that Mr. Brown

9    offered to invest in your company?

10   A.   I have multiple investors I have talked to.  It depends

11   on if they would be interested in the project.

12   Q.   Had anyone else invested in GR Icon when you got this

13   check?

14   A.   At that time the only person that made -- I had a few

15   people.  I can mention maybe a couple of them.  I spoken to

16   Mr. Richard Dent in Chicago.

17   Q.   So people you talked to, but no one actually invested

18   any money or put any money into that GRI account before

19   Mr. Brown, right?

20   A.   Nobody.

21   Q.   Did Mr. Brown ever talk about working for American

22   Building Maintenance Company?

23   A.   He said he owned multiple businesses.

24   Q.   Did he ever discuss American Building Maintenance

25   Company?

1  A.  He never discussed that.

2  Q.  He never said anything about ABM to you, did he?

3  A.  No, he did not.

4  Q.  You don't have any reason to believe that he was

5  connected to ABM at all, did you?

6  A.  The only reason I might believe that is because he said

7  he owned multiple businesses.

8  Q.  So the answer is no, he didn't tell you he worked at

9  ABM, did he?

10  A.  He didn't say he worked there.

11  Q.  You got this envelope in the mail the day after you came

12  back to the United States.  Is that what you testified?

13  A.  Yes.

14  Q.  And there was nothing else in that envelope, correct?

15  A.  It was the check and the envelope.

16  Q.  No promissory note?

17  A.  No.

18  Q.  No instructions?

19  A.  No.

20  Q.  No division of how you should use that money from that

21  check?

22  A.  No.

23  Q.  All of that was over the phone with Mr. Brown after the

24  fact?

25  A.  Yes.

Q.   And you testified that, as a result, you took that check
and went to the bank, correct?

A.   Yes.

Q.   You went immediately to the bank, correct?

A.   Yes, after the phone call.

Q.   In fact, you testified that you were at home when you
received that check, correct?

A.   Yes.

Q.   And it was actually addressed to your home, correct?

A.   Yes.

Q.   You live in Calumet City?

A.   Yes, at that time.

Q.   And you deposited that check somewhere on Dearborn
Street, correct?

A.   Yes.

Q.   Was it at 10 South Dearborn, just two blocks north of
here?

A.   About.

Q.   And you drove from your house in Calumet City to deposit
the check at 10 South Dearborn?

A.   On my way to my brokerage, yes.

Q.   To deposit it at an ATM versus going to a teller,
correct?

A.   I double-parked on Dearborn, and I've done that before.
I deposited it at the ATM.

1    Q.   So you double-parked in the middle of Dearborn to go

2    deposit this check at the ATM?

3    A.   Yes.

4    Q.   A $344,000 check?

5    A.   Yes.

6    Q.   You have never received a check anywhere near that

7    amount for GR Icon, correct?

8    A.   I have received -- no, never around that amount.

9    Q.   So you took a check for $344,000, double-parked your car

10   and just threw it into the ATM and just took off?

11   A.   I didn't throw it.

12              MR. CHERONIS:  Objection.  Asked and answered.

13   BY THE WITNESS:

14   A.   I filled out the form --

15              MR. CHERONIS:  Objection.  Asked and answered.

16              THE COURT:  Objection to asked and answered is

17   overruled.

18              Why don't you repeat your question, Ms. Best.

19   BY MS. BEST:

20   Q.   So you drove your car, double-parked on Dearborn, ran

21   into the bank, deposited that check into an ATM, and then

22   just took off, correct?

23   A.   I didn't just take off.  I parked.  I filled out an

24   envelope.  I put the check inside, and I think I might have

25   used an envelope at that time.

1    Q.   And then you just left?

2    A.   Yes.

3    Q.   You stated that after you deposited this check, you then

4    called Mr. Brown multiple times, correct?

5    A.   Well, not after I deposited the check, but we were in

6    communication from time to time.

7    Q.   So that would have been after the check, correct?

8    A.   I called him before I deposited the check, and I called

9    him after I deposited the check.

10   Q.   So that's yes, you called him multiple times after you

11   deposited the check?

12   A.   Yes.

13   Q.   To get instructions on what to do with the check,

14   correct?

15   A.   Yes.

16   Q.   And he told you, you could keep $45,000, but he wanted

17   the rest of the money, correct?

18   A.   At that time, that wasn't the conversation.  The

19   conversation was to know when the funds will clear.

20   Q.   So he called you just to find out when the check had

21   cleared, correct?

22   A.   Yes.  It was a lot of communication about the status of

23   the deposit.

24   Q.   So between the date you deposited the check,

25   November 27th, 2009, and the date it cleared, end of business

1    December 2000 -- December 7th, 2009, you had multiple

2    conversations with Mr. Brown?

3    A.    I talked to him several times after that.

4    Q.    And he was eager to find out what the status of that

5    check was, correct?

6    A.    Yes.

7    Q.    He wanted to know exactly when it cleared, right?

8    A.    Yes.

9    Q.    And as a result, you called him and told him when that

10    cleared, correct?

11    A.    Yes.

12    Q.    And then at some point, he showed up in Chicago

13    unannounced?

14    A.    Yes.

15    Q.    And you met him at a hotel?

16    A.    Yes.

17    Q.    Was that before you withdrew any money, or was that

18    after you started withdrawing money?

19    A.    Well, before I withdraw -- after our conversation, he

20    said he wanted money.  He wanted cash.  And he told me

21    whatever cash I can get from the bank, I should go and get it

22    and meet him at the hotel, downtown Chicago, which was when I

23    found out he was in Chicago.

24    Q.    And so you -- as a result of that, you went to the bank

25    and actually got cash, correct?

1   A.   Yes.

2   Q.   You wrote -- but you didn't write a -- you didn't go to

3   the ATM, correct?

4   A.   I didn't go to the ATM.

5   Q.   You wrote a check to yourself from your business

6   account?

7   A.   Yes.  That's how -- that's how I will get cash from my

8   account.

9   Q.   Your first check was only for ninety -- around $9800,

10  correct, that first check to yourself on December 9th?

11  A.   You know, I wouldn't recollect the sequence of the

12  withdrawals.  I know I listened to this yesterday, but I

13  would not recollect the sequence.

14  Q.   All right.  But you wrote one check to yourself in the

15  amount just under $10,000?

16  A.   Yes.

17  Q.   And that is a result of the instructions from Mr. Brown,

18  correct?

19  A.   Yes.

20  Q.   Why didn't you write a check -- you didn't write a check

21  for $300,000, at that time, correct?

22  A.   Yes.

23  Q.   You just wrote a check for $9800 at that time, correct?

24  A.   Yes.

25  Q.   And then after that, you met with Mr. Brown?

1    A.    I met with Mr. Brown, yes.

2    Q.    And did you give him that cash?

3    A.    I gave him the cash.

4    Q.    But -- let me back up.

5          Did you explain -- you didn't explain to him why

6    you weren't giving him the whole amount of the money that you

7    owed to him at that time, did you?

8    A.    At the time, the only explanation was that whatever is

9    left in the account for $45,000 is what I will be using for

10   my MRI.

11   Q.    So you owed this man $300,000 and wrote him a check for

12   less than $10,000.  That's your testimony?

13   A.    That's not it.  He wanted the cash as quick as I can get

14   it to him.

15   Q.    You wrote a check to yourself for less than $10,000.

16   You could have written a check to yourself for $300,000;

17   isn't that correct?

18   A.    I could have done that.

19   Q.    But you chose not to?

20   A.    I was following his instructions.

21   Q.    His instructions, as you just testified, was that he

22   wanted cash as quickly as possible, correct?

23   A.    He wanted cash, but he doesn't care how I withdrew it,

24   but give him whatever I can get from the bank.  That was his

25   instruction.

1    Q.   And you could have written yourself a check for the

2    entire amount that you owed to that man, but instead wrote a

3    check for less than $10,000, correct?

4    A.   Which is what he requested.

5    Q.   That's not what you just testified.

6         You just testified that he wanted money however you

7    could get it, correct?

8    A.   Yes.

9    Q.   Are you now testifying that he told you to write a check

10   of less than $10,000?

11   A.   No.  I'm still saying the same thing.  I followed his

12   instructions as to how to withdraw the money and get it to

13   him.

14   Q.   I just want to back up again.

15        What you just testified is that he didn't care --

16   he didn't care how you got him the money as long as you got

17   the money to him in cash, correct?

18   A.   He wants me to give him cash, yes.

19   Q.   So you decided to write a check to yourself for less

20   than $10,000 and to hold on to the rest of that money,

21   correct?

22   A.   And that's what I meant about him telling me I need to

23   get cash out of the account.  I have his money.

24   Q.   And so the next day you then wrote two more checks to

25   yourself, correct?

1    A.   Yes.

2    Q.   You wrote a check for $23,000 in the morning, correct?

3    A.   Yes.

4    Q.   And then you wrote another check for $16,500, correct?

5    A.   Yes.

6    Q.   Why did you -- you didn't write one check for $40,000 to

7    deliver to Mr. Brown, did you?

8    A.   I mentioned to Mr. Brown that he should follow me to the

9    bank, or I write the whole check to him.  He didn't want that

10   to happen.  He said I have his money, and I should just get

11   it out and keep the difference of $45,000.

12   Q.   So you decided to write one check to yourself and then

13   an hour later write another check to yourself and drive to

14   two different bank branches to cash those checks?

15   A.   Yes.  He wanted his money.  He was calling me and giving

16   me pressure about getting him his money.  So he called

17   several times and gave me instructions about how to do them

18   at that point.

19   Q.   You were working in late 2009?

20   A.   In 2009 I was working as a real estate broker, and my

21   office was somewhere on the North -- North Lincoln area,

22   about 6500.

23   Q.   So you decided in the middle of the day to write two

24   separate checks and go to two different banks to cash out

25   this check for someone who was eager to get his money back

1  from you?

2  A.  As I mentioned earlier, I'm a real estate broker at that

3  time, so I'm always showing houses around Chicago.  Mostly I

4  worked in the Lincoln Park area.  That's mostly the area you

5  will find me.

6      So I got several calls from him.  He wanted money,

7  and I -- you know, I thought I have to return his money to

8  him.

9  Q.  So the most efficient use of your time as you are

10  walking around Lincoln Park showing properties to people is

11  to write two different checks to yourself and go to two

12  different banks to cash those checks.  Is that your

13  testimony?

14  A.  No, that's not my testimony.

15      My testimony is that I will use any branch that I

16  find around me.

17  Q.  But you decided to write two separate checks and go to

18  two separate branches in the same day, correct?

19  A.  Yes.

20  Q.  And then the following day, you wrote another check to

21  yourself in the amount of $17,000 and cashed that out,

22  correct?

23  A.  Yes.

24  Q.  And then you went from, after cashing that check out,

25  went to a personal banker and processed that $53,000 wire?

1    A.   Yes.

2    Q.   And then after that, you drove to another -- a third

3    bank -- or a second bank that day and conducted a third

4    transaction, another check to yourself, correct?

5    A.   Yes.  If you will look at that, when I did the wire

6    transfer, I was repairing my car at the Fletcher Jones right

7    across the street from the Chase branch.  I got a call, you

8    know, "Just go and do the wires."

9              And I told him, "I will do it right away.  I'm in

10   front of a Chase."

11             And I went outside, and I did the wire transfer.

12   Q.   You were in a Chase bank, and you cashed a check to

13   yourself, correct, for $17,000?

14   A.   No.  I just mentioned about the wire transfer now.

15   Q.   I understand.

16             You cashed a check to yourself for $17,000,

17   correct?

18   A.   Yes.

19   Q.   And then immediately thereafter you conducted this wire

20   transfer, correct?

21   A.   Yes.

22   Q.   At the same bank branch?

23   A.   Yes.

24   Q.   And then less than an hour later you traveled to the

25   south side and cashed another check to yourself for --

1    A.    Which is on my way home.

2    Q.    An hour later you conducted another -- you cashed yet

3    another check to yourself?

4    A.    Yes.

5    Q.    And you took that out in cash?

6    A.    Yes.

7    Q.    Did you meet with Mr. Brown that day?

8    A.    I met with him in the evening.

9    Q.    Did he say, "I'm eager to get my money"?

10   A.    I gave him whatever cash I had on me.

11   Q.    But you didn't write him a check for the $300,000 or

12   whatever was still due and owing at that point?

13   A.    No, I didn't write him a check because he didn't want a

14   check from me.  He wanted cash.

15   Q.    You didn't write yourself a check and cash that out for

16   the 200-some-odd-thousand dollars that still remained?

17   A.    Oh, no, I didn't do that.

18   Q.    No, you didn't?

19   A.    No.

20   Q.    And you didn't get a cashier's check, did you?

21   A.    I didn't get a cashier's check.

22   Q.    So the next day, again, you write another check to

23   yourself for $9650 and cashed that out, correct?

24   A.    Yes.

25   Q.    And that was on the north side?

1    A.   Yes.

2    Q.   On Lawrence, thereabout?

3    A.   Yes.

4    Q.   And then you wrote another check to yourself and cashed

5    that out again yet another hour later, correct?

6    A.   Yes.

7    Q.   Did you meet with Mr. Brown that day?

8    A.   I met with him several times, like I mentioned.

9    Q.   But you don't recall which days or which times you met

10   with him?

11   A.   I cannot recollect.

12   Q.   I believe you just testified, though, that at some point

13   when you were trying to get in contact with Mr. Brown, you

14   sent him several text messages, correct?

15   A.   Yes.

16   Q.   And then at some point he stopped answering his phone?

17   A.   Yes.

18   Q.   At this point you still owed Mr. Brown more than

19   $100,000, correct?

20   A.   Yes.

21   Q.   And yet, he stopped answering his phone?

22   A.   Yes.

23   Q.   Somehow after flying out to Chicago unannounced, he

24   decided to stop answering his phone when you still owed him

25   over $100,000?

1  A.  Can I back up a second?

2       At the moment, I told him that I wrote a personal

3  check for the difference of the money, whatever is left in my

4  account, and I mailed it to the address on the envelope.  He

5  started asking me who I was with, you know, "Who's there with

6  you?" maybe thinking, you know, that something was going on.

7  Q.  So he stopped answering his phone when you still owed

8  him $100,000?

9  A.  He started --

10  Q.  After -- yes or no?

11  A.  He stopped answering his phone after I told him I made a

12  personal check out to him.

13  Q.  He stopped answering his phone after -- when he owed --

14  when he was still owed $100,000 by you, correct?

15  A.  Yes.

16  Q.  Even though he had flown out to Chicago unannounced and

17  was eager to get that money, correct?

18  A.  Yes.

19  Q.  Even though he told you that he wanted the money as

20  quickly as possible in cash, correct?

21  A.  Yes.

22  Q.  And so you told -- your testimony is that you told him

23  you wrote a check and were going to mail it to him and that

24  he decided to stop answering your calls?

25  A.  I told him, "I want to end this, and I will be writing a

1    personal check," which I did, and I mailed it to the address

2    on the envelope.

3              At that point -- because at that point I wasn't

4    sure what was going on, and he became very rude and arrogant,

5    the way he was talking.  He was saying some derogatory stuff,

6    like he doesn't know how people know their right hand from

7    their left.  They can be told to make a withdrawal, and they

8    don't know how to do it.

9    Q.   So how much was that check that you wrote to Mr. Brown

10   for?

11   A.   I can't recollect, but I know it's over 100,000.

12   Q.   You think it's about $100,000, but you don't know?

13   A.   Over, over.

14   Q.   How did you send that check?

15   A.   I sent it by mail.  I send by mail; put in an envelope

16   and a stamp on it.

17   Q.   Do you have a receipt from that check, from that mail?

18   A.   No, I do not.

19   Q.   So you sent a $100,000 check in the mail to a man you

20   had only met a couple weeks before and didn't retain a return

21   receipt or anything along those lines?

22   A.   At that time, I believed it was his money, and I just

23   wanted to have it over with.

24   Q.   So your answer is no, you didn't retain any

25   documentation to show that you paid that money back?

1    A.    If he cashed the funds, that's how I will know that he

2    has gotten his money.  And there is two ways to that.  I also

3    called the bank and told them to put a stop on that check at

4    some point.  And they told me the account is on hold anyway.

5    Q.    So your answer to that, the question I asked, is no, you

6    didn't retain any documentation at all to show that you had

7    paid him back, correct?

8    A.    The retained document could have been like -- maybe like

9    the canceled check, maybe, if he ever cashed it.

10   Q.    So you didn't have any documentation to show that you

11   paid this man $100,000, correct?

12   A.    Well, the transaction was done in the past.  The only

13   way --

14   Q.    I'm sorry.

15          You didn't retain any documentation to show that

16   you paid this man $100,000, correct?

17   A.    No, I did not.

18   Q.    And, in fact, you didn't have any documentation at all

19   in any of your interactions with Mr. Brown, correct?

20   A.    Well, that would have been my electronic records, which

21   I tried to get from T-Mobile.

22   Q.    So --

23   A.    But they told me I can't get it.

24   Q.    You don't have any records, correct?

25   A.    I don't have any records on me.

1    Q.   And those records from T-Mobile would have been text

2    messages?

3    A.   It would have been text messages.  It would have been

4    phone calls to him.

5    Q.   So at the time, you had created this multipage

6    PowerPoint for your presentation to state governments in

7    West Africa to support this proposal for your MRI-equipment

8    business, correct?

9    A.   Yes.

10   Q.   But you didn't retain any documentation about a $345,000

11   transaction with this man you met on a plane just two weeks

12   before?

13   A.   That would be right.

14   Q.   So you don't have any documentation to show that this

15   man sent that check to you and intended for you to pay any

16   money back to him, correct?

17   A.   I have the envelope with which he sent the money.

18   Q.   You don't have any documentation showing that you sent

19   any money back to him, correct?

20              MR. CHERONIS:  Objection.  Asked and answered.

21              THE COURT:  Overruled.  I don't think he answered.

22   BY THE WITNESS:

23   A.   Can you come back with that question again?

24   BY MS. BEST:

25   Q.   You don't have any documentation showing that you sent

1    that money back to him, the $100,000 back to him, do you?

2    A.   I do not have documentation, but maybe the bank does,

3    maybe from the copy of the check if he tried to cash it.

4    Q.   You don't know if he tried to cash it, correct?

5    A.   I do not know.

6    Q.   You don't have any documentation about any of the cash

7    you gave him over those meetings up on Rush Street, correct?

8    A.   Can you come with that question again?

9    Q.   You don't have any documentation about any of the cash

10   you say you handed off to him, the numerous times you met

11   with him in December 2009, correct?

12   A.   I gave him cash.

13   Q.   You don't have any documentation of that, do you?

14   A.   No.

15   Q.   You didn't write yourself a note saying, "On December

16   9th, I gave Charles Brown $40,000," correct?

17   A.   No, I had a piece of paper I was writing it down on,

18   but, you know, at the end of the day, I wasn't keeping it.

19   Q.   So you testified that he became increasingly rude and

20   arrogant during your conversations with him?

21   A.   Yes.

22   Q.   And yet you didn't do anything to document the fact that

23   you were paying this man hundreds of -- at least, by your

24   estimation, a $100,000 check and then the $95,000 you took

25   out in cash, correct?

1   A.   I did not have documentation.

2   Q.   And this is someone you didn't know at all before you

3   met him on that plane in November of 2009, correct?

4   A.   Yes.

5   Q.   I think you testified on direct that you are an engineer

6   by trade?

7   A.   Yes.

8   Q.   You are pretty well educated?

9   A.   Yes.

10  Q.   You went to college here in the United States?

11  A.   Yes, I did.

12  Q.   You also went to college and obtained a degree in

13  Nigeria?

14  A.   I did some college in Africa.

15  Q.   And you are pretty well-traveled; is that correct?

16  A.   You can say so.

17  Q.   You just testified you went to Cameroon, correct?

18       You have been to the United Kingdom, correct?

19  A.   Yes.

20  Q.   You have been to Nigeria?

21  A.   Yes.

22  Q.   Kenya?

23  A.   Yes.

24       MR. CHERONIS:  Objection.  Relevance.

25

1    BY MS. BEST:

2    Q.   You have traveled throughout Europe, correct?

3    A.   Yes.

4    Q.   So you are pretty well educated, pretty savvy person,

5    correct?

6    A.   Yes.

7    Q.   You were working on getting this MRI business off the

8    ground at the time you testified, correct?

9    A.   Yes.

10   Q.   You didn't have any business expenses out of that

11   GR Icon account that would go to setting up an MRI business,

12   do you?

13   A.   Can you come with that question again?

14   Q.   Nowhere in the bank statements or the bank documents for

15   your GR Icon account at Chase do you have any expenses that

16   were going toward setting up the MRI-equipment business,

17   correct?

18   A.   I have several expenses.  And what I was doing at that

19   time was the money I made at G.E. and my real estate

20   brokerage, once I deposited them into my personal account, I

21   will use it for business purposes.

22   Q.   So you were using your personal account for business

23   purposes, and you weren't using your business account for any

24   purposes?

25   A.   I was using both, you know, regardless -- whichever way

1    I deem to use it.

2    Q.   So you set up the GR Icon business account in 2006,

3    correct?

4    A.   Yes.

5    Q.   Never had any marketing expenses out of that account,

6    correct?

7    A.   I might have.  You mean marketing account?  Yes, I

8    opened up an account with, I think, GoDaddy for the Web site.

9    Q.   You never spent any of the money in that GR Icon on

10   marketing your business, correct?

11   A.   Well, I would have used part of the funds for travel and

12   use part of the funds for my business.  I cannot recollect --

13   Q.   So no marketing expenses, correct?

14   A.   No marketing expenses?  I'm trying to recollect.  I

15   can't recollect.

16   Q.   You don't recall any marketing expenses.

17            You testified that you bought office equipment in

18   December 2009 --

19   A.   Yes.

20   Q.   -- those two computers --

21   A.   Yes.

22   Q.   -- after the check cleared?

23   A.   Yes, which I mentioned to Mr. Brown, and he allowed me

24   to do that.

25   Q.   So you didn't have those business computers until this

1      check cleared, correct?

2      A.   I had one.  I had an HP that I was using at that time.

3      And that's where the files were saved.

4      Q.   This is a home business you were operating?

5      A.   It's kind of a home business.

6      Q.   GR Icon was a home business, correct?

7      A.   Yes, until it starts off.  That's what I was --

8      Q.   You are the only person working for it?

9      A.   At that point, yes.

10     Q.   So you had a computer at home.  You went and bought two

11     more computers at Apple a week and a half before Christmas?

12     A.   I had a personal assistant -- personal assistant that I

13     used out in Africa.

14     Q.   So no one else working with you in your home office here

15     in Illinois --

16     A.   No one.

17     Q.   -- at that time, correct?

18     A.   Yes, nobody.

19     Q.   So you had a computer and went and bought two more

20     computers at Apple --

21     A.   Yes.

22     Q.   -- a week and a half before Christmas?

23          No -- you never bought any MRI equipment out of the

24     GR Icon account, correct?

25     A.   I never did because the instruction from Mr. Brown was

1       that I should wait until we have $45,000 left in the account.

2       Then I can make my purchase.

3       Q.   So the answer is "no"?

4       A.   Yes.

5       Q.   You never bought any MRI equipment before you met with

6       Mr. Brown either?

7       A.   Before I met with him, the only thing I did was

8       communicated with several companies about getting the MRI

9       business started.

10      Q.   But you never actually purchased anything out of your

11      account, correct?

12               You never purchased any MRI equipment with that

13      GR Icon bank account, correct?

14      A.   Not to the point when I met with Mr. Brown.

15      Q.   Or afterwards, correct?

16      A.   Afterwards, yes.

17      Q.   You didn't buy any MRI equipment --

18      A.   No.

19      Q.   -- in December 2009?

20      A.   Because I didn't have money to buy it.

21      Q.   In fact, despite getting this check from Mr. Brown, you

22      didn't go out and start purchasing any equipment.  You didn't

23      make any purchases after that check cleared, correct, the MRI

24      equipment purchases?

25      A.   I might have -- not MRI equipment, not MRI equipment, I

1  purchased.

2  Q.   In fact, before you got this $344,000 check, that

3  GR Icon account was very, very low on funds, correct?

4  A.   Yes.

5  Q.   You had about $90 at the start of the month?

6  A.   Can you come again?

7  Q.   You had about $90 in the GR Icon account at the start of

8  November 2009?

9  A.   Actually, the checks that I deposited would have been

10  two checks.  One was a refund from -- well, about $190, if

11  I'm right.

12  Q.   But you had, by your own calculation, less than $200 in

13  that bank account --

14  A.   Yes.

15  Q.   -- before this check cleared?

16  A.   Yes.

17  Q.   And, in fact, several other months -- several other

18  months that year, you had a negative balance in that GR Icon

19  account, correct?

20  A.   Yes, I have had negative balance in there.

21  Q.   So, in fact, the GR Icon account wasn't doing any -- you

22  weren't generating any business with it at all, correct?

23  A.   None at that point.

24  Q.   You stated that you didn't know who Amelia Granados is,

25  correct?

1    A.    Yes.

2    Q.    And you don't know what ALG Icon -- ALG is?

3    A.    I know ALG as Mr. Brown's business.  He gave me the

4    business name, routing number, and account number to make the

5    deposit.  That's all he gave me.

6    Q.    But you didn't know anything else about it?

7    A.    Didn't know anything about it.

8    Q.    In fact, you didn't investigate it at all, did you?

9    A.    I did not.

10   Q.    You didn't do any Googling, any kind of research to

11   figure out what it was?

12   A.    I didn't research it.

13   Q.    And yet you sent a $53,000 wire off to this account

14   without any knowledge about it at all?

15   A.    That was from instruction from Mr. Brown.

16   Q.    So you just sent it out without doing any research on

17   your own end?

18   A.    Yes.

19   Q.    Let me back up.  I apologize.

20          In fact, you don't have any records -- other than

21   these PowerPoints, you didn't maintain records from the

22   GR Icon account, correct?

23   A.    When you say "account," are you referring to the bank

24   statements or --

25   Q.    Yes.  Any records regarding how you -- well, actually

1    let me strike that.  Let me back up.

2           You became suspicious of Mr. Brown at some point,

3    didn't you?

4    A.   At some point, when he wasn't picking up his calls, I

5    became suspicious.

6    Q.   But up until then, you had no -- you thought what he was

7    asking you to do was fine?

8    A.   I thought it was just he gave me money and wanted his

9    money back, up to the point where I became suspicious.

10   Q.   So you thought . . .

11          You wrote other checks out of that account as well

12   during that couple-day time span after the check cleared,

13   correct?

14   A.   Yes.

15   Q.   You wrote a check to Segun Adetula?

16   A.   Yes, I did.

17   Q.   Who's Segun Adetula?

18   A.   He is somebody that I know from -- I knew him from

19   Africa, and he was asking me for support for his education.

20   Q.   And so you just wrote him a check?

21   A.   I did just write him a check.

22          What happened that day -- can I explain?

23   Q.   Well, I asked you a question.  You wrote him a check --

24   A.   I wrote him a check.

25   Q.   -- for $15,000?

1  A.    Yes.

2  Q.    And then you didn't meet with him again after that,

3  correct?

4  A.    He took off with the funds.

5  Q.    So you never met with him again?

6  A.    Never.

7            MS. BEST:  Your Honor, can I just have a moment?

8            THE COURT:  Sure.

9            (Brief pause.)

10           MS. BEST:  Your Honor, I have no further questions.

11           THE COURT:  Any redirect, Mr. Cheronis?

12           MR. CHERONIS:  Your Honor, can we approach just

13 real quick?

14           THE COURT:  Sure.

15           (The following proceedings were had at sidebar:)

16           MR. CHERONIS:  It seems like one of the issues that

17 the government raised on cross-examination was regarding any

18 documentation or anything from his attempts to do this.

19           This e-mail is marked July 21st, 2009, where he

20 states he's trying to get MRI equipment.

21           The other e-mail that I have --

22           THE COURT:  I thought Ms. Best asked about

23 documentation concerning his communications with --

24           MS. BEST:  Mr. Brown.

25           MR. CHERONIS:  Yes, she asked specifically, but she

1    also asked a more general question regarding documentation

2    regarding his business.  That's the way I heard the

3    cross-examination.

4         MR. BARNEY:  It was regarding dates as to when this

5    proposal was, I guess, created.

6         MS. BEST:  I asked if there were any dates on the

7    document to show when the document was created.

8         MR. BARNEY:  Right.

9         THE COURT:  Unless I missed something, I don't

10   think she opened this door.  Unless I missed something -- and

11   I could have -- I thought she was focusing her grilling at

12   him about documents on --

13        MS. KIM:  With respect to Mr. Brown.

14        THE COURT:  -- Mr. Brown.

15        MR. CHERONIS:  I think she did, but I will respect

16   your ruling, of course.

17        (End of sidebar conference.)

18        MR. CHERONIS:  I have no further questions, Judge.

19        THE COURT:  All right.  The witness may step down.

20        (Witness excused.)

21        THE COURT:  Does the defendant have any further

22   witnesses?

23        MR. CHERONIS:  No, your Honor.

24        THE COURT:  Will there be rebuttal evidence?

25        MS. BEST:  Just briefly, your Honor.  The

1   government calls Inspector Erickson.

2           THE COURT:  All right.  Mr. Erickson, again, you

3   have been sworn, and I want to remind you that you are under

4   oath.

5           THE WITNESS:  Yes, ma'am.

6           MS. BEST:  Your Honor, if we can have a moment?

7           THE COURT:  Why don't we take a break?  Let's take

8   a recess.

9           Ladies and gentlemen, just so you are clear where

10  we stand right now, the government rested its case earlier

11  today after -- you were here for that.  I believe Mr. Ajayi,

12  on his behalf, has rested the case as well.

13          The government is now entitled, if they wish to do

14  so, to offer rebuttal testimony.  We are going to be taking

15  that up.  But I will give you a recess first.

16          All rise.

17          (Jury out at 10:59 a.m.)

18          THE COURT:  We will take a short recess.

19          (A brief recess was taken at 10:59 a.m. until 11:13

20           a.m.)

21          THE COURT:  Are we good to go?

22          MS. BEST:  We are going to rest.  We are not going

23  to call Inspector Erickson, and we are ready to proceed to

24  closings.

25          THE COURT:  Okay.  Great.

1          Before we bring them in, can we take a fast look at

2    the instructions?

3          I had reserved on No. 8, which is the defendant's

4    absolute right not to testify.  That one will be withdrawn,

5    correct?

6          MR. CHERONIS:  Correct.

7          THE COURT:  Government's Instruction No. 9, with a

8    reference to the bracketed language, would also -- would be

9    used with the bracketed language.

10         MS. BEST:  In the first paragraph, your Honor, but

11   just to that last bullet point.

12         THE COURT:  Yes.

13         MS. BEST:  You know, I guess if we are talking

14   about -- we don't have the sort of prior statements, but we

15   do have prior conduct.  So we can have inconsistent or

16   consistent statements or conduct by the witness.

17         THE COURT:  In other words, include the bracketed

18   language in the bullet point as well?

19         MS. BEST:  Correct.

20         MR. CHERONIS:  Okay.  But should statements be

21   included in there?  I am not sure what inconsistent conduct

22   the government is referring to.

23         THE COURT:  No.  It would be consistent.

24         I am sure the -- well, the government could argue

25   that some of Mr. Ajayi's conduct was inconsistent with his

1    claims about the providence of this money and what he
2    intended to do with it.
3              With respect to statements, let's talk about that.
4              MS. BEST:  And I don't think -- I mean, as I think
5    about it, because this is conduct of the witness generally, I
6    don't think we have any witnesses for whom we would have
7    prior statements that are either consistent or
8    inconsistent -- Mr. Ajayi or any of the government's
9    witnesses.  So I think we can probably take out the language
10   "statements" in that portion of that bracket.
11             THE COURT:  So delete the word "statements"?
12             MR. CHERONIS:  Yes.  And I think that inconsistent
13   conduct means that, essentially, there was some conduct shown
14   that is inconsistent with what he did in court.  And I don't
15   know if they have -- if that has been established.
16             I don't think that -- that entire paragraph, I
17   don't think any of it should be in.
18             And they can argue -- certainly, they can argue
19   based on, you know, his demeanor and his prejudice and other
20   things like that, but there has been no conduct that was
21   shown outside of court inconsistent with what he did here.
22   They may argue the unreasonableness of his testimony,
23   certainly, but I don't think there has been any inconsistent
24   conduct shown.
25             MS. BEST:  I think that's -- I mean, I think we are

1    both struggling.  So I think that was my understanding, was

2    the -- what he testified to here today and his explanation

3    for his conduct was consistent or inconsistent with his

4    previous conduct.  But --

5            MR. CHERONIS:  I think what that means, your

6    Honor -- for instance, if Mr. Ajayi were questioned about

7    whether or not he physically did something before, some sort

8    of conduct, and then in this instance, he said something

9    different, that would be inconsistent conduct, I think.  I

10   have never really had this issue before, but it just doesn't

11   seem like it's appropriate based on the testimony that I have

12   heard in this case.

13           MS. BEST:  Your Honor, and just to clarify, also, I

14   mean, we do have -- the defendant is not the only witness we

15   are talking about.  We do have some other witnesses who had

16   other conduct sort of before, and that certainly was explored

17   on cross-examination in terms of what they did or didn't do.

18           So I actually think that bullet point, beyond sort

19   of limiting it to the defendant, actually might be applicable

20   to the other witnesses.  So I actually think it should remain

21   in.

22           MR. CHERONIS:  But inconsistent means something

23   different than what was done in court, I think.  That's my

24   understanding of an inconsistent statement or inconsistent

25   conduct, something different than what they're presenting.

1    And I don't think anybody -- I mean, there was really no

2    impeachment in this case.

3            THE COURT:  No, no.  The factors that you consider

4    are -- factors you may consider in assessing credibility:

5    whether the person has any bias or prejudice, whether the

6    other evidence supports the truthfulness, the witness'

7    demeanor, whether his conduct is consistent with what he is

8    telling us he did.

9            And I think Ms. Best is correct, that there was

10   cross-examination about the investigation done by government

11   witnesses.  In other words, you didn't follow-up on this or

12   you didn't follow-up on that.

13           We will use the last bullet point, but delete the

14   word "statement."

15           Government Instruction No. 10 had already been

16   withdrawn, correct?

17           MS. BEST:  Correct, your Honor.

18           THE COURT:  Government Instruction No. 11 is a

19   prior statement.  And I think it sounds as though that would

20   be withdrawn.

21           MS. BEST:  Correct.

22           THE COURT:  That one is withdrawn as well.

23           Government No. 12 is also a matter of Mr. Ajayi's

24   previous statement.  Am I correct that that's also withdrawn?

25           MR. CHERONIS:  They did not offer the statement.

1          MS. BEST:  Correct, your Honor.

2          THE COURT:  So that's also withdrawn.

3          No. 13 and 14 are both instructions about the

4    summary chart.

5          MS. BEST:  Your Honor, we admitted the summary

6    chart as evidence and not as a sort of demonstrative based on

7    the defendant's objection.  So I think we should probably

8    keep in 13 and strike 14.

9          THE COURT:  Correct.  Although the second sentence

10   in 13 is:  "The accuracy of the summary has been challenged."

11   That's not really true.

12         MS. BEST:  I think there is no challenge to that,

13   your Honor.

14         THE COURT:  It should say "has not been

15   challenged."

16         MS. BEST:  Correct.

17         THE COURT:  Actually, you know what?  Let's just

18   delete the second and third sentences.  So it would read:  "A

19   summary chart has been admitted in evidence.  You may use

20   this chart as evidence even though the underlying documents

21   are not here.  It is up to you to decide how much weight to

22   give to the summary."

23         MS. BEST:  Your Honor, I think the next one we had

24   a question about was 19.

25         THE COURT:  Let me just follow along.  14 is

1 withdrawn.

2 And I think you -- well, let me see. Yes, I think

3 you are right that the -- well, no. The next one -- you are

4 right. The next one we have a question about was 19. And

5 that's the aiding and abetting instruction. I was reserving

6 on this.

7 MS. BEST: I think based on the defendant's

8 testimony -- I don't think we have any -- at this point we

9 can withdraw that instruction.

10 THE COURT: That's withdrawn.

11 And then I think the only other matter as to which

12 I had reserved ruling was Government 24. We reserved it only

13 to allow Mr. Cheronis to take another look at the case law

14 and determine whether or not it's an accurate statement of

15 the law.

16 MR. CHERONIS: Judge, the only -- the only

17 correction I would ask for -- and I don't mean correction,

18 but addition, is -- and I believe the government objects to

19 this, but that the defendant knowingly made pass or attempted

20 to pass or possess a counterfeit or forged security. That

21 would be my only addition to it.

22 The government has indicated they object to that.

23 MS. BEST: And, your Honor, I think it's mainly

24 because inserting that -- first of all, you have the

25 "knowingly making and possessing" in the first sentence of

1     the instruction.

2            But, additionally, if you turn to that third

3     element, I think that gets you to your -- the knowledge and

4     the intent required here because the defendant has to possess

5     or use that security with the intent to deceive.

6            So I think actually putting in "knowingly" into the

7     first element is duplicative and entirely accurate.

8            MR. CHERONIS:  And I will just stand on the

9     argument I made.  I mean, I don't have anything to add.

10           THE COURT:  And the -- I am sorry.  Let me ask:  In

11    *United States v. Chapman*, what language was used there?

12           MS. BEST:  The language that's here.  So there

13    isn't "knowingly" in that first element.

14           THE COURT:  And that's been approved by the Seventh

15    Circuit.  So I'll adopt -- we need to make that correction in

16    Line 1, but other than that, I'll use the instruction

17    as tendered.

18           MS. BEST:  Your Honor, just to be completely clear,

19    I mean, the Seventh Circuit didn't go through a very lengthy

20    discussion of the elements.  So I don't want to make it seem

21    that the Seventh Circuit has, you know, signed off on this.

22    I just want to make it clear this is something that went up.

23    These instructions were the issue of some debate,

24    particularly with an eye to the definition of "organization,"

25    and whether that was proven.

```
 1              So I wanted to give you sort of the citation as to
 2   where this came from, but I don't want to represent that, you
 3   know, there is an opinion out there that goes through each of
 4   these elements and checks them off.  I just -- to be
 5   completely candid, I just wanted to make sure you knew that.
 6              THE COURT:  You know, the "knowingly" appears in
 7   the first line, and "intent to deceive" appears in
 8   Paragraph 3.  And I think that that adequately presents the
 9   jury with the information that Mr. Ajayi has to have acted,
10   not by mistake, but with intention.
11              All right.  With those determinations made, I can
12   get copies printed.
13              MR. CHERONIS:  Judge, I am sorry.  I didn't mean to
14   interrupt.
15              I do have one instruction that --
16              THE COURT:  Oh, good.
17              MR. CHERONIS:  I took your hint on the "reasonable
18   doubt" one and decided not to waste the ink.
19              (Document tendered.)
20              THE COURT:  We will note for the record your desire
21   for a "reasonable doubt" instruction.
22              MR. CHERONIS:  One of these days.
23              THE COURT:  All right.
24              MR. CHERONIS:  I am proposing a "good faith"
25   instruction, your Honor.  And I think it's kind of a modified
```

1  version of 610.

2          It's my position that, based on the committee

3  comments in the Seventh Circuit, the Seventh Circuit has

4  questioned whether a "good faith" instruction is appropriate

5  to provide useful information.

6          It does say that it's appropriate or could be

7  appropriate in cases where the defendant -- they must prove

8  specific intent, such as intent to defraud or willfulness.  I

9  think in this case, certainly, the government has to prove

10  intent to defraud.  So we think it's a proper instruction

11  based on the evidence.  So we would be asking that the Court

12  gives it.

13          I do have a copy on -- electronic copy that I

14  e-mailed to myself in case the Court wants to make --

15          THE COURT:  All right.

16          MR. CHERONIS:  -- any changes if they suggested it.

17          THE COURT:  Is there an objection?

18          MS. BEST:  Your Honor, I don't know this

19  instruction is necessary in light of the specific

20  instructions on what the government has to do to prove the

21  defendant's intent to defraud.

22          I would note that of particular concern is just the

23  reference to the indictment in the last paragraph.

24          Just in that the counts -- all the counts except

25  for the money laundering count, which is Count IV of the

1    indictment, require that intent to defraud.  But that's not

2    an element of the money laundering count.  And so I just want

3    to make clear that to the extent there is this good faith,

4    that it doesn't apply to the money laundering count.

5            And so it would be Counts I through III and V

6    through VII.

7            THE COURT:  And remind me which of your

8    instructions are the elements instructions for those counts.

9            MS. BEST:  Correct.  So 16 covers the bank fraud.

10           THE COURT:  Okay.  One, two -- yes, right.

11           MS. BEST:  Count -- Instruction 22 count covers

12   money laundering, and Instruction 24 covers the possessing or

13   using the altered check.

14           THE COURT:  And what you are saying is any "good

15   faith" instruction would relate only to -- well, would not

16   relate to Count IV.

17           MS. BEST:  Correct.

18           MR. CHERONIS:  I think those instructions need to

19   be read in conjunction with Instruction 18, Judge, which is

20   the "knowingly" provision, from my understanding of the

21   committee comments.

22           THE COURT:  So where are you proposing that this

23   instruction, the modified version of 6.10, be inserted?

24           MS. BEST:  After 18.

25           MR. CHERONIS:  I think after 18 would be where I

1    would suggest it would be appropriate.

2            THE COURT:  And Ms. Best is pointing out that if

3    it's given, we have to remove the reference to money

4    laundering.

5            Am I right about that?

6            MS. BEST:  Correct.  Or just the fact that that

7    last paragraph that just says "as charged in the indictment"

8    versus --

9            MR. CHERONIS:  Well, I do have "money laundering"

10   up on the top.  So that would have to be excised, too, if

11   that's your objection.

12           MS. BEST:  I mean, your Honor, I do want to state I

13   don't think this is actually necessary in light of the -- in

14   light of Instruction 18 and the definition of what's required

15   under the elements of the bank fraud instruction.

16           THE COURT:  You know, I don't have a problem giving

17   this.  I would put a period after "intent to defraud" to

18   redact -- to remove the reference to "as charged in the

19   indictment."

20           What I am struggling with is, apart from deleting

21   the words "and money laundering," how do we make clear to the

22   jurors that this instruction does not apply to Count IV?

23           You are right that we can do so, in part, by

24   putting it right after Instruction 18.

25           MR. CHERONIS:  I think we could, then, specify the

1  counts in the indictment.

2          THE COURT:  That starts to get cumbersome.

3          I wonder if maybe what we should do, given that --

4  well, it does refer to bank fraud.

5          MR. CHERONIS:  And then, your Honor, that would

6  also go to -- I'm sorry.  I think I -- it would also go to

7  Count VII because that is the making and possessing altered

8  security, and that includes with the intent to deceive -- or

9  another person or organization.  So I think that sort of

10  subsumes the intent-to-defraud issue.

11          MS. BEST:  So if we take out the reference to money

12  laundering and just say possession or use of -- of an altered

13  security --

14          MR. CHERONIS:  I would tender it as proposed in

15  that language.

16          THE COURT:  Okay.  So here is a proposal with

17  respect to Mr. Cheronis' tendered instruction.  We could say

18  here or perhaps after the elements instruction on Count VII:

19  "With respect to the charges of bank fraud and of possession

20  of an altered security, if the defendant acted in good faith,

21  then he lacked the intent to defraud required to prove those

22  offenses.

23          "The defendant acted in good faith if, at the time,

24  he honestly believed the validity of that which the

25  government has charged as being fraudulent.

1       "The defendant does not have to prove his good

2    faith.  Rather, the government must prove beyond a reasonable

3    doubt that the defendant acted with intent to defraud."

4    Period.

5       MR. CHERONIS:  I think that's perfect.

6       THE COURT:  Then we would give it after Count --

7    the instruction on Count VII.

8       MS. BEST:  That works, your Honor.

9       THE COURT:  Okay.

10      MS. BEST:  Your Honor, we do have one additional

11   question.  We had this debate yesterday, before the defendant

12   testified, about whether the ostrich instruction was

13   appropriate.

14      Based on the defendant's testimony, I, at least,

15   think there is an argument that, based on what he said, that

16   he had a strong suspicion that that check -- or at least the

17   finder of fact could find that he had a strong suspicion

18   based on what he testified here to today, and that he avoided

19   the truth of that in possessing and then using that check.

20      MR. CHERONIS:  Your Honor, I believe he testified

21   that there wasn't a suspicion until he stopped receiving

22   phone calls from this individual after the transactions were

23   completed.  That was my understanding of his testimony.

24      THE COURT:  His testimony that he became suspicious

25   of the shadowy figure on the plane, Mr. Brown, only after the

1    four days in which he scrambled, in the government's view, to

2    withdraw cash.

3              MR. CHERONIS:  That's when he thought it was

4    Mr. Brown's money, and there was nothing wrong that.

5    Ms. Best asked him if he became suspicious.  His response was

6    something along the lines of, "It is only after he stopped

7    answering my calls," and that was after this had been

8    completed.

9              So I think that would, then, allow the government

10   to argue that sort of post-conduct suspicion somehow should

11   be brought in under an ostrich instruction.  I don't think

12   that's appropriate.

13             MS. BEST:  Not at all, your Honor.  I think what

14   the government can argue is that the defendant's testimony

15   just wasn't credible.  And that the finder of fact has the

16   ability to weigh what the defendant said against his actions

17   and determine whether those actions are consistent with what

18   he testified to here today.

19             And I think there is an argument to be made there

20   that this is someone who was suspicious, who acted, then,

21   in -- conformed his behavior because he knew that check was

22   altered at the time and behaved that way.

23             THE COURT:  All of that goes to that last bullet

24   point in the credibility -- in the credibility instruction.

25   I am not sure it relates to this whole ostrich issue.

1    The ostrich issue would be -- just so I am clear, I

2    think now we're talking -- in my view, the argument that the

3    government just made supports the conclusion that that final

4    bullet point in Government Instruction No. 9 is appropriate

5    here.

6    His conduct, the government would argue, is

7    inconsistent with his testimony about the confidence he had

8    in Mr. Brown.

9    In other words, he leaped to withdraw cash because

10   he knew or -- he knew that the money was a, more or less,

11   windfall to which he wasn't entitled.  It just came to him

12   out of nowhere.

13   I think -- I really think that an ostrich

14   instruction would require some kind of information or a step

15   that he was invited to take or would normally have taken that

16   he didn't take.

17   I think the evidence -- I think the government's

18   evidence here is that he knew, not that he -- that he knew it

19   wasn't his, and that's why he leaped to withdraw the money --

20   that he knew it wasn't -- he didn't -- it didn't belong to

21   him.

22   MS. BEST:  Your Honor, I mean, what he testified is

23   that this check arrived and he sort of took these steps.  The

24   immediate -- the day the check arrived, he deposited it.  And

25   then after it cleared, he took these other steps.  So the

1    possession on November 24th, but then his eventual use of the

2    check and its proceeds through December 12th.

3           And I think his testimony here was that he got this

4    check.  It came without instruction, without any sort of any

5    other information.

6           But he didn't testify that Mr. Brown told him it

7    was an altered check, and he went forward with it from there.

8    But what he testified is that this check came without any of

9    the sort of information he -- not only that one would expect,

10   but the defendant himself expected.  He expected a promissory

11   note.  He expected other instructions to go along with it,

12   but he went ahead, and this man tells him go deposit the

13   check immediately.  And within an hour, he is at the bank

14   depositing this check, despite not having any of the

15   assurances that he thought he was going to get, based on his

16   conversation with Mr. Brown.

17          THE COURT:  But he did -- he did speak to Brown,

18   and Brown said, you know, "We will get to all those things

19   later."

20          So he did follow through, according to him.

21          MS. BEST:  He questioned him.  But, again -- I

22   mean, I think this again goes to why the finder of fact

23   should have a chance to sort of deliberate and take this into

24   account whether his explanation of what he did was actually

25   credible and makes sense with --

1        THE COURT:  And I am sure that they will take that

2   into account.  I think you will so argue.

3        I don't think the evidence supports an ostrich

4   instruction.

5        Okay.  The only thing left I need to do -- you are

6   certainly welcome to proceed with arguments at this point.  I

7   want to make sure I have got my instructions.

8        I don't know whether you have already done this,

9   but can you e-mail me a set so I can --

10       MR. CHERONIS:  Your Honor, I would e-mail you in

11  Microsoft Word form the one I proposed.

12       THE COURT:  That's fine.

13       MR. CHERONIS:  Okay.

14       MS. BEST:  What I had sent previously was in PDF.

15  I do have the version that I sort of e-mailed around last

16  night.  It doesn't have -- it includes the -- I think it took

17  out the ostrich instruction based on what we discussed

18  yesterday and put in "knowingly" at the beginning of that

19  Count VII, but I haven't made, obviously, any other changes.

20       THE COURT:  What I can do, if you e-mail it to me,

21  is, you know, make the other deletions.  And I don't know

22  whether you have still got the markings at the bottom or not.

23  There is a clean set, but I can take care of that as well.

24       MS. BEST:  Which e-mail address should we send it

25  to, your Honor?

```
 1              THE COURT:  Let's just -- just send it to mine:
 2   rebecca_pallmeyer@ilnd.uscourts.gov.
 3              I think I can take care of this in five minutes.
 4   It should be pretty easy.
 5              MR. CHERONIS:  At ILND?
 6              THE COURT:  ILND, as in Illinois.
 7              MR. CHERONIS:  I got that part.  And then .gov?
 8              THE COURT:  Uscourts, one word.
 9              MR. CHERONIS:  Thank you.
10              THE COURT.  .gov.
11              MR. CHERONIS:  How many lawyers does it take to
12   send an e-mail?
13              THE COURT:  I don't know, but when you finish,
14   there is a light bulb in my closet that I can't change.
15              MR. CHERONIS:  You are talking to the wrong guy.
16              (Laughter.)
17              MR. CHERONIS:  So are we going to proceed right
18   away, your Honor, with closings?
19              THE COURT:  Yes.
20              MR. CHERONIS:  Can I use the washroom real quick?
21   I will be right back.
22              THE COURT:  Sure.
23              MR. CHERONIS:  Thank you.
24              (A brief recess was taken at 11:38 a.m. until 11:40
25                a.m.)
```

```
 1                THE COURT:  I got Ms. Best's version right here.
 2                MR. CHERONIS:  Did you get mine, your Honor?
 3                THE COURT:  I don't see any, but I am waiting for
 4     you, Mr. Cheronis.
 5                MR. CHERONIS:  It's sending.
 6                THE COURT:  But I will be able to take care of
 7     getting these ready with no trouble.
 8                It looks like the version you sent me is a clean
 9     copy, Ms. Best.
10                MS. BEST:  Correct, your Honor.  I took all of the
11     notations off.
12                THE COURT:  I thought I was going to be doing that,
13     but obviously I am not.  Good.  Okay.
14                MR. CHERONIS:  I will see if I get better service
15     out here.
16                (Brief pause.)
17                THE COURT:  I got it.
18                Is it okay to bring in the jurors?  Are we all set?
19                MS. KIM:  Yes, your Honor.
20                THE COURT:  All right.  Good.
21                (Jury in at 11:46 a.m.)
22                THE COURT:  You may be seated.
23                Ladies and gentlemen, the government rested its
24     case earlier, and, as you know, the defendant has now rested
25     its case.
```

1       I believe the government has chosen not to present

2    any further evidence.

3       Is that correct?

4       MS. KIM:  Yes, your Honor.

5       THE COURT:  Then we are ready right now to proceed

6    with closings.

7       Closing arguments -- sometimes referred to as

8    "summations" -- are really just that.  The lawyers are going

9    to sum up the evidence that you have heard.  They are going

10   to remind you about what they believe you have heard.  And

11   then they are going to tell you what they think your verdict

12   should be.

13      Two observations.

14      One, I told you earlier:  A statement made by a

15   lawyer is not evidence.  So if anything a lawyer says right

16   now is inconsistent with your view of what the evidence

17   shows, it's your memory and understanding of the evidence

18   that counts.

19      And as a further reminder, nothing that I say or

20   have done during the course of the trial or during the course

21   of these arguments is intended in any fashion to indicate

22   what I believe your verdict should be.  That really is up to

23   you.

24      The government has the burden of proof.  I already

25   explained that.  And because the government bears the burden

1   of proof, the government will begin with the closing

2   argument. There will be a response from the defendant. And

3   then the government will have an opportunity to make a

4   rebuttal argument as well.

5          When we have heard the lawyers' arguments, you will

6   hear my instructions on the law, and you will retire to

7   deliberate on your verdict.

8          Depending how long this all takes, we may or may

9   not take a break.

10          I will say this: I rarely take a break during a

11   lawyers' argument. So if we do take a break, it would be

12   between arguments or after the arguments and before the

13   instructions, for example. It would not be during a lawyer's

14   argument.

15          Ready to go?

16          MS. KIM: Thank you, your Honor.

17          THE COURT: Ms. Kim.

18          CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

19          MS. KIM: Abidemi Ajayi stole money from Chase

20   Bank. He made an ATM deposit of a $344,000 check, a check

21   that he knew he had no right to. And then he systematically

22   drained the account of money until the fraud was discovered

23   by the bank.

24          In just four days, the defendant made out with

25   $172,000 that wasn't his. Over the past day and a half, you

1  have seen and heard evidence that the defendant knowingly

2  carried out this fraud in the early winter of 2009.

3          For the next 20 minutes or so, I will walk you

4  through that evidence that proves beyond a reasonable doubt

5  that the defendant is guilty as charged in the indictment.

6          So let's go over what those charges are.

7          There are three types of charges against the

8  defendant.  First is bank fraud, the second is money

9  laundering, and the third is possession of an altered check.

10         Let's take bank fraud first.

11         The defendant has been charged in five counts of

12  bank fraud -- Counts I, II, III, V, and VI.

13         Each count charges a separate check transaction.

14  Each check transaction is a separate crime.

15         So what is bank fraud?

16         There are five elements to a bank fraud offense.

17         The first is there has to have been a scheme to

18  defraud a bank.

19         Second, that the defendant knowingly executed the

20  scheme.

21         Third, that he acted with the intent to defraud.

22         Fourth, that the scheme involved a materially false

23  or fraudulent pretense, representation, or promise.

24         And, lastly, that the deposits of the bank were

25  FDIC insured.

1          These elements are the same for all five counts of

2     bank fraud in the indictment.

3          Now, first, let's take care of the elements that

4     aren't really of issue in this case.

5          The last element, the FDIC element.

6          You heard a stipulation between the parties, which

7     just means there was an agreement between the parties, that

8     the deposits of Chase Bank were FDIC insured in 2009.  So you

9     know that this last element has been proven.

10         Next, there really is no question here that there

11    was a scheme to defraud Chase Bank.  What does that mean?  I

12    expect that the Judge will later instruct you that a scheme

13    to defraud a bank means a plan or course of action intended

14    to deceive or cheat the bank or to obtain money or property

15    or cause the loss of money or property by the bank.

16         Now, here, we all know that the original $344,000

17    check issued by ABM was forged.  It was originally made out

18    to Pollock Paper, but it was changed later to make it look

19    like the check was made out to GR Icon International, the

20    defendant's company.

21         You heard Dan Corcoran from ABM testify about that.

22         You also saw the voided copy of this check, ABM's

23    check register.

24         You also saw the altered check after it was changed

25    and made to look like it was made out to the defendant's

1  company.

2  It's clear on this check that the payee information

3  or the person to whom the check is made out to, GR Icon, the

4  font used for that payee information is completely different

5  than the rest of the font used in the check.  So it's clear

6  that information was changed.

7  And you know that this check was deposited into GR

8  Icon's Chase account and that withdrawals were made from that

9  account after that.

10  You saw the bank records that proved that.  The ATM

11  history, the bank statements, summary of the bank statements,

12  the teller journals, images of the checks themselves, these

13  all show that money -- that this check went into the account

14  and money was taken out.

15  So all of that evidence shows that the money from

16  the check didn't go to where it was supposed to go.  And as a

17  result, Chase Bank was deceived.

18  You know from that evidence that there was a scheme

19  to defraud the bank.  Element one has been proven.

20  Now let's talk about the fourth element:  Bank

21  fraud.

22  The fourth element requires that the scheme

23  involved a materially false or fraudulent pretense,

24  representation, or promise.

25  So let's break that down a little bit.  What

1  exactly is the representation in this case?

2  The line on the altered check that says "to GR Icon

3  International," that's a representation because it's telling

4  you that that check is made out to GR Icon.  But since the

5  original check was made out to another company, the line in

6  that information is false.

7  So for purposes of bank fraud, that is the false

8  representation.

9  Now, that false representation was material or, in

10  other words, it was important, because the check had a

11  different name than what it was originally issued to.  That

12  check being deposited allowed for money to be taken out of

13  the account, money that shouldn't have been there in the

14  first place.  That's why that representation is important.

15  That's why you know this element has been proven.

16  Let's get to the meat of the case here.  That's

17  elements two and three, that the defendant knowingly executed

18  the scheme to defraud and he acted with the intent to

19  defraud.

20  Now, you know the defendant's intent by looking at

21  his actions.  His actions tell you that he knew that $344,000

22  check that he deposited was fraudulent.

23  Let's take a look at what the defendant did.

24  On November 27, 2009, he had this altered check.

25  He deposits the check into his company's account, GR Icon, an

1    account that he controlled.  You know that because you saw

2    the signature card for the account.  He was listed as the

3    signatory, as the president of GR Icon.

4            Then he deposits this check in an ATM using an ATM

5    card issued to GR Icon and a PIN number.  You know that

6    because Jim O'Shea told you there was an ATM card issued to

7    the defendant and only the defendant.

8            After this check is deposited, what does it do?  It

9    significantly and falsely inflates the account balance of GR

10   Icon.

11           Remember Inspector Erickson going over the bank

12   statements and telling you that in November 2009, before this

13   check was deposited, GR Icon had only $90 in its account.

14           Now, immediately after the check clears, the

15   defendant starts to empty out the account.  During the course

16   of four days, he writes checks; he makes debit purchases; he

17   sends a wire transfer, and he writes checks to other people.

18   In total, he takes out $172,000 from that account.

19           You have seen pictures of the defendant doing this.

20   Inspector Erickson walked you through the video stills from

21   the bank where the defendant presented these checks for

22   payment.  Let's look at them again.

23           Check 1086, which is charged in Count I of the

24   indictment, the photo of the defendant cashing out that check

25   on December 9th, 2009.

1              Check 1088, another photo of the defendant cashing

2  out that check, same day, December 10th.

3              Check 1089, charged in Count II of the indictment,

4  photo of the defendant cashing it out December 10th.

5              Check 1093, charged in Count III, picture of the

6  defendant cashing it out the next day, December 11th.

7              Check 1095, a photo of the defendant cashing it

8  out, again, December 11th.

9              Check 1097, charged in Count V, another photo of

10 the defendant cashing that check out on December 12th.

11             Check 1098, charged in Count VI, a photo of the

12 defendant cashing it out the same day, December 12th.

13             So based on the evidence that you have seen and

14 heard, you know that the defendant is responsible for

15 withdrawing the money out of the account.

16             Now, defense counsel, in his opening statement,

17 told you that there really is no issue here.  The defendant

18 deposited the initial $344,000 check.  It was the defendant

19 who took the money out of the account.

20             He also told you that you need to answer two

21 questions to determine whether the defendant acted with the

22 intent to defraud:  How the defendant got the altered check,

23 and why he did the things he did.

24             Well, ladies and gentlemen, I want to remind you

25 here that the government bears the burden of proof.  The

1    defendant does not have that burden of proof.  But here he

2    chose to testify.  You heard him earlier this morning.  You

3    had a chance to see him on the stand.  You had a chance to

4    observe his demeanor.

5           What did he tell you?  He told you that sometime in

6    the fall of 2009, he met a man on a plane, Mr. Brown.

7    Somebody that he never knew.  A total stranger.

8           Mr. Brown agreed to invest in his company.  He even

9    told him he would send him a check for $344,000.  He was to

10   keep $45,000 and send the rest of it back in cash.

11         The defendant also told you that Mr. Brown was very

12   eager to get his money back, so he wanted it as quickly as

13   possible.  He wanted to get his money back.

14         So what does the defendant do?  He doesn't write

15   one check out to Mr. Brown for the remainder of the amount.

16   He doesn't write a cashier's check.  Instead, he goes to bank

17   after bank -- banks that are spread out all over the Chicago

18   area -- taking out chunks of cash intending to give it back

19   to Mr. Brown.

20         What this tells you, ladies and gentlemen, that his

21   testimony is not consistent with the defendant's conduct.

22         It's not consistent because you have seen and heard

23   evidence that proves otherwise.  And what have you seen?

24         Well, let's take you back to November 27th when he

25   deposits that first check.  He deposits it at an ATM in the

1   Loop in Chicago.

2          When that check clears on December 9th, he is all

3   the way up in Evanston, where he cashes out a check to

4   himself for $9,600.

5          And then that same day, he writes a check to a

6   third-party for $15,000.

7          Next day, December 10th, he is on the south side of

8   Chicago where he cashes out a check for $23,500.

9          Same day, back in the Loop, cashes out a check to

10   himself for $16,500.

11          Next day, another bank in another area of Chicago,

12   where he cashes out a check for $17,000.

13          But he is not done, because 12 minutes after that

14   transaction he walks over to another section of the bank, and

15   he sends a wire transfer for $53,000 to a company.

16          Same day, after that wire transfer -- after that

17   wire transfer, he is all the way down on the south side of

18   Chicago at another Chase Bank branch, where he cashes out a

19   check to himself for $9500.

20          Next day he is at another Chase Bank branch in

21   another area of Chicago, where he cashes out a check to

22   himself for $9,650.

23          And, finally, soon after that transaction, he is at

24   another Chase Bank branch where he cashes out a check for

25   $9,800 to himself.

1    Who goes to bank after bank after bank -- sometimes

2    hitting several banks on the same day, banks that are spread

3    out all over the place -- putting wads of cash in his pocket?

4    Someone who's trying to avoid attention, who wants

5    to get that money out as quickly as possible, as much as

6    possible, before the fraud is discovered.

7    I expect that the Judge will later instruct you

8    that you can use your common sense here when you are

9    evaluating the evidence in this case.  And common sense here

10   tells you that the manner and the frequency and the locations

11   of the defendant's withdrawals show you that he knew that

12   that initial check that he deposited was fraudulent and that

13   he had no right to the money that he subsequently took out.

14   And you don't need a witness to tell you that

15   because you can draw that conclusion on your own based on

16   what you know of the defendant's conduct.

17   Because what else could the defendant have believed

18   in this case?  Before he deposited that huge check, GR Icon,

19   his company, had $90 in its account.  And you have heard the

20   summaries of the bank statements.  Nothing in the bank

21   statements indicate that there was an expense associated with

22   running a normal business.

23   You have also seen the company's articles of

24   incorporation.  You know that this company was dissolved

25   twice for failing to file records and taxes.  There is no

1   history of this business operating as a functional, normal

2   business.

3           And so suddenly the defendant gets this check for a

4   large sum of money from a company all the way in Texas that

5   has no connection to him, no connection to GR Icon.  He takes

6   this check and he deposits it in an ATM, not in a bank where

7   he would have faced a teller, a live person, who may have

8   asked questions, who may have noticed that there wasn't

9   something quite right about this check.

10          Also, there are safer and better ways to withdraw

11  large amounts of cash.  You heard testimony from a Miguel

12  Duenas, the Chase teller, who told you that a safer way would

13  be to take out or write a cashier's check.  But the defendant

14  here didn't do that.  Instead, he asked for cash.  He walked

15  out of all of those banks with a big, thick wad of bills,

16  $95,550 in cash in his pocket.

17          Now, does that tell you that the defendant thought

18  that that initial check that he deposited was legitimate?  Of

19  course not.

20          Now, based on that evidence that you have seen and

21  heard, you know that the last two elements of the bank fraud,

22  Counts II and III, have been proven.

23          Now, let's talk about Count VII, which deals with

24  the possession of a counterfeit or forged security.

25          Now, there are three elements to this charge.  The

1    first is that the defendant made, passed, or attempted to

2    pass or possess a counterfeit or forged security and that the

3    counterfeit or forged security was that of an organization,

4    and that the defendant possessed the counterfeit or forged

5    security with intent to deceive another person or

6    organization.

7         Now, I expect the Judge to later give you some

8    instructions about what some of these definitions mean.  I

9    expect she will instruct you that a security includes things

10   like a check and that the term "forged" means a document that

11   appears to be genuine, but has been fraudulently altered.

12        Now, I also expect her to instruct you that an

13   organization includes companies or corporations that operate

14   in interstate commerce.

15        And "interstate commerce," in this context, means

16   doing business across state lines.

17        Now, I also expect her to instruct you that the

18   term "counterfeit" means a document that's falsely made to

19   appear as a genuine security.

20        So here, what do we have?  We have a check from

21   ABM, a security which was drawn off the Bank of America.  And

22   that check was forged because it was changed to make it look

23   like it was made out to GR Icon International, not Pollock

24   Paper.

25        And you heard a stipulation that the Bank of

1    America and Chase are organizations that operate in

2    interstate commerce, so you know that part of the charge is

3    proven.

4         You also know that the defendant possessed this

5    check because he deposited it into his account via the ATM on

6    November 27th, 2009.

7         We have already covered the defendant's intent to

8    deceive and intent to defraud and the bank fraud counts.  So

9    based on all of this, you know the defendant is guilty of

10   Count VII in the indictment.

11        Now let's take a look at the money laundering

12   charge, which is Count IV of the indictment.  There are also

13   five elements to this charge.

14        First is that the defendant engaged in a monetary

15   transaction.

16        Second, that he knew the transaction involved

17   criminally derived property.

18        Third, that the property had value greater than

19   $10,000.

20        Fourth, that the property was derived from bank

21   fraud.

22        And, lastly, that the transaction occurred in the

23   United States.

24        Several of these elements we have already covered

25   for the bank fraud count, such as elements two and four, that

1    he knew the transaction involved criminally derived property

2    and the property was derived from bank fraud.

3         We have already talked about the defendant's

4    knowledge of the false nature of the check and how the

5    evidence supports that.

6         You know the elements have been satisfied.

7         You also know that elements three and five have

8    been proven.  You have seen wire records that show the wire

9    transfer that the defendant conducted on December 11th of

10   2009 of the $53,000 that he sent to a bank account in

11   Florida.  You also heard testimony from Dawn Hardwick from

12   Chase who told you about that.

13        So you know the transaction occurred in the U.S.,

14   and you know it was for more than $10,000.

15        Let's talk about the last element here, element

16   number one, that he engaged in a monetary transaction.

17        You know, I expect the Judge to give you some more

18   instructions about the definition of this means -- what the

19   definition of this is.  It includes a withdrawal in or

20   affecting interstate commerce of funds through a financial

21   institution.

22        Interstate commerce, which I have explained before,

23   is a sort of fancy way of doing business across state lines.

24        Here, Dawn Hardwick explained to you that the wire

25   that took place on December 11th of $53,000 went from the

1  defendant's bank account in Illinois to a bank account in

2  Florida.  So that's your interstate commerce connection.

3         So based on this evidence, you know that this

4  element has been proven and that the defendant is guilty of

5  Count IV in the indictment, the money laundering count.

6         The defendant here stole money from Chase Bank.

7  His actions tell you that he knew that he wasn't entitled to

8  the money that he took out of the account.

9         In the government's opening, my colleague,

10  Ms. Best, told you that we bear the burden of proof; that we

11  have to prove each and every element beyond a reasonable

12  doubt.  And I submit to you that the evidence here shows you

13  that we have met that burden.

14         After your deliberations, we ask you to return the

15  only verdict that is consistent with the evidence in this

16  case, and that is a verdict of guilty to all counts of the

17  indictment.

18         Thank you.

19         THE COURT:  Thank you, Ms. Kim.

20         Response from the defendant.

21     CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

22         MR. CHERONIS:  Thank you.

23         Good afternoon.  I want to thank you for your time

24  and attention during this trial.

25         When you look at the evidence in this case and when

1    you go back and you go through the documents, you go through

2    the stills, you go through everything you have seen from this

3    bank, you are going to have to ask yourself:  Does it prove

4    that Mr. Ajayi was the knowing member in a scheme to defraud?

5    Does it prove that he knew this check was forged or altered?

6    Does it support the fact that he was committing a crime?

7            Now, if you look at the evidence, essentially the

8    government has said in this case, through their presentation

9    of the evidence, is, "We got you red-handed."  Right?  We

10   have you on videotape, and we have stills of you in the bank.

11   We have you using your own account to put this check into.

12   We have you showing your driver's license to individuals at

13   the bank to get the money out.

14           Now, the government wants you to believe that that

15   shows that this man was part of a scheme to defraud and that

16   he had the intent to defraud.

17           But ask yourself, if you have a check that you know

18   is stolen, that you know is altered, who is going to put it

19   in an account that is tied directly to them?  Does that make

20   any sense, that somebody who has a stolen check is going to

21   put it in their account?  And the answer is no, it doesn't

22   make sense, because it doesn't take a rocket scientist to

23   realize that the person who's supposed to get that check

24   isn't going to get it and that it's going to be found out

25   relatively quickly.

1          So the fact that Mr. Ajayi is banking, is doing the

2     banking, showing his driver's license, going to the bank is

3     actually consistent with the fact that he told you he didn't

4     think there was anything wrong with this.

5          And that's what you have to decide in this case:

6     Whether he knowingly was involved in a scheme to defraud;

7     whether he knowingly possessed a forged or altered check.

8          Now, there was no evidence -- you have heard no

9     evidence from the government that he stole the check.  You

10    heard no evidence that he was involved in the theft of this

11    check.

12         You heard testimony from Special Agent Erickson,

13    who never went out to Texas to interview anybody at the --

14    wherever it was mailed from.  He didn't do that.

15         You have no evidence that Mr. Ajayi altered that

16    check.  You don't have it.  You didn't even see a copy of the

17    actual check.  You saw a photocopy of it.

18         And the government wants you to believe that it was

19    so obvious, just upon looking at that check, that it was

20    altered.  Well, don't take their word for it, and don't take

21    my word for it.  You are going to get that check when you go

22    back to that courtroom -- to that deliberation room and you

23    look at it.  I will tell you that there are about three

24    different fonts on that check.  Okay?  You look at it, and

25    you see if when you look at this check you say to yourself,

1    "This looks like a forgery."

2         But how do you know it wasn't apparent that the
3    check looked forged?  Because the bank credited the check.
4    Okay?  Whether it was put in through an ATM or whether it was
5    seen later, at some point Chase says, "We are going to fund
6    this check."

7         Do you think if it was immediately apparent that
8    this check was altered or forged, Chase would credit the
9    check?  The answer is no.

10        There is nothing on that check that when you look
11   at it should not lead you to believe that it looks like an
12   actual, legitimate check made out to GR Icon.  That's what it
13   looks like.  It's not handwritten.  It's not written in
14   crayon.  It's typed on the check.

15        So when the government wants you to believe that he
16   should have known it was altered because he had it in his
17   possession, and it looked like it was stolen, that's not the
18   evidence, ladies and gentlemen.  And I don't think that's the
19   inference you should draw.

20        The government also wants you to believe that
21   Mr. Ajayi wanted to drain this bank account as fast as he
22   could.  Remember?  They said it in their opening statement.
23   They said, "Here is this guy who gets this money.  And what
24   did he do?  He drains it.  He drains it.  He wants to get the
25   money as soon as possible."

1    Well, if Mr. Ajayi is involved in a scheme to

2    defraud like the government is proposing -- you heard from

3    Jim O'Shea from Chase Bank.  What did he tell you?  He said

4    that on December 8th those funds were available to Mr. Ajayi

5    because they were in the account that was tied to him.  If he

6    is trying to drain this account as quickly as humanly

7    possible, wouldn't you just take it all at once and take off?

8    Wouldn't you do that?  Wouldn't that make sense if, in fact,

9    the government's theory is correct, that he wanted to drain

10   this account as fast as possible?

11   But what you saw was several transactions over a

12   couple of days.  And those were consistent with what he told

13   you, with why he took those checks out, and when he did it.

14   We are going to talk about that later in the closing

15   argument.

16   But the fact that he didn't take all this money out

17   at once actually shows that his testimony as to what happened

18   is credible.  And we are going to speak about that.

19   So here is an individual who the government claims

20   is involved in GR Icon -- and he is -- and it's not

21   legitimate or it's not a real business.  He said it was open

22   for a personal business.  He didn't say it was thriving.  He

23   told you he was employed.  He told you he had other jobs.

24   He told you he went to college and got a degree.

25   He told you he worked at General Electric.  He told you now

1   he works at Sub-Zero/Wolf.  He told you he was a real estate
2   broker.

3          We are not saying GR Icon was Microsoft.  It was
4   something that he wanted to do as a business.

5          And because the papers for the Secretary of State
6   weren't always up to speed doesn't mean that that is not a
7   business and it doesn't mean he can't draft checks and work
8   through GR Icon.

9          The government is right.  They have the burden of
10  proof.  And Mr. Ajayi didn't have to testify, but he got up
11  on the witness stand and he told you what happened.

12         Now, let's look at his testimony.  Okay?  Let's
13  look at what he told you.

14         Is it bizarre that he would meet somebody on a
15  plane, and that this person would do that and give him money?
16  Absolutely.  If it wasn't the real world, maybe something
17  like that couldn't happen.  But let's use our common sense.

18         He tells you that he had worked with MRIs at
19  General Electric.  They didn't say anything to rebut that.

20         He tells you that he has these proposals together,
21  and that he is looking for business partners.  He is trying
22  to start up a business.

23         And he meets an individual on a plane.  That was
24  not rebutted by the government.  He did that.  He had that
25  conversation.

1        And think about this:  If Mr. Ajayi was part of a

2   scheme to defraud, why on earth would he do any of the things

3   that the government claims he did?  Why would he put the

4   check into his own account?  Why would he show his driver's

5   license?  Why would he do that?  Now, think about that for a

6   second, and then think about what he told you.

7        Mr. Brown -- and you have the envelope.  You will

8   see it.  This is not a forgery.  This is not altered.  They

9   have a U.S. postal inspector they could have called as a

10  witness.  This is an actual envelope that he received.  You

11  are going to see that.

12       Let's say that the check was stolen, which we know

13  it was, and you wanted to get that money.  Right?  What do

14  you do?  Well, Mr. Brown can't put that in his account, can

15  he?  It can't happen.  He can't do it because it will lead

16  right back to him.

17       So if you are going to steal a check, you need

18  somebody as a dupe.  You need somebody who can execute your

19  scheme to defraud.  And they don't have to know about it.  As

20  a matter of fact, he didn't know about it.

21       But if we are thinking of somebody who's trying to

22  commit a crime, Mr. Brown needs someone where there is no

23  trail to him; where he can have somebody say, "Hey, you know

24  what?  You have got this business.  It's a good business.  I

25  am going to give you a loan."

1    Mr. Ajayi is excited about it.  "Yeah, absolutely.

2    Fine.  I don't think I'm going to get anything."  But when he

3    gets home, he gets a check.  He was swindled is what

4    happened.

5    And you know what?  It's perfect that if Mr. Brown

6    wants to move this check, he is going to use somebody like

7    Mr. Ajayi, because when the music stops, there is no chairs

8    for him.  Right?  The person with the money is gone, and all

9    roads lead to this man, although there is no evidence he

10   spent that money.  There is no evidence he lived some lavish

11   lifestyle with that money.  There is no evidence he used it,

12   that cash.

13   Doesn't it make perfect sense that if somebody is

14   going to steal a check, they are going to need someone like

15   this man, who's not aware of what's going on?  Because if

16   anybody was aware of what was going on, they wouldn't put the

17   check in their own account.  It does not make sense.

18   They want you to believe that he committed wire

19   fraud -- or excuse me -- money laundering.  Right?

20   Now, let's think about that.  They are charging

21   him, essentially, with several different crimes.  All of

22   those crimes have a specific intent to them.  You have to

23   prove, not that he just did something, but that he knew it

24   was a fraud, and that what he was doing he knew was illegal.

25   Right?

1               Let's talk about the wire fraud.  They want you to

2    believe -- this money laundering charge -- that he wired

3    $53,000 to ALG.  Well, he did.  He admitted that.  He told

4    you that.

5               The government, who believes Mr. Ajayi is involved

6    in money laundering, what do they do with this information?

7    Is there any information that they went to Florida to try to

8    find this woman who got the wire from Mr. Ajayi?  Did you

9    hear any evidence of that investigation?  You would think, if

10   they are trying to find out what happened to this money and

11   trying to get evidence, they would have done that.  You

12   didn't hear any evidence regarding that.  You didn't see any

13   evidence regarding that.

14              So all you have is a wire that he explained to you

15   he was directed to send.  And that's what he did.  There is

16   no relationship between him and that wire.  There is no

17   relationship between him and ALG.

18              And when the government asks you to use your common

19   sense, I agree.  But common sense should not replace

20   evidence.  I don't ask you to not use your common sense, but

21   I ask you to look at the evidence and look at the

22   investigation and look at the steps that this man took,

23   who -- if he was committing a crime, why would he do any of

24   those things like that?

25              And going to all these different banks, he told you

1  that during that period of time, he was being told to get

2  money, to get cash, to do this, to do that.

3       That's actually consistent with his testimony.

4       And by the way, every bank he goes to, again, who

5  is he fooling?  He can take all that money out if he wants

6  to, according to Chase.  He is not hiding anything.  He is

7  showing his identification.  He is signing things.  So where

8  is this big scheme that he is involved in when he is doing

9  these things in the light of day with his own identification

10 with his own bank account?  Where is it?

11      They want you to presume from suspicious

12 circumstances that they have met their burden of proof to

13 prove this man guilty beyond a reasonable doubt.

14      And it's not called a burden because it's easy.

15 They brought these charges.  And they can put up all of the

16 stills they want, and they can put up his bank records, and

17 they can ask you to look at those.  But what you have to find

18 beyond a reasonable doubt is that he had the intent to

19 defraud.  If you go back there and you say, yeah, he cashed

20 these checks.  Yeah, he deposited this check, but he wasn't

21 involved in the scheme to defraud; that he was duped by this

22 individual, Mr. Brown, who does exist -- maybe it's not even

23 his real name, but he exists -- then he is not guilty.

24      If somebody writes a check and somebody else

25 deposits it into an account and it gets altered in the

1    middle, and you don't know about that, that's not a crime.

2         And what evidence have they given you that he knew

3    that check was stolen, or that he had something to do with

4    its theft or something to do with its alteration?  They

5    haven't presented that evidence to you, and that evidence, I

6    suggest to you, would be key.

7         Now, in using your common sense and using your

8    everyday experience, you know, we know, people get swindled.

9    It happens.  And it doesn't just happen to little old ladies.

10   People who want to swindle are nondiscriminatory.

11        Mr. Ajayi was in a situation where it was probably

12   too good to be true.  That does not mean he had the intent to

13   defraud.  That does not mean he committed this crime.  And

14   when you look at all the evidence, and you see what the

15   government didn't do, when you see what they didn't follow up

16   with, when you see that they didn't go out to Florida and

17   interview this Ms. Granados, when you see they have no proof

18   that this man stole this check or altered it, we are asking

19   you to return a verdict of not guilty on all the charges

20   because it's the right thing to do when the government hasn't

21   proven their case.

22        Thank you.

23        THE COURT:  Thank you, Mr. Cheronis.

24        Rebuttal.

25        FINAL ARGUMENT ON BEHALF OF THE GOVERNMENT

1         MS. BEST:   The defendant wasn't a dupe, and he

2    wasn't part of a fraud scheme.   He was the fraud scheme here.

3         Now, what you have heard is that the defendant

4    somehow fell into this.   He had no idea what was going on.

5    But the reality is, you've seen all the evidence over the

6    last day and a half, and there is no debate as to what

7    happened here.

8         The defendant took a check, and he went to the ATM.

9    As he testified, he couldn't even be bothered to park his car

10   properly and go in to see a teller; but, instead, double

11   parked his car, threw a $344,000 check into an ATM, and then

12   went on his way to his brokerage. And then he waited.

13        And somehow in December, that check cleared.   And

14   then over the course of four days he writes seven checks to

15   himself out of his business account for $95,000 in cash.   He

16   takes that cash, and he puts it in his pocket.   He is the

17   only person who profits from this fraud.

18        Now, what you just heard is that he is a dupe; that

19   someone else was involved in this fraud scheme.

20        The defendant sat here and told you that he

21   received an envelope with no instructions in it from a man he

22   had known for a couple weeks, who he met once for a couple

23   hours on a plane on his way to London.   Somehow that man sent

24   him a $344,000 check.   Then called -- then he spoke to him

25   immediately, and that man tells him, "Go to the bank.

1    Deposit it as soon as you can."

2           He deposits it an hour later. And that man calls

3    him time after time to figure out when that check clears.

4           Defense counsel just said he is not asking you not

5    to use your common sense, but that's precisely what he is

6    doing here.

7           Look at the transactions you have seen over the

8    last few days. Your common sense shows you that someone who

9    gets a check for $344,000, and then sees that it clears,

10   tries to take out that money as quickly as possible.

11          Now, Jim O'Shea did tell you he could have written

12   a check for the entire amount and cashed it out then. But

13   this is a man who's flying under the radar. Just like he

14   didn't go to a teller to deposit that check, he also doesn't

15   go to a teller to take out all of it at once. That would

16   raise some red flags.

17          This check cleared because it was a legitimate

18   check. It was a check by a real company, but no one at Chase

19   knew that it had been altered until the victim of the crime

20   reported it.

21          Chase had a check from Bank of America. It's a

22   real account. It is a real company. And they honored it.

23          The defendant knew he didn't have very long before

24   someone caught on to this fraud. And so he goes to the bank,

25   and he withdraws $9800 -- $9600.

1    Then he goes to another bank and gets out another

2    $23,000, another $16,000.  And he does it piecemeal, trying

3    to figure out exactly what he can do to avoid detention

4    before anyone notices what happens.

5    The defendant doesn't have this legitimate

6    business.  He doesn't have any reason to believe that anyone

7    would invest $45,000, much less $344,000, into his business.

8    You heard the testimony about his bank records.

9    You heard the testimony about how this business never got off

10    the ground.  He couldn't be bothered to keep his Secretary of

11    State documents up to date.  That company is being dissolved

12    twice in the four years that it's opened.  He doesn't have a

13    legitimate business, and he has no reason to believe that he

14    is going to get a check for $45,000 to put into this used

15    MRI-equipment business.

16    You know this also, because he is not a dupe,

17    because you heard him talk about how well educated he is.  He

18    is an engineer.  He has been working as an engineer.

19    He is well traveled.  He is putting together --

20    using his expertise at his current job.

21    And when defense counsel tells you that fraudsters

22    are not discriminatory, that's absolutely not true.  A

23    fraudster is not going to talk to someone and trust a

24    complete stranger with a $344,000 check and then just hope

25    that person gives them the money back.

1        What you heard is that -- the defendant's testimony

2   is that someone gave him a check and then just waited

3   patiently at a hotel for Mr. Ajayi to come bring him cash

4   whenever he could.  That does not make any sense.  That's not

5   what happened here.

6        The defendant took that cash.  And true, it's hard

7   to prove up what he did with it because it is cash.  It's

8   fungible.  It's not traceable.

9        You know he took that $95,000.  You saw the picture

10  with a stack of money in his hand at the teller counter.

11  That cash wound up in his pocket.  He is the person who

12  profited from the scheme.

13        The rapid manner in which he conducted these

14  transactions -- a check on December 9th, two on December

15  10th, a check and then a wire and then another check on

16  December 11th, two more checks on December 12th -- that he

17  was giving this money to Mr. Brown, and Mr. Brown was so

18  eager, so desperate to get that money back.  Why does he

19  write a check for $17,000 and then walk over and do a wire

20  for another $53,000?  He had Mr. Brown's company information,

21  or so he says.  He got that wire information from Mr. Brown.

22  But instead, he conducts three different transactions on the

23  same day?  No.

24        If he was trying to get that money back to someone,

25  he could have had any other mechanism to do it.  But instead,

1  what he is trying to do is avoid detection.  He is trying to

2  not get anyone's back up.  He's not -- he's trying to make

3  sure that no one's thinking, "What is this man doing?"

4        He had $90 in his bank account at the beginning of

5  November.  He is running a negative balance several months

6  that year, and somehow this check winds up in his account.

7  He is moving as quickly as he can before anyone catches on to

8  the fraud.

9        He is using his debit card.  It's two weeks before

10  Christmas.  He goes to buy some computers at Apple.  He is

11  using his card at the Gap.  You will see all those

12  transactions when you look at the bank statements.

13        All this depends on is your common sense and

14  looking at the way in which these transactions were

15  conducted.

16        He's got a business that does not exist, that

17  doesn't do any work.  He is underwater.  He has a negative

18  balance for months on end.  And then he comes into this

19  check.  You will look at the check.

20        Ladies and gentlemen, first of all, he didn't know

21  anything about American Building.  Why you would think that a

22  check from a company you never heard of is sending you a

23  check for $344,000 doesn't make any sense.

24        You'll look at the check.  The check is made out.

25  It's got its font.  It's got its two signatures.  It looks

1    like a check of a legitimate company.  And then you have got

2    this area where "GR Icon" is typed on.  That doesn't make any

3    sense.

4         You look at that check, and you know that it's been

5    altered.  The defendant looked at that check, and he knew it

6    was altered.  He deposited it anyway.

7         And then he waited until as soon as he found out it

8    cleared, and then he took that money out.  He drained it.  He

9    racked up as much spending as he could.

10        And keep in mind, it's $172,000 in four days.  It's

11   only because, as you heard from the witnesses, they realized

12   when Pollock Paper didn't get their check, when the

13   legitimate recipient of this check said, "Hey, you owe us

14   $344,000," that someone put a stop to this.  And they did

15   that as quickly as they could, but in that interim, he has

16   made off with $172,000 -- almost $100,000 in cash.

17        Now, the defendant told us that Mr. Brown gave him

18   all these instructions.  When you ask him for any records he

19   has, "Well, you know, now -- oh, I forgot to ask T-Mobile,"

20   or, "They might be out there.  I don't have them."  "Oh, I

21   was keeping some notes of when I gave him money.  I don't

22   know what happened to it."

23        Think about what you would do if you are using your

24   common sense.  If somehow someone gave you several hundred

25   thousand dollars more than what you were expecting, and then

1    said, "Hey, pay me back," and then shows up unannounced.

2            You say, "All right.  Take the cash.  Fine.

3    Whatever.  See you when I see you."

4            It's documented.  This guy shows up unannounced in

5    Chicago.  Do you think you want to be able to say, "Oh, no.

6    You remember that time I gave you that money back"?

7            Do you think you would just put a $100,000 check in

8    the mail and hope that he gets it, and if he cashes it, well,

9    then you have got a canceled check?

10           None of this makes any sense.

11           What happened here and what you can see from all

12   the evidence is that the defendant was the person who

13   profited.  He sends that wire transfer out to another

14   account.  He is the one who takes the cash.  He is the one

15   who uses his debt card.

16           They're trying -- defense counsel is trying to

17   distract you with what was done here and what wasn't done

18   here.

19           The reality is, you heard testimony from

20   Inspector Erickson.  This check could have gone missing at

21   American Building, at the post office, at the lockbox, at

22   Pollock Paper.  No one knows.  But that's not an element of

23   any of the crimes here.

24           You do not have to determine when that check was

25   stolen.  What you have to determine is whether the defendant

1    possessed that check and whether he used that check.

2              Defense counsel said, "Well, there was no

3    investigation into this Amelia Granados."

4              Well, again, Inspector Erickson testified that, in

5    fact, he did investigate the names who turned up on the

6    paper, but the only person whose name showed up time and time

7    again was the defendant.  Amelia Granados' name showed up as

8    one transaction as the recipient of this wire as he drained

9    the account.  Her name didn't show up anywhere else.  And the

10   investigation didn't lead to any other participation by her

11   in this scheme.

12             MR. CHERONIS:  Objection, your Honor.  There is no

13   testimony regarding that.

14             THE COURT:  The jury is reminded that if a juror --

15   if a lawyer makes a statement that's not consistent with the

16   record, it's your understanding of the evidence that counts.

17             MS. BEST:  Now, defense counsel said something

18   about this not being rocket science and that this is not the

19   best fraud.  That's conceded.  Defendant's face is all over

20   it.  He uses his ID.

21             But, again, he has this check that's been altered,

22   and he does what he can as quickly as he can.  You don't have

23   to be a rocket scientist.  He got this money.  He got it in

24   cash before the bank realized what happened.  That fraud was

25   successful.  He got the cash.

1    You-all know that checks like this just don't

2    appear out of the sky.  You don't get manna from heaven, a

3    $344,000 check that shows up at your doorstep the day after

4    you arrive back in the country, and you deposit it and go on

5    your way.

6    Look at everything you've seen.  Look at the

7    picture of the defendant time after time, bank branch after

8    bank branch, an hour apart driving around the city

9    withdrawing this cash.

10   Look at how he uses his debit card.  Look at how he

11   sends a wire transfer even though minutes earlier he was at a

12   teller station.  And look at the sequence of how rapidly this

13   all happens.

14   When you look at all of that evidence in

15   conjunction, there is only one verdict that's consistent with

16   the evidence you seen and heard here over the last day and a

17   half, and that is a verdict of guilty on every count of the

18   indictment.

19   Thank you.

20   THE COURT:  Thank you, Ms. Best.

21   Could I talk to counsel for a moment at sidebar?

22   (The following proceedings were had at sidebar:)

23   (A discussion was had off the record.)

24   MS. BEST:  I'm sorry.  What did you say?

25   MR. CHERONIS:  I think it's fine with the first

1  sentence.

2  MS. BEST:  I think it would be the last sentence,

3  if you take out "even if it's not within a coverup," but "a

4  person may possess an object even if he does not own it."

5  THE COURT:  Any problem with that?

6  MR. CHERONIS:  No.  I think that's fine.

7  THE COURT:  All right.

8  (End of sidebar proceedings.)

9  JURY INSTRUCTIONS

10  THE COURT:  Ladies and gentlemen, you have now

11  heard the evidence.  I will now instruct you on the law that

12  you must follow in deciding this case.

13  You must follow all of my instructions about the

14  law even if you disagree with them.  This includes the

15  instructions I gave you before the trial, any instructions I

16  gave you during the trial, and the instructions I am giving

17  you now.

18  As jurors, you have two duties.

19  Your first duty is to decide the facts from the

20  evidence that you saw and heard here in court.  This is your

21  job, not my job or anyone else's job.

22  Your second duty is to take the law as I give it to

23  you, apply it to the facts, and decide if the government has

24  proved the defendant guilty beyond a reasonable doubt.

25  You must perform these duties fairly and

1    impartially.  Do not let sympathy, prejudice, fear, or public
2    opinion influence you.

3            You must not take anything I said or did during the
4    trial as indicating that I have an opinion about the evidence
5    or about what I think your verdict should be.

6            The charges against the defendant are in a document
7    called an indictment.  You will have a copy of the indictment
8    during your deliberations.

9            The indictment in this case charges that the
10   defendant committed the crimes of bank fraud, money
11   laundering, and possessing or using an altered check.  The
12   defendant has pleaded not guilty to those charges.

13           The indictment is simply the formal way of telling
14   the defendant what crimes he is accused of committing.  It is
15   not evidence that the defendant is guilty.  It does not even
16   raise a suspicion of guilt.

17           The defendant is presumed innocent of each and
18   every one of the charges.  This presumption continues
19   throughout the case, including during your deliberations.  It
20   is not overcome unless from all of the evidence in the case
21   you are convinced beyond a reasonable doubt that the
22   defendant is guilty as charged.

23           The government has the burden of proving the
24   defendant's guilt beyond a reasonable doubt.  This burden of
25   proof stays with the government throughout the case.

1    The defendant is never required to prove his

2    innocence.  He is not required to produce any evidence at

3    all.

4    You must make your decision based only on the

5    evidence that you saw and heard here in court.  Do not

6    consider anything you may have seen or heard outside of

7    court, including anything in the newspaper, television,

8    radio, the Internet, or any other source.

9    The evidence includes only what the witnesses said

10   when they were testifying under oath, the exhibits that I

11   allowed into evidence, and the stipulations that the lawyers

12   agreed to.

13   A stipulation is an agreement that certain facts

14   are true or that a witness would have given certain

15   testimony.  Nothing else is evidence.

16   The lawyers' statements and arguments are not

17   evidence.  If what a lawyer said is different from the

18   evidence as you remember it, the evidence is what counts.

19   The lawyers' questions and objections, likewise, are not

20   evidence.

21   A lawyer has a duty to object if he thinks a

22   question is improper.  If I sustained objections to questions

23   that the lawyers asked, you must not speculate on what the

24   answers might have been.

25   If during the trial I struck any testimony or

1  exhibits or told you to disregard something, you must not
2  consider it.

3  Give the evidence whatever weight you decide it
4  deserves.  Use your common sense in weighing the evidence,
5  and consider the evidence in light of your own everyday
6  experience.

7  People sometimes look at one fact and conclude from
8  it that another fact exists.  This is called an inference.
9  You are allowed to make reasonable inferences so long as they
10  are based on the evidence.

11  You may have heard the terms "direct evidence" and
12  "circumstantial evidence."

13  Direct evidence is evidence that directly proves a
14  fact.  Circumstantial evidence is evidence that indirectly
15  proves a fact.  You are to consider both direct and
16  circumstantial evidence.  The law does not say that one is
17  better than the other.  It is up to you to decide how much
18  weight to give to any evidence, whether direct or
19  circumstantial.

20  Do not make any decisions simply by counting the
21  number of witnesses who testified about a certain point.
22  What is important is how truthful and accurate the witnesses
23  were and how much weight you think their testimony deserves.

24  Part of your job as jurors is to decide how
25  believable each witness was and how much weight to give each

1  witness' testimony, including that of the defendant.  You may

2  accept all of what a witness says or part of it or none of

3  it.

4  Some factors you may consider include the

5  intelligence of the witness; the witness' ability and

6  opportunity to see, hear, or know the things the witness

7  testified about; the witness' memory; the witness' demeanor;

8  whether the witness had any bias, prejudice, or other reason

9  to lie or slant the testimony; the truthfulness and accuracy

10  of the witness' testimony in light of the other evidence

11  presented; and any inconsistent or consistent conduct by the

12  witness.

13  A summary chart was admitted in evidence.  You may

14  use that summary as evidence even though the underlying

15  documents are not here.  The accuracy of the summary has not

16  been challenged.  It is up to you to decide how much weight

17  to give to the summary.

18  If you have taken notes during the trial, you may

19  use them during your deliberations to help you remember what

20  happened during the trial.  You should use your notes only as

21  aids to your memory.  The notes are not evidence.

22  All of you should rely on your independent

23  recollection of the evidence, and you should not be unduly

24  influenced by the notes of others jurors.  Notes are not

25  entitled to any more weight than the memory or impressions of

1    each juror.

2           Counts I, II, III, V, and VI of the indictment

3    charge the defendant with bank fraud. In order for you to

4    find the defendant guilty of this charge, the government must

5    prove each of the following elements beyond a reasonable

6    doubt:

7           One, there was a scheme to defraud a bank or to

8    obtain monies, funds, credits, assets, securities, or other

9    property owned by or in the custody or control of a bank by

10    means of false or fraudulent pretenses, representations, or

11    promises as charged in the indictment.

12           Two, the defendant knowingly executed the scheme.

13           And three, the defendant acted with the intent to

14    defraud.

15           Four, the defendant -- I'm sorry.

16           Four, the scheme involved a materially false or

17    fraudulent pretense, representation, or promise.

18           And five, at the time of the charged offense, the

19    deposits of the bank were insured by the Federal Deposit

20    Insurance Corporation.

21           If you find from your consideration of all the

22    evidence that the government has proved each of these

23    elements beyond a reasonable doubt as to the charge you are

24    considering, then you should find the defendant guilty of

25    that charge.

1    If, on the other hand, you find from your
2    consideration of all the evidence that the government has
3    failed to prove any of these elements beyond a reasonable
4    doubt as to the charge you are considering, then you should
5    find the defendant not guilty of that charge.

6    A scheme is a plan or a course of action formed
7    with the intent to accomplish some purpose.

8    A scheme to defraud a bank means a plan or course
9    of action intended to deceive or cheat that bank or to obtain
10   money or property or to cause the potential loss of money or
11   property by the bank.

12   A person acts knowingly if he realizes what he is
13   doing and is aware of the nature of his conduct and does not
14   act through ignorance, mistake, or accident.

15   In deciding whether the defendant acted knowingly,
16   you may consider all of the evidence, including what the
17   defendant did or said.

18   You may not find that the defendant acted knowingly
19   if he was merely mistaken or careless in not discovering the
20   truth or if he failed to make an effort to discover the
21   truth.

22   A statement is false or fictitious if it was untrue
23   when made.

24   A statement or representation is fraudulent if it
25   is made or caused to be made with the intent to deceive.

1    Count IV of the indictment charges the defendant

2    with money laundering.  In order for you to find the

3    defendant guilty of this charge, the government must prove

4    each of the following elements beyond a reasonable doubt:

5    One, the defendant engaged or attempted to engage

6    in a monetary transaction.

7    And two, the defendant knew the transaction

8    involved criminally derived property.

9    And three, the property had a value greater than

10   $10,000.

11   Four, the property was derived from bank fraud.

12   And five, the transaction occurred in the United

13   States.

14   If you find from your consideration of all the

15   evidence that the government has proved each of these

16   elements beyond a reasonable doubt as to Count IV, then you

17   should find the defendant guilty of Count IV.

18   If, on the other hand, you find from your

19   consideration of all the evidence that the government has

20   failed to prove any one of these elements beyond a reasonable

21   doubt as to Count IV, then you should find the defendant not

22   guilty of Count IV.

23   The term "monetary transaction" means the deposit,

24   withdrawal, transfer, or exchange in or affecting interstate

25   commerce of funds or a monetary instrument, by, through, or

1    to a financial institution.

2         The alleged monetary transaction need not involve

3    all criminally derived property, only over $10,000 in

4    criminally derived property.

5         "Interstate commerce" means trade, transactions,

6    transportation, or communication between any point in a state

7    and any place outside that state, or between two points

8    within a state through a place outside the state.

9         The term "financial institution" includes

10   commercial banks.

11        The term "criminally derived property" means any

12   property constituting or derived from proceeds obtained from

13   a criminal offense.

14        Count VII of the indictment charges the defendant

15   with knowingly making and possessing an altered security of

16   an organization.  In order for you to find the defendant

17   guilty of this charge, the government must prove each of the

18   following elements beyond a reasonable doubt:

19        One, the defendant made, passed, or attempted to

20   pass, or possessed a counterfeit or forged security.

21        Two, the counterfeit or forged security was of an

22   organization.

23        And three, the defendant possessed the counterfeit

24   or forged security with intent to deceive another person or

25   organization.

1       The term "counterfeit" means a document that has
2  been falsely made or manufactured so as to appear to be a
3  genuine security.  To be counterfeit, the fraudulent security
4  does not have to appear to be a genuine security of an
5  organization that in fact exists, but, rather, it must look
6  so much like a genuine security that it is calculated to
7  deceive an honest, unsuspecting person who uses ordinary
8  observation and care.

9       The term "forged" means a document that purports to
10 be genuine, but has been fraudulently altered, completed,
11 signed, or endorsed.

12      An "organization" is a nongovernmental, legal
13 entity.  It includes, but is not limited to, a corporation,
14 company, association, firm, partnership, joint stock company,
15 foundation, institution, society, union, or any other
16 association of persons that operates in or the activities of
17 which affect interstate or foreign commerce.

18      The term "security" includes checks.

19      If you find from your consideration of all the
20 evidence that the government has proved each of these
21 elements beyond a reasonable doubt as to Count VII, then you
22 should find the defendant guilty of Count VII.

23      If, on the other hand, you find from your
24 consideration of all the evidence that the government has
25 failed to prove any of these elements beyond a reasonable

1  doubt as to Count VII, then you should find the defendant not
2  guilty of Count VII.

3         A person possesses an object if he has the ability
4  and intention to exercise direction or control over the
5  object either directly or through others.  A person may
6  possess an object even if he does not own it.

7         With respect to the charges of bank fraud and of
8  possession of an altered check, if the defendant acted in
9  good faith, then he lacked the intent to defraud required to
10  prove those charges.

11         The defendant acted in good faith if at the time he
12  honestly believed the validity of that which the government
13  has charged as being fraudulent.

14         The defendant does not have to prove his good
15  faith.  Rather, the government must prove beyond a reasonable
16  doubt that the defendant acted with intent to defraud.

17         The indictment charges that offenses happened on or
18  about certain dates.  The government must prove that each
19  offense happened reasonably close to those dates.  The
20  government is not required to prove that the alleged offenses
21  happened on those exact dates.

22         The defendant has been accused of more than one
23  crime.  The number of charges is not evidence of guilt and
24  should not influence your decision.  You must consider each
25  charge and the evidence concerning each charge separately.

1   Your decision on one charge, whether it's guilty or not
2   guilty, should not influence your decision on any other
3   charge.

4   In deciding your verdict, you should not consider
5   the possible punishment for the defendant.  If you decide
6   that the government has proved the defendant guilty beyond a
7   reasonable doubt, it will be my job to decide on the
8   appropriate punishment.

9   You should not speculate why any other person whose
10  name you may have heard during the trial is not currently on
11  trial before you.

12  Once you are all in the jury room, the first thing
13  you should do is choose a foreperson.  The foreperson should
14  see to it that your discussions are carried on in an
15  organized way and that everyone has a fair chance to be
16  heard.

17  You may discuss the case only when all jurors are
18  present.

19  Once you start deliberating, do not communicate
20  about the case or your deliberations with anyone except other
21  members of the jury.  You may not communicate with others
22  about the case or your deliberations by any means.  This
23  includes oral or written communication, as well as any
24  electronic method of communication such as telephone, cell
25  phone, smartphone, iPhone, BlackBerry, computer, text

1    messaging, instant messaging, the Internet, chat rooms,

2    blogs, Web sites, or services like Facebook, MySpace,

3    LinkedIn, YouTube, Twitter, or any other method of

4    communication.

5         If you need to communicate with me while you are

6    deliberating, send a note through the court security officer.

7    The note should be signed by the foreperson or by one or more

8    other members of the jury.  To have a complete record of this

9    trial, it is important that you do not communicate with me

10   except by written note.

11        I may have to talk to the jurors about your

12   message.  I'm sorry.  I may have to talk to the lawyers about

13   your message, so it may take me some time to get back to you.

14   You may continue your deliberations while you wait for my

15   answer.

16        Please be advised that transcripts of trial

17   testimony are not available to you.  You must rely on your

18   collective memory of the testimony.

19        If you send me a message, do not include the

20   breakdown of any votes you may have conducted.  In other

21   words, do not tell me that you are split six-six or

22   eight-four or whatever your vote happens to be.

23        A verdict form has been prepared for you.  You will

24   take this form with you to the jury room.  Let me show it to

25   you right now.

1    The verdict form is three pages.  It begins with
2    the name of the court; the name of the case, *United States of*
3    *America versus Abidemi Ajayi;* the number; and my name; and
4    then there is a place for you to complete a verdict for each
5    count.

6    Count I:  "With respect to Count I of the
7    indictment in which Abidemi Ajayi is charged with bank fraud,
8    we, the jury, find the defendant, Abidemi Ajayi" -- there is
9    a place for "guilty" or "not guilty."  You choose one or the
10   other.

11   Same with respect to Count II, which also charges
12   Mr. Ajayi with bank fraud.  You find Mr. Ajayi guilty or not
13   guilty on Count II.

14   Similarly, Count III, which charges Mr. Ajayi with
15   bank fraud, there is a place for you to say "guilty" or "not
16   guilty" on Count III.

17   With respect to Count IV of the indictment,
18   Mr. Ajayi is charged with money laundering.  And again you
19   will be asked whether you find the Defendant Ajayi guilty or
20   not guilty.

21   Count V is another bank fraud count.  You will be
22   asked to complete this with respect to Count V of the
23   indictment.  You find him either guilty or not guilty.

24   Count VI is a bank fraud count.  And again you will
25   be asked whether you, the jury, find the defendant,

1  Mr. Ajayi, guilty or not guilty.

2  And finally, on Count VII, with respect to that

3  count, Mr. Ajayi is charged with possession or use of an

4  altered security.  And you will be asked to find the

5  defendant, Mr. Ajayi, either guilty or not guilty on that

6  count.

7  When you have reached unanimous agreement, your

8  foreperson will fill in, date, and sign the verdict form.

9  Each of you will sign it.  You will advise the court security

10  officer when you have reached a verdict, and when you come

11  back to the courtroom, I will read the verdict aloud.

12  The verdict must represent the considered judgment

13  of each juror.  Your verdict, whether it is guilty or not

14  guilty, must be unanimous.  You should make every reasonable

15  effort to reach a verdict.

16  In doing so, you should consult with one another,

17  express your own views, and listen to your fellow jurors'

18  opinions.

19  Discuss your differences with an open mind.  Do not

20  hesitate to reexamine your own view and change your opinion

21  if you come to believe it is wrong.  But you should not

22  surrender your honest beliefs about the weight or effect of

23  evidence just because of the opinions of your fellow jurors

24  or just so that there can be a unanimous verdict.

25  The 12 jurors should give fair and equal

1    consideration to all of the evidence.  You should deliberate
2    with the goal of reaching an agreement that is consistent
3    with the individual judgment of each juror.

4           You are impartial judges of the facts.  Your sole
5    interest is to determine whether the government has proved
6    its case beyond a reasonable doubt.

7           Ladies and gentlemen, I made reference a moment ago
8    to just 12 of the jurors, and I know there are 14 of you.  I
9    am excusing two of the jurors at this time.  I am going to
10   ask that you continue to abide by my instructions not to
11   discuss the case.  There are occasions in which we bring
12   jurors back who have been excused if one of the jurors -- one
13   of the 12 -- is unable to complete jury deliberations.  I
14   have done this myself.

15          So you should recognize that if I excuse you, you
16   will have to remain under the direction that you not discuss
17   the case until you hear from us that a verdict has been
18   returned or until we invite you to return to the courthouse
19   to begin again the deliberations with your fellow jurors.

20          Mr. McKelphin and Ms. Gonzalez were among the final
21   two jurors to be selected, and they will be excused at this
22   time.  Please do leave your phone numbers with the court
23   security officer.

24          But with respect to the court security officer,
25   let's all stand while he is sworn.

1          (Court security officer sworn.)

2          THE COURT:  Ladies and gentlemen, you are going to

3    be excused for lunch.  It's almost 1 o'clock.  So it's time

4    for you to eat lunch.  I think we will probably provide lunch

5    for the two alternates as well, the ones who are leaving.

6          I will have certificates for you.

7          I will be providing the jurors with a copy of the

8    written instructions and with the exhibits, and you will also

9    get a copy of the indictment.  We are going to collect those

10   materials for you right now while you go to lunch, and we

11   will have them ready for you.

12         (Jury out at 12:59 p.m.)

13         THE COURT:  Do you want to collect the

14   instructions -- or the exhibits?  And I will give them the

15   instructions, and I will also give you a set.

16         Be sure that Officer Mahon has a cell number for

17   you so that if we get a note or a verdict, we can get you

18   back to the courtroom.

19         MS. BEST:  I have a card here with our numbers.  I

20   wasn't sure who to give it to.

21         THE COURT:  Officer Mahon.

22         (An adjournment was taken at 1:02 p.m.)

23         THE COURT:  You may be seated.

24         I understand we have a verdict, and I think

25   Officer Mahon is bringing the jurors in.

```
 1                    (Jury in at 4:23 p.m.)

 2                    THE COURT:  You may be seated.

 3                    Ladies and gentlemen of the jury, I understand you

 4    have reached a verdict; is that correct?

 5                    THE FOREPERSON:  Yes.

 6                    THE COURT:  Mr. Robinson, you are our foreperson?

 7                    THE FOREPERSON:  Yes.

 8                    THE COURT:  Can I ask you to hand the form of

 9    verdict to the court security officer, please.

10                    (Document tendered.)

11                    THE COURT:  Thank you.

12                    The jurors have returned verdicts as follows:

13                    With respect to Count I, the jury has found

14    Defendant Ajayi guilty.

15                    With respect to Count II, they have found the

16    defendant guilty.

17                    With respect to Count III, the jurors have found

18    the defendant guilty.

19                    With respect to Count IV, the jurors have found the

20    defendant guilty.

21                    With respect to Count V, the jurors have found the

22    defendant guilty.

23                    With respect to Count VI, the jurors have found the

24    defendant guilty.

25                    With respect to Count VII, the jurors have found
```

1    the defendant not guilty.

2           The verdict form has been signed by Mr. Robinson as

3    the foreperson and by each of the jurors.

4           Does anyone want the jury polled?

5           MR. CHERONIS:  Yes, your Honor.

6           THE COURT:  Ladies and gentlemen, a poll simply

7    means that I am going to be asking each of you individually

8    whether the jury verdict as I read it just now was the

9    verdict that you reached and whether you stand by it.

10           We will begin with Ms. Thompson.

11           Was this and is this now your verdict?

12           JUROR THOMPSON:  Yes.

13           THE COURT:  All right.

14           Ms. Hunter, was this and is this now your verdict?

15           JUROR HUNTER:  Yes.

16           THE COURT:  Ms. Arneson, was this and is this now

17    your verdict?

18           JUROR ARNESON:  Yes.

19           THE COURT:  Ms. Bucher, was this and is this now

20    your verdict?

21           JUROR BUCHER:  Yes.

22           THE COURT:  Mr. Choksi, was this and is this now

23    your verdict?

24           JUROR CHOKSI:  Yes.

25           THE COURT:  Mr. Robinson, was this and is this now

1    your verdict?

2              JUROR ROBINSON:  Yes.

3              THE COURT:  Ms. Collins, was this and is this now

4    your verdict?

5              JUROR COLLINS:  Yes.

6              THE COURT:  Mr. Lui, was this and is this now your

7    verdict?

8              JUROR LUI:  Yes.

9              THE COURT:  Ms. Castillo, was this and is this now

10   your verdict?

11             JUROR CASTILLO:  Yes.

12             THE COURT:  Ms. Chavez, was this and is this now

13   your verdict?

14             JUROR CHAVEZ:  Yes.

15             THE COURT:  Ms. Coan, was this and is this now your

16   verdict?

17             JUROR COAN:  Yes.

18             THE COURT:  Ladies and gentlemen, you will be

19   excused from further -- did I -- I am sorry.  I missed one of

20   the jurors.

21             That might mean, sir, that I don't have your

22   certificate here.  Hold on.

23             (Brief pause.)

24             THE COURT:  Thank you.

25             It's Mr. Claybrooks, correct?

```
1              JUROR CLAYBROOKS:  Yes.

2              THE COURT:  Was this and is this now your verdict,

3    sir?

4              JUROR CLAYBROOKS:  Yes.

5              THE COURT:  All right.

6              I did have a certificate for you.  I'll have to

7    find it.  I know I signed it.

8              Ladies and gentlemen, your service to the United

9    States in this -- oh, here it is right in front of me.

10             Your service to the United States on this trial is

11   now complete, and I am going to excuse you from further jury

12   service.

13             I will ask that you return to the jury room right

14   now for just a moment, and I am going to return -- I am going

15   to turn these certificates over to you.

16             I want to thank you for your time.

17             All rise.

18             (Jury excused at 4:26 p.m.)

19             THE COURT:  You may be seated.

20             Do we need to make any adjustment to the standard

21   schedule for posttrial motions?

22             MR. CHERONIS:  Your Honor, I would ask for

23   additional time to file posttrial motions.  If I could have

24   30 days?

25             THE COURT:  Any objection?
```

1          MS. BEST:  No, your Honor.

2          THE COURT:  An additional 30 days is fine.

3          We do need to set a date for sentencing.  Today is

4    December 6th.  So we can set a sentencing date anytime after

5    February 28.

6          MR. CHERONIS:  Your Honor, just based on

7    scheduling, I have a back-to-back trial before Judge Castillo

8    and Judge Feinerman.  So would early April be okay?

9          THE COURT:  Early April is fine.

10          MR. CHERONIS:  Thank you.

11          THE COURT:  We will say April 4.  That's a Friday.

12          MR. CHERONIS:  Perfect.

13          MS. BEST:  That works for the government.

14          THE COURT:  At 11:30.

15          All right.  Anything further this afternoon?

16          MR. CHERONIS:  Not on behalf of Mr. Ajayi.

17          MS. BEST:  Nothing from the government, your Honor.

18          THE COURT:  We are adjourned.

19          MR. CHERONIS:  Thank you.

20          (An adjournment was taken at 4:28 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3              I, Frances M. Ward, do hereby certify that the

4    foregoing is a complete, true, and accurate transcript of the

5    Trial proceedings, Volume 2, Pages 185 to 365, had in the

6    above-entitled case before the HONORABLE REBECCA R.

7    PALLMEYER, Judge of said Court, at Chicago, Illinois, on

8    December 6, 2013.

9

10       /s/ Frances M. Ward, CSR, RPR, RMR, FCRR    8/12/14

11              Official Court Reporter              Date
              United States District Court
12           Northern District of Illinois
                  Eastern Division
13

14

15

16

17

18

19

20

21

22

23

24

25