```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                    Plaintiff,      )   Docket No. 12 CR 190
                                      )
 6              vs.                   )
                                      )
 7   ABIDEMI AJAYI,                   )   Chicago, Illinois
                                      )   April 29, 2014
 8                    Defendant.      )   11:52 a.m.

 9
                  TRANSCRIPT OF PROCEEDINGS - Sentencing
10            BEFORE THE HONORABLE REBECCA R. PALLMEYER

11
     APPEARANCES:
12

13   For the Plaintiff:       HON. ZACHARY T. FARDON
                              UNITED STATES ATTORNEY
14                            BY:  MS. YASMIN N BEST
                              219 South Dearborn, 5th Floor
15                            Chicago, Illinois  60604

16
     For the Defendant:       LAW OFFICES OF DAMON M. CHERONIS
17                            BY:  MR. DAMON M. CHERONIS
                                   MR. IAN M. BARNEY
18                            53 West Jackson Boulevard, Suite 1750
                              Chicago, Illinois  60604
19

20   Also Present:            Ms. Danielle Stern, Probation Officer

21

22   Court Reporter:          FRANCES WARD, CSR, RPR, FCRR
                              Official Court Reporter
23                            219 S. Dearborn Street, Suite 2118
                              Chicago, Illinois  60604
24                            (312) 435-5561
                              frances_ward@ilnd.uscourts.gov
25
```

1          THE CLERK:   12 CR 190, United States versus Abidemi

2    Ajayi for sentencing.

3          MS. BEST:   Good morning, your Honor.

4          Yasmin Best on behalf of the United States.

5          THE COURT:   Good morning.

6          MR. CHERONIS:   Good morning, your Honor.

7          Damon Cheronis and Ian Barney on behalf of

8    Mr. Ajayi.

9          MS. STERN:   Good morning, your Honor.

10         Danielle Stern on behalf of probation.

11         THE COURT:   Good morning, Ms. Stern.   I'm sorry we

12   didn't get the word to you about the change in schedule.

13         We are here for sentencing.   I think as a

14   preliminary matter, I need to give you my written ruling

15   denying Mr. Ajayi's motion for a new trial and for judgment

16   of acquittal.

17         They are very short.   It's a very short order, but

18   basically it indicates that I think the evidence is

19   sufficient, and that I am standing by my ruling with respect

20   to the evidentiary issue that came up in connection with

21   those e-mails.

22         (Documents tendered.)

23         MR. CHERONIS:   Thank you.

24         THE COURT:   I have reviewed Mr. -- well, I have

25   reviewed the probation officer's report, of course, and I

1    have reviewed the sentencing memoranda that were submitted by

2    both sides.  There is also a supplemental report from

3    Ms. Stern that I had a chance to review.  Are there other

4    documents?  Oh, and letters of support for Mr. Ajayi from

5    family members.

6              There is also, I believe -- I believe

7    that concludes the materials on sentencing.

8              Has everyone had a chance to prepare?

9              MR. CHERONIS:  Yes.

10             MS. BEST:  Yes.

11             MR. CHERONIS:  There is one other issue I would

12   like to raise about the documents.

13             THE COURT:  Sure.

14             MR. CHERONIS:  Mr. Ajayi, per my request and per

15   probation's request, had sent me some information on, I

16   believe, the 26th or 25th of April.  For some reason, I

17   missed it.  I got it this morning.

18             It is just proof of employment and basically pay

19   stubs for his wife.  In the PSR, it said --

20             THE COURT:  Right.

21             MR. CHERONIS:  -- that there wasn't that

22   information.

23             Essentially that she works Alden, Orland Park

24   Rehabilitation Center.  And as of October of 2013, she makes

25   around $60,000 a year.  So I am going to give that to

1    probation, but I just wanted to let the Court know that we do

2    have that.

3        THE COURT:  All right.  Thanks.

4        Mr. Ajayi, you did get a chance to review the

5    probation officer's report?

6        THE DEFENDANT:  Yes, I got a chance.

7        THE COURT:  You did.  Okay.

8        Well, let's begin with the report.

9        The probation officer has concluded that the total

10   offense level in this case is 24 and there is a criminal

11   history category of I, and that gives us a sentencing

12   guideline range of 51 to 63 months.

13       Is everyone in agreement with those calculations?

14       MR. CHERONIS:  Your Honor, we had posed an

15   objection to the obstruction enhancement -- I included that

16   in our sentencing memorandum -- which would alter the

17   sentencing range.

18       THE COURT:  The objection to the enhancement for

19   obstruction is simply that -- a challenge to the notion that

20   his testimony was obstruction.

21       MR. CHERONIS:  Yes.  We included a few reasons why

22   in our -- in our memorandum.  If the Court wants me to recite

23   some of them or go over them, I could.  But that's the gist

24   of the argument.  His mere testimony and the fact that he did

25   testify obviously does not itself equal an obstruction

1    enhancement.

2         We also pointed out that Mr. Ajayi did give a

3    statement to the Illinois -- excuse me -- to the United

4    States postal inspector.

5         He essentially got off the plane -- and there is

6    some discrepancy between the government and the defense as to

7    whether or not his testimony was consistent with what he told

8    the postal inspector.  I did not get to cross-examine the

9    postal inspector on that statement.

10        They did not get into Mr. Ajayi's statement at the

11   trial, but it's our position that his story really has not

12   changed.

13        The government, I think, characterizes it as

14   "patently unbelievable."  It's our position that it's not

15   patently unbelievable; that things in this world happen like

16   this quite often, and there is no real way to know

17   necessarily what parts of his testimony the jury disregarded

18   or thought he was lying about or if, in fact, they believed

19   his testimony and still convicted him.

20        You know, the facts of the case were as such that

21   it's possible that the jury could have believed what he said

22   and believed that he was guilty anyway.

23        So it's our position that in this instance the

24   obstruction enhancement should not apply to Mr. Ajayi.

25        THE COURT:  Ms. Best, do you want to respond?

1          MS. BEST:  Yes, your Honor.  I think -- I think

2     the question here is -- one, I think that Mr. Cheronis is

3     correct.  The government does not believe that the

4     defendant's testimony was credible.  But it goes beyond just

5     whether there were some inconsistencies between what he

6     testified to at trial and what he said on the stand -- what

7     he testified to at trial and what he said in his post-arrest

8     statement.

9          I think beyond that, disregarding his post-arrest

10    statement, the things that he testified about were not

11    truthful.  From a basic level of his testimony that he was

12    naive and that he didn't understand or maybe should have been

13    slightly suspicious of this Charles Brown character doesn't

14    jibe with who he is and his background that he testified to

15    on the stand.

16         He testified to operating and trying to get up and

17    running several different businesses, being a businessman.

18    The day of his -- he deposited the check in question, he said

19    he had to double park on Dearborn Street because he was on

20    his way to his brokerage.

21         And contrasting that with the idea that he just

22    withdrew tens of thousands of dollars at a time from a bank

23    and then handed it off to a man he didn't really know because

24    the man instructed him to do so, just, on its face, is not

25    credible.

1    I think to Mr. Cheronis' point that the jury might

2    have believed everything he said and convicted him anyway,

3    the jury instructions for bank fraud are very clear.  They

4    have to have found that he intended to defraud in order to

5    convict him.  The idea that they found his testimony credible

6    and still convicted him does not stand.

7    So I think for your Honor to impose the obstruction

8    of justice enhancement, I think all of the criteria here are

9    met.  These were willful statements; they were false; they

10   were material; and the defendant made them in an attempt to

11   escape liability, to avoid being convicted.

12   Your Honor sat through the testimony, as we all

13   did.  And perhaps reasonable people could disagree, but I

14   really feel that after having sat through his testimony and

15   the story he attempted to lay out, it's, on its face, not

16   credible.  I do believe the defendant lied and perjured

17   himself in an attempt to avoid conviction.

18   THE COURT:  Let me just make a couple of comments

19   about this.

20   First of all, you are right, Mr. Cheronis, that we

21   don't know what portion of Mr. Ajayi's statement the jury

22   believed or didn't believe.

23   We do know, however, that the jury acquitted

24   Mr. Ajayi on one of the charges, and that is -- that means

25   that the jurors found the government hadn't proved beyond a

1    reasonable doubt that he knowingly altered or possessed an
2    altered instrument.

3           They did find that he engaged in bank fraud.  And I
4    think the fairest way -- and one money laundering count.  I
5    think the fairest way to understand that verdict is as
6    follows -- and I think it's consistent with much of what we
7    heard at trial -- and that is that Mr. Ajayi -- that this
8    check came into Mr. Ajayi's hands.  We know not how.

9           What we do know is that he deposited it, and then
10   within the day -- within a day of its having cleared began
11   making rapid withdrawals at a number of different
12   institutions in ways that did not require certain
13   identification or in amounts that made it possible for him to
14   do this.  He used a wire transfer in one incident, and
15   he traveled from location to location to make the
16   withdrawals.

17          We know as well that the circumstances of his
18   deposit of the check were at least unusual, if not
19   suspicious.  I don't know how many people with a check of
20   that size would double park and deposit it in an ATM as
21   opposed to looking around for parking and walking into the
22   bank and making sure that a teller got the money.

23          But that having been said, I think a reasonable
24   conclusion is that the jurors understood that although Mr. --
25   we don't know exactly how Mr. Ajayi obtained the check, what

1  we do know is that his conduct after it cleared suggested

2  that he understood he wasn't entitled to the money and was

3  making rapid efforts to get hold of it.  Now, with respect to

4  Mr. -- to get hold of it and dispose of it.

5          Now, with respect to Mr. Brown, there was a

6  post-arrest statement and then a statement at trial.  And

7  they were slightly inconsistent with respect to Mr. Brown,

8  but consistent in the sense that it's Mr. Ajayi's position

9  that he needed to get some money back to Brown.

10         Again, that is not inconsistent -- the jurors could

11 find that was true and still believe, as Mr. Cheronis has

12 acknowledged, that Mr. Ajayi is guilty of bank fraud because

13 it's possible that he knew he wasn't entitled to the money

14 and neither was Brown, and he had to somehow get money back

15 to Brown and withdraw it in certain ways to do that.

16 Obviously that would still make him liable for defrauding

17 Chase.

18         It would also make him only one of more than one

19 person involved in the fraud.  But, of course, we all

20 understand that does not -- that's not a basis on which he

21 could be acquitted.

22         I think what that means with respect to his

23 testimony is the following:  I think it's fair to conclude

24 the jurors did not believe that he was a victim in

25 this episode.  But it's probably also fair to conclude that

1   the jurors understood that he didn't himself believe that --

2   couldn't find beyond a reasonable doubt that he himself

3   manufactured the check.

4           I think -- and then with respect to the sentencing

5   guideline calculations, I think that the Court can conclude

6   that the jurors did not believe all of Mr. Ajayi's testimony,

7   but I am not prepared to conclude that they adopted none of

8   it.

9           And I don't -- you know, the guidelines call for

10  two points as opposed to some kind of split-the-baby

11  resolution.  But I think what I find most appropriate in this

12  case and what I think is consistent with my discretion under

13  *Booker* is that I assign one point for obstruction as opposed

14  to two.

15          Whether we characterize that -- just so it's clear,

16  whether we characterize that as a 3553 adjustment or as a

17  sentencing guideline calculation, again, I think it doesn't

18  make a tremendous amount of difference.

19          What I think I could say, for purposes of the

20  record, is that I am adopting the probation officer's

21  findings, but concluding that the total offense level

22  overstates the offense in this regard: that Mr. Ajayi's

23  obstruction is worth no more than one point.  And that would

24  give us a guideline range of 46 to 57 months as opposed to

25  the 51- to 63-month calculation that the probation officer

1  adopted.

2          I would like to hear first from the government.

3  I'm sorry.  Are there other adjustments or changes to the

4  report?  I know that we did hear this information about

5  Mr. Ajayi and his wife's employment.

6          Let me ask one question about the probation

7  officer's report myself, and then I'll return to the question

8  of whether you have changes.

9          Does the family still have two addresses?

10          MR. CHERONIS:  The one in Wisconsin?

11          THE COURT:  Yes.

12          MR. CHERONIS:  No.  Mr. Ajayi does not have that

13  job any longer.  I don't believe they still have two

14  addresses.

15          THE DEFENDANT:  No.

16          THE COURT:  So you have moved back home?

17          MR. CHERONIS:  He has moved back home.

18          THE COURT:  All right.  That satisfies one of the

19  Court's concerns.

20          All right.  Were there other changes or objections

21  or corrections that should be made in the PSR?

22          MR. CHERONIS:  Just a few brief corrections.

23          I believe in Paragraph 77, it's sort of unclear as

24  to whether or not Mr. Ajayi ever graduated from DeVry

25  University.  I do have a copy of a diploma.  And maybe it

1    doesn't say that he didn't graduate.  There was some issue

2    about him trying to get a master's.  But I have a diploma

3    from DeVry marked October the 27th of 2002.  He did, in fact,

4    graduate from DeVry University.

5              THE COURT:  With a BS in engineering?

6              MR. CHERONIS:  Yes.

7              THE COURT:  Yes.  And I think what the probation

8    officer was telling us there is that it's not clear whether

9    he ever finished a management degree as well.

10             MR. CHERONIS:  Yeah.  I don't believe he has, your

11   Honor.

12             THE COURT:  All right.

13             MR. CHERONIS:  The only other issue is that

14   Mr. Ajayi does have a current and updated real estate license

15   that was recently updated.  I think there was something on

16   the report that said it's no longer active.  It's recently

17   been activated.

18             But other than that, we have no objections or

19   alterations to the PSR.

20             THE COURT:  All right.

21             MS. BEST:  And there are no objections or changes

22   from the government, your Honor.

23             THE COURT:  All right.  Then I would like to hear

24   first from the government about what sentence, Ms. Best, you

25   believe is appropriate.  I will hear from Mr. Cheronis.

1          And then, Mr. Ajayi, you are also free to make a

2     statement, sir.

3          MR. CHERONIS:  And, Judge, just for scheduling, I

4     do have one brief witness that I was going to put on.

5     Mr. Ajayi's wife is present.

6          THE COURT:  That's fine.

7          MR. CHERONIS:  It won't be long.

8          THE COURT:  I am happy to hear her testimony.  I'm

9     not in a big hurry.

10          MS. BEST:  Your Honor, the government is requesting

11     a guideline sentence of 57 months.

12          In light of the nature of the offense, this

13     particular defendant, his history and characteristics, the

14     government does believe that a guideline-range sentence is

15     appropriate to deter him from future criminal conduct, to

16     protect the community, and to promote the respect for the law

17     that both this defendant and the general community need.

18          I think just to back up -- I don't want to belabor

19     too much because, obviously, we all sat through a trial, and

20     I know your Honor is familiar with the facts, but there were

21     a couple things that I wanted to put on the record here.

22          First, I think we've talked a bit about Chase as

23     the victim suffering a loss of $172,000.  But I think one of

24     the things that's been sort of perhaps lost in the shuffle is

25     the fact that Chase was, while the victim left holding the

1  loss at the end, there are other victims involved in the

2  defendant's scheme here.  And I didn't want that to be

3  overlooked.

4  We had testimony at trial from Daniel Corcoran, who

5  works for American Building Maintenance Company, which was

6  the victim company that sent this check out and that was then

7  altered and deposited into the defendant's account.

8  While both ABM and Pollock Paper are large

9  companies, when this check went missing, it really caused

10  both a way to -- a need to re-evaluate a lot of internal

11  processes at ABM and at Pollock Paper, but also just created

12  a significant disruption.

13  You essentially have two companies that have been

14  in business together for a while, and one is left believing

15  that the person or the company that they had been doing

16  business with has shorted them essentially $345,000.  And you

17  have another company trying to, one, repair that

18  relationship; and then, two, figure out what the heck

19  happened to their money.

20  That led to, as I believe there was some testimony

21  at trial, an internal investigation in an attempt to

22  determine how this check went missing, how it was altered,

23  how it was deposited.  And that's not something that should

24  have happened.  That sort of investigation doesn't just

25  happen and is concluded very quickly.  This is something that

1    took time on the victim's part and led to them, again, like I

2    said, doing an internal investigation, trying to figure out

3    how this went missing.

4          Obviously, as we learned at trial, the answer to

5    that hasn't been discovered, but this was something that

6    changed the way that they did their internal processes and

7    changed the way that they interact with other companies.

8          And so I don't want the fact that Chase, this

9    large, you know, multibillion-dollar corporation, is the one

10   that's suffering this loss to overshadow the fact that other

11   people were impacted by defendant's conduct.

12         But to get to the offense here, this is not a

13   complicated crime and it's not something that's hard to

14   understand.  The defendant stole $172,000.  He attempted to

15   steal $344,000 and was stopped only because Chase and Pollock

16   Paper and ABM discovered the fraud before he was able to do

17   so.

18         He did so in a manner of trying to use his company,

19   a company that he, at trial, claimed he was trying to get off

20   the ground to do this mobile MRI.  But as the testimony

21   revealed, he had $90 in his bank account at the beginning of

22   the month.  And then he deposits this significant check and

23   then just immediately starts withdrawing it.

24         That cash obviously hasn't been recovered --

25   $172,000 that this defendant had put his hands on, wired away

1    to an account of a person he claims not to know.  And that

2    money is sort of just off in the ether.  The defendant is

3    able to profit.

4         And then at base, it's just a very -- I mean, it's

5    a theft.  It's a very simple crime.  I think the idea of bank

6    fraud sort of overstates how sophisticated this is.  This is

7    someone who just took money that he wasn't entitled to and

8    then attempted to spend it as quickly as he possibly could.

9         And while -- let me back up.

10        On top of that, the defendant himself is sort of an

11   interesting character.  On the one hand, at trial, as I

12   stated before, he tried to hold himself out as someone who

13   was duped by this Charles Brown character, who got in over

14   his head, who became concerned about tax concerns or the

15   other ramifications of having received this check.

16        On the other hand, he has gone to university in the

17   United States.  He went to university in Nigeria.  He's an

18   engineer.

19        As soon as he came back to the United States in

20   2013, after a significant gap in his employment history, he

21   was able to find a job immediately.  And then the next month,

22   he found another job that paid even more money.  This is not

23   someone who doesn't have resources, who doesn't have skills,

24   who doesn't have a way to support himself.

25        The large number of character reference letters,

1   the support of his siblings, his wife, his family, this is

2   not the defendant who is just struggling and who can't figure

3   out how to feed his family.  This is someone who has numerous

4   resources and sort of intrinsic resources within himself,

5   within his family that he could have relied on, but he chose

6   the easiest way to make a few bucks.

7          He just stole this money when he purportedly has

8   this great work ethic.  He has had numerous jobs.  He's

9   worked in whatever sort of capacity he could, whether it's as

10  a cab driver or as an engineer.  But at the end of the day,

11  this was too easy for him to pass up.

12         Instead of getting this check that says this is

13  made out from a company I have never heard of.  I don't have

14  any dealings with American Building, and it's made out for

15  entirely more than I should be getting.  He could have torn

16  up the check.  He could have sent it back, but he didn't.  He

17  deposited it within an hour of receiving it.  He drove from

18  his house and immediately went and deposited this check into

19  a bank account.  And then as soon as it clears, he starts

20  taking out money.  I mean, this is -- despite all of the sort

21  of skills that he has and despite the resources and despite,

22  you know, the education, this is what he chose to do.

23         And so I think for those reasons and the need to

24  deter him from committing a similar crime and to show the

25  community that, one, these sort of crimes are taken

1    seriously; and, two, that -- to promote the respect for the

2    law, I do think a guideline sentence is appropriate.

3           I know there is one other sort of significant

4    mitigating factor here, and that's his familial situation and

5    his children's well-being.  And there is not much to say

6    about that.  It is a significant mitigating factor.

7           His children -- especially one of his sons, it

8    seems, will require lifetime care.  If the defendant had

9    accepted responsibility for his actions and said, You know

10   what?  I'm struggling.  My family is struggling.  I committed

11   this act.  I shouldn't have.  I'm sorry.  We would be in an

12   entirely different position right now.  But that's not who he

13   is.  He took the stand and he lied over and over again.

14          And now he's sort of availing himself of the fact

15   that he has this very difficult family situation.  He had

16   this situation at the time he committed the crime.  He had

17   this situation at the time he took the stand.  None of that's

18   new.  And he's the one who imperiled his family by deciding

19   to steal this money and then not accept responsibility for

20   his actions.

21          And so while the situation with his family is

22   difficult, I don't think that outweighs the nature of his

23   offense.

24          I would also note that there has been some talk

25   about the defendant's Belgian conviction.  Unfortunately, the

1    case agent is on leave.  I couldn't call him to testify about

2    it.

3              What I will say is, there is noted in the PSR a

4    significant gap in the defendant's employment history

5    that corresponds with that time period.

6              The reality is that his wife took care of his

7    family and his children when he was out of the country, and I

8    have no doubt it was difficult.  But the reality is that the

9    defendant has put his family in this position by his own

10   actions, and I don't think that in and of itself warrants

11   a significantly below-guideline sentence.

12             The defendant knew all this when he chose to commit

13   each of these acts, and he did so regardless.

14             So for those reasons, I do believe a guideline

15   sentence is appropriate.

16             THE COURT:  Thank you, Ms. Best.

17             Mr. Cheronis.

18             MR. CHERONIS:  Would you like me to call my witness

19   first?

20             THE COURT:  Sure.

21             MR. CHERONIS:  Okay.

22             THE COURT:  That's fine.

23             MR. CHERONIS:  Would you mind if they sat down?

24             THE COURT:  Not at all.

25             I will ask that the witness be sworn.

1          You can sit on the witness stand here.  I am going

2     to ask you to raise your right hand.

3          (Witness sworn.)

4          THE COURT:  You may proceed, Mr. Cheronis.

5                    DIRECT EXAMINATION

6     BY MR. CHERONIS:

7     Q.   Would you please introduce yourself to Judge Pallmeyer.

8     A.   My name is Martha Ajayi.

9     Q.   Ms. Ajayi, how old are you?

10    A.   I'm going to be 39 in September.

11    Q.   Where do you work?

12    A.   I work at the Alden rehab facility in Orland Park.

13    Q.   And what are your hours?

14         Is it a full-time job?

15    A.   It's a full-time job.

16    Q.   What is your job there?  What do you do?

17    A.   I'm the director of nursing for the skilled nursing

18    facility.

19    Q.   And you are married to Abidemi Ajayi?

20    A.   Yes, I am.

21    Q.   How long have you been married to Mr. Ajayi?

22    A.   We have been married for 15 years.

23    Q.   How many children do you have?

24    A.   We have four.

25    Q.   And what are their ages?

1    A.   The set of twins are 19.  They're going to be 20 in

2    October.  We have a 13-year-old, and we have a six-year-old.

3    Q.   I want to focus, if I could, on the 19-year-olds.

4         Do they suffer from any type of health issues or

5    learning disabilities?

6    A.   Yes, they do.  They both -- they're autistic.

7    Q.   And what are their names?

8    A.   Kenny Ayobami Ajayi, and the other one is Tayi

9    Oluwamayowa Ajayi.

10   Q.   Okay.  And for lack of a better word, is one of them in

11   sort of worse condition than the other?

12   A.   Yes.  Tayi requires 24-hour supervision.

13   Q.   What do you mean by that?

14        What is a day like for him?

15   A.   Okay.  With Mayo, he requires assistance with bathing --

16   smallest thing from bathing to getting dressed to feeding to

17   providing food to getting him on the school bus.  And with

18   the program he is in, they are teaching him, because of his

19   age, how to do housekeeping, cook and fold clothes or how to

20   be independent.

21        We put him on the school bus, and then they drop

22   him off.  And it requires an adult to put him on the bus and

23   an adult to be home before they will ever let him come off

24   the school bus in the afternoon.

25   Q.   Okay.  And what about your other son?  What is his daily

1    routine like?

2    A.   He's more higher functioning.  He's now in junior

3    college.  He is taking classes to major in biology.  Pretty

4    much, he gets ready, takes the train, Metra, and he goes to

5    South Suburban in South Holland.

6    Q.   Regarding your first son, -- could you say his name

7    again, the one we first discussed?

8    A.   Tayi.

9    Q.   Tayi.

10           Okay.  Are there any plans for him to move out of

11   your home?

12   A.   No.

13   Q.   Why not?

14   A.   He is going to require assistance forever.

15   Q.   Now, during the course of this case, your husband was

16   released.  He was on pretrial release, correct?

17   A.   Yes.

18   Q.   Okay.  And during that period of time, he worked in

19   Wisconsin?

20   A.   Yes.

21   Q.   All right.  Did he see your children often?

22   A.   Yes.  He came home every weekend.

23   Q.   Okay.  When he comes home, is he helpful with the issues

24   that you just discussed?

25   A.   Yes, he's helpful.  He is very helpful.  Morally,

1    mentally, he helps with the children, their homework.

2    Day-to-day he speaks with them all the time on the phone.

3         And since he has been back -- since he has been out

4    of a job in Wisconsin, he helps with Mayo.  He is the one

5    that takes him off the school bus in the afternoon.

6         And when he was in Wisconsin, it was very

7    challenging.  I would have his twin brother sacrifice and

8    leave his school to come -- make sure he is home by 2:30 to

9    pick him up.

10   Q.   And does your husband also help support the family

11   financially?

12   A.   Yes, he does.

13   Q.   And he was working at, I believe it was called, Sub-Zero

14   Wolf for some time?

15   A.   Yes.

16   Q.   And he is currently unemployed?

17   A.   Yes.

18            MR. CHERONIS:  I have no further questions, Judge.

19            THE COURT:  Any cross-examination, Ms. Best?

20            MS. BEST:  No, your Honor.

21            THE COURT:  The witness may step down.

22            (Witness excused.)

23            THE COURT:  All right.  Mr. Cheronis, anything --

24   do you want to make any comments about sentencing?

25            MR. CHERONIS:  Certainly, your Honor.  I would like

1    to make a few.

2           The government in their argument and in their

3    papers have tried to sort of conclude that his work history

4    and his education is something that may almost be an

5    aggravating factor.

6           I have certainly represented individuals who grew

7    up in the inner city and did not have the advantages that

8    maybe Mr. Ajayi had.  And if I was in that situation with

9    him, I would be making the opposite argument, I think.

10          He has had some advantages in this world.  But when

11   you look at some of the things that he has done -- I am sure

12   you have sentenced individuals who just haven't worked their

13   whole lives or individuals who haven't done certain things.

14          Mr. Ajayi is educated.  He has been employed.  He

15   is not a lazy individual.  And he has worked many jobs to

16   support his family.  I think that's important for a few

17   reasons.

18          One, under 3553(a), obviously you can take that

19   into account, as other courts have.  But even maybe more

20   importantly, in this type of situation there is going to be

21   an amount of restitution that needs to be paid.

22          Now, you have seen and sentenced individuals, I'm

23   sure, who have had just amounts of restitution that will not

24   be paid, that cannot be paid; millions of dollars, maybe

25   hundreds of millions of dollars.

1    In this case, we have a restitution amount that is

2    not a drop in the bucket, necessarily, but with somebody

3    being employed and somebody working toward paying that

4    restitution, it's something that can and will be paid off.

5    I have certainly worked with some of the

6    U.S. Attorneys who make sure that happens.  And I have spoken

7    to Mr. Ajayi.  He actually has a job interview tomorrow.  But

8    that's something that can be done.  And the need for

9    restitution and the actual ability to pay back in this case I

10    think is something that is believable and something that can

11    be obtained.

12    So with his background and with his work ethic,

13    with his education, he will be employable.

14    Regarding other 3553(a) factors, just in response

15    to what the government said about this crime or Mr. Ajayi's

16    role in it being sort of inapposite to who he is because he

17    is educated, all I'll say about that is, you know, you have

18    individuals all over this country who do get duped; people

19    who are intelligent; people who are educated.

20    Certainly the jury found Mr. Ajayi guilty, but the

21    fact that he is intelligent does not mean that he couldn't

22    have gotten involved in something that maybe he shouldn't

23    have or that was a little over his head or maybe that he

24    wasn't naive.  I don't think one necessarily means the other

25    isn't true.

1          The real issue, I think, under 3553(a) is his

2     family life.  I didn't call his wife for any type of, you

3     know, sympathy.  I called her because I think it's important

4     to know, sort of, actually what a day is like for her and the

5     situation with her son.

6          It's true that for periods of time Mr. Ajayi has

7     been away, most recently in Wisconsin, but he is back now.

8     And I think he is an integral part of sort of helping her and

9     helping her son attain a better life.

10          You know, every person who goes to jail leaves

11     behind a family, and I think the courts have sort of divided

12     that into normal circumstances where, hey, that's just how it

13     is.  You have got two kids.  They're healthy.  You made that

14     decision.

15          In this case, we have a little bit of a different

16     situation.  There is a serious need for constant care for the

17     19-year-old.  I think this is the type of situation,

18     respectfully, where the Court could find that his family

19     needs are mitigating and that, from what his wife said, he is

20     an important part of his son's life.  He is helping out.  Now

21     that he's back home, he does not plan on moving anywhere,

22     obviously, any time in the near future.  But that's a

23     mitigating factor that the Court can look at.

24          Is the government right that he made certain

25     decisions in this case?  Certainly.  But he has been found

1    guilty, and now we have to look at both the aggravation and

2    the mitigation.  And his family circumstances, I would

3    suggest, are certainly mitigating.

4           I would also adopt the rest of the arguments we

5    made in our presentence -- excuse me -- in our presentence

6    memorandum, and we would be asking for a below-guideline

7    sentence in this case.

8           Regarding seriousness of the offense, I've never

9    been successful arguing to a court that an offense isn't

10   serious.  I'm not going to try now.

11          I had a similar case in front of Judge Gottschall,

12   and she said it wasn't the worst case she has ever seen and

13   it wasn't the least serious case she's ever seen.

14          Whenever money is taken, it's serious, especially

15   in these types of situations.  But there will be restitution

16   paid, and Mr. Ajayi is a good candidate for being able to

17   work and pay that off.

18          So I'm asking on his behalf for a below-guideline

19   sentence, and I thank you for your consideration.

20          THE COURT:  Thank you, Mr. Cheronis.

21          Mr. Ajayi, is there anything that you would like to

22   say before sentence is imposed?

23          THE DEFENDANT:  Yes.  I'm really embarrassed I'm

24   standing here answering for these crimes that have been

25   committed.

1    I'm truly sorry to the government and to you, all

2    the time that's been spent on this case.

3        I thank you, also, for all the consideration you

4    gave to me when I was going to work in Wisconsin.  That was

5    truly helpful because I had to go out of state to the

6    interview and get hired.

7        I am truly sorry once more.  That's what I will say

8    to this Court.

9        THE COURT:  All right.  Thank you, Mr. Ajayi.

10       Let me just briefly review the considerations that

11   are significant to me in this case.  Many of them have been

12   mentioned.

13       Yes, it is a serious matter.  You are right,

14   Mr. Cheronis.  You know, what we do in federal court is

15   generally a serious crime.  We don't have small drug

16   possession cases.  We don't have -- you know, we don't have

17   any petty theft cases.

18       This was a significant amount of money that

19   Mr. Ajayi seized upon and used, although he knew or certainly

20   appeared to know that he wasn't entitled to it.

21       It's nevertheless also the case -- this isn't the

22   worst thing we have ever seen.  No violence was involved.

23   There was -- the scheme didn't spread over a lengthy period

24   of time.  Mr. Ajayi did not, so far as we are aware, involve

25   anybody else in the wrongdoing.  So I am not looking at

1    somebody who's torn apart the fabric of society.

2            It is, however, a significant offense.  Chase was

3    the direct victim, but, as Ms. Best points out, there are

4    other victims.  And the loss of business reputation on the

5    part of the victim company is a significant matter as well.

6            The guideline range here that we are looking at,

7    after the small adjustment that I made, is 46 to 57 months,

8    which is a fairly substantial sentence.

9            Mr. Ajayi's family considerations are important to

10   me.  The difficulties that his wife faces with her children,

11   particularly one of the two -- one of the twins, are very

12   challenging.  And I know that having Mr. Ajayi home, as he

13   has been for a period of time now, is helpful to her.

14           The fact is that, apart from weekends while he was

15   employed in Wisconsin, and not even -- and for the entire

16   period of time that he was in Belgium, Mr. Ajayi was not

17   directly involved in bringing his children up at a time when

18   I think their situation was at least as challenging as it is

19   today.  So that's significant to me.

20           Now, he was, of course -- I am not suggesting he

21   wasn't being a devoted family person.  He was earning money

22   for his family.  His wife tells us he came home every weekend

23   when he lived in Wisconsin.  There is no reason to believe

24   that he wasn't thinking of them and concerned for them, but

25   he wasn't directly involved in assisting his wife with

1  raising these children during significant periods of time.

2  It's also, as Ms. Best pointed out, significant to

3  the Court that this is a person of very substantial

4  abilities.  He earned -- he's earned a bachelor's degree in

5  engineering.  He has got work toward a management degree.

6  In spite of a felony conviction, he is able to find

7  work rapidly.  I understand, from what you told me,

8  Mr. Cheronis, he has a job interview tomorrow.

9  He took a relatively -- actually quite luxurious

10  vacation only recently.  This is a man who does have

11  substantial advantages that many people that I sentence don't

12  have.

13  I would be very unwilling to impose -- to excuse

14  any prison term for such a person because I think it just

15  conveys a very negative message to say that if you have

16  disadvantages and you get involved in criminal conduct, in

17  most circumstances, you go to jail.  And if you have very

18  substantial advantages, then you don't.

19  But nobody is arguing for a noncustodial sentence

20  here.  And what has been asked for instead is a sentence

21  below the guideline range.

22  I think a sentence of custody for an offense of

23  this nature is important.  I would note that Mr. Ajayi has

24  served a sentence already, as I understand it, in Belgium for

25  other wrongdoing on another occasion, and that apparently did

1    not deter him in the way that we would ordinarily expect a

2    prison term would.

3             MR. CHERONIS:  I think that -- just for the record,

4    I think that this -- the facts of this case predated the

5    facts of whatever happened in Belgium.  I just wanted to

6    point that out.

7             MS. BEST:  That's true, your Honor.  This offense

8    was in 2009.

9             THE COURT:  2009.  You are right.  And that's the

10   reason that it was tried as late as it was.  That's correct.

11            All right.  Well, then I want to -- I am going to

12   put to one side any concern that I have about any other

13   sentence and its deterrent effect.

14            I think, under the circumstances, that a sentence

15   at the bottom of the guideline range is appropriate.  And in

16   fact, I am going to make it a little bit shorter than that.

17   It's 46 to 57 months as I recalculated it, and I am going to

18   impose a sentence of 44 months.

19            Note that Mr. Ajayi has been convicted on a number

20   of counts, but I want to observe, as well, that all of them

21   really arise from the same -- the same episode, let's call

22   it.  In other words, although there are a number of charges

23   and a number of convictions, a number of counts of

24   conviction, they really all relate to the same incident in

25   November of 2009.

1    Each one, as I understand it, carries a maximum
2    sentence of 30 years.  Obviously, I think that's more than
3    necessary.

4    Given that there are five counts of bank fraud and
5    one count of money laundering, what I am going to do
6    is impose eight months on each of the bank fraud counts, to
7    run consecutively, and then four months on the Count IV, the
8    laundering count, also to run consecutively.

9    There is a period of supervised release of up to
10   five years on each of the mail fraud counts and up to three
11   years on the money laundering count.  I am going to impose
12   supervised release of three years, and that's on all of the
13   counts to run concurrently.

14   I am not going to impose a fine because Mr. Ajayi
15   will be required to pay a special assessment of $600 and
16   restitution in the amount of $172,160.52 to the JPMorgan
17   Chase Bank.

18   The conditions of supervised release are the
19   standard ones that I will review right now.  That Mr. Ajayi
20   not commit another federal, state, or local crime; that he
21   refrain from any unlawful use of controlled substances; that
22   he cooperate with the collection of a DNA sample; that he not
23   possess a firearm or destructive device; and that he pay any
24   financial penalties imposed by this judgment at the rate of
25   10 percent of his net monthly income per month.

1    I am going to direct that Mr. Ajayi not incur any

2    new credit charges or open any additional lines of credit

3    without the probation officer's approval, unless he is in

4    compliance with an installment payment schedule, and that he

5    provide the probation officer with access to any requested

6    financial information.

7    Because Mr. Ajayi does not have the ability to pay

8    interest, I am going to waive interest and, obviously, waive

9    any fine, but require the $172,000 payment to be made at the

10   rate of 10 percent of his net income per month or more

11   rapidly if his finances enable him to do that.

12   You are right, Mr. Cheronis, that this is an amount

13   that, while very, very steep, is something that he will be

14   able to pay because he does have very significant abilities

15   and has been able to find work.  I have confidence he will

16   continue to do that upon his release from custody.

17   I am also of the view that, because Mr. Ajayi has

18   not -- has been in full compliance with his conditions of

19   release, that there is no reason I can't simply set a

20   surrender date for him.

21   Are there any recommendations that would be

22   requested about the location?

23   MR. CHERONIS:  We talked about him just being as

24   close to home as he can possibly be.

25   THE COURT:  I will make that recommendation.

1           Are there other matters, other than Mr. Ajayi's

2    appeal rights?

3           MR. CHERONIS:  No, your Honor.

4           MS. BEST:  Your Honor, the government is going to

5    move to dismiss the forfeiture allegation.

6           THE COURT:  The forfeiture allegation will be

7    dismissed.

8           Mr. Ajayi, you are entitled to take an appeal from

9    my sentence.

10           If you wish to do so, your notice of appeal should

11    be filed within 14 days.  If you are unable to file a notice

12    of appeal, the court clerk will file a notice of appeal at

13    your request.

14           Anything further?

15           MR. CHERONIS:  Thank you.

16           THE COURT:  We just need to set a surrender date.

17    I would like to set it at a date when the Bureau of Prisons

18    has had a chance to make a designation.  So why don't we say

19    by noon on June 30th?  That's a Monday.

20           MR. CHERONIS:  Thank you.

21           MS. BEST:  Thank you, your Honor.

22           (An adjournment was taken at 12:33 p.m.)

23

24

25

1                              *    *    *    *    *

2        I certify that the foregoing is a correct transcript from the
         record of proceedings in the above-entitled matter.

3

4        /s/ Frances Ward                           September 17, 2014.
         Official Court Reporter
5        F/t

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25